ORIGINAL PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY    0 6 - 3 5 6

UNITED STATES DISTRICT COURT OF DELAWARE

DAMONE FLOWERS                              No. 9808000280

DELAWARE CORRECTIONAL CENTER                SBI # 303627

1181 PADDOCK ROAD

SMYRNA, DELAWARE 19977

DAMONE FLOWERS                          WARDEN THOMAS CARROLL,
DEFENDANT BELOW,
PETITIONER.                      V.     STATE OF DELAWARE.

CARL DANBERG - THE ATTORNEY GENERAL OF THE STATE OF DELAWARE.

IN SUPPORT OF PETITION UNDER 28 U.S.C. § 2254

FOR WRIT OF HABEAS CORPUS

PETITIONER'S OPENING BRIEF

DATE: MAY 24, 2006.

2006 MAY 30 PM 2: 27
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
FILED

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

NATURE AND STAGE OF PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8.

ARGUMENTS

I. THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS FIFTH AND FOURTEENTH
AMENDMENT RIGHTS DUE TO THE STATE PROSECUTOR'S MISCONDUCT, ALONG WITH CHIEF
INVESTIGATOR DETECTIVE ANDREW BROCK'S PROFESSIONAL MISCONDUCT. . . . . . . . . . . 12.

II. THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS FIFTH AND FOURTEENTH AMENDMENT
RIGHTS DUE TO THE STATE PROSECUTOR'S MISCONDUCT. . . . . . . . . . . . . . . . . 19.

III. THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS FIFTH AND FOURTEENTH AMENDMENT
RIGHTS DUE TO THE STATE PROSECUTOR'S MISCONDUCT. . . . . . . . . . . . . . . . . 25.

IV. THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS FIFTH AND FOURTEENTH
AMENDMENT RIGHTS DUE TO THE STATE PROSECUTOR'S MISCONDUCT. . . . . . . . . . . 32.

V. THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS WHEN THE TRIAL JUDGE ABUSED DISCRETION BY FAILING TO GIVE A, SUA SPONTE, CURATIVE INSTRUCTION. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 39.

VI. THE CUMULATIVE ERRORS COMMITTED DURING THE PETITIONER'S TRIAL, THREE OF WHICH PROMPTED MISTRIAL APPLICATIONS, VIOLATED DUE PROCESS CAUSING THE TRIAL TO BE FUNDAMENTALLY UNFAIR. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 44.

VII. THE PETITIONER'S CONSTITUTIONAL RIGHT WITHIN THE SIXTH AMENDMENT'S CONFRONTATION CLAUSE WERE VIOLATED DUE TO THE LACK OF EFFECTIVE CROSS EXAMINATION OF THREE OF THE STATE'S FIVE EYEWITNESSES. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 49.

VIII. THE PETITIONER WAS DENIED DUE PROCESS IN VIOLATION OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS DUE TO THE STATE'S ELICITATION AND UTILIZATION OF FALSE TESTIMONY TO OBTAIN HIS CONVICTION. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 56

IX. THE STATE COMMITTED A BRADY VIOLATION BY WITHHOLDING EXCULPATORY BRADY EVIDENCE AFTER MULTIPLE GENERAL AND SPECIFIC REQUEST FROM THE PETITIONER, WHICH PRECLUDED ITS USE BY PETITIONER AT TRIAL, THUS RENDERING THE TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS. _ _ _ _ _ _ _ _ _ 61.

X. THE PETITIONER'S FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS WERE VIOLATED BY CHIEF INVESTIGATOR DT. ANDREW BROCK'S UTILIZATION OF SUGGESTIVE AND CORRUPTIVE INTERVIEW TECHNIQUES AND PROCEDURES TO ACQUIRE THE UNRELIABLE IDENTIFICATION OF THE PETITIONER, AS THE SHOOTER, FROM STATE WITNESSES MATHEW CHAMBLEE AND VERNON MAYS. _ _ _ _ _ 69.

XI. THE PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO DUE PROCESS DUE TO INEFFECTIVE
ASSISTANCE OF COUNSEL. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 76.

XII. THE ADMISSION OF THE INVOLUNTARY TAPED STATEMENT OF ROWETTA SUDLER PURSUANT TO
TITLE II DEL.CODE § 3507 VIOLATED THE PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT
RIGHT TO A FAIR TRIAL. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 108.

XIII. THE RECKLESSLY ELICITED REFERENCE BY A STATE'S WITNESS THAT THE PETITIONER HAD
PREVIOUSLY GOTTEN OUT OF JAIL WAS PLAIN ERROR, WHICH WAS NOT CURED BY THE COURT'S
UNTIMELY CURATIVE INSTRUCTION, THUS DENYING THE PETITIONER HIS FIFTH AND FOURTEENTH
AMENDMENT RIGHT TO A FAIR TRIAL. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 113.

XIV. THE NON-RESPONSIVE, FLIPPANT COMMENT BY A CRUCIAL STATE WITNESS THAT DEFENSE
COUNSEL HAD PREVIOUSLY REPRESENTED HIM ON A CRIMINAL CHARGE EVISCERATED COUNSEL'S
CREDIBILITY AND DENIED THE PETITIONER A FAIR TRIAL. _ _ _ _ _ _ _ _ _ _ _ _ _ _ 118.

XV. THE PROSECUTION'S OPENING STATEMENT REMARKS ABOUT A "DOUBLE-DEUCE GROUP, the
22ND STREET REGULARS" AND "A CODE OF SILENCE WAS SET INTO MOTION" VIOLATED
THE PETITIONER'S FIFTH AMENDMENT RIGHT TO A FUNDAMENTALLY FAIR TRIAL, WHEN THE
REMARKS WERE NOT SUPPORTED BY ADMITTED COMPETENT EVIDENCE AT TRIAL. _ _ _ _ _ _123.

CONCLUSION. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 128.

# TABLE OF AUTHORITIES

## CASE AUTHORITY

ALBURY v. STATE, 551 A.2d 53 (Del. 1988) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 47, 120

ALCORTA v. TEXAS, 355 U.S. 28 (1957) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 59

ASHLEY v. STATE, 798 A.2d 1019 (Del. 2002) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 42, 95

BARBER v. PAGE, 390 U.S. 719 (1968) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 53

BARKER v. WINGO, 407 U.S. 514 (1972) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 30

BAYNARD v. STATE, 518 A.2d 682, 690 (Del. 1986) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 110

BRADY v. MARYLAND, 373 U.S. 83 (1963) _ _ _ _ _ _ _ _ _ _ _ _ _ 16, 21, 23, 65.

BROOKENS v. STATE, 354 A.2d 422 (Del. 1976) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 47, 115

BROOK-HART v. JANIS, 384 U.S. 1 (1966) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 53

BROWN v. UNITED STATES, 125 U.S.App. D.C. 220 (1966) _ _ _ _ _ _ _ _ _ _ _ _ _ 35

BROWN v. UNITED STATES, 370 F.2d 242, 246 (1966) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 38

BRUTON v. UNITED STATES, 391 U.S. at 136 (1968) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 55

BURGER v. KEMP, 483 U.S. 776, 794 (1987) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 88

CALIFORNIA v. GREEN, 399 U.S. 169-170 (1970) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 51, 53, 54.

CAPANO v. STATE, 2006 WL 47454 (Del. Super.) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

CLAYTON v. STATE, 765 A.2d 940,942 (2001) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 124

COOPER v. WAINWRIGHT, 807 F.2d 881, 888-89 (11TH. Cir. 1986) _ _ _ _ _ _ _ _ _ _ _ _ _ 46

CUPP v. NAUGTEN, 414 U.S. 141 (1973) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 46

DERDEN v. McNEEL, 938 F.2d 605 (5TH CIR 1991) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 46, 48

DONNELLY v. DeCHRISTOFORO, 416 U.S. 637 (1974) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 115.

DOUGLAS v. ALABAMA, 380 U.S. 415 (1965) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 53.

DUTTON v. EVANS, 400 U.S. 74 (1970) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 51, 54.

FELEKE v. STATE, 620 A.2d 222 (Del. 1993) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 108.

FETTERS v. STATE, 436 A.2d 796 (Del 1981) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 14, 21, 27, 71.

FLETCHER v. UNITED STATES, 118 U.S.App. D.C. 137, 332 F.2d 724 (1964) _ _ _ _ _ _ _ _ _ _ 55.

FRAZIER v. CUPP, 394 U.S. 731, 739 (1939) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 110.

GIGLIO v. UNITED STATES, 405 U.S. 150 (1972) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 23.

HATCHER v. STATE, 337 A.2d 30 (Del. 1975) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 108.

HUNTER v. STATE, 815 A.2d 730 (Del. 2002) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 47, 120.

ILLINOIS v. ALLEN, 397 U.S. 337 (1968  ) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 53.

IRVIN v. DOWD  366 U.S. 717 (1961) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 38.

JACKSON v. CALIFORNIA, 336 F.2d 521, 524 (9TH CIR. 1964) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 48.

JACKSON v. STATE, 770 A.2d 506 (Del. 2001) _ _ _ _ _ _ _ _ _ _ 15, 17, 20, 21, 64.

JOHNSON v. CARROLL, 2003 WL 1220237  D. Del. 2003 _ _ _ _ _ 15, 23, 28, 34, 41, 46, 52,
                                        57, 64, 71, 78, 81, 87, 91, 94, 97, 101.
JOHNSON v. UNITED STATES, 347 F.2d 803, 805 (1965) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 35, 38.

KEYS v. STATE, 337 A.2d 18 (Del. 1975) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 108.

KIRKPATRICK v. BLACKBURN, 777 F.2d 272, 278-79 (5TH CIR. 1985) _ _ _ 16  45  46  122  126.

KRULAWIZ v. UNITED STATES, 336 U.S. 440 (1949) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 117.

LAVERNIA v. LYNAUGH, 845 F.2d 493, 496 (5TH. CIR 1988) _ _ _ _ _ _ _ _ _ _ _ _ _ _ 46, 121.

LINES v. LARKINS, 208 F.3d 153 C.A.3 (Pa. 2000) _ _ _ _ _ 57, 64, 71, 78, 81, 87, 91, 94, 97, 101,
                                        15, 23, 28, 34, 41, 46, 52, 105.
LUNDY v. CAMPBELL, 888 F.2d 467, 481 (6TH CIR. 1989) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 46.

LYNUMN v ILLINOIS, 372 U.S. 528, 543 (1963) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 109.

MANSON v. BRATHWAITE, 432 U.S. 98 (1977) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 75, 92.

MICHEAL v. STATE, 529 A.2d 752(Del. 1987) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 21.

MICHELSON v. UNITED STATES, 355 U.S. 469(1948) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 115.

MOONEY v. HOLOHAN, 294 U.S. 103(1935) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 58, 65.

MOSLEY v. STATE, MISS.App., 749 So.2d 1090(1999) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 117.

NAMET v. UNITED STATES, 373 U.S. 179( 1963 ) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 55.

NAPUE v. ILLINOIS, 370 U.S. 264(1959) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 21, 24, 60.

NEIL v. BIGGERS, 409 U.S. 188, 199-200(1972) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 75, 92.

NEW YORK v. BLANCHARD, 442 N.Y.S. 2d 140(1981) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 115.

PAYNE v. JANASZ, 711 F.2d 1305, 1310(6TH CIR. 1983) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 92.

PIKE v. DICKSON, 323 F.2d 856, 860 (9TH CIR. 1963) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 48.

PEOPLE v. ENIS, 564 N.E.2d 1155(1990) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 82.

PEOPLE v SAVVIDE, 1 N.Y. 554, 557 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 60.

POINTER v. TEXAS, 380 U.S. 400(1965) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 53.

POLLARD v. UNITED STATES, 352 U.S. 354(1957) _ _ _ _ _ _ _ _ _ _ _ _ _ 29.

PRESLEY v. NORWOOD, 36 OHIO ST. 2d 29, 33, 303 N.E.2d 81 (1973) _ _ _ _ _ _ _ _ _ 71, 94.

PYLE v. KANSAS, 317 U.S. 213 (1942) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 59, 65.

REYNOLDS v. ELLINGSWORTH, 843 F.2d 712 (3rd.Cir. 1988) _ _ _ 78, 81, 87, 90, 93, 97, 105.

ROBERTS v. RUSSELL, 392 U.S. 293 (1968 ) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 53.

SCHNECKLOTH v. BUSTAMONTE, 412 U.S. 218, 225 (1973) _ _ _ _ _ _ _ _ _ _ _ _ _ _ 72, 109.

SHEPPARD v. MAXWELL, 384 U.S. 333 (1966) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 41.

SIMMONS v. UNITED STATES, 390 U.S. 377 (1968) _ _ _ _ _ _ _ _ _ _ _ _ _ _ 75, 100, 101.

SOMERVILLE v. STATE, 703 A.2d 629 (Del. 1997) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 90.

STATE v. CHAPPLE, 660 P.2d 1208, 1221 (1983) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 73.

STATE v. DAVIS, 504 A.2d 1372 (1986) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 102.

STATE v. FLOWERS, 858 A.2d 328 (Del. 2004) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 44.

STATE v. GEORGE, 481 A.2d 1068 (1984) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 102.

STATE v. McKNIGHT, 469 A.2d 397 (1983) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 117.

STATE v. MOSS, N.C. 532 S.Ed.2d 588 (2000) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 72.

STATE v. ROOKS, 401 A.2d 943 (Del. 1979) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 108.

STATE v. SAVAGE, 2002 WL 187510 at *3 (Del. Super. 2002) _ _ _ _ _ _ _ _ _ _ _ 116.

STATE v. WILLIAMS, 378 A.2d 588 (1977) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 75.

STOKES v. STATE, 402 A.2d 376 (1978) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 66.

STRICKLAND v. WASHINGTON, 466 U.S. 688 (1984) _ _ _ _ _ 47, 78, 81, 87, 91, 94, 97, 101, 105, 120.

SUMNER v. MATA, 449 U.S. 539 (1980-81) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 75.

UNITED STATES v. AGURS, 427 U.S. 97 (1976) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 59, 64, 65.

UNITED STATES v. BAGLEY, 473 U.S. 667 (1985) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 23, 66.

UNITED STATES v. CARPENTER, 776 F.2d 1291, 1296 (5TH CIR. 1985) _ _ _ _ _ _ _ _ _ _ _ _ 115.

UNITED STATES v. CASTILLO, 615 F.2d 878, 883-84 (9TH CIR. 1980) _ _ _ _ _ _ _ _ _ _ _ _ _ _ 17.

UNITED STATES v. FREEMAN, 514 F.2d 1314, 1318 (1972) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 37, 126.

UNITED STATES v. GRASSO, 437 F.2d 317, 319 (3RD CIR. 1971) _ _ _ _ _ _ _ _ _ _ _ _ _ _ 117.

UNITED STATES v. HARRINGTON, 490 F.2d 487 (C.A.2 1973) _ _ _ _ _ _ _ _ _ _ _ _ _ _ 115.

UNITED STATES v. HAWKINS, 480 F.2d 1151 (1973) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 37.

UNITED STATES v. HAYWOOD, 420 F.2d 142 (1969) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 36, 114.

UNITED STATES v. HENDRIX, 549 F.2d 1225 (9TH CIR. 1977) _ _ _ _ _ _ _ _ _ _ _ 38, 43, 47.

UNITED STATES v. KRAVITZ, 281 F.2d 581 (1960) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 30.

UNITED STATES v. LEONARD, 494 F.2d 955, 960-61 (1974) _ _ _ _ _ _ _ _ _ _ _ _ 117.

UNITED STATES v. MARION, 404 U.S. 307, 325 (1971) _ _ _ _ _ _ _ _ _ _ _ _ _ 29.

UNITED STATES v. NINO, 878 F.2d 101, 103 (3RD. CIR. 1989) _ _ _ _ _ _ _ 78, 81, 91, 97, 101, 105.

UNITED STATES v. PHILLIPS, 664 F.2d 971 (5TH CIR. 1981) _ _ _ _ _ _ _ _ _ 17, 36, 126.

UNITED STATES v. PRINCE, 157 F.Supp.2d 316, 327 (D.Del. 2001) _ _ _ _ _ _ _ _ _ _ 110.

UNITED STATES v. REED, 446 F.2d 1226 (8TH CIR. 1971) _ _ _ _ _ _ _ _ _ _ _ _ _ 117.

UNITED STATES v. SWINT, 15 F.3d 286, 289 (3RD. CIR. 1994) _ _ _ _ _ _ _ _ _ 72, 109.

UNITED STATES v. TINGLE, 658 F.2d at 1337 (9TH CIR. 1981) _ _ _ _ _ _ _ _ 109.

UNITED STATES v. VELASQUEZ, 888 F.2d 1076, 1087 (3RD.CIR. 1987) _ _ _ _ _ _ _ 109.

UNITED STATES v. WHITMORE, 480 F.2d 1154 (1973) _ _ _ _ _ _ _ _ _ _ _ 125.

VAN ARSDALL v. STATE, 524 A.2d 3 (Del. 1987) _ _ _ _ _ _ _ _ _ _ _ _ 23.

VIERECK v. UNITED STATES, 318 U.S. 236 (1943) _ _ _ _ _ _ _ _ _ _ _ _ 35.

WALKER v. ENGLE, 703 F.2d 959, 963 (6TH CIR. 1983) _ _ _ _ _ _ _ _ _ 46.

WALKER v. STATE, 790 A.2d 1214 (Del. 2002) _ _ _ _ _ _ _ _ _ _ _ 120.

WASHAM v. STATE, 235 A.2d 280 (1967) _ _ _ _ _ _ _ _ _ _ _ 42.

WHITE v. STATE, 926 P.2d 291, 293 _ _ _ _ _ _ _ _ _ _ _ _ _ 73.

WRIGHT v. STATE, 405 A.2d 685, 690 (Del. 1979) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 45.

## NATURE AND STAGE OF THE PROCEEDINGS

The petitioner below, defendant, was arrested on February 2, 2000, on charges of murder in the first degree, two counts of attempted murder in the first degree, possession of firearm during the commission of a felony and possession of firearm by person prohibited. The offenses were alleged to have occured on August 1, 1998. Thereafter, the petitioner was indicted in Superior Court on charges of murder in the first degree, possession of a firearm during the commission of a felony and possession of a firearm by a person prohibited. A motion to sever the charge of possession of a firearm by a person prohibited was granted so that the petitioner ultimately went to trial on charges of murder in the first degree and possession of a firearm during the commission of a felony.

The petitioner's appointed conflict attorney, Thomas Pedersen Esq., was permitted to withdraw as counsel on October 10, 2001, and thereafter Eugene J. Maurer Esq., entered his appearance. The matter was first scheduled for trial on May 7, 2002, and a jury was selected but before it was sworn in, the State made an oral motion to disqualify defense counsel in light of the fact that the State was developing a last minute witness, who defense counsel had previously represented. Therefore, the Court continued the trial in order to allow both sides to brief the legal issues. On June 25, 2002, the Honorable Haile Alford denied the State's application.

The trial in this matter was held on October 22, 2002, and proceeded through October 30, 2002. On that date, after a lengthy deliberation, the jury found the petitioner guilty of murder in the first degree and possession of a firearm during the commission of a felony.

On November 6, 2002, a motion for new trial was filed in Superior Court, which motion was denied by the Court. A second motion for new trial was filed in Superior Court on December    , 2002, which was subsequently withdrawn.

The petitioner was sentenced on April 25, 2003 by Judge Haile Alford. A sentence of life without the possibility of probation or parole was imposed on the murder conviction and a ten year sentence was imposed on the weapon charge.

The petitioner filed a direct appeal in the Delaware Supreme Court on November 3, 2003. Oral arguments were held before the Court, seated **en banc**, on February 10, 2004. The Delaware Supreme Court affirmed the petitioner's conviction on August 31, 2004.

The petitioner filed a motion for postconviction relief and an attached memorandum of law pursuant to Superior Court Criminal Rule 61 on April 19, 2005. The motion was sent back to the petitioner due to non-compliance, motion did not contain movant/petitioner's original signature. The petitioner signed the motion and mailed it back to Superior Court where it was submitted on May 3, 2005. In an ORDER dated June 28, 2005, the Superior Court denied without prejudice the Rule 61 motion, instructing the petitioner to amend the motion for post conviction relief. Setting forth the grounds argued in summary form as required by Super. Ct. Crim. Rule 61(b)(2).

In as much as the motion for post-conviction relief was already in summary form, it was the attached memorandum of law, which was 133 pages in length, that the Court had an issue with. In a letter to the Honorable Mary Johnston dated July 11, 2005, the petitioner pointed out the fact that the motion for post conviction relief was already set forth in summary form but the attached memorandum of law could not possibly be set forth in summary form and was not required to be according to the language in Super. Ct. Crim. Rule 61(b)(2). The petitioner asked the Court to appoint counsel pursuant to Super. Ct. Crim. Rule 61(e), to assist in amending the Rule 61 motion or accept the conformed motion as it was filed. Judge Mary Johnston opted not to respond to the petitioner's letter or request, so that the petitioner amended the memorandum of law, bringing it down to 107 pages and re-filed the Rule 61 motion on September 20, 2005.

In an ORDER dated December 13, 2005, Judge Mary Johnston denied the Rule 61 motion, claiming that the entire motion was procedurally barred pursuant to Superior Court Criminal Rule 61(i)(4), applicable to any ground formerly adjudicated. The petitioner placed his Notice of Appeal in the prison mail system on Sunday, January 8, 2006. For unknown reasons the mail room held the Notice of Appeal at the facility until Tuesday, January 17, 2006.

On that same date, Tuesday, January 17, 2006, the Clerk of the Supreme Court, Cathy L. Howard, sent the petitioner a NOTICE TO SHOW CAUSE. Directing the petitioner to show cause why the appeal should not be dismissed pursuant to Supreme Court Rule 29(b), for failure to file the Notice of Appeal within 30 days after entry upon the docket of the order of December 13, 2005 from which the appeal is taken as required by Supreme Court Rule 6. The petitioner was given 10 days to respond. The petitioner responded 3 separate times explaining that the Notice of Appeal was placed in the prison mail system on January 8, 2006. The petitioner sent a number of documents showing that the Notice of Appeal was placed in the mail on January 8, 2006, including a statement of his account that showed that his account was charged to cover the mailing cost on the Notice of Appeal on January 8, 2006. On February 15, 2006, Mrs. Cathy Howard directed the State to respond to the petitioner's responses, giving them until March 1, 2006 to answer. The State responded on February 28, 2006. In an order dated April 4, 2006, the Court decided that the petitioner's failure to timely file his Notice of Appeal was not attributable to court-related personnel. Accordingly, the Court has no jurisdiction to hear this untimely appeal and it was dismissed pursuant to Supreme Court Rules 6 and 29(b).(See

This is the petitioner's petition under 28 U.S.C. 3 2254 for writ of habeas corpus.

that the shooter was from the 22nd & Lamotte Street area. Dt. Brock further narrowed that already narrowed field of suspects even further by telling the juvenile witness, while subtly applying unnecessary pressure, that he had seen the shooter before(emphasis added). Both witnesses recanted their prior identification of the petitioner at trial.

11. Defense counsel committed eight deficiencies before, during and after the petitioner's trial. The eight deficiencies constitutes a chronological list of errors. First, in pre-trial decision making counsel decided not to hire a Drug Expert and an Identification Expert. Second, during trial counsel abandoned the petitioner's case by the last minute decision not to present the pre-agreed upon defense, counsel failed to object to the admission of unreliable pre-trial identifications, counsel failed to object to the bailiff's unauthorized courtroom ejections, counsel failed to address the petitioner's flight and failed to request jury instructions. Finally, defense counsel withdrew a motion for new trial on the day of the scheduled hearing for the motion.

12. The Chief Investigator Dt. Andrew Brock threatened to have Ronetta Sudler's children taken away from her, threatened to send her to jail for violation of probation, threatened to charge her with hindering prosecution, implicitly implied that he help her out with that violation of probation, promised her that she would not have to testify if she made a statement and failed to inform her that her statement was being videotaped. These threats and promises coupled with Sudler's long standing drug and alcohole abuse and the fact that she was under the influence on the night in question and on the day she gave her statement, which supports the argument that her statement was not voluntarily given.

13. The prosecutor asked an open ended question of its witness, Adrienne Dawson (petitioner's sister) that revealed the petitioner's prior incarceration. i.e. prior trouble with the law, after being forewarned by defense counsel that the witness would answer the question in a manner that would reveal the prejudicial information to the jury. The prejudicial error was not cured by the trial judge's untimely curative instruction given 3 days after the jury heard the prejudicial information and further was limited in scope.

14. In the midst of an intense cross examination of State's witness Othello Predoux, Predoux gave a flippant, non-responsive answer that revealed to the jury that defense counsel had represented the witness on the exact charges, that he (defense counsel) was attacking his credibility through. The revelation destroyed counsel's credibility with the jury.

15. The State prosecutor's argued an extremely prejudicial theme to the jury in its opening statements that there was an alleged "Double-Deuce group, 22nd Street regulars," the State stopped just short of calling a street gang, who were operating on a conspiratorial "code of silence" immediately after the shooting. Although the State's prejudicial theme was not supported by a shred of admitted competent evidence at trial.

## STATEMENT OF FACTS

On August 1, 1998, at approximately 1:25 A.M. the victim, Alfred Smiley, was operating a motor vehicle in the area of 22ND & LAMOTTE STREET in Wilmington (A-100). There were two passengers in the motor vehicle by the names of James Howell and Lee Davis.(A-99 ).

Although there was a conflict in testimony on this point, there was an argument involving the occupants inside the vehicle and several individuals who were outside the car.(A-129). Apparently that argument spilled over from a fight at the Oasis NIGHT CLUB in Wilmington earlier in the evening.(A-88  ). At some point during the altercation between the occupants inside the car and individuals outside the car, Smiley attempted to run members of the crowd over with his vehicle.(A-89,90-92). At which point gunshots rang out from both sides of the street (A-181    ) One shot struck the passenger side door, three shots struck the front dashboard (A-93,94), three bullets entered the windshield on the drivers side of the car (A-183  ), one bullet struck the left front quarter panel on the drivers side (A-183  ), and one shot struck Smiley in the chest (A-101 ). Witnesses testified to hearing two seperate weapons being fired and witnesses' identified two different shooters. (A-115,164). The vehicle careened out of control on the street ultimately coming to rest after hitting a pole.

The Wilmington Police responded and the victim was taken to the hospital where he died at 3:48 A.M. (A-122-123). The cause of death was gunshot wound to the chest.(A-122 ). The scene was found to be dark with minimal lighting (A-124 ). The police located 4 shell casings associated with an automatic on the northside of 22ND STREET west of Lamotte St.(A-124 ). No other physical evidence was located.

The State's case was presented through 5 eyewitnesses, 4 of whom indicated that they were present on 22ND STREET on the night in question. Since most of the incriminating evidence was presented through prior taped statements, Title 11 Del.Code 3507, care must be taken in identifying the evidence.

VERNON MAYS identified the petitioner as the shooter in a taped statement given to investigators on August 2, 1998 (A-105  , State's Exhibit 1). Mays was in the area of 22ND & LAMOTTE STREET taking a walk at approximately 1:15 A.M. (A-103  ), when he heard gunshots

The suggestive and corruptive interview procedures and techniques utilized by Dt. Brock can obviously lead one to determine that the identifications made by both witnesses were unreliable. But there are other factors that support the petitioner's arguments that the identifications were unreliable.

FIRST, MAYS himself, acknowledged his uncertainty of the identity of the shooter at trial (A-110-117), repeatedly stating that he couldn't be sure that the petitioner was the shooter (A-110-117) having only seen a 5 second glimpse of the shooter at 1:30 A.M. (A-111 ). MAYS clarified that he picked the petitioner's photograph only as someone who looked like or resembled the shooter (A-104 ), who MAYS believed to be a high school football and track star in 1983-1984, when he (MAYS) came home on leave from the armed services. Since the petitioner was only 7 in 1983 and 8 years old in 1984, the unreliability of MAYS' identification was all the more apparent.

Likewise, MATHEW CHAMBLEE also acknowledged that it was **likely**, if not probable, that he was mistaken in his identification of the petitioner, as the shooter at trial (A-158 ), having only gotten a seconds glance of the right side of the shooter's face at night from over 70 feet away. (A-134). CHAMBLEE was not wearing his prescription eyeglasses at the time of the shooting. (A-135 ). Again, the witnesses' recantation of their prior identifications of the petitioner, supports the petitioner's argument here that the unreliable identifications made by both witnesses were the result of suggestive and corruptive interview procedures utilized by Dt. Brock.

SECOND, a point that must be highlighted is each witnesses' description of the shooter, his clothing and the murder weapon, which are diametrically opposite of each other. MAYS described the shooter as medium complexion, medium build, about 6'1" in height. (A-111-112) CHAMBLEE gave no physical description of the shooter's height, weight and complexion.

MAYS described the shooter wearing a royal blue shirt, white shorts and multi-color sneakers. (A-112 ). CHAMBLEE described the shooter wearing no shirt, black jeans and black sneakers. CHAMBLEE also described the shooter wearing a beanie type hat and yellow tinted sunglasses. (A-135,137). MAYS described the murder weapon as a black handgun, with the shooter firing the gun with his left hand, (keep in mind MAYS then changed this detail), while moving away from his position. (A-113).

of varying sound ratios, which he indicated represented two different guns being fired(A-115 ). At trial it was revealed that the Chief Investigator Dt. Brock utilized corrupting interview techniques to obtain the unreliable identification of the petition from MAYS(See Ground$\bar{x}$). MAYS testified that he later picked out the petitioner's photograph as a person who looked like the shooter and gave similar testimony at trial(A-104 ). MAYS indicated repeatedly at trial that he couldn't be sure that the petitioner was the shooter (A-110-117), having only seen a glimpse of the shooter at night(A-111 ).

MAYS testified that the gun was not wrapped in a tee shirt( A-111  ) and that the shooter was wearing a royal blue tee-shirt and white shorts with multi-color sneakers(A -112 ). The shooter was not wearing a beanie hat, nor was he wearing glasses( A-112 ). The gun black (A-113 )and sounded like a 9 millimeter.

MATHEW CHAMBLEE was a second eyewitness presented by the State. Although he did not see the shooting he identified the petitioner as the man holding a gun. Again at trial it was revealed that Dt. Brock utilized suggestive interview techniques on the then 16 year old witness to obtain an unreliable identification of the petitioner (Ground$\bar{x}$). According to CHAMBLEE the shooter was wearing a beanie cap and yellow sunglasses(A-135,137). On cross examination it was revealed that the witness was not wearing prescriptive glasses on the evening of the shooting, which glasses were shortly thereafter prescribed for him(A-133). The witness testified that he only saw the side of the man, holding a weapon, face from over 70 feet away at night.( A-134 ). According to CHAMBLEE the gun was silver(A-137) and the shooter was not wearing a shirt(A-137 ), and had on long black pants and black sneakers (A-137  ). CHAMBLEE acknowledged that it was likely that he was mistaken in his previous identification of the petitioner as the shooter.( A-138 ).

The incriminating testimony as to the remaining witnesses was presented entirely through 11 Del. C. 3507. Ronetta Sudler, who identified the petitioner as the shooter in her statement (A-126 , State's Exhibit 24), also identified another shooter named JOE HARRIS in her statement

9.

(A-164, State's Exhibit 24). Sudler claimed at trial not to recall what happened on August 1,1998 or what she had said in her statement.(A-125 ). She testified that she started using drugs at the age of 16(A-127 ), and that in August of 1998 she was using cocaine, crack cocaine, marijuana,ecstacy and drinking alcohole four days a week (A-127 ). These drugs would make her hallucinate (A-127 ) and see things she didn't see(A-128 ). Due to an extremely oppressive interrogation by Dt. Brock, Sudler testified that she "would have said anything" to Dt. Brock just to get out of the interrogation. (A-185 ).

Tyshiek McDougal also gave a statement to investigators, in which she indicated that she saw the petitioner wrap a gun in a towel or tee-shirt at a residence on E. 23rd Street in Wilmington, five minutes before the shooting on the night in question. (A-156, State's Exhibit 34). She also denied present recollection at trial, indicating that her mind was altered from drug and crack cocaine use(A-154 ). McDougal acknowledged a history of drug use starting at age 15, admitting to being a chronic user in August of 1998. McDougal admitted to being under the influence when she made her statement to investigators.(A-157). At trial she testified that:" I wouldn't believe me when I'm on crack. "(A-157 ).

The State's final witness was Othello Predeaux(Predoux). Predoux also claimed faulty memory at trial(A-145 ). Predoux was approached by State prosecutor's, Cynthia Kelsey and James Rambo, along with Dt. Brock on May 6, 2002, four years after the August 1, 1998 shooting and one day before the petitioner's trial was to commence(A-144,148). At that time Predoux did have two seperate sets of serious criminal charges pending against him in Superior Court along with a violation of probation.(A-193 ).

The May 7, 2002 trial was postponed due to the State's May 8, 2002 last minute application to disqualify defense counsel due to a potential conflict of interest arising from defense counsel having previously represented Predoux on unrelated charges. The State eventually took a statement from Predoux on July 18,2002 in which Predoux identified the petitioner as the shooter.(State's Exhibit 33). Predoux' two sets of pending criminal charges,when combined

10

would have exposed him to a minimum mandatory of 8 years and a maximum of 56 years in jail. After cooperating with the State in this matter, Predoux' charges were subsequently reduced, with the State rewarding him with probationary sentences, so that Predoux ultimately served 1 year at Level V incarceration for the violation of probation (A-56 ). One set of those criminal charges reduced to probationary sentences was awarded to Predoux by Cynthia Kelsey, lead prosecutor in the petitioner's case. (A-150 ).

A sixth witness named LAMAR MARVIN SWANSON was not called by the State at trial. SWANSON was approached by the State after he was convicted on drug charges and sentenced to 9 years at Level V incarceration, suspended after 5 years at Level II. SWANSON gave an incriminating statement to investigators while incarcerated at GANDER HILL, at which point he also identified an additional shooter besides the petitioner. In exchange for his cooperation SWANSON was awarded a release from prison where he'd begun serving that 5 year sentence, after agreeing to testify at the petitioner's trial. The State suppressed SWANSON's statement and the benefits he received for cooperating with the State from the petitioner. (See GROUND 1 & 9).

The petitioner planned to present seven witnesses at trial but defense counsel ultimately rested the petitioner's case without calling any witnesses. (See GROUND 11).

## ARGUMENT I

THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS 5TH AND 14TH AMENDMENT
RIGHTS DUE TO THE STATE PROSECUTOR'S MISCONDUCT, ALONG WITH CHIEF INVESTIGATOR DT.
ANDREW BROCK'S PROFESSIONAL MISCONDUCT.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the
the petitioner's due process rights that would render the trial as a whole fundamentally
unfair.

Specifically, Lamar Marvin Swanson (SWANSON) was an individual who's name did come up
early in the investigation into the shooting of Alfred Smiley on August 1, 1998. SWANSON was
interviewed at least twice within the first 24 hours following the shooting (A- 87, 86, 82).
Neither of SWANSON's interviews produced damaging testimony against the petitioner.
(A- 82, 87).

Roughly three years later in                              SWANSON was convicted in
Superior Court, New Castle County, following a bench trial on charges of possession
with intent to deliver cocaine and tampering with physical evidence. (A- 96 ). SWANSON,
who had been free on bail since his arrest was remanded into the custody of the Department
of Corrections and housed at YOUNGS CORRECTIONAL INSTITUTE (formerly GANDER HILL), pending a
P.S.I. and sentencing. SWANSON was sentenced on                      , on both charges to
a total of nine (9) years at LEVEL Ⅴ incarceration suspended after five (5) years for
decreasing levels of supervision. (A-96     ).

ON May 15, 2001, at an office conference hearing regarding the petitioner's case, State
prosecutor James (Jim) Rambo informed defense counsel, Thomas Pedersen Esq. (PEDERSEN)
that the State had recently come into possession of a tape which was of some BRADY material.
During a video taped interview conducted with an inmate at GANDERHILL, investigators were
advised that there was an additional shooter besides the petitioner on the night in question (A-19-20).

(Subject of BRADY violation arguments in Ground Nine of this petition).

In _____, BENNIE(BENNY) WRIGHT, recently arrested on serious charges was approached by investigators. WRIGHT gave an exculpatory statement to investigators.(Subject of BRADY violation arguments in GROUND NINE of this petition).

On May 6,2002, one day before the petitioner's trial was scheduled to begin on May 7,2002, State prosecutor's, Cynthia Kelsey and James Rambo along with Dt.Brock had Othella Predoux brought up to the old courthouse (DANIEL HERRMAN BUILDING), up to the Attorney General's Division, where they questioned him about the petitioner's case.(Subject of GROUND Two in this petition).

In the defendant's Rule 61 motion, the defendant argued that the State prosecutors along with Dt.Brock repeatedly approached criminals from the 22ND & LAMOTTE STREET area in Wilmington, after they had been arrested on serious charges and propositioned these men and women to make damaging statements against the petitioner. In this practice, the petitioner's case was utilized by the State as a "GET OUT OF JAIL FREE "card to anyone willing to cooperate with the State.(See Rule 61 motion-Ground Three). Due in part to the State's suppression of exculpatory evidence the petitioner was prevented from addressing the issue at trial. But when assertions of professional misconduct rising to the level of a Constitutional violation and the laws of the State or the United States, have their proper setting, initially, in a post-conviction proceeding under Superior Court Criminal Rule 35 (Now Rule 61). "See, FETTERS v. STATE, 436 A.2d 796(1981).

In the Court's order denying the Rule 61 motion, newly assigned Judge MARY JOHNSTON decided that this allegation had been formerly adjudicated thus procedurally barred pursuant to SUPERIOR COURT CRIMINAL RULE 61(i)(4). The basis of her decision seemed to be a sentence from the trial judge's denial of the petitioner November 6,2002, motion for new trial. In the Superior Court's order denying the new trial motion, the HONORABLE HAILE ALFORD stated on page 9: ". . . . Additionally, no prosecutorial misconduct occured. "(See, Court's Order pg 9). Based on this one sentence, Judge Johnston claimed that the first four grounds in the Rule 61 motion coming under the heading: PROSECUTORIAL MISCONDUCT, were procedurally barred due

to former adjudication. Careful review of the new trial motion(A-46-52) and the Court's order denying the motion(A-63-71  ) will show that Judge Alford's statement above was in reference to reckless behavior by the prosecutor at trial when questioning its witness. Further, without conceding that Judge Johnston was correct in her decision, it must be noted that it is well settled Delaware law that when the prosecution fails to disclose material exculpatory evidence in violation of the **BRADY** rule, postconviction relief cannot be procedurally barred, as a **BRADY** violation undermines the fairness of the proceeding leading to the judgement of conviction. See, **JACKSON v. STATE, 770 A.2d 506(Del. 2001).** As such, the release from jail SWANSON received for making a statement, as well as the exculpatory statement itself was suppressed by the State. BRADY violations are attached to this allegation so that it could not be procedurally barred.

As forwarded in **the BRIEF IN SUPPORT FOR EXCUSION,** the Delaware Supreme Court has not heard this allegation, although the petitioner has exhausted all state remedies within the meaning of **28 U.S.C. § 2254(b)(c).** Where state court's refuse to consider petitioner's claim because he failed to comply with independant and adequate state procedural rules, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. See, **LINES v. LARKINS, 208 F.3d 153 C.A.3 (Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del., 2003.** The petitioner has satisfied the cause and **prejudice** standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ of habeas corpus petition, the petitioner argues that he was denied a fair trial in violation of his 5th and 14th Amendment rights due to the State prosecutor's misconduct, along with Dt. Brock's professional misconduct.

The exhibits cited in this brief proves several facts: 1 MARVIN SWANSON was the confidential witness, who identified an additional shooter; 2. The statement taken by investigators at GANDER HILL from SWANSON was both damaging and exculpatory BRADY evidence, which the petitioner was entitled to.

See, BRADY v. MARYLAND, 373 U.S. 83(1963); 3. That BRADY material was withheld from the petitioner preventing its use at trial after both general and specific requests(See GROUND NINE); 4. The suppression of the SWANSON statement and the release from serving that drug sentence he received for making that statement, prevented the petitioner from locating the witness, investigating the identity of the second shooter and utilizing these facts at trial, particularily in attacking the State's "no deals" position at trial when Othello Predoux was presented as a witness for the State. The post trial revelation that SWANSON was released after making a statement is an important change in the circumstances of the case just as the new revelation that Dt. Brock offered JETER help with her drug charges in exchange for her help in convicting the petitioner are. Particularily, the factual basis of issues raised at trial, one of which questioned the State's last minute witness, Othello Predoux' motivation for cooperating with the State as well as the reliability and credibility of the State's case.

At trial the petitioner could have argued and factually shown the jury that the State systematically approached men and women after they'd been arrested on serious charges and gave benefits to at least two witnesses that had been developed through this corruptive process. One witness who did testify, Othello Predoux and another witness not called to testify, MARVIN SWANSON. Had the State not suppressed this information, the State would have had to admit to the jury that they systematically approached people utilizing a corruptive practice to develop witnesses and some of its witnesses were given benefits for cooperating with the State, a point repeatedly denied by the State at trial (A-1165, 143).

The State prosecutors along with Dt. Brock's corruptive process of approaching men and women after their arrest on serious criminal charges with the sole purpose of eliciting damaging statements against the petitioner in exchange for deals, promises, leniency or reduced pleas was/is plain error that violated his "substantial rights" to a fair trial. A petitioner for habeas corpus must show more than prejudice to his substantial right, because habeas writ issues only to correct errors of constitutional magnitude. See, KIRKPATRICK v. BLACKBURN, 777 F. 2d 272, 278-279(5th Cir 1985).

16.

As noted the set a clear pattern of approaching witnesses, some who had no prior connection to the petitioner's case other then the fact that they lived on or frequented the 22ND & LAMOTTE STREET area. Two witnesses, who gave damaging statements received benefits. Of the two SWANSON was not called at trial, likely because he identified a second shooter. But the State presented PEEDOUX to the jury as a cooperating witness, an extremely damaging witness, with whom no deals had been made which strengthened his credibility with the jury. Denying the petitioner his constitutional right to impeach by exposing his bias, prejudice or motivations. Cross examination on bias is an essential element of the right of an accused under the Delaware Constitution, Article 1 3 7, to meet the witnesses in their examination, which makes it an essential element of the Constitutional right of Confrontation. See, **JACKSON v. STATE**, 770 A.2d 506 (Del. 2001). The petitioner will demo-strate later in this petition how the State, after approaching men and women, actually received exculpatory BRADY statements from several witnesses and then suppressed that exculpatory material (See GROUND NINE) so that the State was the architect of a trial that did not comport with standards of justice. Cited in **BRADY**, Court of Appeals 226 Md., at 427, 174 A.2d at 169.

The petitioner has shown that the State prosecutor's misconduct, along with DI.Brock's professional misconduct has abridged his constitutional rights within the 5th and 14th Amendments, meeting the more demanding review of the writ of habeas corpus. **UNITED STATES v. PHILLIPS**, 664 F.2d 971 (5th. Cir. 1981); **UNITED STATES v. CASTILLO**, 615 F. 2d 878, 883-84 (9th. Cir. 1980)

Additionally, the petitioner filed his Rule 61 motion for postconviction relief in Superior Court, New Castle County initially in May 2005. It was denied without prejudice with instructions from the Court to make it more concise and abridged. The Rule 61 motion was resubmitted in September 2005. (See, **BRIEF FOR EXCUSION**). . . . . . This specific allegation was raised, although the petitioner did not have certain documentation relating to SWANSON's case. i.e. court docket sheet, sentencing order etc. (See, Rule 61 motion-Ground Three). The Court directed the State not to respond to the Rule 61 motion pursuant to Super.Ct.Crim.R.61(c)(4) and 61(f)(1). Subsequently, the Court denied the Rule 61 motion pursuant to Super.Ct.Crim.Rule 61(i)(4).

17.

In correlation to the timing of the Rule 61 motion and this specific allegation concerning MARVIN SWANSON's benefit of being released from serving that five year sentence for his drug convictions (A-96  ) after he cooperated with the State. The State, although not made to answer to the allegations raised in the Rule 61 motion, surreptiously had SWANSON detained and remanded to the Department of Corrections at Young's CORRECTIONAL INSTITUTE. In an apparent attempt to cover its tracks the State actually attempted to have SWANSON now serve that five year sentence. A hearing was held before Superior Court Judge Toliver, at which the Court re-imposed only the probationary portion of SWANSON's original sentence. SWANSON was again released dwarfing the state's dispicable tactics. (Under seperate cover, the petitioner has filed a motion pursuant to 28 U.S.C.A. § 2254 Rule 6(a)(b)(c) and Rule 7(a)(b), in order to obtain, inter alia, the transcripts from the hearing.)

The State's systematic practice of approaching men and women from 22ND & LAMOTTE STREET area, after they had been arrested on serious criminal charges with the purpose of eliciting statements against the petitioner in exchang for deals, promises, leniency or reduced pleas by the State violated the petitioner's right to a fair trial.

Regarding the validity of the letters and motion(s) cited in this argument between former defense attorney, THOMAS PEDERSEN and the state, PEDERSEN and the petitioner and PEDERSEN's motion to the Court. The petitioner has secured a letter from THOMAS PEDERSEN acknowledging all cited correspondence as well as the truthfulness of the letter's content (A - 95  ).

## ARGUMENT II

THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF 5TH AND 14TH AMENDMENT RIGHTS DUE TO THE STATE PROSECUTOR'S MISCONDUCT.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's due process rights that would render the trial as a whole fundamentally unfair.

The Court will keep in mind the argument forwarded in ground one of this petition. It was established at trial that State prosecutors, Cynthia Kelsey and James Rambo, along with Dt. Andrew Brock had Othello Predoux brought up to the old DANIEL HERRMAN COURTHOUSE, up to the ATTORNEY GENERAL'S DIVISION on May 6,2002, one day before the petitioner's trial was set to begin on May 7, 2002 (A-142,138), a little over a year after the SWANSON situation. It was also established that Dt. Brock had unsuccessfully attempted to speak with PREDOUX on several occassions prior to the May 6, 2002 meeting. But only wanted to speak with him about the petitioner's case based on a "hunch" (A-169). At the time of the meeting PREDOUX had been incarcerated for 5 months, with two sets of serious criminal charges pending against him in Superior Court, along with a V.O.P. (A-142). Combined those charges carried a statutory range of 8 thru 56 years of jail time (A-147). PREDOUX had already been offered a fast track plea to 8 years minimum mandatory prior to this meeting (A-148).

If the State is to be believed, PREDOUX did not make a statement at the orchestrated May 6,2002 meeting. But indicated that he had knowledge of the August 1, 1998, shooting but wanted a deal or benefit for his cooperation (A-146,148). Towards this end PREDOUX wanted to have his attorney present for any further discussions. On May 7, 2002, the petitioner seated a jury but at the State's request the jury was not sworn in. In the early evening on May 7, 2002 TIMOTHY TERRANOVA ESQ. acting on PREDOUX' behalf allegedly contacted James Rambo with a pro-offer of what information PREDOUX knew about the shooting and an indication that PREDOUX expected some benefit for his cooperation (A-148-149). On May 8, 2002, in an early morning office conference the State moved to disqualify defense counsel, EUGENE J. MAURER, ESQ. based upon a potential conflict of interest arising out of counsel having previously represented

PREDOUX on seperate weapons charges several years prior. The trial was postponed with Judge Alford directing both sides to brief the Court on the disqualification application. The State's application was eventually denied and trial was rescheduled for October 22, 2002.

On July 18, 2002, at the Delaware Correctional Center, PREDOUX made an extremely damaging taped statement identifying the petitioner as the shooter on the night. In attendance were State prosecutor Cynthia Kelsey, Dt. Brock and RICHARD CROSS ESQ. (PREDOUX' ATTORNEY). Exactly eleven days later on July 29, 2002, PREDOUX entered into a reduced plea with the State regarding his weapons charges. The plea recommendation was to time served and probation. A "special condition" of that reduced plea called for PREDOUX to testify for the State if called in any criminal proceeding (A-151 ). At trial PREDOUX acknowledged that the only case he would be testifying in was the petitions trial (A-151 ), so that the reduced plea and special condition of that plea correlated with the damaging taped statement and his willingness to testify at trial.

At trial the State presented PREDOUX to the jury as a cooperating witness with whom no deals had been made. Leading the jury to believe that PREDOUX was a cooperating witness without even a subjective expectation of leniency regarding his pending drug charges. See, JACKSON v. STATE, 770 A. 2d 506 (Del. 2001). Notwithing the State's presentation of PREDOUX to the jury, i.e. their "No DEALS" argument, PREDOUX attorney had sent a letter to State prosecutor Cynthia Kelsey just one month prior to the petitioner's trial, reiterating what PREDOUX hoped to recieve regarding his pending drug charges (Defendant's Exhibit # 6 ). At the time the trial went forward, the SWANSON benefit had been suppressed by the State, so that again PREDOUX appeared more credible to the jury as a witness.

Less than a month after the petitioner's trial on November 18, 2002, PREDOUX entered into another reduced "SPECIAL CIRCUMSTANCES" plea agreement with the State which permitted PREDOUX to plead guilty to simple possession of cocaine. A reduced plea down from the arrest charges of trafficking in cocaine. In as much as PREDOUX had served 11 months on his violation of probation sentence of one year at Level Ⅳ. This second reduced plea labeled a "SPECIAL

CIRCUMSTANCE" plea facilitated PREDOUX' immediate release. That "SPECIAL CIRCUMSTANCE" plea was negotiated, if not awarded to PREDOUX by none other State prosecutor Cynthia Kelsey, lead prosecutor in the petitioner's case. PREDOUX was again sentenced to time served and probation by Judge Silverman, so that in total PREDOUX served 11 months for a violation of probation, while receiving time served and probation on his other two cases. A sharp contrast from the lengthy sentence PREDOUX was facing before he was approached by the petitioner's prosecutors.

The petitioner was unable to raise this argument at trial or cross examine PREDOUX utilizing the SWANSON benefit as a foundation because the State suppressed SWANSON's exculpatory statement and the benefit he received. Further, PREDOUX 'drug charges were not resolved until after the petitioner's trial, so that the petitioner could only present this allegation in a post-conviction proceeding pursuant to Super. Ct. Crim. R. 61. FETTERS v. STATE, 436 A. 2d 796 (Del. 1981).

In the petitioner's Rule 61 motion, the petitioner that the State committed prosecutorial misconduct by extending reduced pleas to Othello Predoux in exchange for his cooperation. See, MICHEAL v. STATE, 529 A.2d 752 (Del. 1987); mislead the jury at trial on this issue, see NAPUE v. ILLINOIS, 370 U.S. 264 (1959); withheld this exculpatory evidence from the petitioner, see BRADY v. MARYLAND, 373 U.S. 83 (1963); which denied the petitioner his fundamental right to confront PREDOUX. DEL. C. ANN. Const. Art. 1§ 7 (cited in JACKSON v. STATE, 770 A. 2d 506 (Del. 2001)). See Rule 61 motion-ground one.

In the Court's order denying the Rule 61 motion, Judge Johnston decided that this allegation was procedurally barred pursuant to Super. Ct. Cr. R. 61(i)(4), formerly adjudicated. (See Court's order pgs 4-5). Judge Johnston alluded to a letter dated May 22, 2002, from defense counsel to Judge Alford in which counsel questioned PREDOUX' credibility and motivation for cooperating with the State. The letter Judge Johnston alluded to was actually counsel's reply brief in opposition to the State's application to disqualify defense counsel (A-172-179). Naturally, the brief dealt with PREDOUX but at no point did counsel ask Judge Alford to make a determination on whether PREDOUX had received benefits from the State in exchange for his cooperation.

This is obvious since the reply brief Judge Johnston alluded to came prior to PREDOUX' July 18,2002, statement, his July 2002, reduced plea, the petitioner's October 2002, trial and PREDOUX' November 2002, reduced plea.

As stated in Ground One, Judge Johnston used a sentence from the trial judge's order denying the petitioner's motion for new trial(See, Court's Order-pg 9) to claim that the first four grounds in the Rule 61 motion falling under the title: PROSECUTORIAL MISCONDUCT, were procedurally barred because they had been formerly adjudicated. In the Court's Order denying the new trial motion Judge Alford stated: ". . . . Additionally, no prosecutorial misconduct occured." The motion for new trial filed in November 6, 2002, dealt with two trial errors. One of which, the Court will see involved the recklessly elicited statement from a state's witness that revealed the petitioner's prior trouble with the law. Since the State asked the open-ended question after being forewarned there was some argument on whether the State's actions were intentionally reckless. i.e. prosecutorial misconduct. Judge Alford's remark above, was clearly in reference to that issue and not a blanket declaration that covered the entire trial, as Judge Johnston would like to claim. (See Court's Order Denying New Trial Motion).

This is supported by Judge Alford's immediate scheduling of an hearing to address the merits of the petitioner's second motion for new trial filed on December 18,2002( A- 59, 53). That second motion, which was subsequently withdrawn, dealt exclusively with PREDOUX and benefits he had received for cooperating with the State. In light of the November 18, 2002, "SPECIAL CIRCUMSTANCES" reduced plea awarded to PREDOUX by Cynthia Kelsey. Upon being appraised of that development, which had clear prosecutorial misconduct implications, Judge Alford ordered a hearing scheduled for January 31,2003(A -59      ). The scheduled hearing by Judge Alford would have been completely contradictory if this allegation had already been addressed by the Court. Because the motion for new trial was withdrawn, the allegations argued here have never been addressed.

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION , the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within

the meaning of 28 U.S.C.§ 2254(b)(c). where state court refuses to consider petitioner's claims because he failed to comply with independent and adequate state procedural rule, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. **LINES v. LARKINS, 208 F.3d 153 C.A.3 (Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del., 2003.** The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ for habeas corpus petition, the petitioner argues that he was denied a fair trial in violation of 5th and 14 Amendment rights because the State prosecutors extended reduced pleas to Othello Predoux regarding his two sets of criminal charges in exchange for a damaging statement and Predoux' willingness to testify against the petitioner at trial. And further suppressed this exculpatory evidence from the petitioner, presenting Predoux to the jury as a witness with whom no deals had been made.

The U.S. Supreme Court has long held that the prosecutions failure to disclose evidence favorable to an accused upon request violates due process . . . **BRADY v. MARYLAND, 373 U.S. 83 (1963).** The BRADY rule was not designed to insure that a miscarriage of justice does not occur. The prosecutor is not required to deliver his entire file to defense counsel but only to disclose evidence favorable to the accused that, if suppressed, would deprive the petitioner of a fair trial. **UNITED STATES v. BAGLEY, 473 U.S. 667 (1985).** The State clearly reduced both sets of Predoux' charges. The Delaware Supreme Court has held that the dropping of a charge against a State's witness is clearly relevant to the issue of bias. **VAN ARSDALL v. STATE, 524 A.2d 3 (Del. 1987).** Evidence which the defense can use to impeach a prosecution witness by showing bias or interest, as well as exculpatory evidence, falls within the BRADY rule. See, **GIGLIO v. UNITED STATES, 405 U.S. 150 (1972).**

The State cannot claim that PREDOUX did not receive reduced pleas for cooperating with the State since just a little over a year prior to them (STATE) approaching PREDOUX, SWANSON

had been approached. SWANSON gave investigators a damaging but exculpatory statement and was released from jail after just recently being sentenced to five years. That exculpatory evidence was suppressed. The pattern has been established by the foundation laid out in ground one. The Court has to agree with the petitioner, that it stands to reason that if SWANSON was awarded release from jail after giving a damaging but ultimately exculpatory statement. Then PREDOUX, who gave an extremely damaging statement to the State, who let it be known from the outset that he wanted some benefit for his cooperation and who was the reason of the May 7, 2002, trials postponement. Held **all** the cards once the State committed itself to developing him as a witness. The handling of his two sets of criminal charges before and after he was approached by the State demonstrates the benefits without factoring in the SWANSON benefit or the JETER offer.

The petitioner should have been afforded the opportunity to probe all these facts with PREDOUX at trial, to get to the reason behind his sudden willingness and motivation to cooperate with the State after over 4 years of silence. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. Indeed, it is upon such subtle factors as the possible interest of the witness in testifying falsely that a petitioner's life or liberty may depend. **NAPUE v. ILLINOIS, 360 U.S. 264 (1959).**

The new developments regarding the SWANSON benefit which was suppressed and the JETER proposition by Dt. Brock, supports the petitioner's argument that the State reduced PREDOUX' two sets of criminal charges in exchange for his cooperation. Since the State suppressed this exculpatory evidence and presented PREDOUX to the jury as a cooperating witness with whom no deals had been made, refusing to even concede that PREDOUX had a subjective expectation of leniency. The State prosecutor's misconduct violated the petitioner's right to due process and thoroughly undermined the integrity of the trial.

## ARGUMENT III

THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF 5TH AND 14TH AMENDMENT RIGHTS DUE TO THE STATE PROSECUTOR'S MISCONDUCT.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's due process rights that would render the trial, as a whole, fundamentally unfair.

During a early morning office conference on May 8, 2002, the State's attorneys, Cynthia Kelsey and James Rambo, along with defense counsel EUGENE MAURER and the HONORABLE JUDGE HAILE ALFORD discussed a potential conflict of interest issue arising from the State's intention to call last minute witness Othello Predoux at the petitioner's trial. Defense counsel had previously represented PREDOUX on seperate charges several years prior (A-168).

From the beginning of the office conference it is clear that defense counsel notified both the trial judge and the State's attorneys, that the petitioner was willing to waive any potential conflict issue arising out of defense counsel having previously Represented PREDOUX and adamately wanted to proceed to trial with his present counsel (A-168). Judge Alford seemed prepared to move the discussion into the courtroom since defense counsel had informed the Court that the petitioner was willing to address the Court on the issue and formerly waive any potential conflict (A-168,169).

At that specific time on May 8, 2002, one day after the jury had been selected but not sworn in at the State's behest. If the State's attorneys are to be believed, the State did not have an "official" statement from PREDOUX. By "official statement" the petitioner means a taped statement, admissible at the petitioner's trial pursuant to Title 11 Section 3507. Since it appeared that Judge Alford was prepared to move the discussion into the courtroom where the petitioner would have waived the potential conflict of interest issue, so that the trial could proceed as scheduled. The State, needing more time to secure that "official statement" from PREDOUX, saw their chance to develop him going out the window, so they orally moved to disqualify defense counsel.

An extreme step considering its timing(A-169).

Judge Alford, besieged with this unforeseen problem and the progression of a trial already under-
way, asked several pointed questions of the State concerning Peedoux' statement. This in an apparent
attempt to find a solution to this last minute problem that would allow the trial to proceed as scheduled
(A-169-170). In answering Judge Alford's questions, James Rambo bolstered Peedoux' statement by
outright lying that the statement was not duplicative in nature(A-170). The Court must keep in mind
that the State allegedly did not even have Peedoux' statement as of May 8, 2002. So the State's
rendition of Peedoux' statement should come directly from Mr. Terranova's pro-offer of what
that statement would be. Here, Mr. Rambo seemed very knowledgeable about Peedoux' statement
leading the petitioner to seriously question the story presented to the Court about that "off the
record" May 6, 2002 meeting(A-142-43, Hd). The State further claimed that Peedoux and the petitioner
were close friends and that the petitioner had given some directives to Peedoux minutes after
the August 1, 1998, shooting(A-170). Not surprisingly, not one of those fabrications were
substantiated by Peedoux in his July 18, 2002 taped statement or in his trial testimony.
(See State's Exhibit #33; A-193). Neither was a witness named BRENDA BRYANT ever produced
by the State to verify a hearsay statement, purported to be made by the petitioner, in which
he declared that he wouldn't turn himself in(A-170).

Deceiptively, the State withheld the fact that they, along with Dt. Brock, had Peedoux brought
over to the old courthouse, up to the Attorney Generals Division less than 48 hours before the
office conference hearing and had an "off the record" discussion with him about the petitioners
case. In a orchestrated meeting that bypassed Peedoux' attorney, Timothy Terranova, in
violation of RULE 4.2 - Communication With Person Represented by Counsel of the Delaware
Lawyers' Rules of Professional Conduct. The State deceiptively failed to disclose that this
orchestrated meeting was the result of an alleged "hunch" on Dt. Brock's part. (The
Court will keep in mind the foundation laid out in ground one of this petition). The State
deceiptively failed to disclose that Peedoux did not make an "official statment" in that

"off the record" meeting and the fact that DI.Brock had attempted to speak with PeeDoux about the petitioner's case on several occassions over the previous two years, whenever PeeDoux was arrested for something. (Again the Court will keep in MIND the foundation laid out in ground one of this petition). The State further withheld the fact that PeeDoux indicated at that May 6,2002 meeting that he would want some benefit for his cooperation(A·165) and wanted to have his attorney present for any further discussions(A·144). Finally, the State withheld the fact that they needed more time to secure an "official statement" from PeeDoux and time to work out whatever benefit he would receive. Based upon the demeanor of Judge Alford before the State moved to disqualify defense counsel, had the State revealed all of the critical facts above to Judge Alford at that May 8, 2002, office conference. She would have, almost certainly, excluded PeeDoux as a last minute witness, as she initially seemed inclined to do (A·169). Further, had the State revealed all of the critical facts above, they would have opened the door for defense counsel to present an argument for dismissal with prejudice. Since the larger ramifications of the State's attorneys and DI.Brock's corruptive practice of approaching men and women, after they had been arrested on serious charges, would have come to light.(GROUN1).

As established the potential conflict of interest situation ultimately prompted Judge Alford to order a postponement, with both sides briefing the Court on the issue.

Without having knowledge of the SWANSON benefit and the JETER proposition, the petitioner argued in his Rule 61 motion that the State's attorney committed prosecutorial misconduct by misleading the Court during the office conference hearing. The petitioner argued that the State's lies and misleading position was calculated to cause a delay of the petitioner's trial and that delay would afford them the needed time to develop PeeDoux into a critical State witness in violation of his due process rights. See, FETTERS v. STATE, 436 A.2d 796(Del.1981). (See Rule 61 motion-Ground Two).

In the Court's order denying the Rule 61 motion, Judge Johnston decided that the allegation was procedurally barred pursuant to Super.Ct.Crim.R. 61(i)(4). Judge Johnston based that decision

on the Delaware Supreme Court's wording in its opinion dated September 16, 2004. The Court stated:

" . . . . Before the selected jury was sworn, the State moved to disqualify defense counsel on the ground that defense counsel had previously represented a State witness Othello Predoux. The trial was rescheduled in order to allow the parties an opportunity to brief the legal issues concerning disqualification. (see, Court's Order pg 9).

Clearly, the Court's statement above was put forth on the record in laying some background foundation to the petitioner's third argument on direct appeal. (See Direct Appeal-Ground Three). The third argument on direct appeal had nothing to do with the allegation raised in Ground Two of the Rule 61 motion. In fact, the Court stated in the sentence preceeding the very sentence Judge Johnston cited above: " The novel nature of this argument in the context of this case requires some background." (Court's order pg. 9). Judge Alford was clearly in error when she took the above referenced sentence stated for the purpose of background foundation and claims that the allegation raised here was formerly addressed based on this sentence, thus barred pursuant to Super. Ct. Crim. R. 61(i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not been addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c), where State courts refuse to consider petitioner's claim because he failed to comply with independent and adequate State procedural rules, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. LINES v. LARKINS, 208 F.3d 153 C.A.3 (Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del. 2003. The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ for habeas corpus petition, the petitioner argues that the State prosecutor's deliberately lied and mislead the the trial judge and the defense in order to cause a delay of the petitioner's May 7, 2002 trial, in order to gain extra time to develop Othello Predoux as a witness violating his 5th and 14th Amendment rights to due process.

And PREDOUX showed the State that he was committed to them when he made an official statement" on July 18, 2002.

The State clearly knew as early as the May 8, 2002 office conference that PREDOUX would likely recant his testimony on the witness stand (A-169  ). If the petitioner's trial had proceeded as scheduled on May 8, 2002, the State doesn't have an "official statement" i.e. a taped statement admissible at the petitioner's trial pursuant to TITLE 11 SECTION 3507. With a last minute witness, a reluctant witness who the State knew would recant his testimony. The Court must agree with the petitioner that the State needed to get PREDOUX' statement on tape before he could utilized as a witness for the State. That would only be possible if they had more time. They got that time by telling lies and misleading the trial judge, so that 2 months and 10 days after the May 8, 2002 office conference they finally got PREDOUX' statement.

Deliberate attempts to delay trial in order to hamper the defense should be weighed heavily against the government in determining whether the defendant's right to speedy trial had been denied. BARKER v. WINGO, 407 U.S. 514 (1972). Although the petitioner is not arguing a speedy trial violation, it must be noted that as of the May 7, 2002, scheduled trial, the petitioner had been incarcerated awaiting trial for 27 months so that the balancing test standard in speedy trial violations, specifically delays which prejudices the accused should be applicable here. BARKER v. WINGO, id. The State attempted to disqualify the petitioner's chosen counsel, whom a considerable amount of money had been spent on to retain. And that attempt was basically a smoke screen to conceal the State's ulterior motive, which was to develop another witness in an otherwise weak case.

Further, the lies and deceptively misleading manner in which the State manipulated the trial judge violated RULE 3.5(d) of the Delaware Lawyers' Rules of Professional Conduct. The Third Circuit Court of Appeals' statement in UNITED STATES v. KRAVITZ, 281 F. 2d 581 (1960); concerning the far reaching language used by a U.S. attorney in closing arguments, are somewhat applicable here... "A U.S. attorney in a criminal case has an even greater

responsibility then counsel for an individual client. . . . . His case must rest on evidence, not epithet. If his case is a sound one, his evidence is enough, if it is not sound, he should not resort to epithet to give it a false appearance of strength. " The State prosecutor's misconduct violated the petitioner's due process rights.

## ARGUMENT IV

THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS 5TH AND 14TH AMENDMENT RIGHTS DUE TO THE STATE PROSECUTOR'S MISCONDUCT.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's due process rights that would render the trial, as a whole, fundamentally unfair.

Beginning with the prosecution's opening statements right through closing arguments, the State's prosecutors suggested and insinuated a total of at least nine times one of the following prejudicial themes: 1. That the petitioner was a "Double-Deuce" group/gang member (DEUCE-DEUCE representing the area of 22nd & LAMOTTE STREET in Wilmington where the victim was shot)(A-97 ); 2. That the petitioner had State witnesses approached on the street and intimidated (A-121, 129 ); causing 3. The fear or intimidation in State eyewitnesses at trial(A-121); 4. And alluded to a vast number of uncooperative people, whom investigators believed were operating on a "code of silence" immediately after the shooting( A-98 ). Twice the State was prevented from introducing prejudicial evidence because the prejudice outweighed its probative value(A-199-201/58).

At trial the petitioner objected during the State's closing arguments when Mrs. Kelsey implored the jury to keep in mind that someone approached State witness VERNON MAYS(MAYS) on the street prior to trial causing him to become scared(A-167 ). On direct appeal the petitioner argued that he was prejudiced by the State's opening statement argument about a "Double-Deuce group, 22nd STREET regulars" operating on a "code of silence" and attempted to argue that he was prejudiced the State's closing argument remarks in a two pronged argument. (See Direct Appeal-Argument 4). The Delaware Supreme Court addressed only the first part of that two-pronged argument, determining that the second part was not sufficient developed for the Court to address. (See Court's Order-pg 7). Since the second part of that two-pronged argument

was not addressed by the Court, the petitioner raised the argument in his Rule 61 motion focusing on specific incidences at trial.(Rule 61 Motion- Ground 4). To avoid confusion in this petition, the petitioner has kept the two arguments seperate. This ground 4 argument correlates with ground 4 in the Rule 61 Motion. The first part of that two pronged is presented in GROUND 15 of this petitioner's writ for habeas corpus.

In the Rule 61 motion, the petitioner argued prosecutorial misconduct due to the State's repeated prejudicial suggestions and insinuations that pressed upon the jury the belief that the petitioner had State witnesses approached on the street and intimidated. Which, in turn, caused these same witnesses to be reluctant and uncertain once on the witness stand. Those suggestions and insinuations further pressed upon the jury the belief that the petitioner had the wherewithal to tamper with the judicial process by suggesting witness tampering.

In the Court's order denying the Rule 61 motion, Judge Johnston decided that this allegations had been formerly adjudicated thus barred pursuant to Super. Ct. Crim.R. 61(i)(4). Judge Johnston alluded the Delaware Supreme Court's opinion dated September 16, 2004, in which the Court addressed the first part of that two-pronged argument on direct appeal. But Judge Johnston then seems to ignore the Court's statement on page 7, where the Court clearly stated that they unable to address the merits of the second part of that argument.(See De. Supreme Court's opinion-pg 7). The petitioner explained this fact in the Rule 61 motion to no avail. It stands to reason that if the Delaware Supreme Court did not address the merits of the second part of that argument, then the allegation raised in ground 4 of the Rule 61 motion could not possibly be barred pursuant to Super. Ct. Crim. R. 61 (i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not been addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c). Where State courts refuse to consider petitioner's claims because he failed to comply with independent and adequate State procedural rules, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes

cause and prejudice or a fundamental miscarriage of justice to excuse the default. See, LINES v. LARKINS, 208 F.3d 153 C.A.3(Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del. 2003. The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ for habeas corpus petition, the petitioner argues that his due process rights were violated due to the State prosecutor's repeated suggestions and insinuations that as a member an alleged "Double Deuce" group/gang, the petitioner directed people to approach State witness on the street in order to intimidate or coerce them prior to trial, so that they would not identify him as the shooter at trial or not testify at trial. When these suggestions were not supported by competent evidence.

Specifically, State witness VERNON MAYS' identification of the petitioner had become very uncertain by the time this trial proceeded. MAYS testified on direct examination and cross examination that he picked out the petitioner's photograph as someone who resembled the shooter. (A-104 ). MAYS repeatedly testified that he could not be sure that the petitioner was the shooter (A-110-117) having only seen a glimpse of the shooter 1:30 A.m.(A-111) on the night in question. The cross examination resulted in MAYS essentially recanting his prior identification of the petitioner. On re-direct examination the State then initiated a line of questioning that led to MAYS revealing to the jury that someone had approached him on the street concerning the petitioner's case. And as a result he became scared and called Dt. Brock.( A-121 ).

The State's suggestion or insinuation here was that the witness would not or could not suddenly identify the petitioner as the shooter because someone, acting on the petitioner's directives or his behalf, had approached MAYS on the street, prior to trial, and intimidated him so that MAYS was afraid to identify the petitioner in court.

The State's strategic move to question MAYS on re-direct examination to reveal that information was calculated to prejudice the jury against the petitioner.

See, UNITED STATES v. HAYWOOD, 420 F. 2d 142 (1969).

A third witness, Othello Predoux, gave a damaging taped statement to Cynthia Kelsey and Dt. Brock just 3 months before the trial, in which he identified the petitioner as the shooter. However at trial PREDOUX claimed memory loss to all inquires about the night in question and his taped statement. (A-145 ). PREDOUX testified repeatedly that he didn't see the petitioner shoot anyone on the night in question (A-145 ). During his direct examination, when it became obvious to the State and everyone else, that PREDOUX was conveniently forgetting everything he'd previous said about the shooting. The State specifically asked PREDOUX : Q". You don't know, okay. Do you have any reason to fear the defendant? . . . . " The State then goes on to ask a line of questions consistent with their prejudicial theme. ( A-145    ).

Once again, the State by asking that line of questions, in that manner of its own reluctant witness. Is suggesting or insinuating some actions on the part of the petitioner that caused fear or the intimidation of this witness, so that his (witness) memory loss or inability to identify the petitioner is somehow the petitioner's fault. And again the State produced not evidence that would support that prejudicial suggestion.

The prosecutor's conduct, those prejudicial suggestions and insinuations, were not isolated, momentary aberrations occuring in the heat of the trial, but were deliberate, calculated and a suffessful effort to prejudice the defendant by references to matter that was not in evidence. Such tactics cannot be tolerated. BERGER v. UNITED STATES, 295 U.S. 78 (1955); also, UNITED STATES v. PHILLIPS, 476 F. 2d 538 (1973).

The suggestions or insinuations that the petitioner had someone approach State witnesses on the street, prior to trial, in order to intimidate them did not stop with the three incidences demostrated above.

During the State's closing arguments, Cynthia Kelsey stated : "Othello Predoux also said there were too people out there, other people say is there were less people out there. Everyone agrees that it seemed like alot. They blocked the street. Keep in mind someone approaches Mr. MAYS

between the time he gives the statement to the police -- Mr. MAURER: Objection, your Honor.
The Court: Once again, your recollection will control. Mrs. Kelsey: Someone approached Mr. MAYS between
the time that he gave a statement to the -- shortly after he gave a statement to the police officers.
And the fact that person approached him made him afraid. He called Dt. Brock. Keep that in mind, also,
( A-167 ).

The prejudicial suggestion here is obvious. The State argued to the jury that the large group of
people on the street that night were allegedly this "Double-Deuce" group/gang. That the petitioner
was a member of this alleged "Double-Deuce" group/gang. And someone out of this alleged
gang approached VERNON MAYS after he'd given a statement to investigators. That someone
scared him. The insinuation being that, that someone was acting on behalf of the petitioner or
at his directives. This suggest witness tampering, specifically that the petitioner had the where-
withal to tamper with the judicial process. Again, no evidence was ever admitted at trial
to support any of the prejudicial suggestions the State pressed upon the jury.

Except in cases of abuse with strong potential for harm to the **defendant; U.S. v. HAWKINS,
480 F.2d 1151 (1973);** the custom of courts in responding to instances of courtroom misconduct by
prosecutors has been to issue a verbal rule. Despite these verbal slaps on-the-wrist, prosecutorial
misconduct continues to provide "one of the most frequent contentions of defendant's on appeal."
[Our] experience thus suggest that courts must begin to take prophylactic consideration together
with probable prejudice to defendant in deciding whether to reverse. **UNITED STATES v. FREEMAN,
514 F.2d 1314, 1518 (1972).** There is, after all, every reason to believe that reversal will have a
greater impact than a reprimand accompanied by affirmance. In this area, unlike the realm
of police misconduct addressed by the Fourth Amendment exclusionary rule, the burden of
reversal falls directly on the one responsible for the misconduct. See

The State's repeated suggestions and insinuations that the petitioner, as a member of the
alleged "Deuce-Deuce" group/gang, had people approach State witnesses on the street, prior to
trial and intimidated or coerced them when not a shred of evidence supported these suggestions,

this violated the petitioner's right to a fair trial. BROWN v. UNITED STATES, 370 F. 2d 242, 246 (1966)
The State's suggestions were both prejudicial and implied actions on the part of the petitioner,
when no competent evidence was admitted to support this argument. JOHNSON v. U.S. supra.

The integrity of the trial was undermined and the conviction obtained through the use of
deliberate, calculated and repeated suggestions or insinuations not supported by evidence. No one can
argue with any degree of certainty that the jury did not begin to view the petitioner as the architect
of a trial, at which witnesses were scared to identify him in court. This due to his alleged member-
ship in what was described as, but not called, a street gang. If the State had produced competent
admissible evidence to support its prejudicial suggestions than the jury would have been justified
if it drew the conclusions the State's insinuations purported. But the State failed in that regard.
The repeated suggestions of witness tampering and gang affiliations cast the petitioner as a
"Dangerous Man" likely guilty of the crime charged. The State's suggestions definetly influenced
the jury both improperly and prejudicially. Indeed, if only one juror is improperly influenced,
a defendant in a criminal case is denied his SIXTH AMENDMENT right to an impartial jury.
UNITED STATES v. HENDRIX, 549 F. 2d 1225 (9th Cir. 1977).

The SIXTH AMENDMENT to the Constitution of the UNITED STATES guarantees that : In all criminal
prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial
jury. The right to an "impartial jury" is not only guaranteed by the Constitution of the State
of Delaware, but the SIXTH AMENDMENT's guarantee of an impartial jury has been applied to
the states through the Due Process clause of the 14th Amendment. As the U.S. SUPREME COURT
held in, IRVIN v. DOWD, 366 U.S. 717 (1961).

## ARGUMENT V

THE PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS 5TH AND 14TH
AMENDMENT RIGHTS WHEN THE TRIAL ABUSED HER DISCRETION BY ELECTING NOT
TO GIVE A, **SUA SPONTE**, CURATIVE INSTRUCTION.

### STANDARD AND SCOPE OF REVIEW

The petitioner must establish that trial error was not merely an abuse of discretion,
but was so grave as to amount to a denial of constitutional right to substantive due process.

On October 25, 2002, the third day of trial, during morning proceedings. There was a
lull in activity directly after state witness, MATHEW CHAMBLEE, was excused as a witness and
the State was preparing to call its next witness. The bailiff chose that inopportune time to walk
from the front of the courtroom into the rear of the courtroom and from the center aisle began
pointing into the section directly behind the petitioner at several people. Indicating, in a very
nondiscreet manner that several women seated in that section needed to immediately get
out of the courtroom. Because there was approximately 25-30 people seated in the section
reserved for the petitioner's family. The women, who the bailiff was referring to were unsure
exactly whom was being singled out. As a result, people began pointing at themselves or at
the person to their left or right trying to figure out who the bailiff was referring to.

By this time the entire courtroom had focused in on the commotion unfolding directly
behind the petitioner in the rear of the courtroom, including a perplexed trial judge, both the
defense and state's attorneys and an apprehensive jury. Eventually two women were singled
out and disrespectfully ejected from the courtroom. The two women, not being aware of
their wrongdoing, were clearly upset, verbally disagreeing with the bailiff's decision to
eject them from the courtroom. Several additional people exited the courtroom on the
heels of the bailiff and the two women.

The trial judge, clearly not knowing what had actually transpired, haulted the State's

attempt to continue with their case until the bailiff returned. Meanwhile, the jury witnessed the entire commotion and was clearly shaken by the situation, which had a very negative aura that permeated the trial. As if impeding doom had been narrowly averted. Roughly several minutes later, the bailiff came back into the courtroom accompanied by several other bailiffs and capital police in a visibly heightened show of security.

At sidebar defense counsel was appraised of the nature of the bailiff's unauthorized ejections. Defense counsel immediately asked to have the jury removed from the courtroom, at which point the issue was argued on the record. (A-139-141) Defense counsel did not request a curative instruction. (See GROUND ELEVEN).

In the Rule 61 motion, the petitioner argued that the judge abused her discretion by electing not to give a, sua sponte, curative instruction to mitigate any prejudice the jury may have unjustifiably attributed to the petitioner, due to the bailiff's unauthorized ejections of his family and friends from the courtroom. (See Rule 61 motion-Ground five)

In the Courts order denying the Rule 61 motion, Judge Johnston's response to this allegation was: ". . . . Defendant's contention that the trial judge abused her discretion by allowing unauthorized ejection of defendant's family and friends by the bailiff is not supported by the record. (Court's order-pg. 8). Judge Johnston's response indicates that either the event leading to this allegation never transpired or the record was not thoroughly reviewed. If the record was insufficiently reviewed, it is impossible to ascertain how Judge Johnston came to the conclusion that this allegation had been formerly addressed thus barred pursuant to Super. Ct. Crim. R. 61 (i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION , the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c). Where state courts refuse to consider petitioner's claim because he failed to comply with independent and adequate State procedural rules, his claims are deemed exhausted but procedurally defaulted unless the petitioner

establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. See, LINES v. LARKINS, 208 F.3d 153 C.A.3(Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del.2003. The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ for habeas corpus petition, the petitioner argues that he was denied due process because of the trial judge's abuse of discretion in electing not to give a, sua sponte, curative instruction to the jury after a bailiff's unauthorized ejections of his family and friends from the courtroom in a negative manner that caused a negative commotion in plain view of the jury, in light of the State's repeated suggestions of the petitioner's gang affiliations.

Courts must take steps by rules and regulations that will protect their processes from prejudicial outside interferences, and neither prosecutors, defense counsel, the accused, court staff nor enforcement officers coming under jurisdiction of the court should be permitted to frustrate its function. See, SHEPPARD v. MAXWELL, 384 U.S. 333 (1966). The trial judge must maintain control of the courtroom at all times. Decisions to eject or permit the public into the courtroom does not rest with a bailiff. This because an accused has a right to a public trial guaranteed by Constitution in the 6TH and HTH Amendments. See, U.S.C.A. Const. Amend. 14. This ensures that the petitioner's family and friends were permitted to attend this trial.

The bailiff involved in this situation specifically stated; "that its, I have the discretion to use whatever I can to remove these people right now. . . . "(A-141). That discretion is not the bailiff's but is actually the trial judge's. The bigger problem here is apparent. The bailiff felt the need to make such a potentially prejudicial decision without the Court's authorization in view of the jury. And that was due, in large part, to the highly corruptive gang affiliations suggestions and insinuations injected into this trial by the State. The prosecution's "Double-Deuce" group/gang suggestions coupled with the State's eyewitnesses' evasive testimony so infected this trial that even security and enforcement officers

41

conducted themselves in a manner that encroached on the petitioner's right to a fair trial. In fact, the bailiff specifically stated her reason for making the prejudicially unauthorized ejection was: ". . . and with the gang-related relations that we have in the Courts, hand signals, eye contact, those things can be effective in the Court system and they can take us out." i.e. kill courtroom personnel. This statement strongly demostrates that the gang associations suggested by the State caused security and enforcement officers to react irrationally to common occurrences, such as the petitioner acknowledging his family's presence in the courtroom, which ultimately led to the bailiff making a prejudicial ejection, in view of the jury, without authorization from the trial judge. In turn the jury may have attached some wrong doing to the petitioner since the commotion involved his family and friends seated directly behind him.

Because the negative commotion did not amount to a courtroom outburst; ASHLEY v. STATE, 798 A.2d 1019 (Del. 2002); defense counsel did not think a curative instruction was necessary.(A-140). But a special burden, as usual, rest on the trial judge to control the conduct of the court's officers and the trial judge should act at times even without an objection. WASHAM v. STATE, 235 A.2d 280 (1967).

To obtain a reversal on direct appeal, a defendant need not show that [the denial of a continuance] denied him due process; he need only show that the [denial] was an abuse of discretion. In these cases, an abuse of discretion is defined as a trial error that "materially prejudices the defendant." Courts also describe this inquiry in other words with the same effect, whether the trial court's [denial of a continuance] prejudiced the defendant's "substantial rights" tracking the language of Federal Rule of Criminal Procedure 52(a) which provides that any error that "does not affect substantial rights shall be disregarded."

An applicant for habeas corpus, on the other hand, must show more than prejudice to his substantial rights, because the habeas writ issue only to correct errors of constitutional magnitude. The petitioner must, therefore, establish that trial error was not merely an abuse

of discretion, but was so grave as to amount to a denial of his constitutional right to substantive due process, this is, that the error made the trial fundamentally unfair. **KIRKPATRICK v. BLACKBURN, 777 F. 2d 272, 278-279 (5TH CIR. 1985).**

The burden rests with the petitioner to show more than prejudice to his substantial rights because the habeas writ issues only to correct errors of constitutional magnitude. The petitioner will concede that standing alone the trial judge's failure to give a sua sponte curative instruction does not amount to a constitutional error. But when coupled with the State's gang suggestions, which ultimately caused the bailiff's unauthorized ejections, the trial judge's decision to forego a curative instruction amounts to a constitutional error. This because the State's suggestions and the heightened security only highlighted that State's suggestions that the petitioner was a gang member. A man worthy of the heightened security and drastic decisions by security during the trial. The State's suggestions deteriorated the judicial calm of the petitioner's trial. Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. **U.S.C.A. CONST. AMEND. 14.** The bailiff's unauthorized ejections and the trial judge's failure to give a curative instruction lengthened the tear in the fabric, that symbolizes a fair trial.

No one can argue that the jury did not associate some wrong doing on the petitioner's part, since the two women ejected were seated directly behind him, therefore associated to him. On the road to a fundamentally unfair trial the trial judge's inability to control the conduct of the State's attorneys and by extention the court's officers only added fuel to the fire that unfairly influenced the jury to believe that the petitioner was a "DANGEROUS MAN", likely guilty of the crimes for which he was on trial. Indeed, if only one juror is improperly influenced, a defendant in a criminal case is denied his 6TH Amendment right to an impartial jury. **U.S. v. HENDRIX, 549 F. 2d 1225 (9th Cir. 1977).** As such, a sua sponte curative instruction was needed, if not warranted, due to bailiff's unauthorized ejections.

## ARGUMENT VI

THE CUMULATIVE ERRORS COMMITTED DURING THE PETITIONER'S TRIAL, THREE OF WHICH PROMPTED MISTRIAL APPLICATIONS, VIOLATED DUE PROCESS CAUSING THE TRIAL TO BE FUNDAMENTALLY UNFAIR.

### STANDARD AND SCOPE OF REVIEW

The court must apply a cumulative error analysis to trial errors to determine if there was a deprivation of due process.

There were three errors committed in the petitioners trial that prompted mistrial applications. The first error revealed to the jury the fact that defense counsel had previously represented a State witness, when the witness made a flippant non-responsive comment in the midst of an aggressive cross examination. The witness' comment destroyed counsel's credibility in the mind of the jury, in violation of the petitioner's SIXTH AMENDMENT right to counsel. The error was argued at trial(A-192   ); was the basis of a motion for new trial and an argument on direct appeal. See, STATE v. FLOWERS, 858 A.2d 328 (Del. 2004)

The second error revealed to the jury the extremely prejudicial fact that the petitioner had previously been incarcerated. i.e. had prior troubles with the law. This after the State asked an open ended question of the petitioner's sister after being warned, moments earlier, to lead the witness to avoid the jury from hearing that prejudicial information. In that the petitioner did not testify at trial and had taken extreme steps to insulate the jury from learning about his prior criminal troubles, the error was devastating. The issue was argued at trial(A-190-191); was the basis of a motion for new trial and an ground on direct appeal. STATE v. FLOWERS, supra.

The third error occured during the direct examination of the State's final witness, Dt. Brock. During an extremely prejudicial examination at which defense counsel had to object a total of fives times due to the State's attempt to correct, doctor and bolster

.14

State witnesses' testimony, prior taped statements and their drawn maps through Dt. Brock. This after each witness had already testified and the corrections, doctoring and bolstering was not done through them(witnesses). The State then asked Dt. Brock about interviews that he had with people who were not witnesses in the trial and asked Dt. Brock to comment on the attitude of these people. Whether they were or were not cooperative with investigators. Defense counsel objected, requested that the jury be removed and then moved for a mistrial with prejudice. Arguing that the State was goeding the defense, seeking to get a mistrial by eliciting blatant hearsay. The objection was sustained but the mistrial application was denied. (A-158-159).

In the defendant's Rule 61 motion, the defendant argued that the three errors cumulatively amounted to plain error. The defendant asked the review court to weigh the cumulative effect of those errors to determine whether there was prejudice amounting to plain error. WRIGHT v. STATE, 405 A. 2d 685, 690(Del. 1979). (See Rule 61 Motion-Ground Six).

In the Court's order denying the Rule 61 motion, Judge Johnston individually rehashed the petitioner's motion for new trial and direct appeal arguments regarding those errors. Alluding to both the Superior Court's order denying the motion for new and the Delaware Supreme Court's opinion affirming the conviction. Judge Johnston seemed to totally ignore the defendant's argument that the errors cumulatively amounted to plain error and that was the petitioner's request of the review court. Subsequently, the argument was deemed formerly adjudicated thus barred pursuant to Super. Ct. Crim. Rule 61(i)(4). (See Superior Court's Order).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254 (b)(c). Where state courts refuse to consider petitioner's claim because he failed to comply with independent and adequate State procedural rules, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default.

LINES v. LARKINS, 208 F.3d 153 C.A.3 (Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del. 2003. The petitioner satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this petition for writ of habeas corpus, the petitioner argues that the three errors committed at trial cumulatively amount to plain error that denied the petitioner due process, causing the trial to be fundamentally unfair. See, DERDEN v. McNEEL, 938 F.2d 605 (5th Cir 1991). Cumulative error analysis is warranted. Id.

It has been the law for some time that one error in a trial can violate a petitioner's 14th Amendment right to due process. See, e.g. COOPER v. WAINWRIGHT, 807 F.2d 881, 888-89 (11th. Cir. 1986). Several errors taken together can also violate a petitioner's right to due process and cause the trial to be fundamentally unfair. LUNDY v. CAMPBELL, 888 F.2d 467, 481 (6th Cir. 1989); WALKER v. ENGLE, 703 F.2d 959, 963 (6th Cir. 1983).

Federal courts review of habeas petitions are for a "constitutional infraction of the defendant's due process rights which would render the trial as a whole fundamentally unfair." See, LAVERNIA v. LYNAUGH, 845 F.2d 493, 496 (5th Cir. 1988)(citation and quotation omitted). "The test applied to determine whether a trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted." KIRKPATRICK v. BLACKBURN, 777 F.2d 272, 278-79 (5th Cir. 1985). The Court has no set formula to perform a cumulative error analysis and each case must be independently examined. LAVERNIA v. LYNAUGH, supra. In DERDEN v. McNEEL, supra., the Court stated: "We held that federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where: 1. the individual errors involved matters of constitutional dimension rather then mere violations of state law; 2. the errors were not procedurally defaulted for habeas purposes; and 3. the errors so infected the entire trial that the resulting conviction violated due process." (citing CUPP v. NAUGTEN).

With respect to the standard above the petitioner asserts: 1. The first error committed at trial eviscerated defense counsel's credibility with the jury. HUNTER v. STATE, 815 A.2d 730(Del. 2002). The defendant, like all defendants in the judicial system, was entitled to the effective assistance of counsel. STRICKLAND v. WASHINGTON, 466 U.S. 688(1984); ALBURY v. STATE, 551 A.2d 53(Del. 1988). When counsel's credibility was destroyed, the petitioner's 6TH AMENDMENT rights were violated.

The second error committed at trial exposed the jury to perhaps the single most prejudicial type of information that can be brought to the attention of the jury. BROOKENS v. STATE, 354 A.2d 422(Del. 1976). It is established that if only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his 6TH AMENDMENT right to an impartial panel. Cited in UNITED STATES v. HENDRIX, 549 F.2d 1225(9TH CIR. 1977).

The third error was another demonstration of the State's corrosive theme which had been injected into the trial from opening statements through closing arguments. (See GROUNDS 4 & 15). This being the State's belief that the petitioner was a member of a "Double-Deuce group/gang," whom were all uncooperative with investigators due to some alleged conspiratorial "code of silence" set into motion immediately after the shooting. Since the State's argument was intended to prejudice the petitioner in the minds of the jury, 6TH AMENDMENT right to an impartial jury are violated here as well.

2. The three errors have been presented to the Delaware Courts. The first and second errors having been exhausted within the meaning of 28 U.S.C. § 2254(b)(c). The third error was presented to the Courts in the petitioner's Rule 61 motion. (See Rule 61 motion-Ground 4).

3. The first and second errors can be connected in that they both can be perceived by the jury to mean that defense counsel was attempting to hide something from them. Such as the petitioner's prior incarceration. Standing alone the two errors destroyed key defense strategies due to no fault of the defense. The State never instructed its witness not to mention defense counsel's prior representation of the witness. Neither did the trial judge until after the prejudicial error had substantially affected the trial, although defense

counsel had already forewarned the both parties during the May 8, 2002, office conference hearing.( A-170  ). Additionally, defense counsel warned the State before the open-ended question was even put to the witness, after defense counsel had just barely prevented the witness from revealing the prejudicial information to the jury. The third error was/is thoroughly argued in GROUNDS 4 and 15 of this petition.

It is important for the Court to keep in mind that in a cumulative error analysis, no single error is ground enough to grant the writ. There must be a cumulation of errors which results in a deprivation of due process. Consequently, the Court should analyze the entire proceeding. DERDEN v. McNEEL, 938 F.2d 605(5TH CIR. 1991).

It is well settled that errors committed during the trial of a criminal case in a state court are not subject to review in a habeas corpus proceeding in a federal court unless it is shown that the errors were so conspicuously prejudicial as to deprive the petitioner of a fair trial. See, JACKSON v. CALIFORNIA, 336 F.2d 521, 524(9TH CIR. 1964); PIKE v. DICKSON, 323 F.2d 856, 860(9TH CIR. 1963). The petitioner has demostrated that the errors were of constitutional magnitude and cumulatively amount to prejudice that deprived him of a fair trial.

## ARGUMENT VII

THE PETITIONER'S CONSTITUTIONAL RIGHT WITHIN THE 6TH AMENDMENTS CONFRONTATION CLAUSE WAS VIOLATED DUE TO THE LACK OF EFFECTIVE CROSS EXAMINATION OF THREE OF THE STATE'S FIVE EYEWITNESSES.

### STANDARD AND SCOPE OF REVIEW

Whether a case by case approach with emphasis on each case's particular facts is appropriate in determining if there has been a violation of the Confrontation Clause due to lack of effective cross examination.

Ronetta Sudler was called by the State to testify on October 23, 2002, as a reluctant witness. Initially, Sudler refused to enter the courtroom (A-184  ), so that stand-by counsel was called in to speak with her, since she refused to speak with the State's attorneys. Sudler had provided investigators with a taped statement on August 11, 1998, in which she identified the petitioner as the shooter on the night in question. After speaking with stand-by counsel, who advised Sudler to take the witness stand and claim memory loss to anything she could not remember. Following that advice, Sudler took the witness stand and claimed not to remember anything from the night in question and nothing from her taped statement (A-184  ). TITLE 11 SECTION 3507 permitted the State to admit Sudler's prior taped statement as affirmative evidence (State's Exhibit #24) and the tape was played for the jury. The State utilized Sudler's prior taped statement at trial and relied heavily on it during closing arguments. Due to Sudler's convenient memory loss, cross examination was confined to the witness' credibility and drug abusive history. (A-127-128).

Tyshiek McDougal was called by the State to testify on October 25, 2002, as a hostile witness. McDougal had provided investigators with a taped statement on August 7, 1998, after being detained as a result of a residence being searched. McDougal indicated in her taped statement that the petitioner had a gun several minutes before the shooting. McDougal was a uncooperative

and hostile State witness, who was held in contempt for several hours for flatly refusing to answer the State's questions or comply with the judge's instructions.(A-196). While held in contempt McDougal spoke with stand-by counsel and asked to speak with the trial.(A-196). Stand-by counsel advised the witness to take the witness stand and claim memory loss to anything she could not remember. McDougal took counsel's advice, taking the witness stand and claiming not to remember all operative facts from the night in question and from her prior taped statement. (A-196). TITLE II SECTION 3507 permitted the State to admit McDougal's taped statement as affirmative evidence (State's Exhibit #34) and the tape was played for the jury. The State utilized McDougal's prior taped statement at trial and relied heavily on it during closing arguments. Due to McDougal's convenient memory loss, cross examination was confined to the witness' reliability and her drug abusive history.

    Othello Predoux was called as a witness for the State on October , 2002. Predoux provided investigators with a taped statement on July 18, 2002, just three months before the trial. Still Predoux claimed not to remember any operative facts from the night in question and nothing from his taped statement at trial. Predoux' attorney, who was present for Predoux' testimony, had previously advised him to take the witness stand and claim memory loss to anything he could not remember. Predoux did just that. (A-145). In as much as Predoux had recently made his statement, defense counsel pressed Predoux on his convenient amnesia. Predoux toyed with the ability to conveniently, if not smugly, forget everything he'd previously spoken about in his taped statement. Going so far as to tell defense counsel during cross examination, that he knew that if he made a prior damaging taped statement and then took the witness stand in the petitioner's trial, and claimed memory loss, that the damaging taped statement would still be admitted into evidence. (A-151-152). Accordingly, TITLE II SECTION 3507 permitted the State to admit Predoux' prior taped statement as affirmative evidence (State's Exhibit #35) and the tape was played for the jury. The State utilized Predoux' taped statement at trial and relied heavily on it during closing arguments. Again, due to Predoux' convenient amnesia, cross examination was confined to the witness' credibility and

motivation for cooperating with the State.(A-150,151).

In the defendant's Rule 61 motion, the defendant argued that his Constitutional rights within the 6TH AMENDMENT'S CONFRONTATION CLAUSE were violated due to lack of effective cross examination of three of the State's five eyewitnesses, which constituted the bulk of the State's case, since the case hinged on eyewitness testimony alone with no physical evidence linking the defendant to the shooting and no motive. The defendant argued that cross examination plays an essential role in the accused's 6TH AMENDMENT right to confront witnesses against him and that role is protected by the 14TH AMENDMENT in State prosecutions. U.S.C.A. CONST. AMEND 6 & 14. When there are instances in criminal trials where a witness claims memory loss which prevents effective cross examination, Delaware Court's interpreted Justice White's opinion in CALIFORNIA v GREEN, 399 U.S. 169-170 (1970), to suggest a case-by case approach with emphasis on each case's particular facts as appropriate in determining whether there has been a violation of the CONFRONTATION CLAUSE due to lack of effective cross-examination. This view is reinforced by DUTTON v. EVANS, 400 U.S. 74 (1970).

In the Court's order denying the Rule 61 motion, Judge Johnston's response was: "In ground seven, defendant claims that the State's case was presented through five eyewitnesses, including three who claimed memory loss at trial, thus hindering effective cross examination. As previously discussed, issues emanating from the testimony of witnesses have been addressed by the Superior Court as well as the Delaware Supreme Court . . . . "page 8. Judge Johnston then refered to the Superior Court's order denying the defendant's motion for new trial which took into account the silence of some witnesses.

Neither the trial judge or the Delaware Supreme Court seemed to dispute that the three State's eyewitnesses mentioned above were less than forthcoming on the witness stand at trial. Both noting the silent, evasive, reluctant testimony of all three witnesses. But acknowledging the three witnesses' silence and determining if the petitioner's constitutional rights within the 6TH AMENDMENT'S CONFRONTATION CLAUSE were violated due to lack of effective

cross examination was never an argument the petitioner posed to either court. Neither did either court address the argument sua sponte. As such the argument could be barred pursuant to Super. Ct. Crim. R. 61 (i)(4)

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c). Where state courts refuse to consider petitioner's claims because he failed to comply with independent and adequate State procedural rule, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. LINES v. LARKINS, 208 F.3d 153 C.A.3 (Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D. Del. 2003. The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this petition for writ of habeas corpus, the petitioner argues his Constitutional rights within the 6TH AMENDMENTS CONFRONTATION CLAUSE were violated because Ronetta Sudler, Tyshiek McDougal and Othello Predoux, comprising the bulk of the State's case, claimed memory loss at trial to all operative facts from the night in question and from their prior taped statements, which hindered the petitioner's ability to effectively cross examine each witness.

At trial, the petitioner was presented with a problem that had no solution. The bulk of the State's case was presented through TITLE 11 SECTION 3507. The eye witnesses were presented for cross examination but had been coached to claim memory loss to any and all questions that they did not want to answer. TITLE 11 SECTION 3507 permitted the State to utilize the prior damaging taped statements to their benefit, while attempts to cross examine the witnesses about the contents of their damaging taped statements were met with convenient memory loss. Attempts to cross examine the witnesses about the night in question likewise was met with convenient memory loss.

The 6TH AMENDMENT'S right of an accused to confront the witness against him is a fundamental right made obligatory on the State's by the 14TH AMENDMENT, See, POINTER v TEXAS, 380 U.S. 400 (1965); see also, DOUGLAS v. ALABAMA, 380 U.S. 415 (1965); BROOK-HART v. JANIS, 384 U.S. 1 (1966); BARBER v. PAGE, 390 U.S. 719 (1968); ROBERTS v. RUSSELL, 392 U.S. 293 (1968); ILLINOIS v. ALLEN, 397 U.S. 337 (1968).

From the viewpoint of the CONFRONTATION CLAUSE, a witness under oath, subject to cross examination and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard. DUTTON v. EVANS, 400 U.S. 74 (1970). But even among proponents of the view that prior statements should be admissible as substantive evidence, disagreement appears to exist as to whether to apply this rule (here that rule being TITLE II SECTION 3507) to the case of a witness, who disclaims all present knowledge of the ultimate event. Commentators have noted that in such a case the opportunities for testing the prior statement through cross examination at trial may be significantly diminished. CALIFORNIA v. GREEN, 399 U.S. 169-170(1970). Here, the Court must agree that the petitioner's ability to effectively cross examine the three witnesses mentioned above severly hindered. There was no way to test the recollection and sift the conscience of either witness regarding the facts of the shooting if they are unwilling or unable to be questioned about it. Defense counsel cannot probe the story of a silent witness and attempt to expose facts that qualify or discredit it. Neither can defense counsel cross examine a video tape.

On the opposite side of the adversarial process, TITLE II SECTION 3507 permitts the State to admit and utilize the damaging taped statements irregardless of the witness' in-court testimony. Here the three eyewitnesses' claimed memory loss to all operative facts from the night in question and to their prior taped statements. Still TITLE II SECTION 3507 allows the State to utilize those damaging statements. In this trial, those taped statement, the content of those taped statements, literally went unchallenged from the State's introduction of them during the trial, to the jury for consideration during deliberation.

For purposes of the CONFRONTATION CLAUSE there is no significant difference between a witness who fails to testify about an alleged offense because he is unwilling to do so and a witness who's silence is compelled by an inability to remember. Both are called to the stand to testify. The jury may view the demeanor of each as he indicates why he will not discuss the crucial events. But in neither instance are the purposes of the CONFRONTATION CLAUSE satisfied, because the witness cannot be questioned at trial concerning the pertinent facts. In both cases, if a pre-trial statement is introduced for the truth of the facts asserted, the witness becomes simply a conduit for the admission of stale evidence, whose reliability can never be tested before the trial fact finder by cross examination of the declarant about the operative events, and by observation of his demeanor as he testifies about them. CALIFORNIA v. GREEN, SUPRA. In this trial, Ronetta Sudler, Tyshiek McDougal and Othello Predoux were simply conduits through which the State was able to admit untested, stale statements, whose reliability could never be tested by cross examination since each witness conveniently claimed memory loss.

TITLE II SECTION 3507, when employed in this type of scenario seems then to conflict with the 6TH AMENDMENT'S CONFRONTATION CLAUSE. Accordingly, to introduce the prior taped statements of the three eyewitnesses for the truth of the facts asserted, when each witness is in court but unwilling to testify regarding the pertinent events from the night in question and more importantly the prior taped statements denies the accused his 6TH AMENDMENT right to grapple effectively with incriminating statements. TITLE II SECTION 3507, which makes admissible prior statement at trial as affirmative evidence inevitably conflicts with the CONFRONTATION CLAUSE. This because absent effective cross examination of Sudler, McDougal and Predoux, the jury was left with only the unelucidated, clearly damning and patently damaging accusations asserted in each witnesses' prior taped statement. DUTTON v. EVANS, SUPRA.

Effective cross examination resulted in both of the State's remaining witnesses, VERNON MAYS and MATHEW CHAMBLEE, recanting their identification of the petitioner, as the shooter. (A-110,138). The petitioner was denied a full and fair opportunity to discredit the remaining three witnesses

damaging taped statements due to their convenient, if not coached, memory loss. Admission in the absense of cross examination of certain types of suspect and highly damaging statements is one of the threats to a fair trial against which the CONFRONTATION CLAUSE was directed. BRUTON v. U.S., 391 U.S. at 136(1968).

Further, the Court must consider the effect of the highly prejudicial theme argued to the jury by the State in this case. (See GROUNDS 4 & 15). The State argued throughout the petitioner's trial that he was a member of an alleged "Double-Deuce group/gang," who were uncooperative with investigators because they all were conspiratorially operating on a "code of silence" immediately after the shooting. The record frequently reflects that the State clearly attempted to establish that Sudler, McDougal and Predoux were friends of the petitioner, even arguing that point during summation to the jury. (A-203). Therefore, the State obviously wanted the jury to believe that Sudler, McDougal and Predoux' convenient memory loss was designed to help the petitioner. Further promoting the State's belief in this alleged "code of silence." The circumstances were such that the jury could infer from each witnesses' refusal to answer questions added critical weight to the prosecution's case in a form not subject to cross examination, and thus unfairly prejudiced the petitioner. See, NAMET v. UNITED STATES, 373 U.S. 179, 187, 83 S.Ct. 1151, 1155, 101 L.Ed. 2d 278(1963); see also, FLETCHER v. UNITED STATES, 118 U.S. App. D.C. 137, 332 F.2d 724(1964).

As such, in this writ of habeas corpus, the petitioner asks this court to review this case's particular facts to determine whether there has been a violation of the CONFRONTATION CLAUSE due to lack of effective cross examination.

## ARGUMENT VIII

THE PETITIONER WAS DENIED DUE PROCESS IN VIOLATION OF HIS 5TH AND 14TH AMENDMENT RIGHTS DUE TO THE STATE'S ELICITATION AND UTILIZATION OF FALSE TESTIMONY TO OBTAIN HIS CONVICTION.

## STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's due process rights that would render the trial, as a whole, fundamentally unfair.

This allegation has been seperated into two arguments which highlight two instances at trial in which the State elicited and utilized false evidence to obtain the petitioner's conviction. The seperation is warranted to avoid confusion of the issues.

The first instance occured during the direct examination of Othello Predoux. The State wanting to dispell the fact that PREDOUX' sole motivation for cooperating with the State was because he had received a reduced plea in one of two cases he had pending against him when he was approached by the State. And further hoped to receive another reduced plea regarding his remaining drug case after the penitioner's. Intent on broaching the subject first, the State asked PREDOUX a line of questions that led to him denying that any promises or agreements had been made to him regarding his charges. ( A·143 ).

The second instance occured during the State's closing arguments. There, Cynthia Kelsey argued to the jury, that no eyewitnesses interviewed by investigators definetly says they saw JOE HARRIS shooting at the victim's vehicle on the night in question. (A-164). This when the State was attempting to explain away Ronetta Sudler's taped statement remarks that JOE HARRIS shot at the vehicle driven by the victim.

In the Rule 61 motion, the defendant argued that the State outright lied to the jury when making the closing argument remarks. The defendant asked Judge Johnston to reserve making a determination on the allegation until the Court had a chance to review the

suppressed exculpatory statements from MARVIN SWANSON and BRUCE DUNCAN. The petitioner asked the Court to expand the record pursuant to Super. Ct. Crim. R. 61(h), to make that review possible in light of the BRADY violations argued in GROUND NINE of the Rule 61 Motion. (See Rule 61 Motion- Ground Eight).

In the Court's order denying the Rule 61 motion, Judge Johnston's response to this allegation was: "... This is essentially the same argument that defendant raised in this very motion styled as prosecutorial misconduct. The Court has found this issue to have been adjudicated." (Court's Order pg-9).

As forwarded in the **BRIEF IN SUPPORT FOR EXCUSION**, the Delaware Supreme Court has not addressed this argument, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c), where state courts refuse to consider petitioner's claim because he failed to comply with independent and adequate State procedural rules, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. LINES v. LARKINS, 208 F.3d 153 C.A.3 (Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del. 2003. The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ of habeas corpus, the petitioner argues that he was denied due process in violation of his 5TH and 14TH AMENDMENT rights due to the State's elicitation and utilization of false testimony to obtain his conviction.

Since the conclusion of this trial, there has been an important change in the circumstances surrounding whether State witnesses received benefits for cooperating with the State and the fact that this exculpatory evidence was suppressed by the State. As forwarded in GROUND ONE of this petition, State witness MARVIN SWANSON was released from serving a five year jail sentence after he gave a part incriminating, part exculpatory statement to investigator. The benefit awarded to SWANSON coupled with the prepositioned posed to MAROCKA JETER, negates the prosecution's argument at trial that "NO DEALS" were given to State witnesses in exchange for

their cooperation.

In Ground One of this petition, the petitioner has demostrated a clear pattern by the State and Dl.Brock, where they approached men and women after they'd been arrested on serious charges and propositioned to make damaging statements against the petitioner in exchange for deals, reduced pleas or leniency regarding those charges. The this pattern is exactly how SWANSON and Predoux came to be State witnesses. With the important changes coming to light, the State's "NO DEALS" position is cast in serious doubt.

Regarding the first instance at trial in which the State elicited false testimony from Othello Predoux, the Court will need to reach three seperate determinations before this allegation can succeed.

1. The Court would need to acknowledge or find merit in the petitioner's argument that the State prosecutors along with Dl.Brock did approach witnesses(men and women) after their arrest on serious charges with the sole purpose of soliciting damaging statements against the petitioner in exchange for benefits for cooperating.(An issue raised in Ground One of this petition). 2. The Court will need to acknowledge that SWANSON did receive a benefit for his cooperation with the State.(An issue raised in Ground One of this petition). And; 3. Determine whether Predoux did receive benefits for his cooperation with the State, after it has been established that the State approached him while he was incarcerated with two sets of serious charges pending against him.(An issue raised in Ground Two of this petition).

If the Court can find merit in all three points above, then the Court should be able to reach a determination of this allegation. This because to find merit in the three points above means by extention that the State already knew that Predoux had received a reduced plea on one set of charges and would receive another reduced plea on the remaining set of charges. Therefore, in asking the question of Predoux and then allowing Predoux response to go uncorrected before arguing a "NO DEALS" position, The State elicited and utilized false testimony. It is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State must fall under the 14TH Amendment. See, **MOONEY v. HOLOHAN, 294 U.S. 103(1935)**;

also, PYLE v. KANSAS, 317 U.S. 213 (1942). The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. ALCORTA v. TEXAS, 355 U.S. 28 (1957). The State's eliciting of false testimony from PEEDOUX and its trial argument that "No DEALS" were awarded to State witnesses, violated the petitioner's due process rights protected by the 14TH AMENDMENT. ALCORTA v. TEXAS, supra. Further, where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured, a BRADY violation occurs. UNITED STATES v. AGURS, 427 U.S. 97 (1976).

In regards to the second instance at trial, when the State's attorney argued during closing argument to the jury that no one says for certain that they saw JOE HARRIS shooting. (A-164). In order for the petitioner to prove that the State told an outright lie to the jury and that more than one witness indicated to investigators that JOE HARRIS shot at the vehicle driven by the victim. The Court will need to first review the exculpatory BRADY statements of BRUCE DUNCAN and MARVIN SWANSON. The Court must keep in the fact in mind that the State suppressed both witnesses statements. (See GROUND NINE). (Pursuant to 28 U.S.C. § 2254, RULE 6(a)(b), the petitioner has subsequently included motions to invoke discovery and expansion of the record to include, inter alia, this suppressed exculpatory BRADY evidence.)

Prior to the filing of this petition, three things have been established: 1. State witness MARVIN SWANSON did identify a second shooter on the night in question when he was interviewed at GANDER HILL. 2. BRUCE DUNCAN gave an exculpatory BRADY statement to investigators that was also suppressed by the State. In addition to this statement, DUNCAN drew a map to correlate with his statement, which the State did turn over to the petitioner. (A-15-16). On the map, the area of 22ND & LAMOTTE STREET is drawn along with several structures which depicts houses and vehicles from the night. On the map is the name of the petitioner and the name "JOE" which obviously indicated where each individual was positioned on 22ND & LAMOTTE STREET when the victim was shot. Careful review of the record shows that the only individual named "JOE" associated with the investigation of this shooting

was JOE HARRIS, a man interviewed within 24 hours of the shooting.( A-83  ). And; 3. State witness Ronetta Sudler identified JOE HARRIS as a shooter in her taped statement on August 11, 1998, (State's Exhibit #24). A point the State briefly touched on during summation.

The petitioner will ask the Court to reserve making a determination on this allegation until the State has turned over to the petitioner and the Court, the suppressed BRADY evidence indicated above. After the Court is able to review the exculpatory BRADY statements from SWANSON and DUNCAN, the Court will be able to factually verify two things: 1. The identity of the second shooter, identified by SWANSON. And; 2. The nature of DUNCAN'S inclusion of JOE HARRIS in his statement. I.e. whether DUNCAN identified JOE HARRIS as the shooter on the night in question when he was interviewed.

Once the Court is able to verify those two crucial facts then the Court will be able to determine whether the State utilized false evidence to obtain the petitioner's conviction. In other words, whether the State's attorney outright lied to the jury by arguing that no one definetly said they saw Joe HARRIS shooting at the vehicle driven by the victim. If both SWANSON and DUNCAN identified JOE HARRIS as a shooter on the night in question, in addition to Sudler. Then that totaled three eyewitnesses who indicated to investigators the very real fact that JOE HARRIS shot at the vehicle driven by the victim on the night in question. A fact the State had to have known prior to trial. To argue anything else to the jury must mean that the State utilized lies to convict the petitioner. A New York Court of APPEALS stated in part: ". . . .A lie is a lie , no matter [360 U.S. 270] what its subject and if it is in any way relevant to the case, the district attorney has a responsibility and duty to correct what he knows to be false and elicit the truth. . ." See, PEOPLE v. SAVVIDES, 1 N.Y. 554, 557; cited in, NAPUE v. ILLINOIS, 360 U.S. 264 (1959).

The State's elicitation and utilization of false testimony to obtain his conviction violated the petitioner's due process rights.

## ARGUMENT IX

THE STATE COMMITTED A BRADY VIOLATION BY WITHHOLDING EXCULPATORY BRADY
EVIDENCE AFTER MULTIPLE GENERAL AND SPECIFIC REQUEST FROM THE PETITIONER,
WHICH PRECLUDED ITS USE BY PETITIONER AT TRIAL, THUS RENDERING THE TRIAL
FUNDAMENTALLY UNFAIR IN VIOLATION OF PETITIONER'S 5TH AND 14TH AMENDMENT RIGHTS.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's
due process rights that would render the trial, as a whole, fundamentally unfair.


Thomas Pedersen Esq. (PEDERSEN) was appointed to represent the petitioner as a conflict
attorney on May 18, 2000. In the course of that representation PEDERSEN attended an office conference
on TUESDAY, May 15, 2001. At that office conference State prosecutor James(Jim) Rambo indicated
to PEDERSEN, that the State had recently come into possession of a video taped interview
conducted with an inmate at GANDER HILL, in which the State was advised that there was
an additional shooter besides the petitioner on the night in question. (A-19-20). PEDERSEN
notified the petitioner of the development by letter dated May 29, 2001. (A-18  ) Subsequently,
PEDERSEN sent a letter to State prosecutor James Rambo dated May 31, 2001, specifically requesting
that exculpatory BRADY evidence. (A-19-20).

By July 2001, the State still had not turned over the exculpatory BRADY evidence. There was
speculation between PEDERSEN and the petitioner about the identity of the GANDER HILL
witness being an individual named LAMAR MARVIN SWANSON. That speculation centered
around the fact that SWANSON had been recently released from GANDER HILL just months
after beginning a five(5) year sentence following a drug conviction(A-96 ) and his release
suspiciously coincided with the timing of the GANDER HILL witness' statement. In as much as
PEDERSEN, while representing SWANSON in an unrelated case, had explored the possibility with
SWANSON of him becoming a defense witness based upon his two(2) August 1, 1998, statements

PEDERSEN would have a potential conflict of interest if SWANSON was indeed the confidential witness from GANDER HILL. With this possibility looming, PEDERSEN sought confirmation from the State regarding the identity of the GANDER HILL witness and whether this confidential witness was indeed LAMAR MARVIN SWANSON, explaining as much in a letter to the petitioner dated **AUG 3**, 2001. (A -21 )

On **AUG** 20, 2001, PEDERSEN filed a motion to withdraw as counsel after receiving confirmation from the State that MARVIN SWANSON was, in fact, the confidential witness from GANDER HILL who identified an additional shooter from the night in question. Although the identity of the second shooter was still being withheld as well as the exculpatory statement made by SWANSON. PEDERSEN's motion to withdraw set forth these facts to the Court. (A-13-20). The motion was granted on September 21, 2001.

The validity of all above correspondence and legal documents between PEDERSEN and the petitioner, PEDERSEN and the State's attorney and PEDERSEN's motion to the Court is substantiated by Thomas Pedersen in a letter dated January 23, 2006( A- 95 ).

In October 2001, EUGENE J. MAURER, ESQ. entered his appearance on behalf of the petitioner. The October 23, 2001, trial was rescheduled for May 7, 2002. In December 2001, State prosecutor, Cynthia Kelsey, notified defense counsel, MAURER, of the fact that the State had recently interviewed another witness who indicated that the petitioner was not the shooter on the night in question by letter dated December 21, 2001 (A- 14 ). This witness, BRUCE DUNCAN, had also drawn a map for investigators during the interview, a copy of which Mrs. Kelsey enclosed with the December 21, 2001, letter. (A-15-16). On January 2, 2002, MAURER sent a reply letter to Mrs. Kelsey specifically requesting a copy of the redacted BRADY tape as soon as possible. ( A-17 ) Subsequently, MAURER notified the petitioner of the developments by letter dated January 3, 2002. ( A-13 )

On February 8, 2002, MAURER sent a request to State prosecutor's Cynthia Kelsey and James Rambo, requesting all discoverable materials. (A-30-31) With no response from the State, MAURER again sent a request to the State on March 25, 2002, requesting discoverable materials pursuant to Super. Ct. Crim. Rule 16.(A-26-29). Still with no response from the State and an approaching trial date in May 2002, MAURER filed two motions in Superior Court on April 15, 2002.

One motion was for the PRODUCTION OF BRADY MATERIAL, specifically pertaining to four eyewitnesses who had been interviewed by investigators over a four year period since the night in question and had provided the State with exculpatory BRADY statements. (A-33-B). The second motion was to COMPEL PRODUCTION OF DISCOVERABLE MATERIALS (A-39-45).

With all due respect, the petitioner would direct the Court's attention to the motion for the PRODUCTION OF BRADY MATERIAL dated April 15, 2002 (A-35-36). On page 1, number #2, the Court will note that defense counsel requested BRADY material regarding a third witness named BENNY WRIGHT. WRIGHT had given an exculpatory statement to the State in which he indicated that the petitioner was not the shooter on the night in question. Having previously notified defense counsel of this fact, the State did turn over a redacted tape of the interview to MAURER, prior to the filing of the motion. But because the tape was, in large part, unintelligible MAURER requested the current or last known address of the witness, copies of all police interview notes reflecting statements of the witness, copies of all transcriptions of the witness' statement and an intelligible copy of the taped statement.

The fourth witness referred to in the motion for PRODUCTION OF BRADY MATERIAL was an eye witness to the shooting who resided in Baltimore, Maryland. (pg 1, #4). In the supplement report, the petitioner was provided with a redacted copy of the police report, which indicated that this witness observed the shooting. And was shown a photograph line-up which included the petitioner and the witness did not identify the petitioner as the shooter on the night in question. ( A-84  ). The petitioner requested the witness' name and address in order to secur the witness' presence at trial through the Inter-State Compact. (A-36-37).

Despite the repeated general and specific request for the above exculpatory BRADY material, the State still withheld the material. In the Rule 61 motion, the petitioner argued that the State violated BRADY by withholding the exculpatory BRADY material of all four witnesses. Which prevented the petitioner from investigating the identity of the second shooter, securing the four witnesses' presence at trial and utilizing the witnesses and any further information they might have provided to the defense, at trial. This after a specific request, which is seldom, if ever, excusable.

See, UNITED STATES v. AGURS, 96 S.Ct. at 2399 (1974). (Sec; Rule 61 Motion-Ground Nine).

In the Court's order denying the Rule 61 motion, Judge Johnston's response to this allegation was: "In ground nine of the Rule 61 motion, defendant alleges that the State failed to disclose exculpatory BRADY material. However, the defendant's contention that such materials exist, and that they would have been exculpatory, is pure speculation and is not supported by the record." (Court's Order-pg. 9). Judge Johnston went on to deny the Rule 61 motion pursuant to Supee. Ct. Crim. Rule 61(i)(4), although it is well settled Delaware law that when the prosecution fails to disclose material exculpatory evidence in violation of the BRADY rule, postconviction relief can not be procedurally barred, as a BRADY violation undermines the fairness of the proceeding leading to the judgement of conviction. See, JACKSON v. STATE, 770 A.2d 506 (Del. 2001). Because BRADY violations strike at the core of a fair trial, the consequences of a failure to comply with BRADY must be examined carefully. Id. Obviously Judge Johnston failed in this regard.

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C.§ 2254(b)(c). Where state courts refuse to consider petitioner's claim because he failed to comply with independent and adequate State procedural rules, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. LINES v. LARKINS, 208 F.3d 153 C.A.3 (Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del. 2003. The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ of habeas corpus, the petitioner argues that the State committed multiple BRADY violations by withholding exculpatory BRADY evidence after repeated general and specific request from the petitioner, which inturn precluded its use at trial thus rendering the trial fundamentally unfair.

Suppression by the prosecution of evidence favorable to an accused upon request violates due process where evidence is material to guilt or to punishment, irrespective of good faith or bad faith of prosecution. U.S.C.A. CONST. AMEND. 14; BRADY v. MARYLAND, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963).

The Court must keep in mind the State's corruptive practice of approaching men and women after they had been arrested on serious criminal charges, propositioning them to make statements in the petitioner's case (See, GROUNDONE). The State's corruptive practice actually turned out to be a double edged sword, that cut both ways. It has been established that the State approached SWANSON after he was convicted on drug charges. DUNCAN after his apprehension on outstanding warrants and WRIGHT after his arrest on serious charges. Ironically, instead of getting damaging statements from these three men, the State got exculpatory BRADY statements. Then, instead of turning over the exculpatory BRADY evidence, the State would notify the petitioner about the exculpatory statements but then withhold them in violation of the petitioner's due process rights.

The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20TH-CENTURY strictures against misrepresentation and is of course most prominently associated with the Court's decision in BRADY v. MARYLAND, SUPRA; MOONEY v. HOLOHAN, 294 U.S. 103, 112 (1935), and PYLE v. KANSAS, 317 U.S. 213 (1942). In UNITED STATES v. AGURS, 427 U.S. 97 (1976), the Court distinguished three situations in which a BRADY claim may arise: 1. where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured, 427 U.S. at 103-104, 96 S.Ct. at 2397-98; 2. where the Government failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence, id. at 104-107, 96 S.Ct. at 2398-2399; and 3. where the Government failed to volunteer exculpatory evidence never requested or requested only in a general way.

The petitioner's BRADY violation claims fall within the second distinguishment. The State volunteered the exculpatory BRADY material but then failed to accede to multiple request for disclosure of the specific exculpatory BRADY statements of SWANSON, DUNCAN and WRIGHT.

The Court stated in **AGURS** that "when the prosecutor receives a specific and relevant request, failure to make any response is seldom, if ever, excusable." **96 S.Ct. at 2399.**

Next, there are three components of a true **BRADY** violation: 1. The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; 2. the evidence must have suppressed by the State, either willfully or inadvertently; 3. prejudice must have ensued. Cited in, **STOKES v. STATE, 402 A.2d 376 (1978).**

Regarding the three components above: 1. The exculpatory **BRADY** statements and materials, actually are statement put forth by real people, who witnessed the shooting of ALFRED SMILEY (victim). Their eyewitness accounts exonerated the petitioner and further identified another the shooter, placing that unidentified shooter in the exact location from which the fatal shots were fired. This in a case that hinged solely on uncertain and unsure eyewitness testimony with no physical evidence linking the petitioner to the shooting and no clear or established motive. 2. The State obviously possessed the exculpatory evidence because they notified the defense about the statements. Something they surely would not do if the exculpatory evidence did not exist. Therefore, the suppression was willful and intentional. 3. The State's suppression of this exculpatory evidence made the State the architect of a trial that was fundamentally unfair in every aspect. The State held the entire deck of cards and willfully chose to deal a hand to the petitioner that it knew to be rigged in their favor.

The final question is directed to materiality. Four aspects of materiality under **UNITED STATES v. BAGLEY, 473 U.S. 667, 105 S.Ct.3375, 87 L.Ed.2d 481 (1985);** bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presense of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant.), **id. at 682, 105 S.Ct. at 3383-3584. BAGLEY'S** touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would likely than not have received a different verdict with the evidence, but whether in its absence

he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability " of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." **BAGLEY, 473 U.S. at 678, 105 S.Ct. at 3581.**

With the absence of this exculpatory evidence, the petitioner rested his case without calling any witnesses. Still the jury deliberated in excess of 10 hours over the course of three days. This demonstrates that the jury was not totally convinced of the petitioner's guilt or the State's case. The State's prosecution hinged on five eyewitnesses. Two of those witnesses, MATHEW CHAMBLEE and VERNON MAYS, recanted their identification of the petitioner on the witness stand. The remaining three witnesses all claimed memory loss, so that the remaining incriminating statements came in pursuant to TITLE 11 SECTION 3507. In addition to DUNCAN, WRIGHT and the witness from Baltimore, Maryland. There was a fourth eyewitness named CHARMAIN MAYO, who also indicated to investigators that the petitioner was not the shooter on the night in question. The State actually claimed for some 3-to-4 years that MAYO had given a damaging statement to investigators identifying the petitioner as the shooter. (A-85  ). It was only after the State turned over MAYO's taped interview did it become apparent that the witness actually indicated that the petitioner was not the shooter. The State claimed that the mistake was inadvertant. (A-182 ). Excluding the exculpatory statement made by SWANSON who identified a second shooter **in addition to** the petitioner. The State's suppression of the exculpatory **BRADY** material prevented the petitioner from presenting 4 eyewitnesses to the jury, who indicated that the petitioner was not the shooter. Had the jury been given the opportunity to hear from these eyewitnesses, hear their description of events and their identification of who the shooter was. It is highly likely that the jury would have returned with a different verdict. The State's suppression then clearly undermined confidence in the outcome of the trial. It's absence must then mean that the petitioner's trial was unfair.

The second aspect of **BAGLEY** materiality bearing emphasis here is that it is not a sufficiency of evidence test. The petitioner does not need to demonstrate that after discounting the inculpatory [514 U.S. 435] evidence in light of the undisclosed evidence, there would not have been enough

## ARGUMENT X

THE PETITIONER'S 14TH AMENDMENT RIGHTS TO DUE PROCESS WERE VIOLATED BY
CHIEF INVESTIGATOR DT. ANDREW BROCK'S UTILIZATION OF SUGGESTIVE AND CORRUPTIVE
INTERVIEW TECHNIQUES TO ACQUIRE THE UNRELIABLE IDENTIFICATION OF THE PETITIONER,
AS THE SHOOTER, FROM STATE WITNESSES MATHEW CHAMBLE AND VERNON MAYS.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's
due process rights that would render the trial, as a whole, fundamentally unfair.


While investigating the shooting, Dt. Brock did interview VERNON MAYS on August 2, 1998. Review
of the taped interview shows that the interview began at approximately 1:45 P.M. and ran through
to 2:25 P.M. at which point the camera was turned off. The tape began again at 4:00 P.M. and ran
for another 20 minutes. During the hour and thirty-five minutes in which the camera was turned
off, the critical identification of the petitioner, being the shooter, was made by MAYS. It was also
during that time, that MAYS changed his previous description of the details from the shooting,
specifically switching the shooter's gun hand from the left hand to the right hand. (A-108).

At trial, voir dire was conducted with Dt. Brock outside the presence of MAYS, concerning the hour
and thirty-five minutes in which the camera was off, the critical identification was made and MAYS
description of events inexplicably changed. Dt. Brock testified that when the camera went off, MAYS
was transported to another interview room where he viewed photograph trays for approximately
20 minutes before identifying the petitioner as the shooter. Dt. Brock testified that after making
the identification, MAYS was left alone in the room for the remaining hour and fifteen minutes until
he was returned to the first interview room and the remainder of the taped statement was made.
Dt. Brock could give no explanation for the witness' sudden change in details. (A-107-108)

During cross examination, MAYS testified concerning that hour and thirty-five minutes in which
the critical identification of the petitioner was made, that contrary to Dt. Brock's false testimony,

he was never alone in a small room viewing photograph. That actually some time elapsed between the time the camera was turned off and the point at which he was shown photographs. MAYS testified that he was in a large conference room seated at a large table with Dt. Brock, a police lieutenant and several other investigators. MAYS testified that everyone, including him, was talking back and forth about the case, discussing details and new developments about the shooting as information came into the station from investigators in the field. MAYS testified that the investigators, including Dt. Brock, were leaving the conference room to discuss developments among themselves before coming back into the conference room to discuss their conclusions with him. After a considerable length of time within this contaminating atmosphere, one of the investigators brought in some photographs and the identification was made.(A-114-115). Subsequently, warrants were issued for the petitioner's arrest.

The following day, August 3, 1998, Dt. Brock did interview 16 year old MATHEW CHAMBLEE. Review of the taped interview shows that CHAMBLEE stated at least 3 seperate times that he did not see the shooting and did not see the shooter. Over the course of a half hour CHAMBLEE began to curtail his statement, saying that he'd only gotten a glance of the shooter's face but still could not identify the shooter. Armed with the petitioner's identity from the previous days interview from MAYS, Dt. Brock would not accept this witness' inability to identify the petitioner. So Dt. Brock suggestively told CHAMBLEE that the shooter was from the 22ND & LAMOTTE ST. area, where CHAMBLEE lived. Gaining confidence from Dt. Brock's suggestive narrowing of the witness' field of suspects, CHAMBLEE was still uncertain of the identity of the shooter. Dt. Brock then went one step further by narrowing that narrowed field of suspects by telling the juvenile witness that he (CHAMBLEE) had seen the shooter before. CHAMBLEE then believes that the shooter was someone who came into the subshop where he worked, located on 22ND & MARKET ST., which is less than a city block from the scene of the shooting and from CHAMBLEE's residence. When shown a 12 photo-array with the petitioner being the only person in the array who frequented the area, CHAMBLEE identified the petitioner as the shooter. (A-131).

In the Rule 61 motion, the petitioner argued that Dt. Brock utilized suggestive and corruptive interview and procedures to obtain an unreliable identification of him in violation of the 14TH AMENDMENT'S

due process rights. See, **FETTERS v. STATE, 436 A.2d 796(1981).** (See Rule (a) Motion-Ground Ten). The petitioner did not object at trial to the admissibility of either witnesses' identification (see Ground eleven), both being the result of suggestive and corruptive interview procedures although his position on the issue was sufficiently clear to the court. See, **PRESLEY v. NORWOOD, 36 OHIO St. 2d 29, 33, 303 N.E.2d 81 (1973).**

In the Court's order denying the Rule (a) motion, Judge Johnston cited the Delaware Supreme Court's September 16, 2004, opinion in which the Court addressed an issue of the utilization of oppressive interview techniques by Dt. Brock when interviewing State witness Ronetta Sudler. The Court stated, inter alia :
"The trial judge, herself, viewed the tape and determined that Dt. Brock was not so unfairly oppressive or overbearing that his manner compromised Sudler's willingness to make a statement. (See, Court's Order pg. ) Based upon the above sentence Judge Johnston claimed that this allegation had been formerly adjudicated thus procedurally barred by Super. Ct. Crim Rule (a)(i)(4). Even though the voluntary nature of Sudler's statement had absolutely nothing to do with this allegation.

As forwarded in the **BRIEF IN SUPPORT FOR EXCUSION** , the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of **28 U.S.C.§ 2254(b)(c).** Where state courts refuses to consider petitioner's claim because he failed to comply with independent and adequate State procedural rule, his claims are deemed exhausted but procedurally defaulted unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. **LINES v. LARKINS, 208 F.3d 153 C.A.3(Pa. 2000); JOHNSON v. CARROLL, 2003 WL 1220237 D.Del. 2003.** The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ of habeas corpus, the petitioner argues that his 14TH AMENDMENT right to due process were violated by Dt. Brock's utilization of suggestive and corruptive interview techniques and procedures to acquire the unreliable identification of him, as the shooter, from MATHEW CHAMBLEE and VERNON MAYS.

In determining whether identification procedures violated defendant's due process rights, it must be determined where identification was unnecessarily suggestive, and if it is found

to have been so, it must be determined whether identification was nevertheless reliable based on examination of the totality of circumstances. **STATE v. McKNIGHT, 469 A.2d 397(1983).** Both CHAMBLEE and MAYS were contacted by investigators and came to the police station voluntarily to be interviewed, so that their statements were voluntarily given. See, **SCHNECKLOTH v. BUSTAMONTE, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed. 2d 854(1973); also, UNITED STATES v. SWINT, 15 F.3d 286, 289(3rdCir.1994).**

The interview with VERNON MAYS became corruptive at the point **where** MAYS was treated as a co-investigator instead of a potential witness. When investigators sat MAYS in a conference room and discussed the case, its details and facts as investigators in the field phoned in new information, the contamination of this witness increased disproportionately. Mays should have been seperated from new leads, details and information coming into the station, not made a participant, so that information he may or may not have known became available to him. It is settled scientific fact that what we think of as memory is actually a three stage process, where each stage can lead to a mistaken identification. The stages are acquisition, retention and retrieval. Events that occur during the retention and upon retrieval can contaminate the reliability of memory and affect an eyewitness 'confidence in the memory'. Indeed, how police procedures, particularily interview techniques are conducted is crucial, not only to whether an eyewitness identifies a suspect at all, but also to why the eyewitness identifies a particular suspect and how confident the eyewitness is in the identification. See, **CRIMINAL PRACTICE GUIDE, EYEWITNESS IDENTIFICATION,** September 27, 2000; **VOL. 1, No. 9.**

The retention and retrieval phases of Mays' memory here are in question. MAYS retained a specific memory of the shooting and the shooter. When placed in a corruptive interview setting, at which point the details and identification is being retrieved, MAYS was basically used as a lab rat. One whom investigators repeatedly tested their conclusions of events and details on. The investigators repeatedly huddled outside the witness' presence, making conclusions based on their own minute information and experiences. Then they all would come back into the conference room to test their theories on MAYS. Over and over again until MAYS' retained memory of the shooting and the shooter, his initial

to his statement until his version of the shooting and the shooter fell in line with what the investigators believed to be true or accurate. A perfect example of this argument being MAYS' inexplicable changing of the shooter's gun hand, going from the left hand to the right hand. It is a certainty, that off camera, in that corruptive, contaminated conference room. In that hour and thirty-five minutes when MAYS is being used like a lab rat, that someone alerted MAYS to the fact that the shooter had to firing the gun with his right hand instead of his left. This based on whatever information led investigators to that conclusion.

The interview with MATHEW CHAMBLEE became unduly suggestive at the point when Dt. Brock, unwilling to accept the fact that the witness could not identify the shooter, specifically tells CHAMBLEE that the shooter **was** from the 22ND & LAMOTTE ST. area. Dt. Brock's directive narrowed the witness' field of suspects from the 80,000 people who reside in Wilmington, down to a couple dozen people who live on or frequent the area of 22ND & LAMOTTE ST. Then seeing the witnesses growing confidence after hearing that the shooter **was** from the area, Dt. Brock further narrows that already narrowed field of suspects even further by telling CHAMBLEE, that he (CHAMBLEE) **had** **seen** the shooter before. In a tone and manner that assured CHAMBLEE that he basically **knew** the shooter. At that point Dt. Brock began telling CHAMBLEE that he needed him, that he was counting on him to identify someone. CHAMBLEE then thinks the shooter was someone who regularly came into a subshop where he worked located on 22ND& MARKET ST., one block from the scene of the shooting and CHAMBLEE's residence.

The petitioner would direct the Court's attention to the area of eyewitness identification known as "UNCONSCIOUS TRANSFERENCE." Which is the mistaken identification of a person whom an eyewitness has observed in a different situation. For example, an innocent person seen on the street or in a mugshot book will be confused for the perpetrator and identified in a line-up. See, **WHITE v. STATE, 926 P.2d 291, 293 (JUSTICE ROSE, dissenting)**; also, **STATE v. CHAPPLE, 660 P.2d 1208,1221.** The mistaken identification known as "UNCONSCIOUS TRANSFERENCE" clearly occured here. CHAMBLEE was then shown a 12 photo line-up, with the petitioner being the only person in the array from the area. CHAMBLEE then positively identified the petitioner as the shooter after initially being unable to do so.

CHAMBLEE described the murder weapon as a chrome, silvery colored handgun, with the shooter firing the gun with his right hand while stand stationary.(A-137 ). The screaming fact here was that MAYS testified that he was standing infront of CHAMBLEE's residence at 31 E. 22ND STREET, talking to CHAMBLEE and an unidentified person when the shooting occured.(A-110-111). However, CHAMBLEE testified that he was taking his nephew and dog into the house when the shooting occured. ( A-188 ). The contrast and broad spectrum in each witnesses' descriptions of the shooter supports the petitioner's arguments.

The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demostrated by the witness at the confrontation, and the length of time between the crime and the confrontation. See, NEIL v. BIGGERS, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed. 2d 401 (1972); STATE v. WILLIAMS, 378 A.2d 588 (1977). Against these factors is to be weighed the corrupting effect of the suggestive identification itself. MANSON v. BRATHWAITE, 432 U.S. 98 (1977); STATE v. LEDBETTER, 441 A.2d 595 (1981).

In STOVELL v. DENNO, 388 U.S. 293 (1967); and, SIMMONS v. UNITED STATES, 390 U.S. 377 (1968), the Court there recognized that evidence of identification--always a critical issue in a criminal trial--should not be received if the circumstances of a pretrial confrontation were so infected by suggestiveness as to give rise to an irreparable likelihood of misidentification.

The unreliable identifications made by both MAYS and CHAMBLEE should not have been admissible at trial since they were the result of unduly suggestive and corruptive interview procedures and techniques utilized by Dt. Brock. Their admission denied the petitioner due process of law at trial and the Court thus has the authority to consider the merits of the argument. See, SUMNER v. MATA, 449 U.S. 539 (1980-81).

## ARGUMENT XI

THE PETITIONER WAS DENIED HIS 6TH AND 14TH AMENDMENT RIGHTS TO DUE PROCESS, DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioners due process rights that would render the trial, as a whole, fundamentally unfair.

Defense counsel committed eight deficiences before, during and after the petitioner's trial. The eight deficiences constitutes a chronological list of errors. First, in pre-trial decisions: counsel decided not to hire a "DRUG" and an "IDENTIFICATION EXPERT." Second, during the trial counsel abandoned the petitioner's case by the last minute decision not to present the pre agreed upon defense, counsel failed to object to the admission of unreliable pre-trial identifications, counsel failed to object to the bailiff's unauthorized courtroom ejections, counsel failed to address the petitioner's flight and failed to request jury instructions. Finally, defense counsel withdrew a motion for new trial on the day of the scheduled hearing on the motion.

1. THE FIRST ALLEGATION of ineffective assistance of counsel is due to counsel's failure to hire a DRUG EXPERT, after a reasonable request, in a murder case in which several state witnesses admitted having long term, chronic drug and alcohole abuse problems, admitted being under the influence at the time of the shooting and at the time of their police interviews.

Prior to trial, counsel and the petitioner determined that several state witnesses were known long term drug and alcohole users. That fact undoubtably would be a factor in the witnesses' ability to accurately recollect and recall the events from the night in question. Since it is known that chronic drug users make for difficult witnesses, the petitioner asked counsel to retain the services of a DRUG EXPERT to assist the defense in preparing the cross examination of those witnesses. In addition to the DRUG EXPERT testifying at trial, in order to

explain to a laymen's jury the scientific components of certain types of drugs and alcohole, their effect on the human body and the human brain's ability to record memory while under the influence. This information would have given each juror a foundation from which they could weigh the witness' demeanor, ability to accurately recollect events and test the reliability and credibility of the witness' description of events and identification of the petitioner.

While in agreement with the petitioner's reasoning, counsel was of the belief that he could cover the same information that a DRUG EXPERT would and elected not to hire **the** expert.

As anticipated, two of the State's witnesses, Ronetta Sudler and Tyshiek McDougal, were difficult witnesses at trial who revealed extensive drug addictions dating back several years leading up to the night in question. (A-127, 151). Both admitted abusing cocaine, crack cocaine, marijuana, ecstacy and alcohole (A-127, 151). Both admitted being under the influence at the time of the shooting and when interviewed by investigators. (A-157, 185). Both witnesses were hostile, reluctant and evasive claiming memory loss to all operative facts from the night in question and their prior taped statements. (A-197-198) Cross examination of both witnesses was confined to the witnesses' drug abuse and credibility issues.

In the Rule 61 Motion, the petitioner argued that counsel was ineffective because he failed to retain the services of a DRUG EXPERT. The petitioner satisfied both prongs of the **STRICKLAND** standard, showing that counsel's decision making fell below an objective standard of reasonableness and the prejudice that resulted. (See Rule 61 Motion- Ground 11).

In the Court's order denying the Rule 61 motion, Judge Johnston's response to the first 3 out of the 8 allegations of ineffective assistance of counsel was: "..The Court finds the defendant's assertions and claims in this regard are pure conjecture, with no factual or legal basis. " (See Court's Order pg.10). Judge Johnston ultimately denied the entire Rule 61 motion pursuant to Super. Ct. Crim. Rule 61(i)(4), applicable to any ground already addressed.

It must be established that this was the petitioner's first and only motion for post conviction relief pursuant to Super. Ct. Crim. R. 61. The petitioner's claims of ineffective assistance of counsel

was not and could not have been raised on direct appeal or at any proceeding leading up to the Rule 61 motion. A motion pursuant to Rule 61 was the proper vehicle by which to bring ineffectiveness claims before the Delaware courts. REYNOLDS v. ELLINGSWORTH, 843 F.2d 712 (3RD. CIR.1988). Therefore, the petitioner could not possibly have been barred by Super. Ct. Crim. Rule 61(i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION        , the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c). Where state courts refuse to consider petitioner's claim because he failed to comply with independent and adequate State procedural rules, his claims are deemed exhausted but procedurally defaulted unless petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. See, LINES v. LARKINS, 208 F.3d 153 C.A.3(Pa. 2000); JOHNSON v. CARROLL, 2003 W.L. 1220237 D.Del. 2003. The petitioner has satisfied the cause and prejudice standard and has shown a fundamental miscarriage of justice will occur if the default is not excused.

In this writ of habeas corpus, the petitioner argues that he was denied his 6TH AMENDMENT right to due process, due to ineffective assistance of counsel.

In order for a defendant to gain relief based on a constitutional claim that his counsel was ineffective, the defendant must satisfy the two-pronged test announced in STRICKLAND v. WASHINGTON, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). The defendant must show "(1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." UNITED STATES v. NINO, 878 F.2d 101,103 (3d.Cir. 1989)(citing STRICKLAND, 466 U.S. at 687-96, 104 S.Ct. 2052). Both STRICKLAND prongs must be met in order to merit relief. NINO, 878 F.2d at 104.

In regard to the two-pronged STRICKLAND standard, the petitioner argues: 1. That defense counsel was unreasonable in deciding not to hire a DRUG EXPERT.

This because the exact anticipated difficulties with Sudler and McDougal were encountered at trial. Both witnesses were difficult to examine by both the State's attorneys and defense counsel. The difference being that the State possessed highly damaging taped statements from both witnesses. Both Sudler and McDougal were hostile, reluctant and evasive, so that cross examination was totally ineffective. Further, defense counsel's decision to attempt to cover the ground a DRUG EXPERT would have covered was also unreasonable. Counsel was not a DRUG EXPERT and thus would not have been permitted to give scientific information on narcotics and alcohole, in addition to their affect on the human body. Counsel's decision not to hire a DRUG EXPERT was a strategic decision that provided no benefit to the petitioner and caused more harm than anything else.

2. The petitioner was prejudiced by counsel's decision not to hire a DRUG EXPERT because the jury had no foundation from which it could weigh the witnesses demeanor, their ability to recollect events from the night in question and their identification of the petitioner, as a shooter. Defense counsel established that both witnesses had drug and alcohole abusive histories, that they both were under the influence on the night in question and at the time they gave statements to investigators. A DRUG EXPERT could have assisted the defense in taking those overall facts further. For example, a DRUG EXPERT could have taken each women's body weight, tolerance levels and years of abuse. And explained to a laymen's jury what amount of drugs and/or alcohole, consumed over a specific number of hours on the night in question, would have been necessary to render either women incapable of accurately recording memory. More importantly, recalling and recollecting those memories. Such an explanation would have armed the jury with a formula by which to test each witnesses recollection of events versus their inebriated state, thus bringing a higher level of scrutiny by the jury. This beyond just being made aware that the witnesses consumed drugs and alcohole.

Without such a working foundation, the jury was left to draw its own connections between the witnesses' long term, chronic abuse of drugs and alcohole. And their (witnesses) ability to observe the events from the night in question. Counsel's decision did not benefit the petitioner. In light of counsel's last minute decision to abandon the defense, that decision undermines confidence in the trial's outcome.

2. The SECOND ALLEGATION of ineffective assistance of counsel is due to counsel's failure to hire an IDENTIFICATION EXPERT, after a reasonable request, in a murder case that hinged solely on uncertain eyewitness testimony.

Prior to trial, defense counsel and the petitioner thoroughly scrutinized the State's eyewitnesses, their prior description of events, their descriptions of the shooter and their credibility as witnesses. It was determined that the State's witnesses' statements in most points diametrically contradicted each other. As a result the petitioner asked counsel to hire an IDENTIFICATION EXPERT to assist the defense in preparing the cross examination of the State's witnesses in addition to being able to provide the jury with a working knowledge of the vast field of eyewitness identification and the many points where mistaken identification can be a factor.

While in agreement with the petitioner's reasoning, defense counsel believed that he could cover the same eyewitness information that an IDENTIFICATION EXPERT would and elected not to retain the services of the expert.

As anticipated, the State's eyewitnesses were alternately uncertain and unsure in their identification of the petitioner and hostile, reluctant and evasive in testifying at trial. Three of the State's five eyewitnesses claimed memory loss at trial, but to counsel's credit the remaining two eyewitnesses essentially recanted their previous identification of the petitioner. In regards to the three eyewitnesses that claimed memory loss, cross examination was largely ineffective.

In the Rule 61 motion, the petitioner argued that counsel was ineffective because he failed to retain the services of an IDENTIFICATION EXPERT. The petitioner satisfied both prongs of the STRICKLAND standard, showing that counsel's decision making fell below an objective standard of reasonableness and the prejudice that resulted.(See Rule 61 Motion - Ground II).

In the Court's order denying the Rule 61 motion, Judge Johnston's response to this allegation was: "... The Court finds the defendant's assertions and claims in this regard are pure conjecture, with no factual or legal basis."(See Court's Order pg. 10). Judge Johnston ultimately

denied the entire Rule 61 motion pursuant to Super. Ct. Crim. Rule 61(i)(4), applicable to any ground already adjudicated.

It is established that this was the petitioner's first motion for post conviction relief pursuant to Super. Ct. Crim. Rule 61. The petitioner's claims of ineffective assistance of counsel was not and could not have been raised on direct appeal or at any proceeding leading up to the Rule 61 motion. A motion under this Rule 61 was the proper vehicle by which to bring ineffectiveness of counsel claims before the Delaware courts. See, REYNOLDS v. ELLINGSWORTH, 843 F.2d 712 (3d Cir. 1988). Therefore, the petitioner could not possibly have been barred pursuant to Super. Ct. Crim. Rule 61(i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c), where State courts refuse to consider petitioner's claims because he failed to comply with independent and adequate State procedural rules, his claims are deemed exhausted but procedurally defaulted unless petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default. LINES v. LARKINS, SUPRA; JOHNSON v. CARROLL, SUPRA. The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the default is not excused.

In this writ of habeas corpus, the petitioner argues that he was denied his 6TH and 14TH AMENDMENT rights to due process, due to ineffective assistance of counsel. In order for a defendant to gain relief based on a constitutional claim that his counsel was ineffective, the defendant must satisfy the two-pronged test announced in STRICKLAND v. WASHINGTON, SUPRA. The defendant must show "(1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." UNITED STATES v. NINO, SUPRA. (citing STRICKLAND, id.). Both STRICKLAND prongs must be met in order to merit relief. NINO, 878 F.2d at 104.

In regards to the two-pronged STRICKLAND standard, the petitioner argues: 1. That defense counsel again was unreasonable in deciding not to hire an IDENTIFICATION EXPERT.

Once again as anticipated the contradictions from the state eyewitnesses surfaced at trial, along with the wide range of the witness' descriptions of events and the shooter. Further, counsel's decision to attempt to cover the ground an IDENTIFICATION EXPERT would have covered was equally unreasonable, if not foolish. Counsel was not an IDENTIFICATION EXPERT and thus would not have been permitted to lay a foundation for the jury, that an IDENTIFICATION EXPERT would have, from which the jury could have scrutinized the **uncertainties** from the witness stand. Counsel's decision not to hire an IDENTIFICATION EXPERT was a unilateral strategic decision that provided absolutely no benefit to the petitioner, causing more harm than anything else.

**2.** The petitioner was prejudiced by counsel's decision not to hire an IDENTIFICATION EXPERT because the jury was prevented from learning that what the average person thinks of as memory is actually a three stage process and each stage can lead to a mistaken identification. The stages are acquisition, retention and retrieval, and a person's ability to observe are affected by internal factors such as "fear, stress and fatigue." External factors such as lighting, the presence of a weapon and the duration of actual observation of the culprits face or other memorable physical characteristics all impact on whether the eyewitness actually had the opportunity for a reliable picture to be imprinted in his or her memory. See, **PEOPLE v. ENIS, 564 N.E.2d 1155 (1990).** An IDENTIFICATION EXPERT could have explained to the jury the "**FORGETTING CURVE**" that eyewitnesses encounter. Which is the fact that once an individual has witnessed an event and observed a perpetrator, that the memory does not sit still in the brain like a photograph in a box just waiting to be taken out. An IDENTIFICATION EXPERT could have made the jury understand the fact that memory quickly dissipates with most of the dissipation occurring within the first 24 hours, thus the "**FORGETTING CURVE.**"

Counsel's decision prevented the jury from learning from an IDENTIFICATION EXPERT the area of eyewitness identification known as the "**CONTAMINATION RISK**," which is involved at every stage of the memory process, especially during the retention and retrieval stages. Particularily, how police procedures such as photo-arrays and line-ups are conducted being the most

crucial time when the risk of contamination is high.

Counsel's decision prevented the jury from learning from an IDENTIFICATION EXPERT that there is a police technique known as "CONFIRMING FEEDBACK," which is a interview technique in which an uncertain witness' confidence is falsely boosted by investigators until an uncertain witness is one hundred percent positive in their identification of a perpetrator or description of events.

Another critical area of eyewitness identification counsel's decision prevented the jury from learning from an IDENTIFICATION EXPERT was/is known as " UNCONSCIOUS TRANSFERENCE," which is the mistaken identification of a person whom an eyewitness has observed in a different situation, such as a store or on the street. As established in GROUND TEU, MATHEW CHAMBLEE clearly identified the petitioner through this process known as "UNCONSCIOUS TRANSFERENCE."

The petitioner can go on and on in this vastly technical and complex field of eyewitness identification. Counsel's decision prevented the jury from becoming armed with a working foundation and the requisite knowledge with which they could navigate the field of eye-witness identification. Which would ultimately assisted the jury in scrutinizing all of the uncertainties from the State's witnesses. In light of counsel's last minute decision to abandon the defense, counsel's decision not to hire an IDENTIFICATION EXPERT prejudiced the petitioner. All of the infirmities and contradictory testimony from the State's eyewitnesses was ripe for the foundation an IDENTIFICATION EXPERT would have provided the jury with. Without such a foundation, the jury was left to guess why the witnesses descriptions of events were so conflicting and at which point the witnesses' identification was correct or incorrect/mistaken.

83.

3. The THIRD ALLEGATION of ineffective assistance is due to counsel's last minute abandonment of the pre-agreed upon defense strategy by counsel's decision not to present the petitioner's case, i.e. the defense, to the jury.

In numerous pre-trial meetings, defense counsel and the petitioner came to the agreement that the defense theory, that would be presented to the jury, would be as follows: FIRST, the jury would be given an accurate sequence of events leading up to the shooting. This would include making the jury aware of the fact that the shooting was the end result of an altercation that began earlier in the night at the Oasis Night Club between two large groups of people from two conflicting areas in Wilmington. Those areas being 22ND & LAMOTTE ST. (DEUCE-DEUCE) and 26TH & LOCUST ST. (THE BUCKET). SECOND, the jury would be made aware of the fact that the petitioner was not at the Oasis Night Club on the night in question and was not a participant in the altercation inside Oasis Night Club or outside the club in the parking lot. THIRD, the defense wanted to press upon the jury the fact that the petitioner had no motive to shoot the victim. And that the State could not establish a motive. FOURTH, the petitioner wanted to highlight all of the external factors that could lead to misidentification, such as, the lighting at the scene of the shooting, the number of guns fired that night as well as the number of shots fired by those guns. All to create doubt in the jury's faith in the State's case.

The defense strategy was predicated on several key points that would need to be kept if the defense was to be successful. FIRST, it was agreed that the petitioner would not testify. This because the petitioner did have prior convictions for TRAFFICKING in COCAINE and Robbery 2ND. Those convictions would damage the petitioner's credibility with the jury, a crucial point in this case. Towards this strategic point defense counsel filed a motion to severe the charge of Possession of Deadly Weapon by Person Prohibited ( A-7    ), so that the jury was further insulated from learning of the petitioner's prior record. Defense counsel also posed a question to prospective jurors in VOIR DIRE regarding they would view the petitioner in a negative light if he elected not to testify.( A-180  ). SECOND, it was agreed that critical and meticulous cross examination of the State's eyewitnesses was warranted to reveal the numerous discrepancies and contradictions in the witness' versions

of events and descriptions of the shooter. **THIRD**, it was agreed that **prior** to trial every state witness and defense witnesses would be interviewed by a private investigators. Towards that end defense counsel hired **FRED TATE** of **TATE INVESTIGATIVE SERVICES.** (A-72-80 ). **FINALLY**, it was agreed that the defense would present **6**, possibly **7**, witnesses at trial. Namely, BENNIE WRIGHT, CHARMAIN MAYO, BRUCE DUNCAN, EARL BAISMORE, SHAWN McNEILL, JOE HARRIS and possibly MICHEAL BARTLEY. Defense counsel submitted the defense witness' names to the Court prior to trial because the names were on the witness'list of people associated with the case called out to potential jurors during juror selection.

Despite the vast amount of time spent planning and the pre-trial movements that would facilitate the defense theory and strategy. One day before the petitioner was set to open his case to the jury, defense counsel suddenly decided to rest the petitioner's case without calling any witnesses. Counsel's reasoning was that the errors committed during the trial (see Trial Record) had already destroyed most of the defense strategy. That the jury did not like the petitioner and was reaching negatively to the defense, i.e. defense counsel and the petitioner. And that all of the defense witnesses had not been interviewed, i.e. prepared for trial, prior to trial thus counsel did not know specifically what the witnesses would do or say on the witness stand. This latter disclosure was unknown to the petitioner and violated **RULE 1.4(3) COMMUNICATION** of the Delaware Lawyers' Rules of Professional Conduct.

It must be understood that four of the seven defense witnesses, were eyewitnesses who had given statements to investigators indicating that the petitioner was not the shooter on the night in question. CHARMAIN MAYO gave a statement to investigators on August  , 1998. It has been established that the State indicated that MAYO had given a damaging statement to investigators, identifying the petitioner as the shooter. (A-25 ). It was only after the State turned over MAYO's taped statement prior to the scheduled May 7, 2002, trial that it was revealed that MAYO had actually told investigators that the petitioner was not the shooter. A fact admitted to by the State at trial. (A-182 ).

BRUCE DUNCAN gave a statement to investigators on December 19, 2001, in which he indicated that the petitioner was not the shooter on the night in question. The exculpatory **BRADY** statement by DUNCAN was withheld by the State and is the source of a **BRADY** violation argued in this petition. (See GROUND NINE).

BENNIE WRIGHT gave a statement to investigators in 2001, in which he indicated that the petitioner was not the shooter on the night in question. The State did turn over a redacted tape of the interview but the tape was unintelligible, therefore unable to be understood. An intelligible tape, the current or last known address of the witness and a transcribed portion of the statement was withheld by the State. And is the source of a **BRADY** violation argued in this petition. (See GROUND NINE).

EARL BAISMORE gave a statement to the State indicating that he witnessed the shooting and the shooter on the night in question. Investigator showed BAISMORE a photo-array that contained the petitioner and the witness did not pick out the petitioner's photograph. (A-84     ). The State withheld the witness' name (which was eventually ascertained through other channels) and his last known or current address, which was in the Baltimore, Maryland area. So that the petitioner was prevented from securing the witness' presence at trial through the Inter-State Compact. That withheld exculpatory information is also a source of **BRADY** violation argued in this petition. (See GROUND NINE).

In the Rule 61 motion, the petitioner argued that he was denied due process, due to ineffective assistance of counsel, as a result of counsel's last minute decision to abandon the petitioner's case. The petitioner satisfied both prongs of **STRICKLAND**, showing that counsel's decision fell below an objective standard of reasonableness and the prejudice that resulted. (See Rule 61 Motion- GROUND 11).

Without ordering an evidentiary hearing pursuant to Super. Ct. Crim. Rule 61(h) or at the least directing counsel to respond to this allegation pursuant to Super. Ct. Crim. Rule 61(g)(2), Judge Johnston's response to this allegation was: "... The Court finds the defendants assertions and claims in this regard are pure conjecture with no factual or legal basis." (See Court's Order-pg. 10) Ultimately Judge Johnston denied the entire Rule 61 motion pursuant to Super. Ct. Crim. Rule 61(i)(4), applicable to any ground already adjudicated.

It has already been established in the previous two allegations of ineffective assistance of counsel that this was the petitioner's first Rule 61 motion. Ineffective assistance of counsel claims could not have been raised on direct appeal or in any proceeding leading up to the Rule 61 motion. Therefore a motion under this Rule 61 was the proper vehicle by which to bring ineffectiveness of counsel claims before the Delaware courts. See, REYNOLDS v. ELLINGSWORTH, 843 F.2d 712 (3rd Cir. 1988). Therefore, the petitioner could not possibly have been barred by Super. Ct. Crim. R. 61(i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCLUSION, the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies withing the meaning of 28 U.S.C. § 2254(b)(c). The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the exhausted but procedurally defaulted claim is not excused. LINES v. LARKINS, supra; JOHNSON v. CARROLL, supra.

In this writ of habeas corpus, the petitioner argues that he was denied his 6TH AMENDMENT right to due process, due to ineffective assistance of counsel. In order for a defendant to gain relief based on a constitutional claim that counsel was ineffective, the defendant must satisfy the two-pronged test announced in STRICKLAND v. WASHINGTON, supra. The defendant must show "(1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." UNITED STATES v. NINO, id. (citing STRICKLAND, supra).

In regards to the two-pronged STRICKLAND standard, the petitioner argues: (1) That defense counsel's decision to abandon his case in the middle of trial constitutes a breakdown in the adversary process that renders the results unreliable. CAPANO v. STATE, 2006 WL 47454 (Del. Super.). No reasonable competent attorney would simply abandon his client in the midst of a close first degree murder trial. Even if counsel's reasons for wanting to rest the petitioners case, i.e. trial errors, are to be weighed into counsel's last minute decision. What chance did counsel reasonable expect the petitioner to have of being found not guilty. When no clear cut explanation was presented to the jury to substantiate his claims innocense. Counsel's last minute decision

87

essentially asked the jury to believe that the State's five eyewitnesses, although uncertain, inconsistent, reluctant and evasive, were all mistaken in their identification of the petitioner as the shooter. In examining trial counsel's conduct in this area, it is necessary to "address not what is prudent or appropriate but only what is constitutionally compelled." BURGER v. KEMP, 483 U.S. 776, 794 (1987). Counsel's last minute decision to abandon the petitioner's case served absolutely no purpose from a strategic standpoint. The one avenue available to counsel by way of an explanation is that the State's suppression of all the exculpatory BRADY material established in GROUND NINE prevented counsel from adequately presenting the petitioner's case to the jury. If this is the case, then counsel did do everything he was constitutionally compelled to do, while trying to obtain that exculpatory BRADY material. (See GROUND NINE). If this was the case, counsel still failed to relay this fact to the petitioner, counsel did not alert the trial judge immediately prior to trial, during trial or at the conclusion of the trial, that the BRADY were/would/had hindered his trial advocacy. Counsel further failed to raise the BRADY issue in a motion for new trial or on direct appeal. Again, no reasonably competent attorney would just abandon his clients in the middle of trial, unless he (defense counsel) had simply given up on his client's case.

The petitioner was prejudiced by counsel's last minute decision to abandon the petitioner's case because the jury was prevented from hearing the solid case the petitioner could have presented. It must be agreed after review of the trial proceedings, that the State's case was not cohesive, it's witnesses' inconsistent and uncertain. The State established no motive whatsoever and not a shred of physical evidence linking the petitioner to the crime. On the other hand, the petitioner's case, properly presented, would have focused the jury on the facts by giving them (jury) a timetable and sequence of events leading up to the shooting. The petitioner had an equal number of eyewitnesses who indicated that he was not the shooter, keeping in mind that at least three witnesses identified another shooter and State eyewitnesses' indicated that two handguns were heard being fired on the night in question. The number of defense witnesses who indicated that the petitioner was not the shooter effectively countered the number of State witnesses who, prior to trial,

indicated that he was. With three of the State's witnesses claiming memory loss at trial, coupled with the recanting testimony of the remaining two eyewitnesses (MAYS & CHAMBLEE). It is almost a guarantee, that had the petitioner's case been properly presented to the jury, the results of the trial would have been different.

Defense counsel rested the petitioner's case without calling a single witness. So that nothing was presented to the jury from the defense's corner except for opening and closing arguments, along with alternatingly intense and ineffective cross examination of the State's witnesses. With just those minute points of advocacy the jury still deliberated in excess of 10 hours over the course of three days. This lengthy deliberation must support the petitioner's argument that but for counsel's decision the jury would have returned a different verdict, keeping in mind the prejudicial errors that scared this trial.

The Court must agree that counsel's decision to abandon the petitioner's case in the middle of the trial was a decision that prejudiced the petitioner. And but for that decision the results of the trial would have almost certaintly have been different.

89.

4. THE FOURTH ALLEGATION of ineffective assistance of counsel is due to counsel's failure to object to the admissibility of the prior out-of-court identification of the petitioner made by state witnesses VERNON MAYS and MATHEW CHAMBLEE. Because those identifications were the result of unduly suggestive and corruptive interview techniques and procedures utilized by Chief Investigator Dt. Andrew Brock.

The background foundation and information for this allegation has been laid in GROUND TEN of this petition. In summary, Dt. Brock utilized highly suggestive and corrupting interview techniques and procedures to obtain an unreliable identification of the petitioner from VERNON MAYS and MATHEW CHAMBLEE. (See GROUND TEN).

In the Rule 61 motion, the petitioner argued that counsel was ineffective by failing to object to the admissibility of the pre-trial identifications. The petitioner satisfied both prongs of the STRICKLAND standard, showing that counsel's failure to object to the admissibility of the witness' identification fell below an objective standard of reasonableness and the prejudice that resulted. (See Rule 61 Motion- Ground 11).

In the Court's order denying the Rule 61 motion, Judge Johnston either over looked this 4TH allegation of ineffective assistance of counsel or completely ignored it. This because there was no response to the allegation from Judge Johnston. In fact, Judge Johnston completely ignored the 4th, 5th, 6th, 7th and 8th allegations of ineffective assistance of counsel. As already noted, Judge Johnston gave the same one sentence response to the first, three allegations of ineffective assistance of counsel. (See Court's Order pg. 10). And ultimately denied the entire Rule 61 motion pursuant to Super. Ct. Crim. Rule 61(i)(4), applicable to any ground formerly adjudicated. Again it must be reiterated that this was the petitioner's first and only motion pursuant to Rule 61 and therefore the proper vehicle to bring ineffectiveness of counsel claims before Delaware courts. REYNOLDS v. ELLINGSWORTH, SUPRA.

The Court determined that, to the extent that defendant did not brief claims raised by defendant's postconviction motion in the Superior Court, those claims were deemed to be waived. SOMERVILLE v. STATE, 703 A.2d 629 (Del. 1997). The petitioner will brief the 4th, 5th, 6th, 7th and 8th allegations of ineffective assistance of counsel, so that the allegations are not deemed waived.

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c). The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the exhausted but procedurally defaulted claim is not excused. LINES v. LARKINS,supra; JOHNSON v. CARROLL,supra.

In this writ of habeas corpus, the petitioner argues that he was denied his 6TH AMENDMENT right to due process, because counsel failed to object to the admissibility of the prior out-of-court identification of the petitioner by witnesses VERNON MAYS and MATHEW CHAMBLEE. Those identifications being the result of highly suggestive and corrupting interview techniques and procedures utilized by Dt. Brock. In order for a defendant to gain relief based on a constitutional claim that counsel was ineffective, the defendant must satisfy the two pronged test announced in STRICKLAND v. WASHINGTON, id. The defendant must show "(1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. " UNITED STATES v. NINO, supra; (citing STRICKLAND, id.) Both STRICKLAND prongs must be met in order to merit relief. NINO,supra.

In regards to the two-pronged STRICKLAND standard, the petitioner argues:(1) That counsel and the petitioner were both aware of the suggestive and corruptive interview procedures prior to trial. It was agreed that further investigation at trial was warranted and depending on what was revealed, counsel would make a timely objection to the admissibility of the pre-trial identifications of either one or both witnesses. An objection to the admissibility of Ranetta Sudler's taped statement was lodged. As noted in GROUND TEN more then enough testimony was revealed to support an objection to the admissibility of both MAYS and CHAMBLEES' pre-trial identification of the petitioner. The Court must agree, with all things considered, that Dt. Brock conducted himself throughout the course of this homicide investigation in a very unproffessional manner. One way to correct some of that unproffessionalism was to challenge the admissibility of the evidence obtained through the utilization of suggestive and corruptive police procedures. Counsel's failure to object allowed

unreliable and unchallenged pre-trial identifications of the petitioner to be admitted at trial without a constitutional test for reliability by the trial judge. NEIL v. BIGGERS, 409 U.S. 189, 199-200 (1972); MANSON v. BRATHWAITE, 432 U.S. 98, 114 (1977).

The petitioner was prejudiced by counsel's failure to object to the admissibility of the unreliable identifications of the petitioner by both MAYS and CHAMBLEE because the jury was allowed to put faith in unreliable identifications obtained through corrupted procedures and not supported by in-court identifications. Which undoubtably played a significant role in the jury's deliberations and verdict.

Further, an objection would have focused the jury's attention on Dt. Brock, specifically his unproffesional manner during this case's investigation. An objection would have been an opportunity for counsel to demonstrate the clear correlation between both MAYS and CHAMBLEE's unreliable identifications of the petitioner at trial, to Dt. Brock's corruptive interview procedures. An objection was an opportunity to convince the jury by focusing their attention, that Dt. Brock's unproffessional conduct was far reaching and not just confined to the interview of one witness. But was a consistent pattern that must checked. The Court must agree after review of the entire record, PAYNE v. JANASZ, 711 F.2d 1305, 1310 (6TH CIR. 1983); that during deliberations the jury likely weighed the in-court identifications made by State witnesses, against the prior out-of-court identifications made by the same witnesses. When weighing the two conflicting sets of eyewitness testimony, the jury should have been excluded from factoring in or putting faith in MAYS or CHAMBLEE's pre-trial identifications since they had not been constitutionally tested. NEIL v. BIGGERS, SUPRA. Had counsel been successful in challenging the unreliable pre-trial identifications of the petitioner from coming before the jury. Then the jury would have had only MAYS and CHAMBLEE's in-court testimony to consider. If counsel's objection was not successful then the issue would have been preserved on the record for direct review.

As such, counsel's failure to object permitted unreliable identifications to be admitted at trial, thereby undermining the confidence in the outcome of the trial.

5. THE FIFTH ALLEGATION of ineffective assistance of counsel is due to counsel's failure to object to the bailiff's unauthorized ejections of the petitioner's family and friends from the courtroom in a negative fashion that prejudiced the petitioner in view of the jury. And counsel's failure to request a curative instruction to cure any prejudice the jury may have unjustifiably attached to the petitioner.

The background foundation and information for this allegation has been laid in GROUND FIVE of this petition. In summary, the bailiff chose an inopportune time during a lull in the trial to disrespectfully eject two of the petitioner's family members from the courtroom in a manner that caused a negative commotion and backdraft in view of the jury, without authorization from the trial judge. (See GROUND FIVE).

In the Rule 61 motion, the petitioner argued that counsel was ineffective by failing to object to the bailiff's unauthorized ejections of his family and friends from the courtroom in a manner that caused a negative commotion in view of the jury. And that counsel failed to request a curative instruction to cure any prejudice in light of the State's arguments that the petitioner was a member of a "DOUBLE-DEUCE group/gang." The petitioner satisfied both prongs of the STRICKLAND standard, showing that counsel's failure to object and request a curative instruction fell below an object standard of reasonableness and the prejudice that resulted.(See Rule 61 MOTION GROUND II).

It has been established that Judge Johnston ignored this allegation, giving no response to the fifth allegation of ineffective assistance of counsel, in the Court's order denying the Rule 61 motion. It has been established that Judge Johnston ultimately denied the entire Rule 61 motion pursuant to Super. Ct. Crim. Rule 61(i)(4), applicable to any ground formerly adjudicated. It has been established that this was the petitioner's first Rule 61 motion and the proper vehicle to bring ineffectiveness of counsel claims before the Delaware courts. REYNOLDS v. ELLINSWORTH, 843 F.2d 712 (3RD CIR.1988). Therefore, the petitioner could not possibly have been barred by Super. Ct. Crim. R. 61(i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254 (b)(c). The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the exhausted but procedurally defaulted claims are not excused. LINES v. LARKINS, supra; JOHNSON v. CARROLL, supra.

In this writ of habeas corpus, the petitioner argues that he was denied his 6TH AMENDMENT right to due process, due to counsel's failure to object to the bailiff's unauthorized ejections of his family members from the courtroom, in a negative manner that prejudiced the petitioner because it was witnessed by the jury. And then defense counsel failed to request a curative instruction to cure that prejudice. In order for a defendant to gain relief based on a constitutional claim that counsel was ineffective, the defendant must satisfy the two pronged test announced in STRICKLAND v. WASHINGTON, supra. The defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error the result of the proceeding would have been different. "UNITED STATES v. NINO, supra; (citing STRICKLAND, supra). Both STRICKLAND prongs must be met in order to merit relief. NINO, id.

In regard to the two-pronged STRICKLAND standard, the petitioner argues: 1. That the State's prejudicial arguments, which forwarded gang affliations and witness intimidation, permeated every facet of the trial including the bailiffs and corrections officers' methods for securing the courtroom. When the bailiff ejected family members seated directly behind the petitioner in a manner that caused him prejudice without authorization from the trial judge, counsel appropriately requested that the jury be removed before further again prejudicing them. Out of their presence counsel made the proper arguments to the court. PRESLEY v. NORWOOD, 36 OHIO ST. 2d 29, 33, 305 N.E. 2d 81 (1973). But counsel failed to register an objection and move for a curative instruction. It was unreasonable, if not naive, for defense counsel to just hope that the jury, after watching such a negative commotion, would simply ignore it or not ponder the reasoning behind it.

Especially in light of the immediate recess following the commotion. Even if the commotion did not rise to the level of an outburst such as in, STATE v. ASHLEY, 798 A.2d 1019(2001), the bailiff's unauthorized ejection warranted an objection and curative instruction.

The petitioner was prejudiced by defense counsel's failure to object and request a curative instruction because the jury may have attributed some wrongdoing on the petitioner's part. This because his family members that were ejected, were seated directly behind him and the State argued, suggested and insinuated repeatedly that the petitioner was a member of a "Double-Deuce" group/gang," who intimidated State witnesses. The jury may well have believed that the petitioner had given some signal to members of this alleged gang, which resulted in the State's witness' uncertainties on the witness stand. The jury may have believed that the large amount of the petitioner's family and friends, whom attended the trial, were actually this alleged gang. And the bailiff's actions were warranted in order to control the petitioner and his alleged "Double-Deuce gang." With the witness being excused and the bailiff's unauthorized ejections coming immediately on the heels of the witness' excusal, the jury may have made some unjustifiable connections between the two actions, which then reflected negatively on the petitioner. A curative instruction would have been appropriate since the prejudice was the result of the bailiff's unauthorized actions and not the petitioner. Instead the jury was left to make whatever assumptions they wanted. Undoubtly, the bailiff's unauthorized ejections, that haulted the trial, coupled with the bailiff's return to the courtroom with several other bailiffs and capital police in a dramatic show of security. In addition to the State's prejudically motivated arguments all played key roles in the jury's deliberations and the verdict that was returned.

**6. THE SIXTH ALLEGATION** of ineffective assistance of counsel is due to counsel's failure to address the petitioner's flight issue during closing arguments.

Prior to trial, defense counsel and the petitioner agreed that the defense would not contest the State's anticipated request that a flight instruction be included in the jury instructions. It was agreed though that counsel would utilize the flight issue as a opportunity to humanize the petitioner in the minds of the jury. Prior to trial, when the pre-agreed upon defense theory and defense strategy was still intact, the flight issue was a minute issue in the midst of the defense's entire case. It has been established that mid-way through the trial with the defense set to open it's case, defense counsel abandoned the pre-agreed upon defense by deciding not to present a case to the jury. With that last minute decision changing the entire dynamics of the case, especially the defense, it stands to reason that peripheral matters like the flight issue, would become critical to the petitioner's cause.

During the State's closing arguments, Cynthia Kelsey hammered into the jury's minds that the petitioner's flight demostrated a consciousness of guilt. Punctuating its arguments with the statement, "if he didn't do it, why did he run?" It was a point the State made certain the jury would not forget. Yet when defense counsel made his closing arguments to the jury, he failed to address the petitioner's flight, more specifically, he passed up the opportunity to humanize the petitioner in the mind of the jury. After counsel completed his closing arguments, the petitioner questioned his decision not to address the flight issue, in light of the State's repeated references in its closing arguments. Defense counsel's response was that he'd forgotten. i.e. "I forgot."

In the Rule 61 motion, the petitioner argued that counsel was ineffective by failing to address the flight issue during closing arguments. The petitioner satisfied both prongs of the **STRICKLAND** standard, showing that counsel's failure to address the flight issue, in light of his last minute decision to abandon the defense, fell below an objective standard of reasonableness and the prejudice that resulted. (See RULE 61 MOTION-GROUND 11).

It has been established that Judge Johnston ignored this allegation, giving no response to the sixth allegation of ineffective assistance of counsel in the Court's order denying the Rule 61 motion. It has been established that Judge Johnston ultimately denied the entire Rule 61 motion pursuant to Super. Ct. Crim. Rule 61(i)(4), applicable to any ground formerly adjudicated. It has been established that this was the petitioner's first Rule 61 motion and thus the proper vehicle to bring ineffectiveness of counsel claims before the Delaware courts, REYNOLDS v. ELLINGSWORTH, 843 F.2d 712 (3RD. CIR. 1988). Therefore, the petitioner could not possibly have been barred by Super. Ct. Crim. Rule 61(i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION , the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. § 2254(b)(c). The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the exhausted but procedurally defaulted claims are not excused. LINES v. LARKINS, supra; JOHNSON v. CARROLL, SUPRA.

In this writ of habeas corpus, the petitioner argues that he was denied his 6TH AMENDMENT right to due process, due to counsel's failure to address the flight issue during closing arguments. In order for a defendant to gain relief based on a constitutional claim that counsel was ineffective, the defendant must satisfy the two pronged test announced in STRICKLAND v. WASHINGTON, SUPRA. The defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error the result of the proceeding would have been different. " UNITED STATES v. NINO, SUPRA; (citing STRICKLAND, supra). Both STRICKLAND prongs must be met in order to merit relief. NINO, SUPRA.

In regard to the two prong STRICKLAND standard, the petitioner argues 1. That defense counsel was expected to maintain a level of competence throughout his representation. See, RULE 1.1[5]- THOROUGHNESS and PREPARATION of the Delaware Lawyer's Rules of Professional Conduct. The stakes of the case warranted that counsel's attention remain high throughout the handling of the case. Counsel stated that he simply forgot to address the petitioner's flight, which demonstrates a slide in

97

counsels level of attention and competence. This in light of his last minute decision to abandon the defense in the middle of the trial and the State's repeated hammering of the petitioners flight as a demonstration of his consciousness guilt during closing arguments. No reasonably competent attorney would forget a key fact that tends to support the State's case, which is inturn a detriment to your client's case.

The petitioner was prejudiced by defense counsel's slide in attentiveness because counsel passed up the opportunity to humanize the petitioner in the minds of the jury. The petitioner anticipated counsel making the jury understand the fact that we, as human beings, all make mistakes. That we all make spur of the moment decisions that are not the best decisions in the long run. At times, people panick and rash decisions when all the options seem like bad options and the resulting rash decision is more harmful than any other. If the jury, as human beings, could agree with counsel on that point. Then they should have been able to empathize with counsel's argument that the above points are especially true in regards to young people. The petitioner was just 22 years old at the time of this unfortunate incident. He(petitioner) made the decision to put some space between a murder investigation, and a murder investigation and himself. In order to allow the police time to investigate the shooting. At the time of this shooting, the jury should have been made aware that the petitioner had just recently graduated from a certification course at Delaware Technical & Community College. Where he had been a keynote speaker to an audience that included the Mayor of Wilmington. His(petitioner) speech and views on secondary education were featured on CHANNEL 12 NEWS and he was employed by the city processing information(DATA ENTRY) at the CITY COUNTY BUILDING located on KING ST. in Wilmington. He(the petitioner) was at a point in his life where things were looking up for him. Unfortunately, the homicide investigation focused in on him as a suspect and he panicked, making a rash decision. That rash decision does not mean that he was a "BAD PERSON" or even the person responsible for the shooting. That rash decision simply meant that he was human. Defense counsel passed up the opportunity to relay all of this information to the jury, which would have humanized the petitioner in the minds of the jury. And further passed up any other opportunities to

humanize the petitioner, so that the jury's estimate of his character was painted by the charges for which he was standing trial and the State's prejudicial arguments.

Defense counsel's slide in attentiveness could have allowed the jury to believe that the petitioner's flight demonstrated a consciousness of guilt associated with wrongdoing. Taking into consideration the prejudicial error that occured at trial that eviscerated defense counsel's credibility in the mind of the jury. The jury may very well have assumed that counsel's silence of the petitioner's flight was another example of him(counsel) trying to keep something else important from them(jury). Therefore, counsel's absent mindedness undermined confidence in the outcome of the jury's verdict.

7. **The SEVENTH ALLEGATION** of ineffective assistance of counsel is due to counsel's failure to request a jury instruction on the dangers of **misidentification** in a case where eyewitnesses are uncertain, unclear and inconsistent.

Review of the trial will show that the State's case hinged on eyewitness testimony alone, with no physical evidence linking the petitioner to the shooting and competent motive. The record reveals that three of the State's five eyewitnesses claimed memory loss to all operative facts from the night in question and to their prior taped statements. The record reveals that the two remaining eyewitnesses recanted their prior identifications of the petitioner as the shooter. So that the State's case was not cohesive and was presented through very uncertain, unclear and inconsistent eyewitnesses.

Unknown to the petitioner at the time of trial was that the UNITED STATES SUPREME COURT had approved the incorporation of language from **SIMMONS v. UNITED STATE, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247(1968)**; into a properly drafted jury instruction, in order to minimize the danger of misidentification in cases where eyewitnesses are uncertain, unclear and inconsistent. Therefore defense counsel had the legal foundation upon which to make such a request to the Court but failed to do so.

In the Rule 61 motion, the petitioner argued that counsel was ineffective for failing to request a jury instruction on the dangers of misidentification, in a case where eyewitnesses were uncertain, unclear and inconsistent. The petitioner satisfied both prongs of the **STRICKLAND** standard showing that counsel's failure to request this jury instruction was unreasonable and the prejudice that resulted in light of counsel's decision to abandon the defense at the last minute. (See Rule 61 Motion-Ground 11).

It has been established that Judge Johnston ignored this allegation, giving no response to the seventh allegation of ineffective assistance of counsel in the Court's order denying the Rule 61 motion. It has been established that Judge Johnston ultimately denied the entire Rule 61 motion pursuant to Super. Ct. Crim. Rule 61(1)(4), applicable to any ground formerly adjudicated. It has been established that this was the petitioner's first Rule 61 motion and thus the proper vehicle to bring

ineffectiveness of counsel claims before the Delaware courts. REYNOLDS v. ELLINGSWORTH, 843 F.2d 712 (3RD.CIR.1988). Therefore, the petitioner could not possibly have been barred by super. Ct. Crim. R. 61(i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION, the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C. §2254(b)(c). The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the exhausted but procedurally defaulted claims are not excused. LINES v. LARKINS, supra; JOHNSON v. CARROLL, supra.

In this writ of habeas corpus, the petitioner argues that he was denied his 6TH AMENDMENT right to due process, due to counsel's failure to request a jury instruction on the dangers of misidentification in a case where eyewitnesses are uncertain, unclear and inconsistent. In order for a defendant to gain relief based on a constitutional claim that counsel was ineffective, the defendant must satisfy the two pronged test announced in STRICKLAND v. WASHINGTON, supra. The defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error the result of the proceeding would have been different. " UNITEDSTATES v. NINO, supra. (citing STRICKLAND, supra.). Both STRICKLAND prongs must be met in order to merit relief. NINO, 878 F.2d at 104.

In regards to the two prong STRICKLAND standard, the petitioner argues: 1. That defense counsel was expected to provide competent representation to the petitioner. Competent representation requires counsel to have the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. RULE 1.1- COMPETENCE of the Delaware Lawyers' Rules of Professional Conduct. When the State rested its case, review of the prosecution showed that the State's eyewitnesses were uncertain, unclear and inconsist. The U.S. SUPREME COURT'S approval of the incorporation of language from SIMMONS v. UNITED STATES, supra., on the dangers of misidentification into a properly drafted jury instruction was legal knowledge counsel should have been aware of. Especially in light of his decision to abandon the defense at the last minute. No reasonable attorney would forego every opportunity to assist the jury in reaching a

fair determination involving his client's case, in a trial where the eyewitnesses were so uncertain, unclear and inconsistent in their prior identification of his client.

The petitioner was prejudiced by counsel's failure to request a jury instruction on the dangers of misidentification because the jury was given no structure by which to analyze the witness' testimony on identification. They (jury) were left to its own devises, during deliberations, where they may well have thought it perfectly acceptable for the State's eyewitnesses to be so uncertain, unclear and inconsistent, when in all actuality there was a very strong possibility that some witnesses may have misidentified the petitioner as the shooter.

While a jury charge on the dangers of misidentification may be given in an appropriate case, the failure to give such a charge is not reversable error where the defendant's conviction was not based upon the testimony of eyewitnesses who were uncertain, unclear and inconsistent. STATE v. DAVIS, 504 A.2d 1372(1986); also, STATE v.GEORGE,481A.2d 1068(1984). The record clearly reflects the nature of the State eyewitnesses testimony, so that there is no question to the relevancy to this jury instruction, in this case.

Indeed, the final decision on whether to give this particular instruction to the jury rested with the trial judge. But the Court must agree with the petitioner, that such an instruction would have been appropriate in this case. In the event that the trial judge would have elected not to give such an instruction, that decision would have been on the record subject to review by an appellant court for reversable error.

In light of counsel's last minute decision to abandon the defense, counsel's failure to request this particular jury instruction undermines confidence in the outcome of the trial, since the jury never was made to be aware and alert to the dangers of misidentification in cases like this.

**8. THE EIGTH ALLEGATION** of ineffective assistance of counsel is due to counsel's withdrawal of a motion for new trial, on the day of the scheduled hearing to determine the merits of the motion.

The background information and foundation for this allegation stretches between GROUND ONE and GROUND TWO of this petition. In summary, it starts with the State approaching men and women after their arrest on serious criminal charges and propositioning them to make statements against the petitioner in exchange for benefits, for their cooperation, regarding their pending charges. (GROUND ONE). It ends with the State approaching Othello Predoux one day before the petitioner's trial started and developing him through this corruptive process, so that he eventually became a damaging state witness. (GROUND TWO).

At trial the State presented Predoux to the jury as a cooperating witness with whom no deals were made. Although Predoux had entered into a reduced plea on his weapons(gun)charges just eleven days after he made a damaging taped statement against the petitioner on July 18, 2002. A condition of that reduced plea was that Predoux testify in any criminal proceeding if called by the State. Predoux acknowledged at the petitioner's trial that the only case he would be testifying in was the petitioner's. So that the reduced plea correlated with Predoux' cooperation and willingness to testify against the petitioner at trial.

It was established at trial, that Predoux had one set of drug charges still pending at the time the petitioner's trial went forward. Although Predoux had originally been charged with trafficking in cocaine and attached felonies, it was determined that by the time the petitioner's trial went forward, that the weight of cocaine did weigh enough to constitute the charge of trafficking. So that Predoux was facing possession with intent to deliver and attached felonies. The defense attempted to show that Predoux had been courted by the State four years after the shooting and his (Predoux) only reason for cooperating with the State was because he had received and would receive reduced pleas regarding his criminal charges. Again, the State presented Predoux

103

to the jury as a cooperating witness with whom no deals had been made.

Less then one month after the petitioner's trial, Predoux returned to court and entered into another reduced plea to simple of cocaine. The State offered time served and probation, which Predoux was eventually sentenced to by the Court. In essense the plea was a probationary plea and in as much as Predoux had served exactly 11 months on a 1 year sentence for violation of probation, the reduced plea facilitated his immediate release from jail. The reduced plea was labeled a "SPECIAL CIRCUMSTANCE" plea and was awarded to him by Cynthia Kelsey, the lead prosecutor in the petitioner's murder prosecution and constant figure at all critical meetings with Predoux.

Upon learning of Predoux' reduced plea, defense counsel filed a Motion for New Trial on December 18,2002, in Superior Court. (A-53-58). Based on the above facts forwarded in the motion the HONORABLE HAILE ALFORD immediately scheduled a hearing for January 31,2003 at 3:30 P.M.(A-59). It was clear from the e-mails sent to Judge Alford from the State, that the scheduled hearing caused cocern. (A-8, 9   ). On the day of the hearing, counsel did not attend the hearing alledly due to illness. Subsequently, on the same day counsel sent a letter to Judge Alford withdrawing the motion for new trial. (A-60  ), so that ultimately the merits of the motion were never addressed by the Court when the issue was still fresh.

In the Rule 61 motion, the petitioner argued that counsel was ineffective because he withdrew the motion for new trial before the Court had the opportunity to address the merits of this allegation. The petitioner satisfied both prongs of the STRICKLAND standard showing that counsel's decision to withdraw the new trial motion was unreasonable and the prejudice that resulted. (See RULE 61 MOTION-GROUND 11).

It has been established that Judge Johnston ignored this allegation, giving no response to the eigth allegation of ineffective assistance of counsel in the Court's order denying the Rule 61 motion. It has been established that Judge Johnston ultimately denied the entire Rule 61 motion pursuant to Super. Ct. Crim. Rule 61(i)(4), applicable to any ground formerly adjudicated. It has been established that this was the petitioner's first Rule 61 motion and thus the proper

vehicle to bring ineffectiveness of counsel claims before the Delaware courts. REYNOLDS v. ELLINGSWORTH, 843 F. 2d 712(3RD.CIR.1988). Therefore, the petitioner could not possibly have been barred by Super. Ct. Crim. Rule 61(i)(4).

As forwarded in the BRIEF IN SUPPORT FOR EXCUSION    , the Delaware Supreme Court has not addressed this allegation, although the petitioner has exhausted all state remedies within the meaning of 28 U.S.C.3 2254(b)(c). The petitioner has satisfied the cause and prejudice standard and has shown that a fundamental miscarriage of justice will occur if the exhausted but procedurally defaulted claims are not excused. LINES v. LARKINS, SUPRA; JOHNSON v. CARROLL, SUPRA.

In this writ of habeas corpus, the petitioner argues that he was denied his 6TH AMENDMENT right to due process, due to ineffective assistance of counsel because counsel withdrew the motion for new trial on the day of the scheduled hearing without good cause. In order for a defendant to gain relief based on a constitutional claim that counsel was ineffective, the defendant must satisfy the two pronged test announced in STRICKLAND v. WASHINGTON, SUPRA. The defendant must show "(i) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error the result of the proceeding would have been different." UNITED STATES v. NINO, SUPRA; (citing STRICKLAND, SUPRA). Both STRICKLAND prongs must be met in order to merit relief. NINO, id.

In regard to the two prong STRICKLAND standard, the petitioner argues: 1. That it was unreasonable for defense counsel to withdraw the motion for new trial on the day of the scheduled hearing because all of the supporting elements were in place for the trial judge to make an independent and decisive determination on whether Predoux did receive reduced pleas for cooperating with the State. And whether the State had mislead the trial judge, defense counsel and the jury on this matter. Counsel's reasons for withdrawing the motion were set forth in a letter to the petitioner dated February 12, 2003. (A-61-62). Essentially, counsel had approached Predoux' attorneys, TIMOTHY TERRANOVA and RICHARD CROSS, ESQ., and had attempted to have them acknowledge that the State had awarded their client reduced pleas in exchange for his cooperation.

Since neither attorney provided counsel with any helpful information, he withdrew the motion. FIRST, counsel's explanation cannot be accepted because it calls for one to believe that counsel filed the motion for new trial based upon information he hoped to obtain from Predoux' attorneys. This is highly unlikely since it is not the actions or thoughts of an experienced, if not highly regarded, defense attorney. SECOND, if the petitioner or the Court is to accept counsel's reasons for withdrawing the motion for new trial. The petitioner has to argue and the Court should agree, that it was naive, if not foolish, for counsel to believe, in any way imaginable, that Predoux' attorneys would provide him with information that would reflect negatively on their client. That is not how lawyer-client relationships work. All conversations between Predoux and his attorney's are protected by the lawyer-client privileges and counsel surely knew that. Predoux' attorneys' were therefore not compelled to disclose any privileged information to defense counsel. THIRD, defense counsel seemed to overlook the fact that the very first meeting between the State's attorneys and Predoux was conducted "off the record" behind closed doors in a orchestrated meeting at the Attorney General's Division on May 6, 2002. Predoux' attorneys were not present and the State utilized the court system for that purpose. i.e. so that they could speak with Predoux alone. It is highly likely that Predoux was made aware that any benefits he received for cooperating with the State were to be suppressed. So that even his attorneys may not have been in the loop. Barring those assumptions, defense counsel did not need any confirmation concerning the facts of this allegation because the record of the State's development and handling of Predoux' two criminal cases supported the merits in the motion for new trial. The trial judge had been a witness to the entire development of Predoux as a witness, and how he was presented to the jury, and finally the disposition of his two criminal cases. Judge Alford was perfectly capable of addressing the merits of the motion for new trial. No reasonable attorney would have withdrawn the motion for new trial, on the day of the scheduled hearing, when all of facts that would support the argument in the motion were in place for the Court's determination.

The petitioner was prejudiced by counsel's withdrawal of the motion for new trial in several ways. FIRST, the State was allowed to develop a damaging witness through the most corruptive of practices and was permitted to parade this witness before the jury, utilizing his damaging taped statement to obtain the petitioner's conviction, while the witness' convenient amnesia prevented effective cross examination. SECOND, defense counsel's withdrawal of the motion for new trial prevented the Court from addressing this allegation when the matter was still fresh in the trial judge's mind. The petitioner is just now, four years later, raising the allegation even though it was raised in the Rule 61 motion. Judge Johnston replaced the trial judge in this case and it is obvious based upon her handling of the Rule 61 motion. That she is very hesitant to upset the results from the prior proceeding, notwithstanding the gross miscarriage of justice that has transpired here. FINALLY, the allegation was not raised on direct appeal, which would have preserved the argument in the record for direct review.

Further, defense counsel's alleged health issues which prevented him from attending the scheduled hearing and the subsequent withdrawal of the motion for new trial coupled with his transparent reasons for withdrawing the motion demostrated defense counsel's unwillingness to address a controversial issue. RULE 1.2[5] and RULE 1.3[1] of the Delaware Lawyers Rules of Professional Conduct.

Therefore, counsel's decision to withdraw the motion for new trial allowed to stand a conviction that was the result of a fundamentally unfair trial.

## ARGUMENT XII

THE ADMISSION OF THE INVOLUNTARY TAPED STATEMENT OF RONETTA SUDLER
PURSUANT TO TITLE 11 DEL.CODE 3507 VIOLATED THE PETITIONER'S 5TH AND 14TH
AMENDMENT RIGHTS TO A FAIR TRIAL.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's
due process rights that would render the trial, as a whole, fundamentally unfair.


An important part of the State's evidence in this case was a statement given by Ronetta Sudler,
who identified the petitioner in her taped statement as being the shooter. At trial Sudler claimed
that she did not remember what she had told Dt. Brock in her taped statement nor did she
recall seeing the petitioner at all or with a gun on August 1, 1998.

Sudler acknowledged prior convictions for drug related offenses and indicated that she had started
using drugs at age sixteen. Her drugs of choice were alcohole, marijuana, powder cocaine, crack cocaine
and ecstacy. She testified that she had been partying with friends on the night of the shooting and
was high from smoking marijuana and drinking. She testified that when high she would frequently
hallucinate and see things that were not there. She also indicated that she smoked marijuana shortly
before she was accosted by Dt. Brock on August 11, 1998. The petitioner argued at trial and on direct
appeal that Sudler's taped statement was not voluntarily given and its admission violated the petitioner's
due process rights.

Title 11 Del. Code §3507 allows for the admission of the prior out-of-court voluntary statements
of witnesses who are present and who testify at trial. The constitutionality of this statute has
been repeatedly upheld. KEYS v. STATE, 337 A.2d 18(Del. 1975); FELEKE v. STATE, 620 A.2d 222(Del. 1993).
However, in order for the statement to be admissible the state must first establish by a
preponderance of the evidence that the statement was voluntarily made. HATCHER v. STATE
337 A.2d 30 (Del. 1975); STATE v. ROOKS, 401 A.2d 943(Del. 1979).

A statement is given voluntarily if, under the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker. See, SCHNECKLOTH v. BUSTAMONTE, 412 U.S. 218, 225 (1973); also, UNITED STATES v. SWINT, 15 F.3d 286, 289 (3RD. CIR. 1994); UNITED STATES v. VELASQUEZ, 885 F.2d 1076, 1087 (3RD CIR. 1989).

It was established at trial that Dt. Brock staked-out Sudler's residense for a period of time and accosted her when she, her fiance and infant child arrived home. Sudler was not given the choice of whether she did or did not want to go to the police station. Dt. Brock brusquely grabbed her out of her vehicle, indicating that she needed to go with him. Sudler testified that she did not want to go to the police station.

Sudler testified that at the police station Dt. Brock told her that the petitioner shot the victim. (A-125 ). Sudler repeatedly told the detective that she was not present on 22ND & LAMOTTE ST. at the time of the shooting. At that point during the interview Dt. Brock began making threats and promises to Sudler if she would not change her story to one more agreeable to him. Sudler did not know that her statement was being video-taped. Sudler testified that after Dt. Brock began threatening her, that she would, "say anything to get out of there." i.e., say whatever Dt. Brock wanted her to say, so that she could leave the police station.

Dt. Brock threatened to take Sudler's children away from her if she would not make a statement. That being a statement agreeable to Dt. Brock's version of events, since Sudler's statement was that she not present on 22ND & LAMOTTE ST. and did not see the shooting. Dt. Brock admitted under oath that he was aware that she had children and he hung this threat over her head to ensure that she would talk. "Express threats that the defendant's children will be taken away . . . if she fails to cooperate, have been held to be so coercive that the defendant's statements were rendered involuntary." See, LYNUMN v. ILLINOIS, 372 U.S. 528, 543 (1963). Even if threats of this type are more subtle rather than direct, but have the same "purpose and effect" as express threats, a defendant's statements are not voluntary. See, UNITED STATES v. TINGLE, 658 F.2d at 1337 (9TH CIR. 1981). In other words, when the purpose and objective of an interrogation is to cause a defendant to fear that

failure to cooperate will result in loss of her children, any statement made in the course of the interrogation will be considered to be coerced and involuntary. See, Id. at 1336.

"Although the mere fact that one has taken drugs does not render [one's statement] involuntary, it can have an impact on the voluntariness of one's statement." UNITED STATES v. PRINCE, 157 F.Supp.2d 316, 327 (D.Del. 2001). Therefore, the Court must consider "a defendant's demeanor, coherence, articulateness, his capacity to make full use of his facilities, his memory and his overall intelligence." Id. (citation omitted.) The reality was that Sudler was a 9th grade drop out, a mother of two small children, on probation for drug convictions, with a longstanding miscellaneous drug problem. She was under the influence at the time of the interview and faced with a alternatingly bullying and dismissive, brusque and threatening detective intent on making her give a statement that comported with what he believed to be the truth. After over an hour and a half of threats and promises, Sudler admitted that she would "say anything to get out of there." It is highly unlikely that Dt. Brock would have taken such a discourteous and unproffessional position had this potential witness been an educated and respected member of society. i.e. a doctor, lawyer or government official. Dt. Brock seized upon an uneducated, young mother and utilizing an oppressive interrogation technique, extracted a statement from Sudler that agreed with him. This must militate against a finding of voluntariness. A statement must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of improper influence. U.S.C.A. Const. Amend. 5 (cited in U.S. v. PRINCE, id).

During her testimony, Sudler stated that Dt. Brock promised her that if she made a statement she would not have to testify in court. (A-187 ). At trial Sudler initially refused to even enter the courtroom (A-184 ) which supports the argument that Sudler completely believed Dt. Brock's lies. The BAYNARD COURT equated "a lie told to a defendant about an important aspect of the case" as having similar effects as any other extravagant and overbearing tactics employed by detectives when interviewing a witness, that "may affect the voluntariness of a statement." BAYNARD v. STATE, 518 A.2d 682, 690 (Del. 1986) (quoting FRAZIER v. CUPP, 394 U.S. 731, 739 (1939)). If Dt. Brock had been completely candid with Sudler, instead of telling her bold faced lies, Sudler, knowing that

110.

she would have to testify at trial if she made a statement, would very well not have made any statements.

How many times must the petitioner demonstrate Dt. Brock's varied threats and promises before the Court determines that Sudler's statement was not voluntarily made? Another example, Dt. Brock knowing that Sudler was on probation, hung the threat of jail time over her head. He specifically told her that he believed she was on 22nd & Lamotte St. at 1:30 A.M. on the night in question. And she was thus in violation of the terms of her probation which required her to be in the house between 10:00 P.M. and 6:00 A.M. Dt. Brock told her that since she was on probation, they could be in a position to help each other out. Here, Dt. Brock implied that he could help her avoid jail time if she was cooperative. Also implicit is that he could send her to jail if she did not help him out. Dt. Brock indicated that he had probation & parole officers right outside the interview room. This to support his implicit threat that Sudler would be sent to jail for violation of probation if she would not cooperate. "A statement must not be extracted by any sort of threats . . . nor obtained by any direct or implied promises, however slight, nor by the exertion of improper influence." UNITED STATES v. PRINCE, SUPRA.

Dt. Brock also threatened to place Sudler under arrest and charge her with hindering prosecution if she did not change her statement to one more agreeable to him. All the combined threats and promise overcame Sudler's rational intellect and free will because she believed it necessary to talk to Dt. Brock to avoid jail time.

The State argued on appeal that the petitioner has not demostrated that any possible police promises or inducements to Sudler were so extravagant or overbearing that her free will and rational intellect were distorted. (See State's Answering Brief pg. 11). The State cannot dispute that Dt. Brock made threats and promises to Sudler, putting their arguments behind the thought that those threats and promises were not so extravagant or overbearing that Sudler's free will was distorted. The petitioner asks this review Court, what more did Dt. Brock have to do past what has been demostrated here? If Dt. Brock had drawn his service weapon and aimed it at Sudler during the interrogation, demanding under the penalty of death, that she make a statement that agreed

with him. And Sudler's statement was extracted under those circumstances, would that severe threat then render Sudler's statement involuntary?

The Delaware Supreme Court noted that the trial judge allowed voir dire examination of Sudler's in order to determine the voluntariness of her August 11, 1998 taped statement. Sudler testified during voir dire that she was probably high on drugs, possibly hallucinating on the night of the shooting. Sudler maintained that she could not remember anything about her statement, including Dt. Brock's threats to take her children if she did not cooperate. The Delaware Supreme Court agreed with the trial judge's finding that Dt. Brock's questioning was reasonably calculated to obtain her statement about the incident. And since voir dire produced no new, significant, credible evidence touching on the voluntary nature of Sudler's statement. Both the trial judge and the Delaware Supreme Court determined that Dt. Brock was not so unfairly oppressive and overbearing that his manner compromised Sudler's willingness to make a statement.

Both, the trial judge and the Delaware Supreme Court failed to factor in the fact that when Sudler initially refused to participate in the trial, stand-by counsel, one BRANDON O'NEIL ESQ., advised Sudler to take the witness stand to avoid being held in contempt of court. But claim memory loss to any question she could not remember. I.e., any questions she did not wish to answer. Therefore, voir dire essentially served no purpose since Sudler had already begun direct examination claiming memory loss to all operative facts from the night in question. Past Sudler's testimony that Dt. Brock accosted her outside her home, grabbed her from her car and child, took her to the police station and that she did not voluntarily go to the police station. All of Dt. Brock's threats and promises are clearly demonstrated on the video tape. So that voir dire did not need to produce any new, significant, credible evidence touching on the voluntary nature of her statement. "A statement must **NOT** be extracted by any sort of threats... nor obtained by any direct or implied promises, however slight, nor by the exertion of improper influence."*id.* The threats and promises demonstrated on the tape has met the threshold to render a statement involuntary, and was significant and credible enough standing alone. The trial judge and the Delaware Supreme Court erred in finding that Sudler's statement was voluntarily given, and should have been suppressed.

## ARGUMENT XIII

THE RECKLESSLY ELICITED REFERENCE BY A STATE'S WITNESS THAT THE PETITIONER HAD PREVIOUSLY GOTTEN OUT OF JAIL WAS PLAIN ERROR THAT WAS NOT CURED BY THE COURT'S UNTIMELY CURATIVE INSTRUCTION, DENYING THE PETITIONER HIS 5TH AND 14TH AMENDMENT RIGHT TO A FAIR TRIAL.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's due process rights that would render the trial, as a whole, fundamentally unfair.

It was the strategy of the defense from the outset of the trial that the petitioner not testify. The basis of the defense strategy was predicated upon the fact that the petitioner had a prior conviction for robbery in the second degree as well as a conviction for trafficking in cocaine. For the petitioner to testify in this trial would allow the jury to find out that he had a prior criminal record. See. Delaware Rules of Evidence 609. Indeed, counsel stressed this point from the outset and provided the court with a voir dire question to determine whether or not any of the jurors would react adversely to the fact, if the petitioner elected not to testify. Counsel addressed the fact that it was not likely that the petitioner would testify in his opening statement. This strategy was calculated to avoid the jury's learning that the petitioner had a prior criminal record.

The Court also went to great lengths to assure that the jury would not hear that the petitioner had previously been convicted of a felony level offense. Prior to trial, the petitioner filed a "Motion for Severance of Charges" so as to remove the charge of possession of a deadly weapon by a person prohibited from the jury's consideration. The Court granted counsel's Motion for Severance indicating that given the "gravity of the matter" it was appropriate that the jury not be advised that the petitioner had a prior criminal record.

During the course of the trial, the State called the petitioner's sister, Adrienne Dawson, as a witness. The purpose of calling this witness was to establish that the petitioner had fled subsequent

113.

to the incident in question and had not returned to her house at any time, in light of the fact that the petitioner had been living at her house. The State had abundant other evidence of this fact and indeed introduced evidence thereon through the testimony of Ot. Brock. During the course of the witness' direct examination and in an unresponsive answer to the prosecutor's question, defense counsel was able to anticipate that the witness was going to calculate how much time the petitioner had lived at her house by stating to the jury the date on which the petitioner got out of jail.

Counsel immediately objected and the witness did not respond to the question. (A-190). Prior to the next question being asked counsel spoke with the prosecutor and advised him of what the witness was about to say and indicated to the prosecutor that counsel would have no objection to his leading the witness so as to avoid the introduction of the prejudicial testimony. (A-191). Notwithstanding defense counsel's warning, the prosecutor again asked an open-ended question at which point the witness indicated that the petitioner had gotten out of jail on a certain date. Counsel immediately objected, approached side bar and requested a mistrial.

The petitioner argues here that the State's actions in eliciting the prejudicial testimony was intentional because after being forewarned, the prosecutor asked nearly the same question, that would still call on the witness to calculate time, which he now knew she would do by referring to when the petitioner had previously gotten out of prison. The UNITED STATES SUPREME COURT stated: "... He (prosecutor) may prosecute with earnestness and vigor, indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. BERGER v. UNITED STATES, 295 U.S. 78, 88 (1935) (cited in UNITED STATES v. HAYWOOD, 420 F.2d 142 (1969). As a result of the above situation, the jury became aware of the fact that the petitioner had been incarcerated and therefore inferencially became aware of the fact that the petitioner was involved in other criminal activity. This is so since the period of incarceration referred to by the witness preceded the charges that were brought in this case. The Court did instruct the jury to disregard the witness' response about the petitioner having been in prison

and/or jail. (A-201 ). which made the second time the jury was alerted to that highly prejudicial information. By the time the instruction was given, however, the skunk was already in the jury box and the stench could not be removed. See, DONNELLY v. DeCHRISTOFORO, 416 U.S. 637 (1974). Some comments or remarks are so prejudicial that even the strongest instructions to the jury to disregard the witness' questions or comments will not suffice. UNITED STATES v. CARPENTER, 776 F.2d 1291, 1296 (5TH.CIR. 1985).

Testimony regarding the existence of a prior criminal record or prior criminal activity on the part of the petitioner is perhaps the single most prejudicial type of information that can be brought to the attention of the jury. As was noted in BROOKENS v. STATE, 354 A.2d 422 (Del. 1976), "While our trial procedure is based on . . . . it is essential that jurors be insulated as much as possible from the irrelevant, particularly as to matters so prejudicial as a prior criminal record." This is especially so where the petitioner has elected as a part of his strategy not to testify, so as to keep this very information away from the jury. As was made clear in UNITED STATES v. HARRINGTON, 490 F.2d 487 (C.A.2 1973) . . . " If, at his trial, a petitioner does not take the witness stand in his own defense, and if he has not himself been responsible for causing the jury to be informed about his previous convictions, he is entitled to have the existence of any prior criminal record concealed from the jury . . . "id.

The rationale behind this rule was noted by a New York Court in dealing with the same issue where a petitioner did not testify : "This rule derives from a recognition of the human tendency to more readily believe that a person is guilty of a crime if he has a prior criminal history and the possibility that a jury may convict the petitioner on **that** basis, even though not convinced beyond a reasonable doubt of the guilt of the crime charged ( citation omitted). A petitioner is entitled to have his guilt or innocence determined solely upon the evidence tending to prove the crime charged, uninfluenced by irrelevant and prejudicial facts and circumstances. NEW YORK v. BLANCHARD, 442 N.Y.S.2d 140 (1981); also, MICHELSON v. UNITED STATES, 355 U.S. 469 (1948).

The State argued that the "jail" reference by the witness in this case was brief, unresponsive, not clearly elicited by the State and of minimal impact. (State's Answering Brief-pg. 13).

And further argued that the reference to the petitioner's prior jailing by his sister was not so prejudicial that the trial judge's curative instruction to the jury was insufficient. (State's Answering Brief-pg. 15).

The Delaware Supreme Court reviewed the prejudicial for an abuse of discretion. Finding that the trial judge's immediate curative instruction cured any unfair prejudice. (See Court's Opinion pgs. 8-9).

The petitioner argues here that the prejudicial error was not inadvertent as the State seems to suggest, but was plain error that violated the petitioner's 5TH AND 14TH AMENDMENT rights to a fair trial. The fact that the petitioner had previously been in jail and/or prior trouble with the law, came before the jury two times. Once when his sister revealed that prejudicial fact and again when the trial **judge** gave the instruction to the jury, so that their was nothing brief about it. Surely the Court must agree that this prejudicial information, heard twice over a period of three days, played a role in the jury's deliberation and its verdict.

The curative instruction given by the trial judge was limited in scope and was given on Monday, October 28, 2002. The record will reflect that the witness' revelation of the petitioner's prior troubles with the law occured on Friday, October 25, 2002, so that there was nothing immediate about it. The prejudicial information, once revealed, was followed by a recess that extended into the entire weekend. Which only could focus the jury's attention on the prejudicial information more closely. Then on Monday, October 28, 2002, the first thing the jury hears when they return to the courtroom is the jail reference all over again, this time from the trial judge. The instruction did not timely or effectively mitigate the impression left on the jury. Regarding the immediacy of the limiting instruction, the Superior Court in stated that: "...limiting instructions should be given immediately because a delayed instruction would be tantamont to giving none at all." STATE v. SAVAGE, 2002 WL 187510 at *3 (Del. Super. 2002).

Not only was the instruction untimely, it was also insufficient to effectively mitigate the disclosure of the petitioner's prior felony conviction. The trial judge should have instructed the jury to totally and completely disregard the prejudicial testimony. Here, the trial judge did not

cite Delaware Rules of Evidence 609(b) in its instruction and without explaining to the jury why they should not consider the reference about the petitioner being in prison and/or jail, simply told the jury that they ought not consider the reference and that the reference was stricken from the record. (A-201 ). Again, this did little more than refocus the jury's attention on the fact that the petitioner had prior troubles with the law, that had required him to be incarcerated. The Court should be mindful of Mr. Justice Jackson's words in his concurrence in the case, **KRULAWIZ v. UNITED STATES, 336 U.S. 440 (1949)**, as to the efficacy of cautionary instructions: " The naive assumption that prejudicial effects can be overcome by instructions to the jury .... all practicing lawyers know to be unmitigated fiction. " Thus, the untimely and limited instruction given by the trial judge in this case fell short of satisfying the requirement.

Further, numerous courts have recognized that the impact of a jury's learning that the petitioner has had prior problems with the law is exacerbated in situations where the petitioner does not testify. See, **MOSLEY v. STATE, MISS.App., 749 So.2d 1090 (1999); STATE v. MOSS, N.C., 532 S.Ed.2d 588 (2000)**.

There are cases to suggest that reversal on a plain error rational may require more than a simple finding that the error was not harmless. e.g. **UNITED STATES v. LEONARD, 494 F.2d 955, 960-61 (1974); UNITED STATES v. GRASSO, 437 F.2d 317, 319 (3RD.CIR. 1971)**; also **UNITED STATES v. REED, 446 F.2d 1226 (8TH CIR. 1971)**. Federal Rules of Criminal Procedures 52(b) however, makes trial defects cognizable as plain error if they affect "substantial rights," the precise standard under which Federal Rule of Criminal Procedures 52(a) requires courts to determine whether an error is harmless.

The petitioner has shown that the prejudicial error here was not harmless and violated his 5TH and 14TH AMENDMENT rights to a fair trial. Review is de novo.

## ARGUMENT XIV

THE NON-RESPONSIVE, FLIPPANT COMMENT BY A CRUCIAL STATE WITNESS THAT
DEFENSE COUNSEL HAD PREVIOUSLY REPRESENTED HIM ON A CRIMINAL CHARGE
EVISCERATED DEFENSE COUNSEL'S CREDIBILITY AND DENIED THE PETITIONER A FAIR TRIAL.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's
due process rights that would render the trial, as a whole, fundamentally unfair.

Trial in this case was originally scheduled to begin on May 7, 2002. A jury was selected on that
date but not sworn in at the State's behest. On May 8, 2002, the State moved to disqualify
defense counsel on the ground that he had previously represented a last minute witness, Othello
Predoux. (See GROUND 1, 2, &3). The petitioner resisted the State's application so that the trial was
postponed while both parties briefed the Court on the legal issue. The petitioner was subsequently
transferred from general population in Young's Correctional Institute (formerly GANDER HILL) to isolation
at the maximum security wing (SHU) at the Delaware Correctional Center.

Ultimately the court determined that counsel did not have a conflict of interest in previously
representing Predoux and currently representing the petitioner, reasoning that all of the information
that counsel would use in cross examination was a matter of public record. It was clear that counsel
would not utilize any information derived from his prior attorney-client relationship with Predoux
during cross examination. It was equally understood that it would not be necessary for the petitioner's
jury to learn of counsel's prior representation of Predoux. In as much as Predoux was the State's
witness, it was left to the State to relay to its witness, that he was not to mention defense counsel's
prior representation of him at the petitioner's trial.

At trial, Predoux was a very damaging witness. Although he claimed lack of memory on direct
and cross examination, he had provided the State with a prior taped statement on July 18, 2002. In
that statement he had indicated that the petitioner was the shooter on the night in question.

During cross examination counsel attempted to show that the witness had not come forward for four years and was approached by the State after he had pending two seperate sets of serious charges, (See, Ground 1 & 2). The maximum sentence on those charges was 56 years and conviction on all offenses then pending would have carried with it a minimum mandatory jail term of eight years. Counsel attempted to show that the witness had already received a benefit with regard to one set of charges and expected a benefit with respect to a set of charges still pending at the time that he testified.

After a painstaking and aggressive cross examination calculated to show that the witness was mendacious and his statement's self serving. This exchange occured:

Q. Now, when you gave the statement to the police you added a touch saying this, you vomited right?

A. Yes.

Q. Because I guess you don't like violence or it upsets you to see that kind of violence?

A. No, it is the first time I saw something like that before.

Q. Okay. But you don't have a problem with violence now, do you?

A. I mean, I don't know what you're saying.

Q. Well, I am asking if that upsets you?

A. If you do something to me, I'm going to upset you.

Q. Maybe you didn't just add that for effect, the vomiting part?

A. No, that's what happened, that's what I did.

Q. You're certaintly not a stranger to guns?

A. No

Q. And guns cause violence, don't they?

A. Yes

Q. As a matter of fact, back in 1998' when we were talking about that you had two of them on your person, didn't you

A. Yes

Q. As a matter of fact, that was in September, early September of 1998, wasn't it ?

A. Yes, you represented me.

Q. Answer my -- ( A-204 ).


The entire jury laughed at Predoux' flippant response.(A-192 ). Counsel approached sidebar and requested that the jury be removed. At which point he inquired if the State had instructed their witness not to mention defense counsel's prior representation. When the State replied that they had not, counsel moved for a mistrial.( A-204 ).

The mistrial application was denied and no curative instruction was given to the jury. The trial judge instructed the witness not to make any further reference to defense counsel's previous representation. And further suggested, as a curative measure that defense counsel briefly question Predoux to establish that the non-responsive remark that revealed defense counsel's prior representation resulted in Predoux taking a plea agreement.

Subsequent to the petitioner's conviction, counsel filed a motion for new trial on November 6,2002. Arguing that the prejudicial error warranted a new trial.(A-46-52). That motion was denied by the Superior Court, so that the argument was raised on direct.(See, Opening Brief pgs.20-24). The Delaware Supreme Court affirmed the conviction on August 31,2004.(See, Court's Opinion).

Here, the petitioner argues that it is settled that Delaware Court's have recognized the necessity of maintaining the integrity of defense counsel before the jury in the context of unwarranted prosecutorial attacks. See, WALKER v. STATE, 790 A.2d 1214(Del. 2002). The Court noted that in order for counsel to effectively and vigorously defend his client, his credibility may not be denigrated by participants in the process. HUNTER v. STATE, 815 A.2d 730(Del. 2002).

The petitioner is entitled to effective assistance of counsel. STRICKLAND v. WASHINGTON, 466 U.S. 668 (1984); ALBURY v. STATE, 551 A.2d 53(Del. 1988). The Court must agree that in order to succeed on behalf of a client it is crucial that counsel have the trust of the jury so that his arguments, on behalf of the client are made to a receptive audience. The jury must believe that counsel

is a person of integrity and fairness in order for his arguments to be given credibility.

In the present case, counsel had spent his entire cross examination of Predoux attempting to belittle him, prove him to be a liar and otherwise impugn his character. Basically had attempted to show that Predoux was a "sham artist" unworthy of belief. When Predoux revealed that counsel had previously represented him, without being asked, counsel's credibility was lost. Again, the jury laughed indicating that they recognized defense counsel's seemingly hypocritical position. Certainly the jury could not be expected to understand the ethical niceties, which allow such successive representation. See, Delaware Rules of Professional Conduct 1.9.

The prejudicial error was aggravated in this case because the petitioner elected not to testify. If counsel's credibility was compromised and eroded, then the jury may well have distrusted the decision not to have the petitioner testify. The jury may well have concluded that an untrustworthy attorney must be trying to keep something from them. For example, the prejudicial error that revealed to the jury the petitioner's prior incarceration. The jury may well have viewed this second prejudicial error, that revealed counsel's prior representation of the witness, as another example of an untrustworthy attorney trying to hide facts from them. Facts that reflected badly on him and his client.

The trial judge gave no curative instruction to the jury. Again, this is a situation where the trial judge and/or the parties involved in this case, seem to think that the jury would ignore prejudicial information that came to their attention. The Court must agree that the jury no doubt lost faith in the defense counsel when he was made to appear as a hypocrite before them. And that lost faith undoubtably played a role in their (jury) deliberation and resulting verdict. Thus denying the petitioner a fair trial.

Federal courts review habeas petitions for a "constitutional infraction" of the petitioner's due process rights which would render the trial as a whole fundamentally unfair. See LAVERNIA v. LYNAUGH, 845 F.2d 493, 496 (5TH CIR. 1988)(citation and quotation omitted). The test applied to determine whether a trial error makes a trial fundamentally unfair is a reasonable

probability that the verdict might have been different had the trial been properly conducted. See, KIRKPATRICK v. BLACKBURN, 777 F.2d 272,278-79(5TH CIR. 1985). The prejudicial error here eroded counsel's credibility which by extension reflected badly on the petitioner in violation of his due process rights to a fair trial and effective assistance of counsel.

## ARGUMENT XV

THE PROSECUTION'S OPENING STATEMENT REMARKS ABOUT A "DOUBLE-DEUCE GROUP, THE 22ND STREET REGULARS" AND "A CODE OF SILENCE WAS SET INTO MOTION" VIOLATED THE PETITIONER'S 5TH AMENDMENT RIGHT TO A FUNDAMENTALLY FAIR TRIAL, WHEN THE REMARKS WERE NOT SUPPORTED BY ADMITTED COMPETENT EVIDENCE AT TRIAL.

### STANDARD AND SCOPE OF REVIEW

The scope of review for habeas petitions is for a constitutional infraction of the petitioner's due process rights that would render the trial, as a whole, fundamentally unfair.

In the opening statement, the prosecution argued a theme that served as an undercurrent throughout the trial relative to the unwillingness of witnesses to come forward in this case. In its opening statements, the prosecutor stated: "Alfred Smiley died in surgery at the Christiana Medical Center later that morning. You will see in the evidence all of the Double-Deuce group, the 22ND Street regulars, clammed up immediately. A code of silence was set into motion. All of the people out that night weren't regulars, however, and that's why, in part, we are here today." (A-98.).

Late in the case the State was twice stymied in their efforts to introduce such testimony through Dt.Brock. Photos purporting to show a Double-Deuce group reflecting a group of loosely associated 22ND Street people with silence as its common bond were excluded.(A-119,158). The State also attempted to introduce evidence that witnesses, other than those who testified at trial were interviewed and were uncooperative.( A-158-59). Objection to this line of questioning was also sustained. Accordingly no evidence to support the prosecution's arguments that there was a "Double-Deuce group, 22ND Street regulars" and "a code of silence" in operation between them was ever introduced.

The petitioner did not object to the State's opening statement remarks because the defense anticipated that the State would have competent evidence to support its remarks. It has been established that no such evidence was ever forthcoming. The petitioner did object during

the State's closing arguments when Mrs. Kelsey argued that a large group of uncooperative people was present on the street, on the night in question. This immediately before she implored the jury to keep in mind that someone approached State witness, VERNON MAYS, on the street after he gave his statement to the police. And as a result of being approached MAYS became scared for his safety. ( **A-167** ). The suggestion here being that the large group was this alleged "Double-Deuce group, 22ND Street regulars" whom had been operating on a "code of silence" immediately after the shooting.

On direct-appeal this argument was essentially seperated into two parts. The first part dealing with the State's opening statement remarks about a "Double-Deuce group, 22ND Street regulars" and "a code of silence" which was unsupported by competent evidence. The second part dealing with the State's suggestion or insinuations that the petitioner, as a member of this "Double-Deuce group, 22ND Street regulars," had directed unidentified members of this alleged Double-Deuce group approach state witnesses on the street in order to intimidate them prior to trial. The petitioner attempted to demostrate how the State made the latter suggestions and insinuations when State witnesses, VERNON MAYS and MATHEW CHAMBLEE testified at trial. (See DIRECT APPEAL-GROUND IV). The Delaware Supreme Court addressed only the first part of that argument in its opinion. (See COURT'S OPINION pg. 6-7). Since the Court determined that the second part of that argument had not been fully developed, the petitioner argued that second part in his Rule 61 motion for post-conviction relief. (See Rule 61 Motion-GROUND 4). In as much as the Rule 61 motion was denied pursuant to Super. Ct. Crim. Rule 61(i)(4), The second part of that argument is also presented in this petition in GROUND IV. The petitioner chose to keep the two arguments seperate to avoid confusion. This GROUND 15(IV) argument deals with the State's opening statement remarks and the lack of competent evidence admitted at trial to support those prejudicial arguments.

The Delaware Supreme Court applied a plain error standard of review since the petitioner did not object to the prosecution's opening statement remarks. **CLAYTON v. STATE, 765 A.2d 940, 942 (2001).** Acknowledging that the record was sparse in regards to any evidence to support

the prosecution's opening statement remarks, the Delaware Supreme Court seemingly bailed the State out of its error by shifting the Courts focus to inferences of "a code of silence" drawn from the State witness' reluctant and evasive trial testimony. The petitioner argues that this cannot stand because to interpret the prosecution's opening statement remarks would not lead any rational person to believe that the State was referring to its own witnesses. And if the State was referring to its own witnesses being members of this alleged "Double-Deuce group, 22ND Street regulars "operating on "a code of silence," they (State) still never admitted a shred of competent evidence to support that position. So the Delaware Supreme Court's bail out can not possibly stand.

The simple truth is that the State argued a prejudicial theme from the beginning of trial and then failed to produce and/or admit any competent evidence to support its arguments. A deliberate and calculated effort to prejudice the defendant by references to matter not in evidence is improper and cannot be tolerated. UNITED STATES v. WHITMORE, 480 F.2d 1154 (1973).

Further, the Delaware Supreme Court seemed to focus its attention on only the "code of silence" remark by picking the bones of State witness' trial testimony to give substance to the prosecution's opening remarks about "a code of silence." But then seems to totally ignore the prosecution's remarks about this alleged "Double-Deuce group, 22ND Street regulars." Not once did the State admit competent evidence that this alleged "Double-Deuce group, 22ND Street regulars "even existed. The petitioner challenges this review court to find any instances during the course of the petitioners trial where the State admitted competent evidence that supported their argument that this alleged group even existed. Much less any competent evidence to support their argument that the petitioner was a member of this alleged group.

An aggravating fact was that in the prosecution's opening remarks, James Rambo argued or made reference to this alleged "Double-Deuce group" a total of 6 times. ( **A-97** ). And not once did the State admit competent evidence to support their extremely prejudicial theme that this alleged group, the "Double-Deuce group, 22ND Street regulars" ever existed.

The prosecutor's conduct amounts to a denial of due process when his comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." SEE, DARDEN v. WAINWRIGHT, 477 U.S. 168,181(1986). The conduct must be [either] persistent and pronounced. . . . KIRKPATRICK v. BLACKBURN, 777 F.2d 272, 281(5TH.CIR. 1985).

Except in cases with strong potential for harm to the petitioner, the custom of courts in responding to instances of courtroom misconduct by prosecutors has been to issue a verbal rule. Despite these verbal slaps on the wrist, prosecutorial misconduct continues to provide "one of the most frequent contentions of petitioners on appeal. Experience suggests that courts must begin to take prophylactic considerations together with probable prejudice to petitioners in deciding whether to reverse. UNITED STATES v. FREEMAN, 514 F.2d 1314, 1318(1972).

The prosecution's opening statement remarks led the jury to believe: FIRST, that there was a "Double-Deuce group, 22ND Street regulars," who the State stopped just short of calling a street gang.(A·199-200). SECOND, that the "Double-Deuce" group, 22ND Street regulars were operating on a conspiratorial "code of silence" immediately after the shooting, and, FINALLY, that the petitioner was a member of this alleged "Double-Deuce" group, 22ND.Street regulars. The resounding problem with this extremely prejudicial theme was that no competent evidence was admitted, not one shred of evidence, to support that argument. In fact, the State never admitted a shred of competent evidence that would support the belief that the petitioner even frequented the 22ND & LAMOTTE street area at all.

The prosecutor's conduct was not an isolated, momentary aberration occuring in the heat of trial (See Ground 4), but was a deliberate, calculated and successful effort to prejudice the petitioner by referencing matters that was not in evidence. Such tactics cannot be tolerated. See, BERGER v. UNITED STATES, 295 U.S. 78 (1935); UNITED STATES v. PHILLIPS, 476 F.2d 538(1973). Prosecutor's remarks render state court trial fundamentally unfair within meaning of 14TH AMENDMENT [ U.S.C.A. Const. Amend. 14] only if remarks evince either persistent and pronounced misconduct where evidence was so insubstantial that in probability but

for the remarks no conviction would have occured, when thus attacked, prosecutorial comments are not considered in isolation, but are evaluated in context of entire trial as a whole including prosecutor's entire closing argument. **KIRKPATRICK v. BLACKBURN, 777 F.2d 272, 278-79(5TH.CIR. 1985).**

The petitioner has shown that the prosecution's remarks prejudiced his substantial rights and the habeas writ issues only to correct errors of constitutional magnitude. **Id.**

## CONCLUSION

THEREFORE, for the foregoing reasons asserted in the application, the petitioner requests that this HONORABLE COURT grant the writ, reverse the conviction and remand the case to the Superior Court in New Castle County for a new trial to be held within 90 days or release the petitioner from confinement.

DATE: MAY 24, 2006

Respectfully submitted,

Damone Flowers

DAMONE FLOWERS

D.C.C.

1181 PADDOCK ROAD

SMYRNA, DE. 19977

# THOMAS A. PEDERSEN

**ATTORNEY AT LAW**
**MEMBER DE. BAR**

**727-B N. MARKET ST.**
**WILMINGTON, DE 19801**
**TEL. (302) 652-7905**
**FAX (302) 652-1467**

**2 N. RACE ST.**
**GEORGETOWN, DE 19947**
**TEL. (302) 856-2533**

January 23, 2006

To Whom It May Concern:

I was initially assigned to represent Damone Flowers in the Superior Court of the State of Delaware In and For New Castle County. I have been contacted by Mr. Flowers asking that I verify that letters dated 5/29/01, 5/31/01, 8/3/01, 8/20/01 and a Motion to Withdraw as Counsel were in fact filed by me during my representation of him. I have compared these letters to my file and they are in fact various correspondences I sent to my client, the prosecutor, and his new attorney during that time.

Please let me know if the Court needs any additional information on behalf of this request.

Very truly yours,

*Thomas Pedersen*

Thomas A. Pedersen

TAP/pah
Cc: file

**SHU LAW LIBRARY**

Westlaw.

784 A.2d 1082                                                                                      Page 1
784 A.2d 1082, 2001 WL 1388618 (Del.Supr.)
**(Cite as: 784 A.2d 1082)**

(The decision of the Court is referenced in the Atlantic Reporter in a 'Table of Decisions Without Published Opinions.')

Supreme Court of Delaware.

Marvin SWANSON, Defendant Below-Appellant,

v.

STATE of Delaware, Plaintiff Below-Appellee.

**No. 248,2001.**

Submitted Oct. 18, 2001.
Decided Oct. 31, 2001.

Court Below-Superior Court of the State of Delaware, in and for New Castle County, Cr.A. No. IN00-02-0191 and -0194.

Before VEASEY, Chief Justice, WALSH, and STEELE, Justices.

### ORDER

*1 This 31st day of October 2001, upon consideration of the appellant's Supreme Court Rule 26(c) brief, his attorney's motion to withdraw, and the State's response thereto, it appears to the Court that:

(1) The defendant-appellant, Marvin Swanson, was convicted, following a Superior Court bench trial, of possession with intent to deliver cocaine and tampering with physical evidence. The Superior Court sentenced Swanson on both charges to a total of nine years at Level V incarceration, suspended after five years for decreasing levels of supervision. At trial, Swanson's defense was mistaken identity. This is Swanson's direct appeal.

(2) Swanson's counsel on appeal has filed a brief and a motion to withdraw pursuant to Rule 26(c). Swanson's counsel asserts that, based upon a complete and careful examination of the record, there are no arguably appealable issues. By letter, Swanson's attorney informed him of the provisions of Rule 26(c) and provided Swanson with a copy of the motion to withdraw and the accompanying brief. Swanson also was informed of his right to supplement his attorney's presentation. Swanson has not raised any issues for this Court's consideration. The State has responded to the position taken by Swanson's counsel and has moved to affirm the Superior Court's decision.

(3) The standard and scope of review applicable to the consideration of a motion to withdraw and an accompanying brief under Rule 26(c) is twofold: (a) this Court must be satisfied that defense counsel has made a conscientious examination of the record and the law for arguable claims; and (b) this Court must conduct its own review of the record and determine whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation. [FN*]

> FN* *Penson v. Ohio,* 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wisconsin,* 486 U.S. 429, 442 (1988); *Anders v. California,* 386 U.S. 738, 744 (1967).

(4) This Court has reviewed the record carefully and has concluded that Swanson's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that Swanson's counsel has made a conscientious effort to examine the record and the law and has properly determined that Swanson could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the State's motion to affirm is GRANTED. The judgment of the Superior Court is AFFIRMED. The motion to withdraw is moot.

Del.Supr.,2001.
Swanson v. State
784 A.2d 1082, 2001 WL 1388618 (Del.Supr.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5

1  tragedy occurred.
2      The 22nd Street travels west up to Lamotte.
3  it goes on up and up this way and it goes -- I'm sorry
4  we've got this turned upside down and that won't work
5  because 22nd Street does travel west and it goes up to
6  Market; that's where this incident occurred in '98.
7      This incident was an outrageous senseless
8  murder and it was committed, the State's evidence will
9  show, by this man behind me.
10     The State's evidence will compel that
11  conclusion because Damone Flowers seated before you
12  today messed up. He overplayed his hand as is so
13  frequently in the case of criminal cases. Damone
14  Flowers believed that the group that frequented 22nd
15  and Lamotte Streets always stuck together. The Double
16  Deuces. 22nd Street. 22nd Street, the Double Deuces.
17  he thought always stuck together. And they mostly did
18  stick together as you will hear through the evidence,
19  but they didn't always stick together; that's why
20  we're here today.
21     On August the 1st, 1998, Alfred Smiley and
22  two passengers in a car he was driving west on 22nd
23  Street -- those passengers where James Howell, and

6

1  Hallowed Davis also known as Lee Davis, they were
2  riding around Wilmington in a tan 1998 Honda four door
3  Accord. Smiley and the others had been drinking, you
4  might see pictures, you might see a beer bottle in the
5  car and you'll probably learn through the evidence
6  that goes by that Smiley smoked some marijuana that
7  night because it was in his system.
8      They had stopped at Walt's Chicken, a local
9  place at Vandever Avenue. They stopped at a MAC
10  machine on 9th and Market Street, and, finally, -- and
11  maybe it the basis of this tragedy, but they also
12  stopped at the Oasis Club. The club is on 1600 North
13  Vandever Avenue, which you see on your map. As they
14  drove up 22nd Street, they went west on 22nd Street up
15  towards Market. And when they reached 22nd Street and
16  Lamotte, the senseless part began. Because when they
17  reached that intersection at 22nd at Lamotte, which
18  you can see in front of you there, they met up with a
19  crowd, and this was in the early morning hours about
20  1:25 in the morning, and the crowd was out onto the
21  street.
22     Remember it was summertime, folks were out
23  all over the place. When they pulled up to the

7

1  intersection, those three men in the car, they were
2  confronted by that loud and obnoxious mob scene. And
3  you'll probably hear through one of the State's
4  witnesses at least they have taken one car or maybe
5  two cars to back up, because that crowd wouldn't let
6  them on through.
7      You're going to hear from James Howell about
8  that. He was a passenger in the front seat. Smiley
9  was driving and Lee Davis was in the back seat.
10  You're not going to hear from Lee Davis who was in the
11  back seat because he's in the Armed Forces and
12  unavailable to be with us today.
13     Smiley saw one person when he got to that
14  intersection and met up with the crowd that he knew.
15  and that person was Lamar Swanson. Lamar is also
16  known as Pookie, so if you hear that nickname through
17  the evidence you'll know that that's referencing
18  Lamar, whom Alfred Smiley knew.
19     And, of course, being confronted with a
20  crowd, he called Lamar Swanson over there and said,
21  Hey, what's the matter? And, ironically, he and Lamar
22  shook hands as Smiley reached out from the driver's
23  side. As Lamar and Smiley shook hands, all hell broke

8

1  loose. There may have been someone who punched the
2  driver, Smiley, and that got things started even more
3  than they had already been started. In any event, the
4  engine started revving on the car, there was some --
5  probably some indication that they might be going
6  forward or trying to get through the crowd. The
7  engine was revving loudly and finally shots rang cut.
8  A number of shots, maybe five, maybe six.
9      The State's witnesses will tell you that
10  Damone Flowers was standing on the north side of 22nd
11  Street and he fired numerous times into the vehicle
12  that was occupied by those three young men. He fired
13  into it through the passenger's side, and he fired
14  through the front window with a handgun.
15     One of the shots ripped right through Alfred
16  Smiley's right side from this section of his body and
17  nearly tearing his entire chest cavity, puncturing
18  both lungs and tearing through his heart.
19     He turned to his passenger, James Howell, and
20  said, I think I've been shot. He then raised his
21  right arm up into the air, Smiley, to check on his
22  condition and the Honda that he was driving suddenly
23  raced up 22nd Street, west up toward Market, and you

A-56 2

State v. Damone Flowers

9

1  will see and you will hear through the investigators
2  in this case that as that Honda raced from the
3  interaction at Lamotte -- and this is where the corner
4  of where the shots rang out. As it raced up here, as
5  it got near Market, obviously Smiley in bad condition
6  ran into a telephone pole suddenly and the car -- the
7  whole front end of the car was damaged seriously.
8       Smiley laid there dying in the front seat.
9  He was not deceased at this point. His passenger,
10  James Howell, in the passenger side front jumped out
11  and ran as did Lee Davis from the back seat. They all
12  ran up towards Market Street because there was a
13  relative up there who's home they could use to make a
14  phone call, an emergency phone call.
15       You'll find there were no shots that injured
16  one of the passengers. The only injuries to those
17  folks are the injuries of the car that ran into the
18  telephone pole.
19       What Smiley and his passengers didn't know
20  when they got to that intersection that night was that
21  there had been a fight and an argument earlier that
22  same evening at the Oasis club. And it involved one
23  or two of the women who frequented 22nd and Lamont

10

1  Streets. After the argument and fight, the women
2  walked to the corner and their recitation of what
3  happened at the crowd, if you will, was that they were
4  a little fired up. So they didn't know whether they
5  would be facing retaliation of what happened or
6  whether somebody would come by and cause them a
7  problem, but they were ready for what happened.
8       They were in an expression, spoiling for a
9  fight. Alfred Smiley's arrival on the scene with his
10  two friends gave them exactly what they wanted because
11  Smiley did yell out the window: Hey, you know, get
12  out of the way. Get the hell out of the way, whatever
13  it was. Maybe he blew the horn. You'll learn through
14  the witnesses exactly what occurred.
15       Whatever happened, Damone Flowers was excited
16  by it or incensed by it and he reacted in a violent
17  manner. Alfred Smiley died in surgery at the
18  Christiana Medical Center later that morning. You'll
19  see in the evidence all of the Double Deuce crowd, the
20  22nd Street regulars, clamped up immediately.
21       A code of silence was set into motion. All
22  of the people out that night weren't regulars,
23  however, and that's why in part we're here today. One

11

1  25-year-old man who is not one of the regulars at that
2  corner will testify, an eyewitness who knew the
3  witness by his name, Mone. And later he picked Damone
4  Flowers out as the killer from a group of photo
5  graphs. He was one hundred percent positive. His
6  name is Vernon Mays.
7       There will be a second witness presented by
8  the State. Also, he was familiar by the defendant.
9  He was a kid that worked in a sub shop and he also
10  picked Damone Flowers out of photos that he was shown
11  after this killing. So Damone Flowers was arrested
12  immediately, right? Wrong.
13       Damone Flowers, you will find, immediately
14  left the State of Delaware, left his family, left 22nd
15  Street, not to be found for a year and some three
16  months later down south. He was then brought back to
17  Delaware by the police, specifically in November of
18  1999.
19       The murder weapon wasn't found. And looking
20  through the newspaper more recently --
21       MR. MAURER: Objection, Your Honor.
22       THE COURT: Counsel approach, please.
23       (A sidebar was reported.)

12

1       MR. RAMBO: It has nothing to do with this
2  case. I was reminded of this case -- We can find all
3  of these things about the body, but we can't find a
4  motive --
5       MR. MAURER: Can I as counselor to make a
6  proffer as to what the argument is going to be?
7       MR. RAMBO: I have tried to make a proffer.
8  What I'm saying is that we can see all these things on
9  software in the body. We can see in 3-D dimension of
10  every part of the human body based on software, but
11  we're never going to find out what's going through
12  people's mind.
13       (End of sidebar.)
14       MR. MAURER: Based on the State's proffer,
15  Your Honor, the objection is withdrawn.
16       THE COURT: Very well.
17       MR. RAMBO: As I was saying, I was reminded
18  of a case when I saw something in the paper about
19  software making visible humans easier to see. And
20  they were talking about medical students and how they
21  can look on computer software, and they can look at
22  every part of the human body in 3-D and turning on the
23  internet and getting on a computer; however, we

A 20·32

## State v. Damone Flowers

29

1  you've heard all the evidence in a case like this and
2  when you've looked at it very, very carefully as we go
3  along, you will not reach the conclusion that the
4  State wants you to reach and you will not, unlike
5  Vernon Mays, allow yourself to be swayed about what is
6  told to you about the evidence.
7      I look forward to spending the next several
8  days with you. And, hopefully, we'll move through
9  without too much interruption. Thank you very much.
10     THE COURT: Ms. Kelsey.
11     MS. KELSEY: Thank you, Your Honor. The
12  State's first witness is James Howell.
13     JAMES HOWELL, having been called on the part
14  and behalf of the State as a witness, being first duly
15  sworn under oath, testified as follows:
16          DIRECT EXAMINATION
17  BY MS. KELSEY:
18  Q. Mr. Howell, how old are you?
19  A. 27.
20  Q. Now, do you remember the events which
21  occurred on the night of July 31 into August 1st?
22  A. Yes, ma'am.
23  Q. Of the year 1998?

31

1  about what you were going to do that night?
2  A. No.
3  Q. Okay. Where did you go after he picked you
4  up?
5  A. We went to a number of places, actually.
6  Q. Try and remember --
7  A. I don't remember the exact order, but I do
8  remember everywhere we went to.
9  Q. Why don't you tell us to the best of your
10  recollection where you went?
11  A. We stopped by his cousin's house for a while.
12  I didn't go in with him, I waited in the car. After
13  that, we went to the liquor store on New Castle
14  Avenue; then after that we went to Walt's Chicken on
15  Vandever Avenue, and then we took some check into his
16  girlfriend --
17  Q. Where does his girlfriend live again?
18  A. Lea Boulevard.
19  Q. On Lea Boulevard?
20  A. Yes. And then we went to Leroy's Bar.
21  Q. Where is Leroy's Bar?
22  A. I don't know the street. I really don't
23  know.

30

1  A. Yes.
2  Q. Okay. And did you have contact with the
3  person by the name of Alfred Smiley on that day?
4  A. Yes.
5  Q. When did you first see Alfred Smiley that
6  day?
7  A. About maybe 10:30 that evening.
8  Q. Is this -- what day of the week is it, do you
9  remember?
10  A. Friday.
11  Q. It is a Friday?
12  A. Yes.
13  Q. And where did you see him at 10:30 that
14  evening -- Mr. Howell, they are having trouble hearing
15  you, can you put the microphone in your face.
16  A. He picked me up from work at 9th and Market
17  Street.
18  Q. Is that where you were working then?
19  A. Yes, ma'am.
20  Q. And how long had you known Mr. Smiley?
21  A. About three years. I met him in '94,
22  something like that.
23  Q. Okay. And did you have any specific plans

32

1  Q. Can you give us an area in the city?
2  A. Right off Governor Prince.
3  Q. How close to where this eventually happened?
4  A. Maybe a five-minute ride, I guess.
5  Q. From -- do you remember where else besides
6  Leroy's Bar you went?
7  A. We went and picked up my cousin on West 2nd
8  Street.
9  Q. What's your cousins name?
10  A. Lee Davis.
11  Q. Okay. And do you know if you picked him up
12  before you did any of those other things or --
13  A. This was the last stop we made.
14  Q. Okay. And from picking up your cousin where
15  did you go?
16  A. We just rode around, nowhere specifically,
17  just rode around. Just riding around the city.
18  Q. Okay. Did you come to be on West 22nd
19  Street?
20  A. Yes, ma'am.
21  Q. Okay. Now, during the course of the time
22  that you were riding around, had you had anything to
23  drink?

33

1    A. Yes.
2    Q. Anything of an alcoholic nature?
3    A. Yes.
4    Q. Do you know if Mr. Smiley had anything to
5    drink that night?
6    A. Yes.
7    Q. Do you know how much he had to drink?
8    A. He had a beer.
9    Q. A beer?
10   A. Yeah.
11   Q. Okay. Do you know if he had participated in
12   any other intoxicating substances?
13   A. No.
14   Q. You don't know?
15   A. No.
16   Q. You don't know or no, he did not?
17   A. He didn't while I was with him.
18   Q. Okay. Then -- okay. When you got to the
19   area of 22nd and Lamotte, do you know about what time
20   it was?
21   A. No.
22   Q. Okay. Did you come down 22nd Street or did
23   you come from Lamotte onto 22nd, if you remember?

34

1    A. I really -- I don't remember. I really don't
2    know the streets over there too well.
3    Q. Did you see a crowd?
4    A. Yes.
5    Q. Well, could you see the crowd before you got
6    to that intersection or --
7    A. No, we really weren't paying attention. We
8    were just kind of talking back and forth in the car.
9    And once we got to a stop sign, there was a stop sign
10   in the intersection before we got to the crowd,
11   that's when we noticed the crowd.
12   Q. Okay. Now, where -- Alfred Smiley was
13   driving?
14   A. Yes, ma'am.
15   Q. Okay. And you were -- where were you seated?
16   A. Front seat, passenger.
17   Q. And your cousin --
18   A. He was in the back seat.
19   Q. He was in the back seat. Now, when you got
20   to the stop sign and saw the crowd, what did you do?
21   A. We proceeded -- we proceeded to where the
22   crowd was because we were going in that general
23   direction.

35

1    Q. And when you got into the crowd, what
2    happened?
3    A. Well, we saw someone that we knew so we
4    stopped and spoke to him for maybe thirty seconds.
5    Q. Now, can you kind of describe what the crowd
6    was like?
7    A. I guess there was about maybe 20 people out
8    there just standing in the street, some alongside of
9    cars, some in the street. And we pulled up to the
10   crowd and we saw the person that we knew and we spoke
11   to him for a little while --
12   Q. Do you remember his name?
13   A. Lamar Swanson.
14   Q. And do you remember what he said or --
15   A. No, we just said what's up and everybody
16   shook his hand, and then we tried to get past the
17   crowd.
18   Q. Okay. And as you tried to get past the
19   crowd, what happened?
20   A. Smiley hit the horn a couple of times and I
21   had waived my hand like that there. And they were
22   moving. They were moving gradually, but they weren't
23   moving -- they were a little sluggish, so he had hit

36

1    the horn again. And we tried to go through the crowd
2    and something had -- I think someone threw something
3    in the car and something like that and because I saw
4    him -- I saw his face twitch like that.
5    Q. Saw who's face twitch?
6    A. Smiley's face.
7    Q. Twitch like what?
8    A. Like a quick twitch, like he was trying to
9    duck from something or something like that. And I had
10   turned back because I was looking at some girl so I
11   turned back --
12   Q. "Turned back," meaning you were looking
13   behind you in the back of the car?
14   A. Yes, I was looking behind me.
15   Q. Okay.
16   A. That's when the gunshots rang out. I didn't
17   know they were gunshots at the time. I didn't know
18   anything that was going on, anything.
19   Q. When you say you were looking -- were you
20   looking back over your right shoulder or your --
21   A. My right shoulder.
22   Q. Your right shoulder?
23   A. Yes.

37

1    Q. Towards the driver's side?
2    A. Yes.
3    Q. Okay. And you said you heard shots rang out?
4    A. Yes.
5    Q. But you didn't know they were shots?
6    A. No.
7    Q. Did anything happen in the car as far as from
8    bullets hitting?
9    A. I really didn't notice any bullets hitting
10   because I was looking to the back of me. I didn't
11   notice anything strange until I had turned around and
12   I saw glass on my pants, and I proceeded to brush the
13   glass off. But I still didn't realize anything that
14   serious was going on.
15   Q. When the shots rang out, was your window on
16   your side of the car open or closed?
17   A. Open.
18   Q. Okay. When the shots ran out, did anything
19   happen to the windshield?
20   A. I didn't notice anything.
21   Q. Okay. Do you know where the glass that was
22   on your pants came from?
23   A. The bullets going through the windshield.

38

1    Q. Okay. But you know that now, did you know
2    that then?
3    A. No.
4    Q. Did you -- did you notice whether or not
5    Alfred Smiley did anything in particular?
6    A. No, not until we proceeded up the road and he
7    said something to me.
8    Q. Okay. What did he say to you --
9    A. He said, Oh, man, I think I got shot.
10   Q. Okay. Now, -- but before we get to that
11   part, you said, "shots rang out." You didn't realize
12   they were hit?
13   A. Yes.
14   Q. What happened next after that?
15   A. He just pulled off real fast. He pulled
16   off -- we were at a complete stop when this had
17   happened and then he just pulled off real fast.
18   Q. Like gunned the motor?
19   A. Yeah.
20   Q. And what happened to the crowd then?
21   A. The crowd wasn't in front of us anymore, they
22   were all ducked down, I guess. There was a few people
23   out there and from -- from there -- from the -- from

39

1    the -- from the expressions and the faces on the
2    crowd, you know, they saw what was happening --
3    MR. MAURER: I'm going to ask that be
4    stricken, Your Honor, it is hard to get things from
5    people's expressions.
6    THE COURT: I'll sustain that objection.
7    BY MS. KELSEY:
8    Q. What you need to do is say what the people's
9    expressions were?
10   A. I saw people running and ducking.
11   Q. The girl you were watching, what did her face
12   do?
13   A. She said, Oh, shit.
14   Q. And did she run and duck too?
15   A. Yes.
16   Q. And so when he gunned the motor, did he hit
17   anybody?
18   A. No.
19   Q. And where did you go as he gunned the motor?
20   A. We traveled up the street a short distance,
21   then we crashed into a telephone pole.
22   Q. Did he gun the motor before he said, I think
23   I'm shot or after he said, I think I'm shot?

40

1    A. As he pulled off, I guess, he first realized
2    he was shot and he pulled off real fast; that's when
3    he gunned the motor.
4    Q. How far did you go before he crashed into the
5    telephone pole?
6    A. Maybe 50 feet, 60 feet.
7    Q. Did you go through any intersections?
8    A. No.
9    Q. Did you make it all the way to the end of the
10   block?
11   A. No.
12   Q. Did he just crash into a telephone pole or
13   did he say anything before he crashed into the
14   telephone call?
15   A. He said, I think I got shot. I saw his head
16   go back and that's when we crashed into the telephone
17   pole.
18   Q. So his head went back before he crashed into
19   the telephone pole?
20   A. Yes.
21   Q. Did your cousin say anything at this point in
22   time?
23   A. I was unconscious for a short period of time.

A - 5⁷ (6)

57

1    A. Yes, ma'am.
2    Q. Okay. Do you live near the area of Market
3    Street and 22nd Street?
4    A. Yes. I live two blocks up.
5    Q. Now, do you remember -- did you live in that
6    area on the night of July the 31st into August the 1st
7    of the year 1998?
8    A. No, ma'am.
9    Q. You didn't live there?
10   A. No, I always lived at 123 Concord Avenue.
11   Q. You lived in the same place?
12   A. I lived in the general vicinity, yeah.
13   Q. Now, did you happen to be out on the night of
14   July 31st into August the 1st of 1998?
15   A. Yes, ma'am.
16   Q. Okay. And did you work that day?
17   A. Yeah. Actually, I had worked all day that
18   day.
19   Q. Okay. And had you -- did you -- what did you
20   do after you worked that day?
21   A. Well, I went out and had a couple of beers,
22   went out and started working on my car. My car was
23   giving me trouble that night, that whole week, nothing

58

1    went right, so I started messing with it. And I guess
2    at about 10:00 or 11:00, after working all day, I went
3    in the house, took a shower, and just couldn't sleep
4    so I went out for a walk.
5    Q. Where did you go?
6    A. I walked down 22nd.
7    Q. Okay. And when you walked down 22nd Street
8    in the area of 22nd and Lamotte, was there a crowd of
9    people?
10   A. Yeah. Yeah.
11   Q. Okay. Did you stop to talk to anybody?
12   A. Well, there was a couple of people that were
13   standing in front of their houses. I just stopped and
14   had a conversation chat with them. They said, Hello.
15   Q. Do you know the people that you stopped to
16   talk to -- do you know their names?
17   A. No, not their names, just seen them around.
18   Q. Okay. And how long were you standing there
19   talking to those people?
20   A. I'd say about a good maybe 10 to 15 minutes.
21   Q. Now, do you know which house they were in
22   front of on 22nd Street?
23   A. Well, it was about the fourth house up from

59

1    the corner.
2    Q. Fourth house up from where?
3    A. From Lamont -- fifth house, when you look at
4    the side house.
5    Q. Which side of the street were you on?
6    A. I was on the left side, coming down.
7    Q. Are you any good at maps, Mr. Mays?
8    A. Yeah, very good at maps.
9    Q. I'm going to show you -- turn this a little
10   towards you so you can see it.
11       THE COURT: Actually, if the bailiff could
12   put the map over here in this corner, I think
13   everybody can see it and so can the witness. Or put
14   it on the easel, either way.
15       MS. KELSEY: Can the jury see that? Can you
16   see that?
17   BY MS. KELSEY:
18   Q. Okay. Mr. Mays, do you see the -- do you see
19   22nd Street?
20   A. Yes.
21       MS. KELSEY: If you stand next to the map
22   maybe you can --
23   BY MS. KELSEY:

60

1    Q. And you said you were by the fifth house up
2    from Lamont?
3    A. Yeah. I was right up in this general area.
4    Q. Right in that general area?
5    A. I'm trying to get it -- okay. This is
6    Lamotte here.
7    Q. I'm going to ask you to put a red mark where
8    you were standing?
9    A. I was standing about here.
10   Q. Do you want to mark that, okay. You may sit
11   down now. Mr. Mays how long had you been standing
12   there?
13   A. As I said, it couldn't have been no more than
14   10, 15, maybe 20 minutes at max.
15   Q. You also said you had been drinking that
16   night?
17   A. Yeah.
18   Q. How many beers did you have, do you remember?
19   A. About two.
20   Q. Now, were you -- were there other people on
21   the street?
22   A. Yeah, it was quite a few -- it was a group of
23   people I'd say about --

State v. Damone Flowers

61

1    Q. When you say, "a group," how large of a
2    group?
3    A. Between 20, maybe 25 people.
4    Q. Were the cars parked on the Street?
5    A. Yeah, it was on both sides.
6    Q. Full, not full?
7    A. No, they were all parked. The residents that
8    lived there had cars and there was a van that was
9    parked right in front of me about ten yards.
10   Q. Okay. Now, did you -- did you -- had you
11   seen any cars come up 22nd Street while you were
12   standing there?
13   A. It might have been one or two, I -- it was
14   pretty quiet, you know, everybody was down on the
15   corner. Usually everybody stands out there and talks
16   and everything else. So it was like one of those
17   normal things to me. I really didn't pay no
18   attention.
19   Q. Did you see a car pull up?
20   A. No, I didn't.
21   Q. You didn't see the car pull up?
22   A. No.
23   Q. Did you see the crowd gather around the car?

62

1    A. No. As I said, where I was standing there
2    was a gray van. It was like parked on the street
3    side, out in the street, so I didn't even notice or
4    pay attention to it.
5    Q. Okay. At some point in time, did you hear
6    shots fire or see shots fire?
7    A. Yeah, I heard -- I heard them before I even
8    noticed what was going on.
9    Q. Okay. What did you do when you heard the
10   shots fired?
11   A. My instant reaction was to look around to see
12   which direction they were coming.
13   Q. Do you have any experience with guns,
14   Mr. Mays?
15   A. I was in the military.
16   Q. How long were you in the military?
17   A. Six years.
18   Q. Did you have any active duty where you were
19   around --
20   A. We were required to learn how to fire
21   firearms.
22   Q. Okay. So when you -- when you heard the
23   shots and looked around, what did you see?

63

1    A. I just took a glance and at that time the
2    'crowd more or less started jumping up so I didn't
3    really pay no attention. All I know is somebody is
4    shooting, time to go down.
5    Q. Did you see who shot the gun?
6    A. No. I just faintly glanced at a couple of
7    people, but I can't really tell you I saw a lot,
8    because mines was something like a five-second glance.
9    Q. How many gunshots were fired?
10   A. In the general area -- it was like three
11   different sounds, and they were just firing, and we --
12   some of them were like pat, pat, pat, all at the same
13   time, but they were different sound ratios.
14   Q. Mr. Mays, did you talk to Detective Brock
15   back in -- right after this happened?
16   A. The next day, yeah. He had came up to my
17   shop and got me.
18   Q. And did you tell him what you had seen then?
19   A. Yeah. I told him pretty much what I had
20   seen.
21   Q. And was your recollection as to what you had
22   seen better then than it is now?
23   A. No, it is about the same.

64

1    Q. It was about the same?
2    A. Yeah.
3    Q. So you think you can remember four years --
4    A. Well, I can't say I can remember exactly,
5    but, you know, it pretty much stayed on my mind the
6    whole time.
7    Q. Okay. Did -- you said you did talk to a
8    Detective Brock?
9    A. Yeah.
10   Q. And you told him what you had seen happen?
11   A. Yeah, pretty much.
12   Q. And Detective Brock is in the courtroom
13   today?
14   A. Yes.
15   Q. And did you look at some photographs at the
16   Wilmington Police Station?
17   A. Yeah.
18   Q. And they didn't just show you a line-up --
19   MR. MAURER: Excuse me, Your Honor, this is
20   her witness. I'm going to ask that she not lead the
21   witness.
22   MS. KELSEY: I apologize, Your Honor. I'll
23   withdraw the question.

A 106   State v. Damone Flowers

65

1  BY MS. KELSEY:
2     Q. What kinds of photographs did they show you?
3     A. Different mug shots of different individuals
4  to see if maybe I could pick one that fit the
5  description or close to it.
6     Q. How many mug shots did they show you?
7     A. I'd say he pulled out maybe four trays.
8     Q. Four trays. And do you know how many
9  pictures were in a tray?
10    A. No, ma'am.
11    Q. And -- but -- how many of those -- did you
12 pick someone out?
13    A. Yes, ma'am, I did.
14    Q. Okay. And how many of those trays did you go
15 through before you picked someone out?
16    A. I'd say about two, two and a half.
17    Q. And -- okay. Was that part of the
18 conversation on the videotape?
19    A. I think all of it was.
20    Q. You think all of it?
21    A. Yeah, for what he told me for when I did the
22 video was just specifics, point blank specifics.
23 Exact word for word I'm not sure, but --

67

1     Q. Now. --
2        MS. KELSEY: Yes. Your Honor. I have no
3  further questions at this time. However. before the
4  defense gets to cross-examination with this witness I
5  would like to present Detective Brock to do a 3507.
6        THE COURT: Very well.
7        MR. MAURER: Your Honor. if we're going to do
8  a 3507 assuming the foundation is laid, they should
9  hear the tape since it is the best evidence and not
10 have Detective Brock selectively recall what was and
11 was not said. I would object if the State's purpose
12 to proceed is in that fashion.
13       MS. KELSEY: The sole purpose is to call
14 Detective Brock is to have him present the tape.
15       THE COURT: That answers that question.
16       MS. KELSEY: Mr. Mays, you can step down for
17 a minute. You need to remain in the hallway.
18       THE WITNESS: Okay.
19       MS. KELSEY: Your Honor, we're going to need
20 to set up the equipment, perhaps this would be a good
21 time for the afternoon break.
22       THE COURT: That sounds like a good idea.
23 Members of the jury, we'll take a ten-minute.

66

1     Q. And the person that you picked out in those
2  four trays was that the person that fired the shots?
3     A. That's the person that, you know, looked like
4  the individual to me. But it is like I told him, I
5  really can't say 100 percent for sure.
6     Q. Okay. And is that person in the courtroom
7  today?
8     A. Yes, ma'am.
9     Q. And where is he seated?
10    A. He's sitting right over there.
11    Q. You have to say, you have to point, the court
12 reporter can't say that?
13    A. Damone is sitting in --
14    Q. Describe what he has on?
15    A. Oh, he has on a brown jacket with a brown
16 sweater, glasses.
17       MS. KELSEY: Your Honor, I'd ask that the
18 record reflect that he's identified the defendant.
19       MR. MAURER: I object to that. He identified
20 him as being the person who looked like the person not
21 as being the person.
22       THE COURT: Very well.
23 BY MS. KELSEY:

68

1  hopefully only a ten minutes, recess. Please be
2  reminded not to discuss the case amongst yourselves.
3        (The jury left the room at 3:40 p.m.)
4        THE COURT: It has been brought to my
5  attention through the bailiff that juror number one,
6  who's name is Mr. Patel, has indicated that he owns a
7  liquor store in that area and knows a lot of the
8  people in the area. And I get the impression that
9  he's uncomfortable at this point. So as soon as she's
10 done, I'll ask that she bring him in.
11       MR. MAURER: Okay.
12       THE COURT: The defendant has not been
13 brought in.
14       Would you bring in juror number one. please.
15       THE COURT: Good afternoon, Mr. Patel, you
16 indicated that you have a liquor store?
17       THE JUROR: Yes.
18       THE COURT: And what's the name of the liquor
19 store?
20       THE JUROR: Brandywine Liquors.
21       THE COURT: Where is that located?
22       THE JUROR: The corner of Market Street and
23 Vandever Avenue.

State v. Damone Flowers

73

1  identification?
2  THE CLERK: Marked State's identification A.
3  (State's Identification A was marked.)
4  MR. MAURER: Yes.
5  BY MS. KELSEY:
6  Q. I'm going to show you what's been marked as
7  State's Identification A, and ask you who's
8  handwriting is on that videotape?
9  A. It is my handwriting.
10  Q. Does that -- does that identify who that is a
11  videotape of?
12  A. It identifies it as a videotape of Vernon
13  Mays.
14  Q. Okay. Is that a true and correct copy of the
15  videotape as prepared by you?
16  A. Yes, it is.
17  MS. KELSEY: Your Honor, I would like to
18  offer it into evidence at this time.
19  MR. MAURER: Can I have some voir dire at
20  this time, Your Honor?
21  THE COURT: Yes, you may.
22  VOIR DIRE
23  BY MR. MAURER:

74

1  Q. Good afternoon, Detective Brock.
2  A. Good afternoon, sir.
3  Q. First of all, and I'm just asking you these
4  questions for the record, so that we can establish
5  that -- the statement was given voluntarily, correct?
6  A. Yes, it was.
7  Q. He wasn't threatened or promised or coerced
8  or induced into making this statement in any way?
9  A. No, he wasn't.
10  Q. Now, I have had a chance to look at this
11  taped statement beforehand and it appears to me that
12  the statement was taken on August 2nd of 1998 at
13  approximately 1:44 p.m., does that comport with your
14  recollection?
15  A. I'm not 100 percent sure of the time at this
16  point.
17  Q. But that sounds about right?
18  A. I can't recall the exact time.
19  Q. All right. Well, it looks to me like this
20  tape runs then from about 1:45:33 to approximately
21  1425, which would be from 1:45:33 p.m. to 2:25 p.m.,
22  and then it stops. Do you remember that, stopping the
23  tape at that point in time?

75

1  A. I recall that there was a -- there was a
2  'stoppage, yes.
3  Q. Okay. And do you remember how long a period
4  of time went by before you started the interview up
5  again on tape any way?
6  A. I don't recall the time.
7  Q. If I told you it was about an hour and a half
8  does that sound about right?
9  A. Again, I don't recall, if that's what you can
10  compute with the times you have there that could be
11  correct.
12  Q. In that hour and a half period of time were
13  was Mr. Mays?
14  A. He was still, if I'm not mistaken, he was
15  viewing photographs.
16  Q. For an hour and a half?
17  A. I'm not sure.
18  Q. If you don't recall --
19  A. I'm getting into an area that I'm not 100
20  percent sure.
21  Q. Where were you during this period of time?
22  A. In the office near where he was doing other
23  things for --

76

1  Q. I'm sorry, I interrupted you.
2  A. -- as far as doing things -- as far as
3  investigative-wise other things were coming in and
4  compiled.
5  Q. Did you converse at 1425 p.m. and 4:01 p.m.
6  on August 2nd of 1998?
7  A. It is a possibility, but nothing of note
8  occurred.
9  Q. Pardon me?
10  A. It is a possibility that I conversed with
11  him, but not of note occurred.
12  Q. We'll talk about that later, but you do
13  remember turning the tape off for about an hour and a
14  half?
15  A. I do remember that, but I don't remember to
16  it stopping, yes.
17  MR. MAURER: I have no objection to it's
18  admissibility at this time.
19  THE COURT: Very well.
20  THE CLERK: State's for Identification A
21  becomes State's Exhibit No. 1, Your Honor.
22  (State's Exhibit No. 1 was marked.)
23  MS. KELSEY: Your Honor, with the Court's

State v. Damone Flowers

5

1    Q. Okay.
2        MS. KELSEY: May I have this marked for
3    identification?
4        THE CLERK: Marked as State's identification
5    B, Your Honor.
6        (State's Identification B was marked for
7    identification.)
8    BY MS. KELSEY:
9        Q. I'm going to show you what's been marked as
10   State's Identification B, and ask you if that is in
11   fact the map that he drew on the video?
12       A. Yes.
13       MS. KELSEY: Your Honor, I would like to
14   introduce that into evidence also.
15       MR. MAURER: Can I see it, please? It is
16   without objection, Your Honor.
17       THE COURT: Very well.
18       THE CLERK: State's Identification B becomes
19   State's Exhibit No. 3.
20       (State's Exhibit No. 3 was marked.)
21   MS. KELSEY: I have to further questions.
22       THE COURT: Mr. Maurer?
23       MR. MAURER: Thank you.

6

1        CROSS-EXAMINATION
2    BY MR. MAURER:
3        Q. Good morning, Mr. -- Detective Brock?
4        A. Good morning, Mr. Maurer.
5        Q. I want to touch up on a few things from
6    yesterday. And by my notes it appears that the
7    videotape runs from 145:33 to 1425 and then it stops.
8    Now having seen the video, do you recall that's what
9    the length of it was?
10       A. Yes.
11       Q. And just for those of us who weren't in the
12   military, basically what time-wise it is? Like, 1:45
13   in the afternoon until about 2:25 in the afternoon; is
14   that correct?
15       A. That is correct.
16       Q. The tape then blanks out and the next thing
17   we see is that Mr. Mays is speaking again at
18   approximately 1601, which would be 4:01, correct?
19       A. That is correct.
20       Q. The tape is off and Mr. Mays is not on a tape
21   for a period of what appears to be one hour and 36
22   minutes, correct?
23       A. Yes. Yes, I didn't compute it, but yes.

7

1        Q. Was he at the Wilmington Police Department
2    , the entire time of one hour and 36 minutes while that
3    tape was on then?
4        A. Yes, he was.
5        Q. And the tape was not on him at the time he
6    made the initial photographic identification?
7        A. That is correct.
8        Q. Was that done in a separate room?
9        A. Yes, it was.
10       Q. Could you have brought the photographs in the
11   room where the tape was observing what he was doing?
12       A. Yes; but we thought it would be more
13   comfortable if he was in a room with a little more
14   space because of the amount of trays we wanted to show
15   him.
16       Q. I understand your answer, but my question
17   was: It was physically possible to take the tapes
18   into the room where the camera at the Wilmington
19   Police Station operated?
20       A. Yes, it was possible.
21       Q. You felt in terms of your last answer he felt
22   more comfortable?
23       A. Yes.

8

1        Q. Identification made in this time span?
2        A. The exact time he made the identification?
3        Q. Yeah.
4        A. It was within that hour.
5        Q. It is actually an hour and 36 minutes?
6        A. It was within that hour and 36 minutes.
7        Q. Do you notes that might help you refresh your
8    recollection at that point?
9        A. No.
10       Q. Do you have additional notes, police reports,
11   to see if there's any notation about that?
12       A. There are a few notes, yes.
13       MR. MAURER: Your Honor, may I have an
14   opportunity to look at the handwritten notes?
15       THE COURT: Yes, you may.
16   BY MR. MAURER:
17       Q. I'm going to look at you master report with
18   many many yellow notes. Right now I just want to look
19   at only the point of time -- Mr. Mays notes, that's
20   all. I'm entitled to so maybe you can look at them
21   and --
22       A. The only note is the diagram that has been
23   marked as Exhibit 3. There are no other notes here

B 6-13,15,16                State v. Damone Flowers

9

1  that would indicate conversation or notetaking that I
2  was with Mr. Mays.
3      Q. Okay.
4      A. Those are notes from other interviews.
5      Q. So you have no handwritten interview notes
6  regarding your contacts with Mr. Mays on what appears
7  to be August 2nd of 1998?
8      A. Correct.
9      Q. So some time within this hour and 36 minute
10 time period, this paragraph is picked out. Are you
11 with Mr. Mays when this happens?
12     A. No.
13     Q. Is there another police officer that's with
14 Mr. Mays when that happens?
15     A. No.
16     Q. Do you say anything to Mr. Mays before he
17 starts looking at the photographs?
18     A. We tell him that these are four trays. If
19 you can identify the individual you saw doing the
20 shooting at the time, if he's in these trays, we would
21 like him to select it and then we'll check back with
22 him soon.
23     Q. You told us that you do not know exactly when

10

1  the photograph was picked out in terms of this hour
2  and 36 minutes. Where was Mr. Mays for all this time
3  period?
4      A. He was in a room on that same floor as the
5  room in the interview videotape.
6      Q. And you were --
7      A. Maybe four offices over.
8      Q. And you were not with him at the time?
9      A. No.
10     Q. And was there any other Wilmington police
11 officer with him?
12     A. No, he was alone.
13     Q. So what happened? He sat alone in the room
14 for an hour and 36 minutes?
15     A. No, sir.
16     Q. How long did he take picking out the
17 photograph?
18     A. I would say would have been 15 to 20 minutes.
19 I don't have a particular note to back that up. I
20 would estimate it was that timeframe. It was not that
21 long.
22     Q. Your police report indicates approximately 15
23 minutes. Do you recall that in your report?

11

1      A. I recall that in my report, yes.
2      Q. So when it took about 15 minutes that leaves
3  about an hour and 21 minutes unaccounted for?
4      A. It is not unaccounted for, no.
5      Q. What did he do for hour and 21 minutes?
6      A. After he selected the photographs, we
7  continued our investigation as far as trying to find
8  who the individual was, what's his address. There's
9  other individuals being obtained. We had other
10 officers in the field conducting interviewing --
11     Q. Can I can stop you there are a minute. What
12 did he do?
13     A. Within the 15 minute timeframe after he
14 selected photograph he was alone.
15     Q. So he sat alone for an hour and 21 minutes
16 accord to your testimony?
17     A. That is correct.
18     Q. And no Wilmington police officer talked to
19 him?
20     A. No.
21     Q. And no Wilmington Police Officer said
22 anything to the effect, you know, We've got some other
23 information that the shooter was right-handed. Nobody

12

1  mentioned that to him?
2      A. No.
3      Q. Nobody pointed that out?
4      A. No.
5      Q. Nobody said anything to him?
6      A. No.
7      Q. But you heard him consistently throughout the
8  tape over and over and over again say that the person
9  who fired the shots was left-handed, not right-handed,
10 fired the shots with his left hand?
11     A. I don't know if it was over and over and over
12 again, but he said it a few times.
13     Q. How many times?
14     A. He said it a few times.
15     Q. Five?
16     A. I don't know.
17     Q. You saw him make the mention with his left
18 hand?
19     A. I seen him make the motion with his left
20 hand.
21     Q. And you're telling us that not one police
22 officer said anything to him during that one hour and
23 36 time period that suggested that he fired with the

13

1    right hand?
2        A. That's correct. Nobody suggested that to
3    him.
4        Q. You have no idea why he would say, Oh, geez,
5    I don't know why but he shot with the right hand?
6        A. No.
7            MR. MAURER: That's all.
8            THE COURT: Anything further?
9    BY MS. KELSEY:
10       Q. When the interview rooms -- when you can tape
11   people, where are they located in the Detective
12   division?
13       A. There are four, and they are located on the
14   main floor of the Detective office.
15       Q. And when he was moved to a place where he
16   would be more comfortable, where was that room
17   located?
18       A. On the same floor. It is just our conference
19   room, it is a little bigger.
20       Q. Where do the doors from all of those rooms
21   open out into?
22       A. Onto the main floor of the Detective office.
23       Q. And what's on the main floor of the Detective

14

1    office?
2        A. The desks, other offices.
3        Q. Now, when you're conducting an interview and
4    it is being taped, do you shut the doors?
5        A. Yes.
6        Q. When he was sitting in the conference room
7    looking at the Roladexs, was that door shut?
8        A. Yes, it was.
9        Q. Okay. How did he notify you that he had made
10   an identification?
11       A. He didn't, we checked on him.
12       Q. Okay. So -- and did you check on him again
13   at any time between the time you -- he told you about
14   the identification?
15       A. I don't recall that we did.
16       Q. Okay. After he made the identification, what
17   happened right before you put him back on the
18   videotape?
19       A. What happened?
20       Q. Yeah, I mean, how did that come about that he
21   was back in the room with the videotape?
22       A. Well, after a discussion amongst our
23   detectives, we decided that since he made the

15

1    identification to put the identification on tape.
2        Q. So what did you do?
3        A. We grabbed the tray that he selected
4    identification of the photograph, put him back in the
5    same room where the interview was taking place, and we
6    had him make that identification.
7            MS. KELSEY: Thank you, I have no further
8    questions.
9            MR. MAURER: Your Honor, this is beyond the
10   scope, but I would have to put him back on.
11           THE COURT: Very well.
12   BY MR. MAURER:
13       Q. If I could just return to this left hand. I
14   counted while you were there and the tape will show
15   that there were five separate occasions where Mr. Mays
16   indicated that the shooter fired with his left hand.
17   does that sound accurate to you?
18       A. I didn't count. If you counted, I didn't.
19       Q. This was a factor that was pretty
20   significant, was it not, in terms of your
21   investigation, which hand the shooter used?
22       A. Yes, it was -- not significant, it was
23   important.

16

1        Q. But you had other information to the
2    contrary, correct, that the person who fired the shots
3    shot with his right hand?
4        A. At the time we interviewed Mr. Mays?
5        Q. Yeah.
6        A. I don't believe so.
7        Q. Actually, at 1579, the question you asked him
8    was, Are you sure it was his left hand? Do you
9    remember asking him that question?
10       A. I believe so, yes.
11       Q. At which point he responded, Yeah, pretty
12   much. Pretty much sure. Do you remember that
13   exchange between the two of you?
14       A. Yes.
15       Q. You actually asked that question to make sure
16   that that's what he was saying, correct?
17       A. Correct.
18           MR. MAURER: That's all, thank you.
19           THE COURT: Anything further?
20           MS. KELSEY: No, Your Honor.
21           THE COURT: You may step down.
22           MS. KELSEY: Your Honor, Mr. Mays would be
23   back on the witness stand at this point in time.

f. 17-18                          State v. Damone Flowers

17

1        BY MR. MAURER: Your Honor -- I'm sorry.
2        THE COURT: I remind you that you remain
3    under oath.
4        MR. MAURER: Your Honor, can I wait a moment
5    I thought we were going to have a tab for the easel,
6    which I want to use when I'm questioning Mr. Mays.
7        THE COURT: Very well.
8        MR. MAURER: Actually, I could probably start
9    without it and then stop.
10       VERNON MAYS, having been previously sworn
11   under oath as a witness for the State, was recalled to
12   the stand and testified further as follows:
13   BY MR. MAURER:
14       Q. Good morning, Mr. Mays.
15       A. Morning.
16       Q. Mr. Mays, let me -- first of all, I have got
17   a lot of questions for you. Let me first of all make
18   sure I understand what it is that you're saying today
19   or what you said yesterday as far as your testimony is
20   concerned, and then we'll go into some more details
21   about what you said on prior occasions.
22       If I understand correctly, correct me if I'm
23   wrong, but if I understood your testimony yesterday

18

1    you were saying you did not get a good look at the
2    individual who fired the shots on August 1st of 1998;
3    is that correct?
4        A. That is correct.
5        Q. Okay. And if I understood what you said
6    yesterday, it is my understanding that what you're
7    saying is that the person who's photograph you picked
8    out and the person who is sitting in court at this
9    time looks like or resembles the shooter?
10       A. That's correct.
11       Q. You have to speak up, please.
12       A. That is correct.
13       Q. You are not saying, if I understand you
14   correctly, that he is the shooter, are you?
15       A. No, sir. I can't say that one hundred
16   percent, no.
17       Q. In fact, you're not sure, are you?
18       A. No, not really.
19       Q. As you sit here today?
20       A. Yes.
21       Q. Do you remember giving a statement to the
22   police on August 2nd of 1998? It was on tape?
23       A. Oh, okay, on tape.

19

1        Q. Do you remember that?
2        A. Yeah.
3        Q. Do you remember that that statement probably
4    lasted 45 minutes to an hour and you were questioned
5    by Detective Brock?
6        A. Yeah.
7        Q. And do you remember you came down to the
8    Wilmington Police Department and you were questioned
9    there?
10       A. Yes.
11       Q. Have you had a chance to look at the
12   statement from when you made it and when you testified
13   today?
14       A. No.
15       Q. No one has showed you the statement?
16       A. Not the tape or the statement, no.
17       Q. Do you remember it?
18       A. Vaguely, yeah, pretty much.
19       Q. Good, because I want to ask you some
20   questions about it. But before I do that, let me just
21   go back again.
22       If I understand your testimony yesterday
23   you're indicating that you worked that night. You got

20

1    out of work, you did some stuff with your car, and
2    then you started walking east on 22nd Street?
3        A. Yeah, just generally walking.
4        Q. And as you proceeded east of 22nd Street it
5    is about 1:20, 1:25 in the morning?
6        A. Yeah, close to it.
7        Q. And you indicated on the tape -- and I assume
8    that you were saying to look to purchase any drugs for
9    yourself?
10       A. No, I was on a walk actually. I don't even
11   know why, but I just felt like going on for a week.
12       Q. It is 1:20, 1:25 in the morning?
13       A. I had the next day off. I wasn't in a big
14   hurry to do anything.
15       Q. As you proceeded down East 22nd Street you
16   run into a person, correct?
17       A. Yeah.
18       Q. Pardon me.
19       A. A group of people.
20       Q. Actually, you spoke to a couple of people on
21   the side of the street?
22       A. Yeah, just sitting there having a
23   conversation.

State v. Damone Flowers

21

1  Q. Do you know who those people were?
2  A. No, not by name.
3  Q. Do you know how old those people were?
4  A. One was a young kid, 17 or 18; the other was
5  his grandmother.
6  Q. Do you know what that kid's name was? Was it
7  Michael Shamely?
8  A. No.
9  Q. You did however know a person who worked at
10  the Quality Sub Shop, did you not?
11  A. Yeah.
12  Q. Quality Sub Shop is a sandwich shop?
13  A. Yeah, it is a sandwich shop on Market Street.
14  Q. If I understand your testimony yesterday and
15  also what was on the tape, you indicated that as you
16  were talking to this -- and if we're going to assume
17  that the shooter is down some distance to you -- you
18  turned your back as you were talking to this person?
19  A. Yeah, I had my back -- my back was towards
20  the crowd.
21  Q. And you're walking backwards down Second
22  Street -- 22nd Street. Help me understand what made
23  you turn around. Did you hear the shots being

22

1  discharged at that time?
2  A. Yeah. I heard a couple shots going off.
3  Q. Did you turn around before the shots were
4  discharged?
5  A. I can't say immediately after the first shot,
6  maybe after I heard about three or four shots.
7  Q. But my point is you had not turned around to
8  look down the street until you actually heard a shot
9  being fired?
10  A. Yeah.
11  Q. Do you whether it was one shot or two shots?
12  A. I didn't turn around.
13  Q. The point is you didn't turn around. When
14  you turned around, your testimony was, you didn't see
15  the face when you saw the shots?
16  A. My actions were a glimpse to see what was
17  going on. And in a glimpse, like I said, I heard the
18  shots. You hear shots -- you hear a lot of other
19  things going on and it is like all confusing at the
20  same time. So when you just turn around, you look at
21  the closest thing and then you -- I just went down.
22  Q. You went down. I think one of the things you
23  said on the taped statement was that bullets don't

23

1  have names?
2  A. No, they don't.
3  Q. So you were concerned about possibly being
4  shot at that time?
5  A. Yes.
6  Q. For how long a period of time did you get a
7  glimpse at the individual who was firing the shots?
8  A. It is kind of hard to say, maybe five
9  seconds, ten seconds.
10  Q. Not very long?
11  A. No.
12  Q. You went to the ground -- when you saw the
13  person with the gun -- did you see the gun?
14  A. No, just like I told them, what I saw it
15  looked like the figure of the gun. It had sparks.
16  Q. No, you told him you saw a gun, Mr. Mays, do
17  you remember telling them that?
18  A. No. To me it looked like a gun whether I
19  said it was a gun or not I'm not sure, but to me it
20  looked like a firing mechanism, yeah.
21  Q. And, specifically, you told the police that
22  the gun was black, did you not?
23  A. Yeah, it was a black object.

24

1  Q. All right. When you observed the item that
2  you previously indicated was a gun and that you now
3  indicate looks like a gun, did the shooter have the
4  gun wrapped up in a T-shirt?
5  A. No, I didn't see a T-shirt.
6  Q. No. So that definitely was not -- there was
7  something in the shooters hand that you could see and
8  it was definitely not wrapped up in a T-shirt,
9  correct?
10  A. Yeah, from -- yeah.
11  Q. Okay. Now, do you recall when you were
12  questioned by the police that you provided them with a
13  description of the individual who you believed to be
14  the shooter at that time?
15  A. Yeah, close -- as close as I could.
16  Q. Okay. And if I might go over that with you a
17  little bit here. We had the benefit of having viewed
18  your statement yesterday, so -- and you hadn't seen it
19  for a while. I realize that puts you at a
20  disadvantage position. If I recall on the tape you
21  describe the individual as a black male?
22  A. Yes.
23  Q. 20 to 25 years of age, correct?

State v. Damone Flowers

25

1    A. Yeah.
2    Q. Medium build?
3    A. Yeah.
4    Q. And complexion?
5    A. Dark.
6    Q. I'm sorry?
7    A. Just like me. I thought you asked a
8    question --
9    Q. And then you were asked what the shooter was
10   wearing?
11   A. Yeah.
12   Q. And you remember telling him he wore a blue
13   T-shirt?
14   A. Yes, it looked like a blue T-shirt.
15   Q. Do you remember telling the police officers
16   that the person who shot wore a blue T-shirt?
17   A. I'm not sure whether or not it was blue or
18   not.
19   Q. If I tell you it is on the tape, you don't
20   disagree?
21   A. No.
22   Q. For our point here it is for the person who
23   fired the shots definitely had a shirt on?

26

1    A. No, he wasn't walking around naked or
2    topless.
3    Q. Let's talk about the pants he was wearing,
4    okay. Do you remember it today, what kind of pants he
5    was wearing?
6    A. I think they were white shorts, I'm not sure.
7    THE COURT: I'm sorry, I hate to interrupt
8    you, can you all see the witness. If you put that
9    easel back there next to you that would be a better
10   position.
11   MR. MAURER: I thought these courtrooms would
12   be better. I apologize.
13   THE COURT: No comment for the record.
14   MR. MAURER: All right. Mr. Mays, with the
15   Courts permission I'm going to come up here with you.
16   THE WITNESS: That's fine.
17   BY MR. MAURER:
18   Q. By the way, we don't know each other, do we?
19   A. No.
20   Q. I have seen you one or two times before, but
21   we've never had a conversation have me?
22   A. No.
23   Q. Personally?

27

1    A. No.
2    Q. Okay. All right. So we were talking about
3    the blue T-shirt that the shooter was wearing -- by
4    the way this was occurring at 1:35 in the morning?
5    A. Yeah.
6    Q. Happened fast?
7    A. Happened very fast.
8    Q. I just asked you about the shorts that the
9    person was wearing and you told me that he had shorts
10   on, white baggy shorts, I think is what you said?
11   A. Yes, pretty much close to it.
12   Q. Okay. So the person that you saw firing the
13   shots had shorts on?
14   A. Yeah.
15   Q. Huh?
16   A. Yes.
17   Q. And you were sure of that back then?
18   A. Yes, pretty much. Yeah as far as I can
19   remember.
20   Q. Back then when you talked to the police the
21   day after the incident occurred, you said the person
22   had on a blue T-shirt and white baggy shorts. You
23   were pretty much sure 100 percent of that, right?

28

1    A. Considering the situation, no, I couldn't
2    tell you I was one hundred percent sure. Maybe today
3    I -- under the situations and circumstances, I
4    probably did say a lot of things, but --
5    Q. All right. But in any event this was the
6    description that you provided them, right?
7    A. Yes.
8    Q. What kind of hat was he hearing?
9    A. I didn't notice a hat.
10   Q. You indicated to the police, did you not,
11   that he was not a wearing hat?
12   A. No.
13   Q. And, specifically, you did not indicate that
14   he was wearing a black beanie hat, did you?
15   A. No.
16   Q. So no hat. And obviously if you looked at --
17   got a glimpse of the person's face you would be able
18   to tell us whether or not the person was wearing
19   glasses at the time, was the person?
20   A. No.
21   Q. No glasses. So physically he wasn't wearing
22   glasses then obviously he wasn't wearing yellow tinted
23   glasses?

B 27-33

29

1    A. No.

2    Q. Okay. So would you pretty much agree that it

3    was a black male, 20 to 25, medium complexion, wearing

4    a blue T-shirt, white baggy shorts, no hat and no

5    glasses. That was the best description you could give

6    at the time of the person firing the shots?

7    A. Yes, sir.

8    Q. Okay. I'll probably come back up again, I'm

9    sorry, I didn't know I was going to do this. You also

10   provided the police, at that time, at least a little

11   bit, with a description of the gun. Do you remember

12   that?

13   A. No.

14   Q. Huh?

15   A. No.

16   Q. You don't recall that?

17   A. No.

18   Q. But if I told you that it is on -- put your

19   name down here?

20   A. On the tape.

21   Q. That it was on the tape that you said that

22   the gun was black?

23   A. Oh, you mean part of it is black and it

30

1    looked like it could have been a nine millimeter.

2    Q. Do you remember talking about that?

3    A. Yeah.

4    Q. But you, specifically -- you were asked what

5    color the gun was and you recall it was black?

6    A. It was a dark object.

7    Q. You said it was black, then clearly it wasn't

8    silver, right?

9    A. No.

10   Q. So black not silver. And you indicated to

11   them that you thought it was a nine millimeter, but it

12   just shoots out?

13   A. Yeah, possible.

14   Q. A .22?

15   A. A .22 or .38.

16   Q. Those are the ones you mentioned?

17   A. Yeah. Like I said, it was just a dark

18   object.

19   Q. So .22, .38 or a nine millimeter, but I guess

20   more importantly for our purposes you're indicating or

21   did indicate that it was a black dark object?

22   A. Yeah.

23   Q. And you also indicate that it was not hidden

31

1    by a T-shirt of any color, correct?

2    A. Yeah.

3    Q. Thank you. Now, you testified yesterday that

4    after you got off of work you had a couple of beers?

5    A. Yes.

6    Q. Do you remember testifying to that, okay? Is

7    that a fact that you're certain of today?

8    A. That I had a couple of beers?

9    Q. Yeah.

10   A. Yes.

11   Q. When you talked to the police back in August

12   of 1998, and they asked you that question, you told

13   them that you had not had anything to drink. Do you

14   remember that?

15   A. No.

16   Q. Pardon me?

17   A. I don't remember that.

18   Q. You don't remember telling them that you

19   didn't have anything to drink?

20   A. Not anything to drink, no.

21   Q. If I told you that it was on the tape that

22   you said that you had not had any alcohol or drugs

23   that night, would that refresh your recollection as to

32

1    what you told them?

2    A. No.

3    Q. So you're testimony is that you could not

4    have told them that you had nothing to drink because

5    in fact you had two beers?

6    A. I had two beers that night; that's all I know

7    for now. Like I said, with the tape I'm really not

8    sure.

9    Q. I'm going the tell you that what you said on

10   the tape was that you had nothing to drink; that you

11   did not have any drinks that night.

12   A. Okay.

13   Q. Is there any reason to, prior to witnessing

14   what you witnesses, why you didn't tell the police

15   that you had anything to drink?

16   A. None.

17   Q. No reason why?

18   A. No.

19   Q. Your statement indicates that there was some

20   lighting from an electric pole that was in the area

21   there, correct?

22   A. Yeah, a little, not much.

23   Q. Pardon me?

B 34-38

State v. Damone Flowers

33

1    A. A little, not much.
2    Q. And the light on the pole was not shot out,
3    it wasn't damaged, there was some light there to see
4    what you were seeing?
5    A. Yeah.
6    Q. You also indicated in your statement. and may
7    be I should put this down too, that as the shots --
8        THE COURT: Behind you.
9        MR. MAURER: Thanks. Judge.
10   BY MR. MAURER:
11   Q. As the shots were being fired the person
12   fired the shots -- and let's assume for a minute I'm
13   the shooter, the person who fired the shots was
14   walking as he was shooting.  Do you remember saying
15   that?
16   A. What -- not walking fast?
17   Q. No, I didn't say fast, but he was --
18   A. He was moving.
19   Q. He wasn't stationary firing the shots, was
20   he?
21   A. Yes, he was moving.
22   Q. Do you remember saying on the tape that the
23   person was walking as he fired?

35

1    A. Yeah.
2    Q. So that's what your recollection is today
3    that the shots were fired from the left hand of the
4    shooter?
5    A. Yeah, pretty much.
6    Q. Now. we watched your tape and what happened
7    was that you talked about 35 minutes or so and the
8    tape went off. you went into a room and looked at some
9    photographs. after going off at 2:35, and one of the
10   first things you said was that the shooter was right
11   handed. do you remember that?
12   You said, I made an photographic
13   identification and by the way the shooter was
14   right-handed?
15   A. No, I don't.
16   Q. Do you remember that period of time during
17   which you were not on tape?  Maybe I should ask you
18   this:  Did you know you were on tape at any point in
19   time?
20   A. No, well, only when he took me the first time
21   it started and stopped, then we came back for the
22   second one. the statement, that was the only time.
23   Q. I'm missing you.  What was the first thing

34

1    A. Yeah.
2    Q. Okay.  Now, do you remember when you spoke
3    with the police that you had told them initially that
4    the person firing the shots fired with his left hand?
5    A. His right hand.
6    Q. Pardon me?
7    A. I think it was his right hand.
8    Q. You think that now, but you remember as
9    you're being interviewed by the police that on five
10   separate occasions the police asked you -- well not
11   asked you but on five separate occasions you gave a
12   statement to the effect that the shooter fired with
13   his left hand.  And as a matter of fact you even
14   demonstrated for the police as you were talking to him
15   as you lifted your hand up and said that the shooter
16   was going like this?
17   A. I guess it was because of the position he was
18   in, it probably was his left and because, as I said,
19   when I had turned at a glance he was like facing me
20   and we were like at a quick face off as I was going
21   down.  And I just seen a jerking motion going into the
22   ground.
23   Q. With his left hand?

36

1    you said?
2    A. The first time they made the tape they
3    brought me in and said in there is so and so and so
4    and so, and just like an interview of who I was and
5    then they stopped it.  I left and went to look at the
6    things and then came back with my statement.
7    Q. Now. the testimony has been -- there were two
8    separate places that you were, right?  You're in a
9    small room?
10   A. Pretty much I was in the whole office
11   upstairs different rooms.
12   Q. When you left that small room, where your
13   taped statement was given, where did you go?
14   A. Into the interview room, the conference room.
15   Q. Who was in the conference room?
16   A. Let's see Sergeant Brock, Lieutenant and a
17   couple of other officers.
18   Q. Where were you guys?
19   A. We were all sitting at a table in the
20   conference room.
21   Q. Is that when you were looking at the
22   photographs?
23   A. It had been some time that we were sitting

3 3432

State v. Damone Flowers

37

1    there talking first. They were asking me some
2    questions. Then they said, Hold up, and they brought
3    in the cases for me to look at the photos.
4        Q. So it is your, according to your
5    recollection, Officer Brock, a lieutenant, and other
6    officers were sitting at a conference table and you're
7    being questioned in that context there, correct?
8        A. Yeah.
9        Q. Were they talking to you about the case and
10   what you had seen?
11       A. Well, they had just seen what I had seen.
12       Q. But you continued to talk with them at that
13   point in time?
14       A. Well, no, because most of the time I was just
15   sitting there. They went out and started discussing
16   -- and then they would come out to me and then come
17   back in so I was basically just sitting there.
18       Q. You're sitting there with the police
19   officers, from what you're telling, and they are
20   coming back and forth talking about the case?
21       A. Yeah, I guess, they had investigations and
22   paperwork they need to do, so I just sat there and
23   waited.

38

1        Q. How often would you say they would come back
2    to you and talk about the case?
3        A. It was more or less a whole day thing. Once
4    they got me from work I was there from about 12:00 to
5    6:00, so --
6        Q. You were?
7        A. Yeah.
8        Q. So you're at the police station from 12 noon
9    to 6 o'clock p.m.?
10       A. Yeah, roughly, maybe 5:00 somewhere around
11   there. I knew it was quite a while.
12       Q. Bear with me for just a second, please?
13       A. Un-huh.
14       Q. All right. Just a couple other questions
15   about what you observed when you were on 22nd Street.
16       On the tape you are heard to say that prior
17   to the shooting you heard a voice say, Give me the
18   gun, I'll put a cap in his ass.
19       A. Yeah.
20       Q. Do you remember saying that on the tape? Do
21   you recall that the person who fired the shots said
22   that prior to the shooting, today?
23       A. Well, I'll put it to you this way, at the

39

1    same time those words were said the motion was being
2    moved. Whether it came out of him, like I said, I
3    didn't stay up long enough to find out.
4        Q. All right. But there was a suggestion that
5    at least someone else had to give the gun to the
6    shooter in order for the shots to be fired, at least
7    what your statement was based on?
8        A. Yeah, pretty much. Like I told them, it
9    pretty much seemed like a dare thing, whether they
10   were doing it or not didn't make a difference.
11       Q. And you had military training, correct?
12       A. Yeah.
13       Q. Did you not express an opinion at some point
14   to someone that you believed that there were two guns
15   firing shots that evening?
16       A. I know it was more than one.
17       Q. How do you know that?
18       A. Like I said, it was a different range and for
19   one gun to let out that many bullets at once, I don't
20   think so.
21       Q. Okay. You've given us an idea, and on your
22   document that's been introduced into evidence, where
23   some of the shots were being fired from. Do you have

40

1    any idea where the other shots might have been firing
2    from that you're talking about?
3        A. Well, like I said, Some were close and some
4    were like at a distance. It would have been across
5    the street. It could have been on the other side of
6    the van.
7        Like I said, I didn't really get a good
8    glimpse of everything that was around me. I just saw
9    that little bit and then went down.
10       Q. You're expressing to a great degree of
11   certainly as you're testifying here that there were
12   two different guns being fired that evening?
13       A. Yeah, there were more than one, yes.
14       Q. Did you see anything that was happening with
15   the car in which the individual was located that was
16   shot?
17       A. No, I didn't even know anybody was there,
18   actually.
19       Q. You didn't ever see the car in the street?
20       A. No.
21       Q. Okay. So you would not have seen any
22   activity that was going on out of the car?
23       A. No.

State v. Damone Flowers

41

1    Q. Would you have heard any loud music playing?
2    A. No. Like I said, it was a crowd of people,
3 you know, some people get together and they just stand
4 out there and play their music loud and anything else.
5 You never really think anything of it because it is
6 normal.
7    Q. Now, you mentioned when you spoke to the
8 police officer on August 2nd of '98, that you
9 apparently knew that some of the girls out on the
10 street had just come from a club. Do you remember
11 telling the police that?
12    A. I had no idea what that crowd was there for.
13    Q. You don't remember telling the police they
14 were coming from the gun?
15    A. What I had heard is hearsay --
16    Q. Without getting into what you heard, but you
17 said you heard some things after the fact, you mean
18 after the shooting took place?
19    A. No, it was a couple days later after the
20 fact.
21    Q. We're only talking a day later?
22    A. Yeah, as far as -- no, I didn't even know
23 they were coming from a club.

42

1    Q. So you don't -- you didn't say that to the
2 police officer?
3    A. No.
4    Q. Didn't you say, they were just coming from a
5 nightclub?
6    A. No, it might have been in a phrase that I
7 thought they were coming from a nightclub. But like I
8 said, I really didn't know because I didn't know what
9 the crowd down there was for. I just thought it was a
10 group of people.
11    Q. All right. Let me just go back to your
12 identification, if I could just for a minute.
13    Do you recall, when you were talking to the
14 police and you were telling them who the person was
15 that you thought did the shooting, making reference to
16 an individual that you knew that grew up in the
17 neighborhood there?
18    A. Well, yeah. They asked me if I knew the guy
19 that I picked up out of the line-up. I told them.
20 No. At first I didn't even know who he was.
21    Q. But you also mention to them that you
22 recognized the guy as someone who -- I'm using your
23 words from the tape -- the last time I came home on

43

1 leave he was some sort of high school star, track or
2 football star. Do you remember saying that?
3    A. Yeah this is only from the photo that I
4 picked up, yeah.
5    Q. So the person you were referring to at this
6 time you made the identification is the person you had
7 seen -- the last time you saw him was when you were on
8 leave?
9    A. Yeah. Pretty much. One of the kids in the
10 neighborhood that I seen grow up.
11    Q. At that time that you were on leave the
12 person you identified as the shooter you identified as
13 being some sort of a high school star, track or
14 football?
15    A. Yeah, I remember him --
16    Q. Do you remember saying that?
17    A. Yes.
18    Q. When was the last time that you were on leave
19 from the Army? What year?
20    A. 1982.
21    Q. I think you mentioned it was 1983 or 1984,
22 right, do you remember saying that?
23    A. Okay. Yeah that was the second time.

44

1    Q. And you remember that in 1983 or 1984 the
2 person you believed to be the shooter would have been
3 in high school?
4    A. I'm only going by my recollection. I
5 couldn't tell you I just remember him -- my nephew
6 went to school with him.
7    Q. The point I'm trying to make that you said on
8 the tape was the person you believed to be the shooter
9 was the person that the last time when you came home
10 from leave at which time that person was a track or
11 football star; that's what you said on the tape. Is
12 that right?
13    A. Yeah.
14    Q. And that's the person you believe was the
15 shooter, someone who was in high school when you were
16 home on leave and someone who was a track or football
17 star?
18    A. Yes; but that's not the person that I'd say
19 is the shooter, that's the person I said I picked out
20 from the photo.
21    Q. That's right. Do you know how old he was in
22 1983?
23    A. No.

45

1    Q. Seven in '83 and eight in '84?
2    A. Oh, okay.
3    Q. So obviously it couldn't have been him?
4    A. Not in high school, no, but I do know he was
5    in sports. Like I said, that was years ago.
6    Q. So as you sit here today, you cannot say I do
7    not believe in fact that he was the one who fired the
8    shot?
9    A. No, I can't say that honestly, I can't.
10    MR. MAURER: Thank you.
11    BY MS. KELSEY:
12    Q. Mr. Mays?
13    A. Yes.
14    Q. Did you -- you communicated yesterday that
15    you didn't see the shooter?
16    A. I didn't get a good glimpse at him, no.
17    Q. You started to say that you couldn't see him
18    because there was a van in the way?
19    A. No, I couldn't see the activity that was
20    going on because of the van. The person I caught a
21    glimpse at, he was like maybe ten feet away -- ten
22    yards more or less.
23    MS. KELSEY: May I have this marked for

46

1    identification?
2    THE CLERK: State's for Identification C.
3    (State's Identification C was marked for
4    identification.)
5    BY MS. KELSEY:
6    Q. I'm going to show you what's been marked as
7    State's for Identification C, and ask you if you see a
8    van?
9    A. Yeah.
10    Q. Do you?
11    A. Yes.
12    Q. Is that the van?
13    A. Yeah.
14    Q. It is?
15    A. Yes.
16    Q. Why don't you hang on -- hang onto that
17    photograph for a minute. Can you see in that
18    photograph where you were standing?
19    A. Faintly. It is about the first step up --
20    Q. The first step that you see on --
21    A. Not the first step, where the motorcycle
22    is --
23    THE COURT: Can you describe the position for

47

1    the transcript.
2    MS. KELSEY: It is two or three steps up in
3    the photograph.
4    THE COURT: Meaning the top center of the
5    photo?
6    MS. KELSEY: Yes.
7    THE WITNESS: Yeah, pretty much.
8    BY MS. KELSEY:
9    Q. I hesitate to get -- can I have this marked
10    as State's Exhibit Number --
11    MR. MAURER: No objection.
12    THE COURT: Very well.
13    THE CLERK: State's for identification C
14    becomes State's Exhibit No. 4.
15    (State Exhibit No. 4 was marked.)
16    BY MS. KELSEY:
17    Q. Now, -- but you did -- how did you come to go
18    to the Wilmington police? Why don't you tell us that?
19    A. After the incident, I walked back home and
20    went back to bed. The next day I got up my boss had
21    called me in for a couple of hours, so I went back to
22    work. The next thing you know homicide came up to see
23    me.

48

1    Q. They came to see you at work?
2    A. Yeah.
3    Q. Okay. When they came to see you at work, did
4    they ask you if you knew anything about it?
5    A. Well, the rest was just me. I felt something
6    bad had happened and I don't get homicide cops coming
7    up to my shop seeing me.
8    Q. Okay. Well, did they ask you if you would
9    come do the police station?
10    A. Yeah.
11    Q. And what did you tell them?
12    A. Yeah.
13    Q. And did they give you a ride or did you meet
14    them there later?
15    A. No, they gave me a ride.
16    Q. You said that was around noon, you think?
17    A. Yeah.
18    Q. When you got to the -- was it Detective Brock
19    who came to see you or was it somebody else?
20    A. I really didn't see Detective Brock until I
21    got there. There was a couple other officers, I
22    really didn't remember their names or who they are.
23    Q. How long did you have to wait until you saw

State v. Damone Flowers

49

1  Detective Brock?
2      A. Well, it was like as soon as we got to the
3  station, he was there. He introduced himself and told
4  me who he was.
5      Q. Okay. And was that in that interview -- in
6  the interview room where they took the taped statement
7  or was it somewhere else?
8      A. No, this was as soon as I walked into the
9  homicide squad. He greeted me, because it was a
10  Sunday pretty much and everybody -- all of them were
11  there to do their work. I don't know, but you know,
12  he greeted me as soon as I came in and so on, things
13  like that.
14      Q. Did you go right into the interview room or
15  did you sit around a little?
16      A. No, he wanted to talk to me first about what
17  I had seen and what went on.
18      Q. So he talked to you before he put you on the
19  tape?
20      A. Pretty much. Like I said, it was like the
21  whole day I was here; and then I was moved here, and
22  then I was moved here. And to tell you exactly when
23  where and how, I couldn't do it.

50

1      Q. All right. But it's, so you're saying --
2  you're saying today that you did see a shooting?
3      A. I saw an individual pointing a gun at the
4  ground and shooting it, whether he was killing
5  somebody, I don't know. Whether he was aiming at
6  somebody, I don't know. To me it looked like he was
7  going to hit somebody else before he hit his actual
8  target.
9      Q. So today you actually remember that the van
10  wasn't blocking your view and you did see the
11  shooting?
12      A. No, the van was blocking my view at what they
13  were shooting at. So I had no idea at the time what
14  he was shooting at. Alls I know is somebody had a
15  gun, he was shooting at the ground, things were
16  whizzing and I went down.
17      Q. Do you remember telling the officer that you
18  could see the guys hand jerking?
19      A. Yeah, I seen a jerking motion, yeah.
20      Q. And do you remember telling him that
21  that's -- that's how you knew it was a gun?
22      A. That's just my own senses of knowing what it
23  is. Like I said, I seen sparks. I seen things

51

1  hitting into the ground and ricocheted up. I don't
2  think it is a cap gun.
3      Q. I wanted to show you, if I may, do you
4  remember telling officer -- Detective Brock that the
5  person was 6'1?
6      A. Relatively, yeah.
7      Q. About your height?
8      A. More or less.
9      Q. And how tall are you?
10      A. 6'1.
11      Q. And do you remember telling Detective Brock
12  about the noise that the gun made?
13      A. No, outside of it was loud.
14      Q. Do you remember talking about a pop, pop,
15  pop, pop. Does that refresh your recollection?
16      A. Oh, yeah, it was -- that was coming from just
17  about all over the place.
18      Q. Do you remember telling him that it sounded
19  like a nine millimeter?
20      A. I'll put it to you this way, some of the
21  sounds I heard sounded like a nine millimeter. Like I
22  said, you got more than one gun shooting. I couldn't
23  tell you exactly which gun was shooting off.

52

1      Q. When did you decide there was more than one
2  gun?
3      A. I knew that as soon as I heard the shots.
4      Q. Did you tell Detective Brock that?
5      A. I think I did, I'm not sure.
6      Q. If I told you it wasn't on the tape, would
7  that refresh your recollection?
8      A. No.
9      Q. Would there be a reason why you wouldn't tell
10  Detective Brock that there was more than one gun?
11      A. Because they really didn't ask me. They
12  asked me about the shooter. Most of my interview was
13  basically about the shooter and what I heard around
14  me.
15      As I said, the sounds I heard was more than
16  one.
17      Q. Okay. Well, are you saying now that you
18  remember that you didn't tell Detective Brock about
19  the second gun or you don't remember?
20      A. Well, I don't remember whether I told him or
21  not, no.
22      Q. And if you -- if you didn't tell him because
23  he didn't ask you, that's what you're saying now?

53

1    A. I probably did say it, but you know. like I
2    said, they basically asked me about what I saw more or
3    less, whether there was one or two.
4        Q. But you do remember describing the pop. pop.
5    pop?
6        A. Yeah.
7        Q. So you described to him what you heard as
8    well as what you saw?
9        A. Well, pretty much.
10       Q. Okay. And you didn't see the second shooter,
11   is that what you're saying?
12       A. Yeah.
13       Q. But you did hear the second shooter, is that
14   what you're saying?
15       A. I heard the weapons, but as far as who else
16   was firing them, no.
17       Q. Okay. But when you described the pop, pop.
18   pop to Detective Brock, you didn't mention that there
19   was two guns?
20       A. No, because as I said it was --
21       Q. Okay. Was there a reason why you didn't do
22   that?
23       A. No.

54

1        Q. No, okay?
2        A. No.
3        Q. Now, the person that you picked out of the
4    line-up, you identified yesterday as being the person
5    who is in the courtroom today?
6        A. Yes, ma'am.
7        Q. And that you're sure?
8        A. Yeah.
9        Q. And do you remember telling Detective Brock
10   how sure you were at the time?
11       A. No, I don't.
12       Q. You don't?
13       A. No.
14       Q. You don't remember telling him that you were
15   100 percent sure that that was the shooter?
16       A. Not telling him that that was the shooter.
17       Q. Some time between when this happened and
18   yesterday, did you become aware that you knew the
19   defendant?
20       A. Actually, I became aware three days after it
21   happened.
22       Q. Okay. So after you talked to Detective Brock
23   you realized you knew him?

55

1        A. Yeah.
2        Q. And how did you know him?
3        A. I watched his family grow up around the
4    corner from me.
5        Q. Was he the kid you were thinking about when
6    you said you thought --
7            MR. MAURER:  Your Honor. this is a little bit
8    leading, I'm going to object.
9            THE COURT:  If you rephrase.
10   BY MS. KELSEY:
11       Q. Okay. Do you remember telling the officers
12   that you knew a kid that was an athlete? You talked
13   to Mr. Maurer about a kid who had been a track star or
14   football star, do you remember that?
15       A. The gentleman that I remember telling
16   Detective Brock about was the individual that I picked
17   out from the line-up. I didn't really know who he was
18   before I got at home because it is like I haven't seen
19   these guys for years. They were little kids when I
20   was growing up. Then I found out who he was just by
21   name and everybody said that's so and so's son.
22       Q. Okay. My question is:  is he the same kid
23   that you were thinking about when you were talking

56

1    about the track star or the football star?
2        A. Yeah.
3        Q. Yes, it is the same kid?
4        A. Yeah --
5            MR. MAURER:  Your Honor, same objection.
6            MS. KELSEY:  I apologize, Your Honor.
7    BY MS. KELSEY:
8        Q. Do you remember how old that kid was when you
9    were home on leave?
10       A. No.
11       Q. Okay. All right. Do you remember saying
12   high school?
13       A. Yeah, at least I thought -- at least I
14   thought. Guys are bigger than what they look nowadays
15   and he looked to be in high school.
16           MS. KELSEY:  May I have a minute, Your Honor?
17           THE COURT:  Yes, you may.
18   BY MS. KELSEY:
19       Q. Did you ever talk to Detective Brock after
20   the taped interview?
21       A. Do you mean as far as the case itself?
22       Q. Well, did you ever call Detective Brock at
23   all, is my first question?

57

1 A. Yeah. one time.
2 Q. Okay. What did you call him to talk about?
3 A. Well, it was just surrounding the case. you
4 know, people were coming up to me bothering me and I
5 called him to let him know, Hey, look, I don't know
6 what's going on, but different people are coming up to
7 me. I don't know for what reason.
8 Q. How did those people coming to you and saying
9 stuff to you make you feel?
10 A. Scared.
11 Q. Okay. And how long did -- how long after the
12 shooting did people come up and bother you?
13 A. No, it was one guy. He came up once and
14 after that I haven't been messed with since. So, I
15 just figured maybe it was somebody in an attempt so I
16 didn't think too much of it.
17 Q. Do you remember talking to Detective Brock
18 back in May of this year?
19 A. Only to come up for the briefing at the
20 District Attorney'S Office.
21 Q. And had -- other than that, have you talked
22 to anyone else about this case?
23 A. Mr. Fredrick's, a private investigator.

58

1 Q. Mr. Fredrick?
2 A. Fredrick, he's a private investigator for the
3 defendant or at least that's who he told me he was.
4 Q. When did you talk to him?
5 A. I would say that was directly a week later
6 after I had gave my statement to the police.
7 Q. A week later after you gave your statement?
8 A. Roughly, it was directly after I had got, you
9 know, picked for it. A private investigator said he
10 was from -- for Damone Flowers and came up to speak to
11 me.
12 Q. Would that have been in May of this year?
13 A. I'm not sure.
14 Q. Or was it back in 1998?
15 A. That could have been in '98.
16 Q. So is it either right away or --
17 MR. MAURER: Your Honor, can you ask Ms.
18 Kelsey to please not lead the witness. For the fourth
19 time I object.
20 MS. KELSEY: I apologize.
21 BY MS. KELSEY:
22 Q. You don't know when in those four years it
23 was?

59

1 A. I know it was directly after I had came from
2 making my statement, the exact time and date, no.
3 Q. Okay. When you came from making your
4 statement to Detective Brock?
5 A. Yeah.
6 MS. KELSEY: I have no further questions.
7 RECROSS-EXAMINATION
8 BY MR. MAURER:
9 Q. Mr. Mays, do you have trouble with your
10 perceptions, visual perceptions, ability to remember,
11 time perceptions?
12 A. Well, that depends on --
13 Q. Depends on what?
14 A. It depends.
15 Q. If I'm understanding your testimony, you
16 correctly stated there was an interview that you with
17 an --
18 A. Well, he said he was --
19 Q. Let me finish please. You said an
20 investigator came to see you -- that I asked to talk
21 to you -- and you're indicating a person about a week
22 or two after you spoke with Detective Brock?
23 A. I guess -- it was.

60

1 Q. In '98?
2 A. Yeah, somewhere in there.
3 Q. Are you -- you've been throwing percentages
4 out and the prosecutor said you were 100 percent sure
5 that's when it was. Are you --
6 A. No.
7 Q. -- 100 percent sure?
8 A. I would put it at 50/50 at this point in
9 time.
10 Q. There will be testimony to back this up, but
11 if I told you that the interview took place on
12 April 9, 2002, almost four years after you spoke to
13 Detective Brock would that surprise you somewhat?
14 A. That would probably be the interview that I
15 did at the Attorney General's Office.
16 Q. I'm talking about the interview you did with
17 Mr. Tate?
18 A. Oh, okay. No, it wouldn't.
19 Q. Now, you've indicated that there were times
20 that you spoke with Detective Brock at the police
21 station and other Wilmington police officers that were
22 not on the taped statement that we saw you give,
23 correct?

State v. Damone Flowers

65

1   Did you go across Lamotte? How did you get to that
2   intersection?
3       A. Going down Lamotte and turned onto 22nd. And
4   the subjects on the street were pointing up further on
5   the street towards Market Street on 22nd.
6       Q. And people were pointing up 22nd Street, what
7   did you -- did you have a partner with you?
8       A. Officer Gleen was my partner. I was training
9   him at the time.
10      Q. What did you do with your partner?
11      A. We responded up 22nd street. We located a
12  vehicle run off the sidewalk onto a telephone book.
13      Q. Do you recall the condition of the car?
14      A. Yeah, it was damaged, naturally, from running
15  into a telephone pole. There appeared to be bullet
16  holes on the windshield and some spider webbing on the
17  windshield.
18      Q. Was there spider webbing on both sides of the
19  windshield or the one?
20      A. Yes, sir, it was both sides.
21      Q. Was there anyone in that car?
22      A. Yes. There was a subject on the driver's
23  side slightly reclined and slumped down.

66

1       Q. Okay. Did you approach that person?
2       A. Yes, we did.
3       Q. And that's just you and your partner at that
4   point?
5       A. Yes, sir.
6       Q. When you approached, what did you observe?
7       A. That he was bleeding from the right side
8   underneath his arm area. At that point he was still
9   breathing, but it was quite labored.
10      Q. And what did you do in response to seeing him
11  in that condition?
12      A. Fire department had already been notified,
13  apparently, and at that time Sergeant McNeil was
14  rolling up on that scene also.
15      Q. Was there any other stains of blood you
16  noticed?
17      A. Coming from the passenger side door out that
18  way.
19      Q. Coming outside the car itself or inside the
20  car?
21      A. May I refer to my report?
22      Q. Sure you can.
23      A. Passenger side, inside the vehicle.

67

1       Q. Were there any bullet holes that you noticed
2   in the car?
3       A. The windshield areas were --
4       Q. What kind of car was that?
5       A. It is an '88 Honda Accord.
6       Q. Does any other officers arrive after you --
7       A. Sergeant McNeil had arrived and then some
8   other officers helping secure the scene.
9       Q. Was that his responsibility securing the
10  scene?
11      A. No, he was the supervisor.
12      Q. Did he call anybody else?
13      A. He notified the Detectives who also responded
14  to the area.
15      Q. Was that him that called the Detective?
16      A. Serious cases, such as shootings, rapes,
17  anything of that, serious assaults, they are notified
18  to investigate.
19      Q. Did the Detectives respond?
20      A. Yes.
21      Q. Do you recall who they were?
22      A. Not offhand, no.
23      Q. Okay. What happen to the man behind the

68

1   wheel that you observed in that condition?
2       A. Paramedics and fireman removed him and placed
3   him in an ambulance. I believe it was Clamont Fire
4   Company who were the ones who responded and
5   transported him down to Christiana. And my partner
6   went with him in the ambulance.
7       Q. What was your partner?
8       A. Officer Gleen was my partner.
9       Q. Why would he go with him in the ambulance?
10      A. In case the victim made any statements in the
11  ambulance.
12      Q. Did he?
13      A. No.
14      Q. Did the paramedics work on him at the scene?
15      A. Yeah. They started working on him there and
16  then I observed them still working on him as they
17  started in the ambulance.
18      Q. His name was Alfred Smiley. Do you know
19  which hospital he was taken too?
20      A. Christiana Hospital.
21      Q. Was he worked on there?
22      A. Yes, he was.
23      Q. In what fashion?

State v. Damone Flowers

69

1    A. He was in the trauma room at the hospital
2    where a doctor was working on him and then transported
3    him up to surgery from the trauma room.
4    Q. Did he survive surgery?
5    A. No.
6    Q. Do you know when he was pronounced?
7    A. 3:18 in the morning.
8    Q. Okay. And what happens when someone is
9    pronounced like that in a hospital that's involved
10   with an incident of this kind? Do you have to notice
11   anybody else?
12   A. ME's Office is to respond.
13   Q. Did you do that?
14   A. That was done.
15   Q. Was there anyone else located that night
16   that's indicated in your report who was involved in
17   this incident?
18   A. Another Detective responded down to the
19   Christiana hospital.
20   Q. Okay. And there were two other passengers in
21   that car did anyone contact them that night?
22   A. They were located by Officer Mevy at the
23   Wilmington Hospital.

70

1    Q. And you have no information as to why he
2    drove out there?
3    A. He did a supplement, I have no idea.
4    Q. When the scene was secured what fashion was
5    it secured, please?
6    A. The area is usually taped off. To ensure a
7    secure scene the officers are positioned in that area
8    plus the Detectives usually came and talk to the
9    witnesses.
10   Q. Did you play any part securing of the scene
11   some period of time?
12   A. Not that long, because after the ambulance
13   left and Sergeant Akill got there, they responded they
14   started securing the scene, and I followed down to go
15   with my partner.
16   Q. So you picked your partner up at the
17   hospital?
18   A. Yes. We remained down there.
19   MR. RAMBO: No further questions.
20   THE COURT: Mr. Maurer?
21   MR. MAURER: Just a couple. Thanks.
22   CROSS-EXAMINATION
23   BY MR. MAURER:

71

1    Q. Got afternoon. You said you saw some bullet
2    holes in the windshield?
3    A. If I recall, yes.
4    Q. Which windshield?
5    A. It would be the Honda, that was on the
6    telephone pole.
7    Q. But where on the windshield?
8    A. I don't really recall exactly where on the
9    windshield.
10   Q. Do you recall how many there were?
11   A. No.
12   Q. I guess that's not your responsibility, I
13   guess, to check that out. Evidence detection would
14   take care of that?
15   A. They usually take care of that when they
16   arrive.
17   Q. You just remember there were bullet holes in
18   the windshield, you don't remember how many or where?
19   MR. MAURER: Thank you.
20   MR. RAMBO: No more questions. May he be
21   excused?
22   THE COURT: Very well. You may step down and
23   be excused.

72

1    MR. RAMBO: Your Honor, if I may have some
2    assistance by the bailiff with setting up the ELMO
3    machine. We're going to call Officer Sammons from
4    Wilmington PD as well.
5    THE COURT: Do we need it set up?
6    MR. RAMBO: Maybe we need to.
7    THE BAILIFF: No, it is already to go.
8    MR. RAMBO: All right then, the officer may
9    come in.
10   OFFICER JOSEPH SAMMONS, having been called on
11   the part and behalf of the State as a witness, being
12   first duly sworn under oath, testified as follows:
13   DIRECT EXAMINATION
14   BY MR. RAMBO:
15   Q. Good afternoon, officer Sammons.
16   A. Good afternoon.
17   Q. You're with Wilmington PD?
18   A. Yes, I am.
19   Q. You were with them specifically in August of
20   1998?
21   A. Yes, I was.
22   Q. What were your duties at the time, if you
23   will, please?

State v. Damone Flowers

77

1  it not?
2      A. Yes.
3      Q. Did you do other measurements that is the
4  distance from there down onto the street, maybe to the
5  intersection at Lamotte?
6      A. I'm not certain. The last measurement I have
7  is 602 feet east of Market Street was a copper
8  jacketing from a projectile.
9      Q. So you're talking roughly two football field
10  down there?
11      A. Yes.
12      Q. Thank you, you can take the stand. Never
13  mind on second thought we have got some photos to take
14  a look at.
15      MR. RAMBO: Your Honor, at this time, without
16  objection I've been told, I will introduce a group of
17  photos as the State's next exhibit.
18      MR. MAURER: That is correct. For the
19  record, Your Honor, there's no objection.
20      THE COURT: Do you want them marked as one
21  and two?
22      MR. RAMBO: I think for the sake of
23  simplicity it could be, but whatever pleases the

78

1  Court.
2      THE COURT: Mark them separately if you're
3  going to use them separately.
4      THE CLERK: Any particular order, Mr. Rambo?
5      MR. RAMBO: No, thank you.
6      THE CLERK: Okay.
7      (State's Exhibit Nos 5 and 6 were marked.)
8  BY MR. RAMBO:
9      Q. Did you take photographs, Officer?
10      A. Yes, I did.
11      Q. Do you know approximately today how many you
12  took?
13      A. I guess thirty some, probably.
14      Q. Okay.
15      A. Close to 40.
16      Q. Were the lighting conditions good?
17      A. It was dark with minimal street lighting.
18      Q. Okay. Was that all the way down the street?
19      A. Yes.
20      Q. Okay. What was the focus of the photos you
21  took, if you would, sir, focus areas?
22      A. Well, the general area of 22nd Street east
23  and westbound showed different directions and also the

79

1  victims vehicle. Its location at the point of impact
2  into a telephone pole and also spent cases that were
3  from a -- fired from a weapon that were located
4  further down the block closer to Lamotte Street.
5      Q. Would you be good enough to point to that
6  general area where those casings were located?
7      A. Yes, again, it is approximately 600 feet east
8  of Market Street, so it would be closer down this way
9  towards Lamotte.
10      Q. I'm looking at State's Exhibit No. 6 and I'll
11  ask you if you can take a look at that. Do you
12  recognize that area?
13      A. Would it all right if I move in a bit.
14      Q. Yeah. In fact, stand on the other side of
15  it.
16      A. Yes.
17      Q. And what area is that? Is that an area up
18  near Market Street or is that an area closer to 22nd
19  and Lamotte?
20      A. It is closer to Lamotte street. It is a
21  westbound view of -- I believe, it was a Honda and in
22  the picture is four numbers -- yellow numbers where
23  spent brass casings were found.

80

1      Q. And you said there were four casings found?
2      A. Yes.
3      Q. And did you take those into your custody?
4      A. Yes.
5      Q. All right. And you took other photos of that
6  area as well? This is looking west, is it not,
7  looking out towards Market?
8      A. Yes; that would be the north side of the
9  right, if you're looking west it would be the right
10  side of the street.
11      Q. Okay. Next one is State's 19?
12      A. That's the same vehicle and it is from -- it
13  is kind of a southeasterly direction, the photograph.
14      Q. Okay?
15      A. And it shows the -- where the casings were
16  located from just another angle.
17      Q. So that's a photo from the north side of the
18  street, is it not?
19      A. Shooting towards the southeast.
20      Q. This is State's Exhibit 18, and do you
21  recognize that one as well?
22      A. Yes. It is another westbound view of 22nd
23  Street and that appears to be prior to putting the

State v. Damone Flowers

**121**

1  A. Nothing. He sat me in there for a while.
2  Q. They sat you in there for a while?
3  A. Or just came in and started asking me
4  questions.
5  Q. Okay. And who came in and started asking you
6  questions?
7  A. Brock.
8  Q. Detective Brock?
9  A. Yeah, Detective Brock.
10  Q. Now, did you -- and you remember that that
11  happened?
12  A. That he asked me questions?
13  Q. Yes.
14  A. Yeah; that's what he took me down there for.
15  Q. And they took you down there to ask you
16  questions about what?
17  A. About the shooting. They was saying that
18  Damone Flowers supposed to have shot that guy.
19  Q. Did -- did you talk to Detective Brock about
20  that?
21  A. Yes.
22  Q. Do you remember what you told Detective
23  Brock?

**122**

1  A. No.
2  Q. Do you remember what happened?
3  A. No.
4  Q. Okay. So you couldn't tell us at all whether
5  or not you went down there, what you said then?
6  A. No.
7  Q. And you don't remember at all what happened
8  on that particular day?
9  A. Bits and pieces like the big events, I don't
10  know. I was on drugs at the time, but I really don't
11  remember --
12  MR. MAURER: I'm sorry, I didn't hear the
13  last thing the witness said.
14  THE WITNESS: I really don't remember.
15  BY MS. KELSEY:
16  Q. Do you remember going to Oasis?
17  A. Is that Ambrozers.
18  Q. Yeah --
19  A. They call it Oasis now I'm not sure.
20  Q. Do you remember who you went there with?
21  A. No.
22  Q. Do you remember their being a problem there?
23  A. There was like a who lot of us, so it is

**123**

1  like -- I really can't -- I don't know. I don't
2  remember.
3  Q. Okay. Do you remember coming back from there
4  to 22nd Street?
5  A. Yes.
6  Q. Do you remember who you were with that night?
7  A. A whole lot of different people, I don't
8  know. I'm not sure.
9  Q. Do you remember any of their names?
10  A. No, it was a lot of people.
11  Q. And do you remember seeing boys from
12  somewhere else coming there?
13  A. No -- the boy that got shot?
14  Q. Well, before that, were there some boys from
15  another part of town to talk about the fight that had
16  been at Ambrozers earlier?
17  A. No.
18  Q. You don't remember any of that?
19  A. No.
20  Q. Do you remember when the boy got shot?
21  A. Yeah, I remember hearing that, I remember
22  that.
23  Q. Do you remember seeing who had the gun?

**124**

1  A. No, I ducked.
2  Q. And what happened after the boy got shot?
3  A. I don't know. I heard the boy got shot when
4  I was in the Thunderguards, so I really don't know.
5  Q. You didn't learn the boy got shot --
6  A. Not until -- the Thunderguards -- you don't
7  really know somebody got shot, but I went to the
8  guards, I mean, I heard from several other people and
9  I just heard that the boy got killed, got shot.
10  Q. Is 22nd Street a one-way street?
11  A. Yes.
12  Q. And does it go -- which way does it go?
13  A. Up, it goes up to Market.
14  Q. It goes up to Market?
15  A. Yes.
16  Q. To get from there you were on 22nd Street to
17  the Thunderguards, do you have to go up 22nd Street to
18  Market?
19  A. No.
20  Q. You didn't go down 22nd Street to Market?
21  A. You can go up to 22nd and Market and Vandever
22  Avenue and right straight down to the Thunderguards.
23  Q. Were you on 22nd Street?

5

1    THE COURT: As you know you remain under
2    oath.
3        THE WITNESS: Yes, Your Honor.
4    BY MS. KELSEY:
5    Q. Detective Brock, did you interview Ms.
6    Sudler?
7    A. Yes.
8    Q. Do you remember the date you interviewed her?
9    A. I believe it was August the 11th, 1998.
10   Q. Did you make a videotape recording of that
11   interview?
12   A. Yes, I did.
13       MS. KELSEY: If I could have this marked for
14   identification.
15       THE CLERK: Marked for identification State's
16   identification D.
17       (State's Identification D was marked for
18   identification.)
19   BY MS. KELSEY:
20   Q. I'm going to show you what's been marked as
21   State's for identification D, and ask you if that's
22   marked as a copy of the videotape recording of Ronetta
23   Sudler on that date?

6

1    A. Yes. It is marked as the interview of
2    Ronetta Sudler and myself.
3        MS. KELSEY: Your Honor, I would like to
4    introduce that into evidence at that time.
5        MR. MAURER: No objections, Your Honor.
6        THE COURT: Very well.
7        THE CLERK: State's identification D is now
8    State's Exhibit No. 24, Your Honor.
9        THE COURT: Thank you.
10       (State's Exhibit No. 24 was marked.)
11       MS. KELSEY: I have no further questions of
12   Detective Brock.
13       MR. MAURER: No questions at this time.
14       THE COURT: Very well, you may step down.
15       MS. KELSEY: Your Honor, at this point in
16   time the State would recall Ronetta Sudler.
17       RONETTA SUDLER, having been previously sworn
18   under oath as a witness for the State, was recalled to
19   the stand and testified further as follows:
20       FURTHER DIRECT EXAMINATION
21       MS. KELSEY: Your Honor, while the bailiff is
22   getting Ronetta Sudler may I set up the videotape?
23       THE COURT: You probably ought to wait for

7

1    the bailiff.
2        MS. KELSEY: Yes, Your Honor.
3        THE COURT: I'll remind you that you'll
4    remain under oath.
5    BY MS. KELSEY:
6    Q. Ms. Sudler, yesterday we talked about the
7    interview that you had with Detective Brock?
8    A. Yes.
9    Q. At this point in time we're going to play the
10   videotape of that recording.
11   A. Okay.
12       (A videotape was played for the jury.)
13       MS. KELSEY: Your Honor, to you think it
14   would be a good idea to take a break.
15       THE COURT: We'll take a ten-minute recess at
16   this time. The usual instructions apply.
17       (The jury left the room at 11:00 a.m.)
18       THE COURT: You may step down.
19       THE COURT: Court stands in recess.
20       (A recess was taken.)
21       THE COURT: Bring in the witness. Bring in
22   the jury, please.
23       (Jury enter the room at 1120 a.m.)

8

1        THE COURT: All right. You may proceed.
2        MS. KELSEY: Thank you, Your Honor. With the
3    Court'S permission I'm going to replay the tape and
4    there are about 45 minutes left -- or start the tape,
5    not replay it.
6        (A videotape was continued for the jury.)
7    BY MS. KELSEY:
8    Q. Ms. Sudler, does that refresh your
9    recollection as to what happened that day?
10   A. No.
11   Q. Let me ask you some questions, while she's
12   doing that and with the Court's permission I'm going
13   to put this map up next to you so you can answer some
14   questions. Did you get a chance to look at that map?
15   Can you see it.
16   A. Un-huh.
17   Q. Can you show me --
18       THE COURT: Is that a yes?
19       THE WITNESS: Yes.
20   BY MS. KELSEY:
21   Q. The 22nd Street that you're talking about,
22   where Ms. Brenda's house is --
23   A. Yes.

29

1  particularly that evening. Also her convictions need
2  to be explored.
3       MS. KELSEY: The State is not objecting to
4  him asking her about her drug usage and as to whether
5  or not it would affect her --
6       THE COURT: This day?
7       MS. KELSEY: The day that this happened in
8  1998 or her drug usage now, if she was using right
9  before she testified. And we're not objecting to the
10  introduction of convictions or of her convictions of
11  crimes of dishonesty. We are objecting to the rest of
12  her history --
13       THE COURT: Since I don't know what the rest
14  of her history is, what exactly are you objecting to?
15       MS. KELSEY: I'm objecting to the question
16  about here drug usage over the years. I don't think
17  there's any foundation or medical testimony to show
18  that could affect her ability to be able to perceive
19  or not perceive on this particular day.
20       THE COURT: I'm assuming -- in
21  cross-examination of this witness, that they either
22  already indicated that to test her reliability of her
23  recollection and observation. Now, her continued

30

1  usage would be relevant to that issue because if she
2  were using it prior to that day and using it after
3  that day, would that be relevant to the fact she was
4  probably using it that day in particular or any other
5  day? I don't know where the defense is going?
6       MS. KELSEY: The case law with regards to
7  whether or not the State can ask a defendant or a
8  witness those kinds of questions is that they can't
9  ask them.
10       THE COURT: You're talking about misdemeanor
11  convictions as opposed to felony convictions?
12       MS. KELSEY: Yeah.
13       THE COURT: I assume --
14       MR. MAURER: I'm not asking about
15  convictions, I'm asking about her history of using
16  drugs.
17       MS. KELSEY: Well, it is the same.
18       THE COURT: I don't believe it is the same.
19  I will sustain the objection if it is to the use of
20  misdemeanor convictions, but there is actually history
21  of using drugs and I think it is relevant and I'm
22  overruling that objection.
23       (A sidebar ended.)

31

1  BY MR. MAURER:
2       Q. Okay. If I go back to the question that I
3  had previously asked you, okay. I asked you, first of
4  all, how old you are and you indicated how old?
5       A. 23.
6       Q. Okay. And you have quite a bit of a drug
7  history in terms of your usage of drugs, do you not?
8       A. Yes.
9       Q. Can you tell us how old you were when you
10  first started using drugs?
11       A. Probably 15, 16.
12       Q. Could you tell us what you started using at
13  that age?
14       A. Marijuana.
15       Q. As you proceeded, and I guess if we could --
16  if we could look at 1998, at that time in August 1st
17  of 1998, you were 19 year's old; is that right?
18       A. Yeah, maybe -- yes.
19       Q. I'm sorry?
20       A. Yeah.
21       Q. Date of birth?
22       A. 2/20/79.
23       Q. That would have been four years then that had

32

1  you been using drugs, is that correct?
2       A. Yes.
3       Q. Pardon me?
4       A. Yes.
5       Q. And was it always marijuana that you used?
6       A. No.
7       Q. What other drugs had you used over the years?
8       A. Alcohol, cocaine, Ecstasy.
9       Q. Okay. Cocaine, what kind of cocaine powder?
10       A. Crack cocaine.
11       Q. Crack cocaine?
12       A. Yes.
13       Q. Okay. And how frequently would you use crack
14  cocaine, let's say, in the four years between the time
15  you started and the time August 1st of 1998 occurred?
16       A. Maybe like four days a week, four out of
17  seven.
18       Q. By the way, were you working back then
19  outside the home?
20       A. No.
21       Q. In August of '98?
22       A. No, I don't remember.
23       Q. Did you have a job?

37

1   Q. And at least with respect to the '97 case
2   that was a charge that was -- were you on probation
3   for that in August of 98?
4   A. Yes, I was on probation for it.
5   Q. Detective Brock also brought up a different
6   charge that you were facing at that time, that was a
7   marijuana charge. Do you remember him mentioning that
8   on the tape?
9   A. I don't remember him mentioning it or not,
10  I'm not sure if that's what the charge was or that's
11  what I'm incarcerated -- this charge has been going
12  on for about four or five years, trafficking cocaine,
13  it is not marijuana.
14  Q. So obviously since you've been incarcerated,
15  when ever that date specifically was. And I think you
16  told us when it was, you have not been using any drugs
17  since that time?
18  A. Yeah, I have been on medication while I was
19  incarcerated.
20  Q. But besides prescribed medication you haven't
21  been using any illegal drugs, so your mind is pretty
22  clear at that time?
23  A. Yes.

38

1   Q. If I can take you back to August 1st of 1998,
2   you're indicating you don't have a very good
3   recollection of that particular incident, but you do
4   recall, do you not, that you had in fact been over at
5   that night club, Ambrozers, Oasis, whatever it is
6   called, earlier in the evening; is that true?
7   A. I didn't understand the question.
8   Q. All right. You testified on direct
9   examination that your recollection about August 1st of
10  1998 is not great?
11  A. No, it is not.
12  Q. Okay. But if I understood your testimony
13  correctly, specifically yesterday when I asked you
14  some questions, you do remember having been at a
15  nightclub that night, do you not?
16  A. Yes.
17  Q. And I asked you some questions yesterday
18  outside of the presence of the jury which I wanted to
19  repeat at this point in time, you talked to us about
20  your drug usage?
21  A. Yes.
22  Q. You've indicated to us that on various
23  occasions you would use marijuana, alcohol, Ecstasy

39

1   and cocaine, correct?
2   A. Yes.
3   Q. Would you use them individually or
4   independent of each other or would you on occasion use
5   them all or less than all at one time?
6   A. Some occasions I would use them all.
7   Q. When you would use drugs, okay, which effect
8   would the use of those drugs have on your brain?
9   A. Can't function, some times hallucination.
10  Q. When you say that you would at times be
11  caused to hallucinate, what do you mean by that?
12  A. Seeing thing that you don't see and things
13  like that.
14  Q. Okay. What else?
15  A. Just high, can't get myself together.
16  Q. You used an expression?
17  A. On cloud nine.
18  Q. I think those were your words?
19  A. Yes.
20  Q. Cloud nine, all right.
21  A. Body numb, can't really use your legs --
22  Q. I didn't hear that.
23  A. Body numb, really walking on air.

40

1   Q. You've gotten away from all that since you've
2   been in jail?
3   A. Yes.
4   Q. But during the four years from age 15 to age
5   19, when this incident happened, that was sort of like
6   a state of being for you; is that true?
7   A. Yes.
8   Q. Would the usage of drugs ever cause you to
9   see cars when there aren't cars?
10  A. Oh, yes.
11  Q. See people who where there that aren't
12  people?
13  A. Yes.
14  Q. Now, before you were interviewed by Detective
15  Brock there was a lot of talk on the street about what
16  had happened on 22nd Street, was there not?
17  A. Yes.
18  Q. Because there's an awful lot of people that
19  hang out on 22nd Street; is that correct?
20  A. Un-huh.
21  Q. You have to answer?
22  A. Yes.
23  Q. And you yourself had a lot of girlfriends

73

1    A. I grabbed my dog and was running in the house
2    and the next thing I know my door -- my uncle closed
3    the door behind me, so we all was in the house and
4    that's it.
5    Q. Okay. You say that you did see someone shot
6    that night?
7    A. I seen a person wearing something black, but
8    I ain't never seen the person who's face -- I just see
9    shades and it looks like one of those beanie hats or
10   something.
11   Q. Shades and a beanie hat?
12   A. Yes.
13   Q. Do you recall today what kind of shades?
14   A. They looked like they was kind of like
15   yellow, wide shades.
16   Q. Right. What kind of beanie hat?
17   A. It looked like it was some type of hat.
18   Q. Ever have anybody in the neighborhood
19   approach you to talk about this case?
20   A. No.
21   Q. Matt, what was your answer?
22   A. No.
23   Q. Ever complain to anybody about somebody

75

1    where I used to live at. about right there.
2    Q. And that would be how far? Would it be as
3    far as I am from you or a different distance?
4    A. As far as where you is from me.
5    Q. So you're walking to get your dog and what
6    happens while you're walking to --
7    THE COURT: For the record, that is the
8    distance between the witness and the prosecutor.
9    MR. RAMBO: Thank you, Your Honor.
10   THE WITNESS: After I reached to get my dog,
11   it was about a nice little couple seconds AND a car
12   came around the corner and just speed up, and then
13   just stopped and somebody had some words with the car.
14   And the next thing I know the car must have did
15   something and the guy just rang out shots.
16   Q. Okay. Now, let me ask you this, in
17   connection with the car coming to the intersections,
18   do you have any estimate today about how many people
19   were there?
20   A. No, it was some people there. It was a lot.
21   Q. A lot of people, okay.
22   A. People outside at the time.
23   Q. Men?

74

1    showing you a police report?
2    A. No.
3    Q. Why don't you tell us about that night and
4    what you did see?
5    A. Okay.. After -- well, when I was taking out
6    the trash, I put the trash in the trash can. I sat
7    out there, it wasn't even a good ten minutes, so my
8    dog came out some how, within I'd say the next five
9    minutes, he came out and he had to use the bathroom so
10   I sat on the step waiting until he went the bathroom,
11   then he started walking towards where a whole crowd of
12   people were at, so I reached to retrieve the dog.
13   Q. Let me stop you there, if I may for just a
14   second. When you go get the dog, in what direction
15   are you walking, are you walking towards Market or
16   Lamotte?
17   A. Toward Lamotte.
18   Q. Okay. And are you on the pavement or on the
19   street?
20   A. I'm on the pavement.
21   Q. Okay. And how far did you have to walk to go
22   to retrieve your dog?
23   A. Well, in the middle of this abandoned house

76

1    A. Men and women.
2    Q. Men and women. Between the men and women,
3    what was the balance do you know?
4    A. I couldn't tell you.
5    Q. You heard something going on near the car,
6    could you tell us anything at all about anything that
7    was being said between people there?
8    A. Well, not actually offhand, I can tell you
9    that, you know, it was a lot of unfaithful words being
10   said.
11   Q. A lot of what kind of words?
12   A. A lot of cuss words.
13   Q. Okay. Who was doing the cussing?
14   A. I couldn't say.
15   Q. No. Were they male voices or female voices?
16   A. It looked like it was males.
17   Q. Were those males that you heard cussing on
18   your side of the street, the north side, or were they
19   on the south side?
20   A. On the south side.
21   Q. Away from you?
22   A. Away from me.
23   Q. And then you say you heard a car engine race?

81

1    MR. RAMBO: This far?
2    THE WITNESS: Yeah.
3    BY MR. RAMBO:
4    Q. Is this -- it is to the gate. Can you see
5    me, do I have glasses on?
6    A. Yeah.
7    Q. Do I have a hat on?
8    A. No.
9    Q. Did you see who was doing the shooting?
10   A. Actually, I didn't see the person, but I can
11   tell with the beanie hat and the glasses the person
12   who was doing it -- what the person was doing.
13   Q. And how could you tell what the person was
14   doing?
15   A. Because when I went in the house and closed
16   the door I seen the gun and I was -- that's when it
17   made me look back and see how close I was to know if I
18   was shot or not.
19   Q. Okay. What did you see about the gun, did
20   you notice anything in particular about it?
21   A. Yeah, that it was kind of chrome.
22   Q. Kind of chrome?
23   A. Yeah.

82

1    Q. And do you remember what the lighting
2    conditions were that night? Could you see it clearly
3    or not?
4    A. Not clearly.
5    Q. And could you see the person holding the gun?
6    A. Yes.
7    Q. Okay. And did you recognize the person
8    holding the gun that night, sir?
9    A. Yes.
10   Q. Is that person in the courtroom today?
11   A. Yes.
12   Q. Where is he?
13   A. Sitting over there.
14   Q. Would you describe what he's wearing?
15   A. Wearing glasses.
16   Q. What kind of suit does he have on or what
17   kind of clothes does he have on?
18   A. I don't know. I think it is brown and tan or
19   something, black, black shirt.
20   Q. Black shirt?
21   MR. RAMBO: Let the record reflect that he's
22   identified the defendant, Damone Flowers.
23   BY MR. RAMBO:

83

1    Q. How many shots were fired by that person?
2    A. I couldn't even tell you.
3    Q. How many did it should like, do you know?
4    A. No idea.
5    Q. Okay. What was the car doing when that
6    happened when the shots were fired?
7    A. It was going up the block, that's all I seen.
8    Q. Did you ever see where the car went to
9    finally?
10   A. No.
11   Q. Never did?
12   A. Just went in the house and went to sleep.
13   Q. Okay. Have you ever -- had you ever been
14   that day, that night, had you ever seen Damone Flowers
15   in the neighborhood?
16   A. Well, kind of, occasionally. It all depends.
17   I probably seen him once or twice. The majority of
18   the time he would come into Qualities and getting
19   something to eat. He never seemed like the type of
20   person that would do something.
21   He always seemed like he was always cool.
22   For this case to really happen the guy must have
23   really ticked him off --

84

1    MR. MAURER: Your Honor, I'm going to
2    objection at that point.
3    THE COURT: Disregard the response, it is
4    sustained.
5    BY MR. RAMBO:
6    Q. Just answer my questions, if you will please,
7    Matt, okay?
8    A. Okay.
9    Q. All right. Did you ever see him driving a
10   car?
11   A. When I was working at Qualities, yes.
12   Q. Do you recall today what kind of car it was
13   that he drove?
14   A. It was a Honda.
15   Q. And do you know the color, Matt?
16   A. It would be red or burgundy.
17   Q. Burgundy or red, okay. Your uncle, Earl
18   Basemore, is he from Wilmington and did he live in the
19   neighborhood?
20   A. No, he was just staying up there on the
21   weekends.
22   Q. Did he spend much time in that neighborhood
23   at all?

93

| | |
|---|---|
| 1 | MR. MAURER: May we approach? |
| 2 | (A sidebar was reported.) |
| 3 | MR. MAURER: Jim is not prepared to put the |
| 4 | tape in because the redactions -- |
| 5 | MR. RAMBO: We have agreed that there is a |
| 6 | redaction at least several redactions and I'm prepared |
| 7 | to the put the officer on to redact the tape. If he |
| 8 | wants to I'm not sure he wants me to introduce the |
| 9 | tape without these redactions. |
| 10 | MR. MAURER: Of course I don't. |
| 11 | THE COURT: So you need to take a recess at |
| 12 | this time? |
| 13 | MR. RAMBO: Yes. |
| 14 | (A sidebar ended.) |
| 15 | THE COURT: Once again, we'll take a recess |
| 16 | until whenever. The usual instructions apply. |
| 17 | (A recess was taken.) |
| 18 | THE COURT: Bring in the jury. |
| 19 | (The jury enters the room at 4:00 p.m.) |
| 20 | THE COURT: We'll restart. |
| 21 | MR. RAMBO: Your Honor, for the record the |
| 22 | tape has been turned back about a minute and a half, |
| 23 | the purpose of it is so that people catching up with |

94

| | |
|---|---|
| 1 | notes that were necessary. |
| 2 | THE COURT: Thank you. |
| 3 | (The tape is being played for the jury.) |
| 4 | MR. RAMBO: Your Honor, that completes the |
| 5 | tape. May I have just a moment? |
| 6 | . THE COURT: Yes, you may. |
| 7 | MR. RAMBO: May I have this marked for |
| 8 | identification, Your Honor? |
| 9 | MR. MAURER: No objection. |
| 10 | MR. RAMBO: Move it into evidence then as |
| 11 | State's Exhibit -- |
| 12 | THE CLERK: State's Exhibit 31. |
| 13 | (State's Exhibit 31 was marked.) |
| 14 | THE COURT: Very well. |
| 15 | MR. RAMBO: May I approach the witness, Your |
| 16 | Honor? |
| 17 | THE COURT: Yes, you may. |
| 18 | BY MR. RAMBO: |
| 19 | Q. Matt, I'm going to hand you up that map and |
| 20 | ask you whether you recognize this map? |
| 21 | A. Yes. |
| 22 | Q. What is it? |
| 23 | A. It is the drawing that Officer Brock and me |

95

| | |
|---|---|
| 1 | drawed together. |
| 2 , | Q. Is that the same one that you drew on the |
| 3 | tape? |
| 4 | A. Yes. |
| 5 | MR. RAMBO: Thank you, Matt, I have no more |
| 6 | questions, Your Honor. |
| 7 | MR. MAURER: If I might start? |
| 8 | THE COURT: Yes, you may, Mr. Maurer. |
| 9 | CROSS-EXAMINATION |
| 10 | BY MR. MAURER: |
| 11 | Q. Mr. Chamblee, good afternoon. |
| 12 | A. Afternoon. |
| 13 | Q. The last thing -- the last thing that -- one |
| 14 | of the last things you were asked on that tape was |
| 15 | that no one put into your mind who this shooter was, |
| 16 | do you remember that? |
| 17 | A. Yeah. |
| 18 | Q. Who's the first one who told you the person |
| 19 | who fired the shots was from the neighborhood? |
| 20 | A. Nobody. |
| 21 | Q. Didn't you hear Detective Brock on that tape |
| 22 | indicate to you the person who fired the shots must |
| 23 | have been in the neighborhood and someone was familiar |

96

| | |
|---|---|
| 1 | in that area? |
| 2 | A. No. |
| 3 | Q. He didn't tell you that on that tape? |
| 4 | A. No, sir. |
| 5 | Q. Did you listen wile that tape was just |
| 6 | playing? |
| 7 | A. Yeah, I was listening. |
| 8 | Q. Did you hear him say that to you? |
| 9 | A. I couldn't hear it, the thing -- I couldn't |
| 10 | hear it clear enough. |
| 11 | Q. Maybe we will come back to it tomorrow. But |
| 12 | at the present time, you don't recall him saying that |
| 13 | to you, do you? |
| 14 | A. He said it must be somebody that knows |
| 15 | that -- that be around there or hang around there, not |
| 16 | as often. |
| 17 | Q. He said that the person who fired the shots |
| 18 | must have been somebody from the neighborhood? |
| 19 | A. Yes. |
| 20 | Q. Didn't he? |
| 21 | A. Yes. |
| 22 | Q. So in terms -- you didn't say that to him he |
| 23 | said that to you, didn't he? |

C 96-97                          State v. Damone Flowers

97

1   A. Right.
2   Q. Do you ever make mistakes?
3   A. Every now and then.
4   Q. Are you capable of making mistakes?
5   A. Some times.
6   Q. Some times. You don't believe your
7   identification of Mr. Flowers is a mistake, however?
8   A. Not picturing him with the glasses and the
9   hat.
10  Q. But do you allow for the possibility that you
11  could be mistaken about it?
12  A. It is a possibility.
13  Q. That you might be mistaken about that?
14  A. Slight possibility.
15  Q. You allow for that. If I can show you a
16  couple of things that you were mistaken about in terms
17  of your description about what occurred that night,
18  might that allow for a greater possibility that you
19  might be mistaken?
20  A. It all depends.
21  Q. Do you follow my question?
22  A. No.
23  Q. All right. If I can demonstrate to you that

98

1   there was at least and perhaps two or three other
2   things that occurred that night that you talked about
3   and you're mistaken about, would you then agree with
4   me that that increases the possibility that you could
5   be mistaken about your identification?
6   A. Could be.
7   Q. You were asked by the police officer at
8   4:27 -- 1627:41 on the tape whether or not there were
9   any street lights operating that night?
10  A. Right.
11  Q. Do you remember what your answer to the
12  police officer was as to whether or not there were any
13  street lights operating that night?
14  A. It was -- it was -- it was blinking off and
15  on.
16  Q. You told them there were no street lights,
17  didn't you?
18  A. Right.
19  Q. I'd like to show you what's been marked as
20  State's Exhibit 19, I'll represent to you that it is a
21  photograph taken by the Wilmington police that
22  evening. Do you see that photograph?
23  A. Yes.

99

1   Q. Do you recognize that photograph?
2   A. Yes.
3   Q. Do you recognize what's as bright as can be
4   on that street?
5   A. Yes.
6   Q. What are they?
7   A. Street lights.
8   Q. So you were mistaken about that, weren't you?
9   A. Yes.
10  Q. Something about which you were pretty darn
11  sure, I'll be it maybe a smaller point, but something
12  about which you were pretty darn sure. You were
13  mistaken about that in terms of what you saw that
14  night?
15  A. Yes.
16  Q. Would you agree that that increases the
17  possibility that you could be mistaken about who it
18  was, Mr. Flowers?
19  A. It could be.
20  Q. Do you know someone by the name of Vernon
21  Mays?
22  A. No.
23  Q. If I understood your testimony correctly, and

100

1   I guess it is somewhat buttress by this map, diagram,
2   when you came out of your home -- and this has now
3   been introduced into evidence so that perhaps myself
4   --
5   MR. MAURER: Your Honor, could I ask the
6   bailiff to just circulate it real quickly to the jury?
7   THE COURT: Yes, you may.
8   THE COURT: I presume it is State's No. 31.
9   MR. MAURER: I'm sorry.
10  THE CLERK: Yes, Your Honor, State's No. 31.
11  (State's Exhibit No. 31 is being circulated
12  to the jury.)
13  MR. MAURER: Thank you. Thank you, Your
14  Honor. May I approach the witness, please?
15  THE COURT: Yes, you may.
16  BY MR. MAURER:
17  Q. Mr. Chamblee, let me get on this side so I
18  don't turn my back to the jury. This is in fact
19  State's Exhibit No. 31, which you with the assistance
20  of Detective Brock drew on the evening in question or
21  on the date you were interviewed, correct?
22  A. Right, right.
23  Q. Now, there's a W-2, I take it that would be

| | 105 |
|---|---|
| 1 | noticed the problem the further a person is away from |
| 2 | you the more difficult it is for you to see that |
| 3 | person? |
| 4 | A. Yeah, it is kind of blurry. |
| 5 | Q. Pardon me? |
| 6 | A. It is kind of blurry. |
| 7 | Q. Kind of blurry. This condition just came on |
| 8 | recently you're saying? |
| 9 | A. Yes. |
| 10 | Q. Has it been developing over the years? |
| 11 | A. I have been -- that was my first time being |
| 12 | tested for an eye examine and I needed glasses. |
| 13 | Q. So the first time that you got tested for an |
| 14 | ocular or an eye examine you learned at that time that |
| 15 | you needed glasses for farsightedness? |
| 16 | A. Yes. |
| 17 | Q. So you don't know how long that problem |
| 18 | existed, do you? |
| 19 | A. No. |
| 20 | Q. Do you think that that problem might have |
| 21 | affected your ability to see whether or not there were |
| 22 | any street lights on that night? |
| 23 | A. Could have been. |

| | 107 |
|---|---|
| 1 | STATE OF DELAWARE: |
| 2 | |
| 3 | ,NEW CASTLE COUNTY: |
| 4 | |
| 5 | |
| 6 | I, Michele L. Rolfe, Official Court Reporter of the Superior Court, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the proceedings had, as reported by me in the Superior Court of the State of Delaware, and supervised by Kathleen D. Feldman, Chief Court Reporter, RPR, in and for New Castle County, in the case therein stated, as the same remains of record in the Office of the Prothonotary at Wilmington, Delaware, and that I am neither counsel nor kin to any party or participant in said action nor interested in the outcome thereof. |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | WITNESS my hand this 28th day of July, 2003. |
| 13 | |
| 14 | MICHELE R. HONAKER SUPERIOR COURT REPORTER Cert#156-PS |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

| | 106 |
|---|---|
| 1 | Q. Could have effected that? |
| 2 | A. Yeah, it could be. |
| 3 | Q. Okay. |
| 4 | MR. MAURER: You know what, Your Honor, I'm |
| 5 | going to move into a different area. Would it be okay |
| 6 | to pick this up tomorrow because I'll never finish |
| 7 | today. |
| 8 | THE COURT: You understand that you are to |
| 9 | remain under oath and not to discuss your testimony |
| 10 | and you're asked to return tomorrow, and we will start |
| 11 | with you tomorrow at 9:30. So you still remain under |
| 12 | subpoena and must return tomorrow at 9:30. Do you |
| 13 | understand that? |
| 14 | THE WITNESS: Yes. |
| 15 | THE COURT: Very well. You may step down. |
| 16 | Members of the jury, as you know that concludes the |
| 17 | testimony for today. As I said, you will return |
| 18 | tomorrow at 9:30. I will remind you, once again, not |
| 19 | to discuss the case or not to view or listen to the |
| 20 | trial or any publicity. Have a good evening. I'll |
| 21 | see you tomorrow at 9:30. |
| 22 | (The jury left the room at 4:45 p.m.) |
| 23 | (Whereupon, court is in recess.) |

State v. Damone Flowers

5

1    Q. Now, I also -- if I understand your testimony
2    correctly yesterday -- let me just use this if I
3    could --
4         MR. MAURER: May I, Your Honor?
5         THE COURT: Yes, you may.
6    BY MR. MAURER:
7         Q. And we have your drawing and this is going to
8    be very rough, all right. If this is East 22nd here,
9    and this is your home here, and the alleyway is down
10   here?
11        A. Yeah.
12        Q. Okay. I take it that at some point in time
13   you see this person who's going to shoot -- and we'll
14   talk about that in a minute or two, but you do see the
15   person, don't you?
16        A. Right.
17        Q. Now, the person who has shot is in a car, out
18   on the street or somewhere around here, correct?
19        A. Correct.
20        Q. Okay. And the shot we've already heard
21   testimony came through the person's -- under his right
22   arm, so you would agree that the shots are being fired
23   in this direction, would you not?

6

1         A. Right.
2         Q. So therefore the person shooting would have
3    to be facing in that direction; is that correct?
4         A. Right.
5         Q. If you're standing or if you're in this
6    vicinity here, and this person is shooting in this
7    direction, it seems pretty clear that you would have
8    only gotten a look at the side of the persons face; is
9    that right?
10        A. Correct.
11        Q. The person didn't turn around and look at
12   you?
13        A. No.
14        Q. So all you would have seen was -- if you're
15   there and I'm somewhere outside of this courtroom,
16   okay, what you're seeing is the side of the person's
17   face, correct?
18        A. Right.
19        Q. From a distance outside of the courtroom,
20   with the only light being a street light, correct?
21        A. Right.
22        Q. Which at that time you didn't even think was
23   on, right?

7

1         A. Right.
2         Q. Now, you also indicated that you had a couple
3    of distractions going on; is that right?
4         A. Yes.
5         Q. One of which was that your 12-year-old nephew
6    was -- uncle, I guess, was out there; is that right?
7         A. Yes.
8         Q. Another of which was you had a dog?
9         A. Yes.
10        Q. You were trying to control your dog at this
11   time?
12        A. Yes.
13        Q. What kind of dog did you have at this time?
14        A. Pit Bull.
15        Q. How heavy is the Pit Bull?
16        A. I'd say probably like 45 pounds.
17        Q. So the Pit Bull was kind of moving around and
18   causing you trouble in terms of holding onto him?
19        A. Right.
20        Q. You're trying to get the Pit Bull back in the
21   house, correct?
22        A. Yes.
23        Q. So you would agree you're probably distracted

8

1    at the time as well?
2         A. Yes.
3         Q. Would you agree with me that if you don't see
4    someone's face you cannot identify who they are?
5         A. Right.
6         Q. In other words, if I'm holding a picture
7    of -- here, just assume for the moment that there's a
8    person's face on here, if you don't see it you can't
9    identify whose picture is on here, can you?
10        A. Right.
11        Q. Now, I've listened carefully to your
12   statement as I'm sure you have yesterday, and at
13   1602:51, you make a statement to the police officer to
14   the effect -- not to the effect, you specifically say,
15   I didn't see his face. Do you remember saying that?
16        A. No.
17        Mr. Maurer: Can we -- can you help me out
18   with this, can you bring the tape player over. Could
19   we have the State's Exhibit, please. Mr. Chamblee's
20   videotaped statement.
21        THE COURT: That's State's 30 for the record.
22        MR. MAURER: I think.
23        THE COURT: It would be on the box.

State v. Damone Flowers

9

1    MR. MAURER: It is on the box, okay. Good
2    memory, Your Honor, it is 30.
3    (A videotape was played for the jury.)
4    BY MR. MAURER:
5    Q. Did you hear that answer?
6    A. Yes.
7    Q. Did you hear yourself first say I didn't see
8    him?
9    A. Yes.
10    Q. And then did you hear yourself say that I
11    didn't see his face?
12    A. Yes.
13    Q. And you just agreed with me that if you can't
14    see his face you can't identify him?
15    A. Right.
16    Q. And that isn't the only time you said that?
17    A. Right.
18    Q. Let's move forward to 1605, please.
19    (A tape was played for the jury.)
20    BY MR. MAURER:
21    Q. Did you hear that answer?
22    A. Yes.
23    Q. Did you here the police officer specifically

10

1    ask you, did you get a look at his face?
2    A. Yes.
3    Q. And what was your answer?
4    A. No.
5    MR. MAURER: Can we move forward?
6    BY MR. MAURER:
7    Q. Now, before we get to that point,
8    Mr. Chamblee, we're coming to a portion later in the
9    tape where you're continue to talk to the police
10    officer, and it appears that at that point it seems
11    like you then said, you saw a glance of his face. Do
12    you remember saying that on the tape?
13    A. Yes.
14    Q. Okay. Let's just get to that. All right.
15    Did you hear yourself tell the officer then at that
16    point that you got a glance of his face?
17    A. Yes.
18    Q. Did you not see his face or did you get a
19    glance?
20    A. I got a glance.
21    Q. You mentioned three times on that tape that
22    you never saw his face?
23    A. Right.

11

1    Q. Then you later said you got a glance of his
2    'face?
3    A. Right.
4    Q. Which is it?
5    A. The reason why I said that was because of the
6    glasses and a hat.
7    Q. So it was because of glasses and a hat?
8    A. And the frames.
9    Q. The frames, right?
10    A. Yeah.
11    Q. Again, you're looking from the side though?
12    A. Right.
13    Q. Was there anyone objecting your view from the
14    person who was actually doing the shooting?
15    A. Again my dog.
16    Q. Besides your dog?
17    A. No.
18    Q. Do you remember later on in the statement you
19    were talking about the structure of the area there of
20    the buildings and you told the police officer that
21    there was a side of brick that could prevent you from
22    seeing what was happening?
23    A. Yes.

12

1    Q. What was that? What's the brick that you
2    were making reference to?
3    A. The house, like to a pathway to an alleyway.
4    Q. And you indicated to the officer at that time
5    that that sort of prevented you from seeing what
6    happened as well; is that right?
7    A. Yes.
8    MR. MAURER: Thank you.
9    BY MR. MAURER:
10    Q. So you would agree, I assume, given all the
11    things that you just told me and what you saw on the
12    tape, that your ability to observe the person fire the
13    shots was extremely limited?
14    A. Yes.
15    Q. Correct?
16    A. Correct.
17    Q. And that you had a very brief and limited
18    opportunity to see that person; is that correct?
19    A. Yes.
20    Q. I wanted to ask you the same questions that I
21    have asked other witnesses. Have I ever talked to you
22    about the case before?
23    A. No.

State v. Damone Flowers

13

1   Q. Have I ever interviewed you?
2   A. No.
3   Q. You've never spoken to me before?
4   A. No.
5   Q. And would you agree with me all these factors
6   make it more likely that you could possibly be
7   mistaken?
8   A. Yes.
9   Q. You probably could be mistaken, that's what
10  you think today?
11  A. Yes, could be.
12  Q. And your words are "could be"?
13  A. Yeah.
14  Q. All right. Let me just ask another question.
15  In listening to the tape it sounded to me -- and this
16  is early on in the tape, right around 403 -- when you
17  were talking to the police officer about the time you
18  were out in front, you were with you nephew and you
19  were with the dog, and you were telling us that you
20  went into the house and you heard pow, pow, pow, pow?
21  A. Right.
22  Q. Does that mean when shots were fired you were
23  actually back in the house?

14

1   A. Not all the way.
2   Q. How much of the way?
3   A. I was to the screen door and it was open.
4   Q. So you were at the screen door and the screen
5   door was open, were you walking into the house when
6   you heard the shots?
7   A. Yes.
8   Q. Did you turn and look down the street or
9   continue to go into the house?
10  A. I continued in the house.
11  Q. So you didn't even look down?
12  A. I looked down, but I continued to go in the
13  house as I was looking.
14  Q. You were asked this question, specifically on
15  the tape, as to whether or not you heard any loud
16  music come from the car?
17  A. Right.
18  Q. Do you remember being asked that question?
19  A. Yes.
20  Q. Do you remember what the answer to that
21  question was?
22  A. No loud music.
23  Q. So you didn't hear any music, is that your

15

1   testimony?
2   A. Nope.
3   Q. You also testified yesterday that you
4   heard -- and it was on the tape, I think, as well --
5   that you heard cursing coming from the people inside
6   the car?
7   A. Yes.
8   Q. You definitely heard that?
9   A. Yes.
10  Q. Did you hear what they were saying?
11  A. Not clearly.
12  Q. Not clearly?
13  A. No, but I know it was bad words.
14  Q. And that was coming from people inside the
15  car, you are saying?
16  A. Yes.
17  Q. So you heard no music and you heard cursing
18  coming from within the car.
19  Now, you first talked to the officers, I
20  guess, on August 3rd; is that correct?
21  A. Yes.
22  Q. Okay. You mentioned yesterday that the
23  person that you have identified initially, 100

16

1   percent, and now you're saying you could be mistaken,
2   you saw him in church, did you say that?
3   A. Yes.
4   Q. Did you mention yesterday -- did you testify
5   that you saw him in church?
6   A. No, I seen him at the sub shop.
7   Q. And prior to the incident occurring, for how
8   long a period of time had you been seeing him at the
9   sub shop?
10  A. Before the incident?
11  Q. Yeah.
12  A. Varies like off and on.
13  Q. How far back a year, two years?
14  A. It was like a year.
15  Q. Now, this incident occurred on August 1st of
16  1998, so your testimony is that the person you
17  identified initially 100 percent as the shooter, you
18  would have seen him as far as July 1st -- August 1st
19  of 1997?
20  A. Yeah.
21  Q. He had been coming in the store that long?
22  A. Yes.
23  Q. Okay. You've also gave a description, did

State v. Damone Flowers

17

1  you not, based upon the observations that you had?
2      A. Yes.
3      Q. And you described several things, one of
4  which was the gun, correct?
5      A. Yes.
6      Q. And the spelling of your name is
7  C-H-A-M-B-L-E-E, correct?
8      A. Yes.
9      Q. Now, just to summarize yesterday, when I
10  asked you a question about whether you spoke to
11  someone out on 22nd Street that night, specifically
12  right in this area here, you said you didn't speak to
13  anybody, correct?
14      A. Nope.
15      Q. Now, yesterday when you testified you
16  indicated that the gun was chrome, did you not?
17      A. Yeah, it looked silver, chrome.
18      Q. And when you spoke to the police you told the
19  police that the gun was shinny, right?
20      A. Yes.
21      Q. And that it was silver?
22      A. Right.
23      Q. Did you not?

18

1      A. Yes.
2      Q. Now, in order for you to have seen that, the
3  gun must not have been wrapped up in anything?
4      A. Right.
5      Q. So your testimony is that the person shot the
6  gun and did not have the gun wrapped up in a shirt?
7      A. Right.
8      Q. Other any color?
9      A. Right.
10      Q. Because if you're correct, if it was in a
11  shirt, you couldn't have seen it, right?
12      A. Right.
13      Q. Okay. You also gave a description of the
14  person, did you not?
15      A. Yes.
16      Q. Looking at the tape and having had some time
17  to look at this, you indicated that the shooter had
18  some sort of black little beanie hat, right?
19      A. Yes.
20      Q. You're indicating that the shooter had on
21  yellow glasses?
22      A. Yes.
23      Q. How could you see what color they were from

19

1  the side at night?
2      A. How big they was.
3      Q. Pardon me?
4      A. How big they was.
5      Q. You're indicating that the shooter had -- now
6  let me just make sure I understand this correctly,
7  your testimony is that the person fired the shots and
8  had no shirt on?
9      A. Yes.
10      Q. You're sure of that?
11      A. I think so -- I don't know. It is a
12  possibility that he had a shirt on or off.
13      Q. What were the words that you used when I
14  asked if you were sure of that?
15      A. I'm not sure.
16      Q. Didn't you just say, I think so and I'm not
17  sure?
18      A. Right.
19      Q. But when you talked on the tape, you told the
20  police officer that he had no shirt on?
21      A. Right.
22      Q. Correct?
23      A. Yes.

20

1      Q. No shirt, I'll just put your words down, I
2  think, not sure.
3          You were then asked, were you not, what kind
4  of pants the shooter was wearing. Do you remember
5  that?
6      A. Yes.
7      Q. And you told the police officer that the
8  shooter was wearing black pants, do you remember
9  saying that?
10      A. Yes.
11      Q. And do you remember that after you told the
12  police officer that at 1628 on the tape, he said to
13  you, Are you sure he was wearing pants. Do you
14  remember that?
15      A. Yes.
16      Q. Do you know why he went back over there or
17  why he asked you that again? If you don't know, don't
18  guess.
19      A. No, I don't know.
20      Q. After you told him he was wearing black -- I
21  take it that he was wearing long pants?
22      A. Right.
23      Q. They come down to the ankles, right?

21

1    A. Right.
2    Q. The officer stopped and asked you if you were
3    sure of that and your words were, Positive?
4    A. Right.
5    Q. Now, today after we went over that are you
6    still positive about that?
7    A. Nah.
8    Q. But back then you indicated that the person
9    was wearing black pants?
10    A. Right.
11    Q. And if he was wearing long black pants then
12    obviously he wasn't wearing a pair of white baggy
13    shorts?
14    A. Right.
15    Q. Are you sure of that?
16    A. Yes.
17    Q. You're sure the person wasn't wearing white
18    paints that day?
19    A. Nah.
20    Q. You're also indicated that the person was
21    wearing black sneakers?
22    A. Right.
23    Q. Does this accurately set forth the

22

1    description that you gave back then?
2    A. Yes.
3    Q. All right. Now, would you agree with me that
4    if you are mistaken about what the shooter was
5    wearing, then it's likely that you're mistaken about
6    who the shooter was?
7    A. Right.
8    Q. And you think there's a real chance that
9    you're mistaken about that?
10    A. There's a possibility.
11    Q. Could be?
12    A. Yeah.
13    Q. And it could be you're mistaken about him
14    being the shooter?
15    A. Right.
16    MR. MAURER: No other questions.
17    THE COURT: Mr. Rambo?
18    MR. RAMBO: Thank you, Judge.
19    REDIRECT EXAMINATION
20    BY MR. RAMBO:
21    Q. Matt, you indicated also that you had gone
22    after your dog, I think, yesterday during your
23    testimony, did you not?

23

1    A. Yes.
2    Q. Would you tell us -- and I think you said you
3    went toward Lamotte Street -- when you went after the
4    dog?
5    A. Right.
6    Q. How far toward Lamotte Street did you tell us
7    that you went after the dog?
8    A. About next door to my abandoned house where I
9    used to live at like right there to the middle of the
10    other abandoned houses.
11    Q. The other what?
12    A. The other abandoned houses that's on the
13    block.
14    Q. Okay. That would be how far it was as far as
15    I was at you at the podium?
16    A. No, farther back.
17    Q. Tell me when?
18    A. About right there.
19    Q. Okay. When you --
20    THE COURT: Can you indicate for the record
21    how far that is.
22    MR. RAMBO: Back to the prosecution table and
23    my chair.

24

1    THE COURT: The back end of it.
2    MR. RAMBO: Yes, thank you.
3    BY MR. RAMBO:
4    Q. Now, when you did that, when was it exactly
5    that the shots rang out in comparison to when you were
6    this far down from your house?
7    A. I think I got my dog almost back to the house
8    when the shots started ringing.
9    Q. Okay. So you were on your way back then?
10    A. Right.
11    Q. You say, Almost back to your house. Help us
12    again with how far you were from your house when the
13    shots started ringing?
14    A. Like a little closer.
15    Q. Right about right there?
16    MR. RAMBO: Okay. I'm going to estimate that
17    that's about -- I'm standing back about six feet from
18    you, okay.
19    THE WITNESS: Yes.
20    MR. RAMBO: Maybe seven.
21    BY MR. RAMBO:
22    Q. Did the -- did those bricks that you referred
23    to earlier that prevented some of your seeing, that

29

1   Q. How many steps away was the alley from your
2 house, if you recall today, Matt?
3   A. It's about a good 15, like 20 steps.
4   Q. Okay. And who is the cheese steak guy, the
5 chicken cheese steak guy?
6   A. Mr. Flowers.
7   Q. Is that your experience from the sub shop?
8   A. Yes.
9   MR. RAMBO: Thank you, I don't have any more
10 questions, Judge.
11   THE COURT: Anything further?
12   RECROSS EXAMINATION
13 BY MR. MAURER:
14   Q. So I take it if we can boil this whole thing
15 down based upon everything you've said in response to
16 Mr. Rambo's question you're saying that the shooter
17 could be him?
18   A. Could be.
19   Q. You're also saying that the shooter could not
20 be him?
21   A. Right.
22   Q. And that's the degree of your certainty?
23   A. Right.

31

1   Q. And that you hung around with him?
2   A. Yes.
3   MR. MAURER: That's all I have.
4   THE COURT: I presume --
5   MR. MAURER: I'm done.
6   THE COURT: You may step down.
7   MR. RAMBO: No, redirect, Your Honor. Thank
8 you.
9   THE COURT: Any reason why he may not be
10 excused?
11   MR. RAMBO: No, Your Honor, we'd like him
12 excused.
13   THE COURT: I'm sure he would too. You're
14 excused.
15   MR. RAMBO: Your Honor, the State calls
16 Tyshiak McDougall, Your Honor.
17   MR. RAMBO: May we approach side-bar
18 concerning scheduling, Your Honor?
19   THE COURT: Can you wait one moment, please,
20 until the bailiff returns.
21   MR. RAMBO: Yes, Your Honor.
22   (A side-bar was not reported).
23   THE COURT: Members of the jury, we need to

30

1   Q. Let me just try to understand what went on
2 with this. You testified yesterday that you knew the
3 person who was shot, right?
4   A. Yes.
5   Q. And you also testified in front of this jury
6 that you hung around with the person that was shot?
7   A. Hung around him and my cousin.
8   Q. When you knew him, did you know him as Alfred
9 Smiley?
10   A. No, I know him as -- they never said his name
11 around me, I just know him to say what's up. I didn't
12 say nothing to him..
13   Q. What made you think the person who was shot
14 was the person you hung around?
15   A. I heard somebody, my cousin say something
16 about he thinks one of his boys got shot, but he
17 didn't ever say when or when that occurred.
18   Q. So any way then once again yesterday -- since
19 you're now looking at the photograph who was
20 represented to be or was Mr. Smiley, the deceased,
21 once again you were mistaken on that point as well
22 when you said you knew him?
23   A. Yes.

32

1 take a recess at this time, there's some matters that
2 need to be discussed outside of your presence. Pease
3 be reminded of the usual instructions not to discuss
4 the case.
5   (The jury left the room at 10:30 a.m.)
6   THE COURT: I have informed counsel that two
7 young women that were sitting in the back were
8 excluded from the courtroom. Can you explain to them
9 what happened?
10   THE BAILIFF: I've spoke to the two women
11 several times about having communications with the
12 defendant or communications in the courtroom at all,
13 and they continue to have communications with the
14 defendant and they are distracting corrections. And
15 for procedure and security issues, I have asked them
16 to remove themselves from the courtroom.
17   MR. MAURER: Your Honor, I will admit that
18 throughout the trial Mr. Flowers has been told by
19 corrections that he's not to communicate with the
20 people in the courtroom. Specifically, what I'm
21 concerned about is the fact that these are people who
22 are sitting on the defendant's side, who are clearly
23 associated.

D 3 - 58

33

1  This bailiff did a wonderful job, but at the
2  same time I think it is inappropriate to take it upon
3  herself to eject people from the courtroom who are
4  associated with the defendant without advising the
5  Court first. I think the Court has no control of that
6  and should be in control of that. What concerns me is
7  that her actions were observed apparently by the jury
8  and could be viewed as somewhat damaging to the
9  defendant's side, and that he was doing something that
10 was improper. I don't think it rises to any of the
11 level of the case with courtroom outbursts and things
12 of that nature -- I forget that guy's name, but in any
13 event I'm just concerned if that's going to happen or
14 something like that, but it should have happened where
15 we took a recess and got the jury out of here and
16 admonished the people and --
17     The Court: I agree that the bailiff should
18 have come to me first and advised me as to what was
19 going on. I did not actually notice them continuing
20 to do that, I did see them talking, but I didn't
21 notice that they were communicating to the defendant.
22     THE DEFENDANT: I don't mean to speak out,
23 but I don't think the communications -- what is the

35

1  security procedures we're going to take the steps
2  necessary to secure our situation.
3     The Court: Do you understand what's being
4  said to you?
5     THE DEFENDANT: Yes.
6     The Court: If you instructed not to
7  communicate that's what you have to do.
8     THE DEFENDANT: If you don't obey the rules
9  you can be thrown out of here. Now that is a very
10 drastic step so I hope that you may be doing something
11 like that, but you don't have a say so, period.
12     You speak to your counsel and that's it, do
13 you understand that?
14     THE DEFENDANT: Yes.
15     MR. MAURER: I'm not asking for any curative
16 instruction. If something happens like that again I
17 just ask that we clear the courtroom and deal with it
18 outside the presence of the jury.
19     The Court: Very well. Do you understand?
20     THE BAILIFF: I understand, Your Honor.
21     The Court: Now, as far as witnesses are
22 concerned what's going on?
23     MR. RAMBO: Your Honor, we were -- we had

34

1  communication supposed to be? I haven't said anything
2  to anybody in the courtroom.
3     THE CORRECTIONAL OFFICER: May I address the
4  Court. Several times -- my name is Corporal Reginald
5  Brown, several times we have recognized him
6  communicating with people in the back. He's been
7  informed by three officers that he's supposed to pay
8  attention to his lawyer and with the Court procedures,
9  and not as far as what's going on outside the Court.
10 He's been told to face the front. Our security
11 procedures call for individuals that have been
12 incarcerated to face the front, no communication with
13 anyone in the office.
14     He has been observed with his hand signals
15 and verbally. Now, those two young ladies that just
16 came in, he turned and faced them. He communicated
17 with them verbally and that's when I approached the
18 bailiff when she came through and asked to have them
19 removed because he keeps turning around and we can't
20 have it.
21     He has been spoken already about it. I don't
22 want to position myself directly behind him, I don't
23 want to do it, but if he fails to adhere to the

36

1  called -- we were about to call Tyshiak McDougail as
2  Your Honor is aware Ms McDougall has been problematic
3  in getting her attendance in the -- in that crime and
4  she was again here a little bit and left and said she
5  would be back in an hour and it is over an hour since
6  she left. So we had asked Detective Brock to go and
7  find her and he has not yet returned. We do have a
8  witness in lock up, Othello Predeaux whom we had plan
9  to call possibly last or last witness other than
10 police witnesses and Adrienne Dawson, but if we need
11 to we can always call up Mr. Predeaux next. Just
12 wanted to court to know where we stand.
13     The Court: I understand you just said, but
14 who -- do you want to check now and see if she's
15 there.
16     MR. RAMBO: If she's not available, we'll ask
17 that Mr. Predeaux be brought up from lock up.
18     MR. MAURER: I have to go to the men's room,
19 is that okay?
20     THE BAILIFF: Your Honor, may I approach?
21     The Court: Yes, ma'am. The bailiff feels
22 strongly that she needs to make a further record as to
23 what she did.

37

1       THE BAILIFF: No -- no disrespect to the
2   attorneys' on the case and Your Honor at hand, when
3   security -- when a higher security, which is
4   corrections, gives me a notation that I need to make a
5   move towards a measure that needs to be taken at that
6   point, I have the discretion to use whatever I can to
7   remove these people right now or do I take the time to
8   come across the Court to address the Judge. When an
9   officer, an armed officer, feels uncomfortable in a
10  situation, it is at that point that I need to take the
11  measures that I need to take and say, Excuse me, can
12  you come with me.
13      I didn't -- at no point -- I didn't say. You
14  got to get out of the courtroom, you got to leave the
15  Court. I addressed them in a manner that they needed
16  to come with me. They needed to come with me now.
17  And if an armed officer feels uncomfortable, I felt
18  that these measures needed to be taken, but not to
19  override what the Judge's discretion would be or the
20  attorneys' discretion would be, but it is just a
21  security breech to have an armed officer
22  uncomfortable. And with the gang-related relations
23  that we have in the Courts, hand signals, eye contact,

39

1   not here. Your Honor, so the State's next witness
2   would be Othello Predeaux and he is down in lock up.
3       It is going to take him a few minutes to get
4   him.
5       The Court: We'll take a ten-minute recess at
6   this time.
7       (A brief recess was taken.)
8       MR. RAMBO: Your Honor may be aware we are
9   off to quite a start. Again, Mr. Predeaux is
10  reluctant to testify. We decided that Ms. McDougall
11  did appear, so we will be calling Tysniak McDougall,
12      MR. MAURER: We're going to have another
13  3507.
14      The Court: Robert Cross -- Richard Cross is
15  on his way. Are there any issues with the tape?
16      MR. RAMBO: We have, I believe, resolved
17  those issues. Mr. Maurer and I have discussed two
18  parts of the tape that are objectionable and the State
19  has agreed and so I think we're fine with the tape.
20      MR. MAURER: It seems to be the case, Your
21  Honor.
22      The Court: And that's not with Ms. McDougall
23  is with Mr. Predeaux.

38

1   those things can be effective in the Court system and
2   they can take us out.
3       And I just needed to address the Judge on
4   that matter and notify the attorneys that those are
5   the measures that I took and it was to the point that
6   I felt that it was totally necessary.
7       The Court: In other words, what she had
8   indicated to me was she was not clear whether there
9   was imminent danger or not, and for that reason she
10  did not want to take the time to come across to the
11  Court and ask. She thought it necessary to remove
12  them first and then make that determination.
13      MR. MAURER: I don't want to make a big
14  issue, I don't agree in terms of her discretion.
15      The Court: What she's indicated was that
16  they were talking to each other, they were also making
17  signals. They have no idea what those signals mean
18  and because of that they felt it was a security issue
19  both she and the officer. I'm only making a record as
20  to what happened. I won't say anything further.
21      MR. MAURER: I won't either because it is not
22  worth pursuing further at this point.
23      MS. KELSEY: Your Honor, Tyshiak McDougall is

40

1       MR. RAMBO: That's with Ms. McDougall.
2       I want the Court to be aware for scheduling
3   reasons and other reasons having to do with patience,
4   I suppose I will not play the entire tape of
5   Ms. McDougall. Mr. Maurer understands that I will not
6   be playing the entire tape, and, frankly, it is
7   somewhat difficult at times to understand
8   Ms. McDougall. And I can't imagine the jury would
9   want to sit during the time play part of it.
10      MR. MAURER: You're going to play the
11  beginning of it? That's agreed, Your Honor.
12      The Court: Would you bring in the jury,
13  please?
14      (The jury entered the room at 11:05 a.m.)
15      The Court: Very well. We will proceed.
16      MR. RAMBO: Thank you, Your Honor. The State
17  calls Tyshiak McDougall.
18      TYSHEIK McDougall, having been called on the
19  part and behalf of the State as a witness, being first
20  duly sworn under oath, testified as follows:
21              DIRECT EXAMINATION
22  BY MR. RAMBO:
23  Q. Good morning, Ms. McDougall.

State v. Damone Flowers

| | |
|---|---|
| 57 | 59 |

**Column 1 (page 57):**

1 transported today is what they were indicating to me
2 so they didn't see what -- there was the same
3 conflict so they didn't see them on the same list.
4 they saw two separate lists. As a result I think
5 that's what caused this, but --
6     THE COURT: Now, is that now resolved to make
7 sure that that doesn't happen again. Well, they have
8 indicated to me at least with respect to my client
9 that that won't occur again with respect to my client,
10 I don't know if that's --
11     THE COURT: That's what I'm talking about.
12     MR. RAMBO: Your Honor, one other matter that
13 I want to bring to the Court's attention that we
14 haven't discussed is the schedule of Mr. Cross and I
15 believe he would like to address that he probably has
16 a problem.
17     MR. CROSS: Your Honor, I have a doctor's
18 appointment today, if his cross-examination or if he's
19 on the stand, stay 20 of, if we could break until I
20 get back from that I would appreciate, I would like to
21 be present while he's on the stand.
22     MR. MAURER: That's fair.
23     THE COURT: Very well.

**Column 2 (page 59):**

1 duly sworn under oath, testified as follows:
2     DIRECT EXAMINATION
3 BY MS. KELSEY:
4     Q. Mr. Predeaux, where are you staying now.
5     A. I haven't decided yet.
6     Q. Nowhere --
7     A. I'm at Smyrna.
8     Q. How long have you been there?
9     A. Since June.
10     Q. What are you there for?
11     A. Violation of probation.
12     Q. When did you get convicted of violation of
13 probation?
14     A. July 31st, I was arrested in January, but I
15 went to court for that in July.
16     Q. Okay. Well, did you go for the violation of
17 probation some time earlier than July?
18     A. No.
19     Q. You didn't go in April?
20     A. Yeah, it was April, matter of fact it was
21 April, I think it was.
22     Q. That's when you got convicted of violation of
23 probation?

| | |
|---|---|
| 58 | 60 |

**Column 1 (page 58):**

1     MR. RAMBO: We can probably get through his
2 direct examination.
3     THE COURT: Would you bring in the jury,
4 please?
5     THE BAILIFF: Yes, Your Honor.
6     (The jury entered the room at 11:45 a.m.)
7     THE COURT: With respect to telling the jury,
8 I think, with regards to Miss McDougall we're giving
9 her some time to think as to whether or not she's
10 going to testify.
11     MR. RAMBO: Very well.
12     MR. MAURER: Very well.
13     THE COURT: Good afternoon once again. With
14 respect to Ms. McDougall, I'm giving her some type to
15 think about her complying with the subpoena and
16 testifying. So we'll -- and we're going to move on to
17 another witness at this point in time.
18     MS. KELSEY: Thank you, Your Honor.
19     THE COURT: Ms. Kelsey?
20     MS. KELSEY: The State's next witness is
21 Othello Predeaux.
22     OTHELLO PREDEOUX, having been called on the
23 part and behalf of the State as a witness, being first

**Column 2 (page 60):**

1     A. Yeah.
2     Q. Okay. And then as part of your violation was
3 because you were arrested for new charges?
4     A. Yes.
5     Q. When did the -- how many sets of charges did
6 you get arrested for?
7     A. Two separate sets of charges.
8     Q. Okay. And when -- did one of those sets of
9 charges get resolved?
10     A. Yeah.
11     Q. When did that happen?
12     A. I'd say like maybe a couple of months ago.
13     Q. Was that in July?
14     A. Yeah, maybe July.
15     Q. Now, did you in May get brought to the court
16 house, the old court house?
17     A. Yes, I believe so.
18     Q. Okay. And did you know why you were getting
19 brought to the court house?
20     A. In May?
21     Q. Yes.
22     A. I'm not sure which time I went to --
23     Q. Did you come to the court house and talk to

61

| 1 | Detective Brock? |
| 2 | A. Oh, yeah. |
| 3 | Q. Okay. That day, did you know why you were |
| 4 | getting brought to the court house that day? |
| 5 | A. No, I did not. |
| 6 | Q. And when you got there, did you talk to |
| 7 | Detective Brock and some other people? |
| 8 | A. Yes. |
| 9 | Q. Did you tell them -- |
| 10 | MR. MAURER: Objection, Your Honor, at this |
| 11 | point I am going to object the others were |
| 12 | preliminary. |
| 13 | THE COURT: Sustained. |
| 14 | BY MS. KELSEY: |
| 15 | Q. Did you talk to Detective Brock? |
| 16 | A. Yes. |
| 17 | Q. Okay. Did you have your attorney with you |
| 18 | when you talked to Detective Brock? |
| 19 | A. No. |
| 20 | Q. What did you do about not having your |
| 21 | attorney present? |
| 22 | A. I didn't do anything. |
| 23 | Q. Did your attorney come and talk to you later? |

63

| 1 | myself? |
| 2 | A. My attorney. |
| 3 | Q. Okay. And who was that attorney? |
| 4 | A. Richard Cross. |
| 5 | Q. And is he in the courtroom today? |
| 6 | A. Yeah, he's -- yeah, he's there. |
| 7 | Q. Now, -- and when Detective Brock talked to |
| 8 | you in May and when he talked to you at Smyrna, what |
| 9 | did he talk to you about? |
| 10 | A. He was talking to me about a case involving |
| 11 | somebody else. |
| 12 | Q. Okay. Did -- who contacted who, did |
| 13 | Detective Brock come and see you or did you contact |
| 14 | Detective Brock? |
| 15 | A. He contacted me. |
| 16 | Q. Okay. When -- and did you decide that you |
| 17 | were going to talk to him about that case involving |
| 18 | somebody else? |
| 19 | A. At this time, yes. |
| 20 | Q. And did you have a reason why you wanted to |
| 21 | do that? |
| 22 | A. No, not really. |
| 23 | Q. When you talked to Detective Brock at Smyrna, |

62

| 1 | A. Yes, he did. |
| 2 | Q. Okay. And then -- okay. Is that the same |
| 3 | attorney that you have now? |
| 4 | A. No. |
| 5 | Q. And is that the same attorney that you had in |
| 6 | July? |
| 7 | A. Yes. |
| 8 | Q. Okay. The attorney that came and talked to |
| 9 | you in May is the same attorney that came and talked |
| 10 | to you in July? |
| 11 | A. Nah, that couldn't be because I had -- I |
| 12 | forget his name, Timothy Terranova or something like |
| 13 | that. But then they appointed me somebody new. I |
| 14 | don't know if that was July or I don't know when that |
| 15 | was. |
| 16 | Q. Now, did Detective Brock come and see you |
| 17 | at -- in Smyrna? |
| 18 | A. Yes. |
| 19 | Q. And was he accompanied by some other people? |
| 20 | A. Yes. |
| 21 | Q. And was that me? |
| 22 | A. Yes. |
| 23 | Q. And who else was with Detective Brock and |

64

| 1 | did you have any promises or agreements with regards |
| 2 | to what would happen with your charges? |
| 3 | A. No. |
| 4 | Q. Okay. And what did you tell Detective Brock |
| 5 | when you talked to him in Smyrna? |
| 6 | A. I talked to him about an incident that |
| 7 | happened back in '98. |
| 8 | Q. Okay. Who did that incident involve? |
| 9 | A. Damone Flowers. |
| 10 | Q. Is he in the courtroom today? |
| 11 | A. Yes. |
| 12 | Q. Where is he seated? |
| 13 | A. Sitting right there. |
| 14 | Q. You have to -- the court reporter can't take |
| 15 | down a point, you have to tell us where he is? |
| 16 | A. He's sitting next to Mr. Maurer. |
| 17 | MS. KELSEY: Your Honor, I ask that the |
| 18 | record reflect that he's identified the defendant. |
| 19 | BY MS. KELSEY: |
| 20 | Q. Did -- do you remember that incident back in |
| 21 | '98? |
| 22 | A. A little bit. |
| 23 | Q. Okay. What do you remember about that |

State v. Damone Flowers

77

1   A. Yes, it appears to be a copy of the -- copy
2   of the original that I believe has been edited.
3       Q. Thank you.
4       A. It is a copy of the interview with Othello.
5       MS. KELSEY: Your Honor, I would like to
6   introduce this into evidence at this time.
7       MR. MAURER: Just a little voir dire very
8   briefly.
9               VOIR DIRE
10  BY MR. MAURER:
11      Q. Good afternoon, Detective.
12      A. Good afternoon.
13      Q. Detective, I just have a few questions at
14  this point and perhaps more later. At the time that
15  you spoke with Mr. Predeaux, he was in Smyrna, right?
16      A. Yes, he was.
17      Q. That is a state correctional facility,
18  correct?
19      A. Yes.
20      Q. And you had actually attempted to speak with
21  him prior to that, had you not?
22      A. Yes, we did.
23      Q. And this tape is going to show us that the

78

1   tape was taken in July of 2002, you had actually tried
2   to speak with him in May 2002?
3       A. That is correct.
4       Q. You went to Smyrna at that time?
5       A. Yes. He was brought, I believe, from Smyrna
6   to the old court house.
7       Q. Up the street here?
8       A. Yes.
9       Q. That was at your request? Now, you didn't
10  take any taped statement at that day?
11      A. At that day, no.
12      Q. You did see him and talk to him briefly, did
13  you not?
14      A. Yes. We spoke with him very briefly.
15      Q. He wouldn't talk with you, would he?
16      A. Yes. He wanted to speak but we believed that
17  he needed to have an attorney present.
18      Q. Why didn't you have an attorney there? How
19  did that happened?
20      A. I'm not sure, that's just the way it
21  happened.
22      Q. But he wouldn't talk to you that day, right?
23      A. He wanted to speak with us with an attorney

79

1   present before he rendered an interview with us.
2       Q. If you were so worried of having an attorney
3   present why drag him up from jail?
4       A. I can't answer that question.
5       MR. MAURER: I have no more questions at this
6   point, I have more later. No objection to the tape.
7       THE COURT: Very well.
8       MS. KELSEY: I have no further questions for
9   Detective Brock.
10      THE COURT: You may step down.
11      THE CLERK: State's Identification G, becomes
12  State's Exhibit 33.
13      (State's Exhibit 33 was marked.)
14      THE COURT: Approximately how long is the
15  tape?
16      MS. KELSEY: Half an hour, Your Honor. For
17  the record the State will now play State's Exhibit No.
18  33.
19      (A tape is being played for the jury.)
20      THE COURT: Members of the jury, that's going
21  to conclude the testimony this morning, I'll
22  excuse you for lunch. The usual instructions about
23  discussing the case or any trial publicity apply.

80

1   Have a good lunch and we'll see you at 2:00 p.m.
2   You may step down, you'll be recalled.
3       THE COURT: I'll just put on the record that
4   with respect to Ms. McDougall, the – her attorney
5   spoke to Ms. McDougall and has indicated that she is
6   willing to retake the stand and testify, so I told him
7   we'd probably not get to her until 2:45 and he is
8   going to return around that time.
9       Court stands in recess.
10      (Lunch recess was taken.)
11      THE COURT: Good afternoon.
12      MR. MAURER: Afternoon, Your Honor.
13      MR. RAMBO: Good afternoon.
14      MR. MAURER: Your Honor, before the jury
15  comes in, I just have one application. I'm told by
16  Ms. Kelsey that there are a few more questions for Mr.
17  Predeaux, and after which he will be turned over for
18  cross-examination. I have been provided with a copy
19  of his prior criminal record and it appears there are
20  numerous crimes of dishonesty for impeachment
21  purposes.
22      I did want to make an application rather than
23  just asking the question because I thought I should

85

1  isn't it?
2      A. Yes.
3      Q. And you -- did you just see the tape?
4      A. Yeah, I saw the tape.
5      Q. What did you say on the tape with regards to
6  talking to the defendant about the shooting that
7  night?
8      A. I mean, I might have said it, but I don't
9  remember saying what was on the tape.
10     Q. You don't remember saying that?
11     A. No.
12     Q. Well, is that what happened or --
13     A. Is that what happened that night?
14     Q. Yes in 1998?
15     A. I don't know. I can't remember.
16     Q. You can't remember and you can't remember
17  what you said in July of 1998 -- or of July of this
18  year?
19     A. Yeah, I might have said it, but I don't
20  remember now if I said that.
21     Q. Did you see yourself on the tape?
22     A. Yes.
23     Q. Talking about seeing the shooter?

86

1      A. Yes.
2      Q. Okay. Does that refresh your recollection as
3  to what you said to Detective Brock?
4      A. No.
5      Q. It doesn't refresh your recollection?
6      A. No.
7      Q. Do you know what you said to Detective Brock
8  about whatever you saw the shooter?
9      A. I can't really remember to tell you the
10  truth.
11     Q. Do you remember if you saw the shooter in
12  August of 1998?
13     A. August of -- Nah, I can't remember.
14     Q. That is you on the tape that we just saw?
15     A. Yes.
16     Q. Okay. And -- is that a true and correct copy
17  of the tape, I mean, is that what you said?
18     A. I mean, that's what the tapes says, I guess
19  so.
20     Q. Do you remember, specifically, different that
21  you didn't say that on the tape?
22     A. I mean, I can't remember the videotape. I
23  might have said it, but I don't remember now as we

87

1  speak now.
2      Q. And you don't remember if that's what
3  happened in 1998?
4      A. No.
5      Q. If you said it on the tape and you didn't
6  remember in 1998. is there some reason why you would
7  have said that on the tape?
8      A. I don't know.
9      Q. You don't know, okay. Do you have any reason
10  to fear the defendant?
11     A. I don't understand what you mean.
12     Q. Do you have any grudges against the defendant
13  or reasons to want to get him in trouble?
14     A. No.
15     Q. No. What was your relationship with him back
16  in 1998?
17     A. I didn't really know him that well.
18     Q. What about since then, has something happened
19  which would make you want to get him in trouble for
20  some reason?
21     A. No.
22     Q. You said that you were on the pod with him in
23  2000, did anything happen in 2000, which would make

88

1  you want to get him in trouble?
2      A. No.
3      Q. Did anything happen before you went -- when
4  you went to DCC to make you want to get him in
5  trouble?
6      A. No.
7      Q. Do -- you said in the tape that you got a
8  letter from him, do you remember that?
9      A. Not really, I might have, I don't know.
10     Q. Did you get a letter from him?
11     A. I don't even remember if I did, I don't have
12  it. I don't know about no letter.
13     Q. Did you write a letter to the defendant?
14     A. No.
15     Q. You never wrote a letter to the defendant?
16     A. No.
17     Q. When you were-- do you remember back in May
18  when you came to the old court house and talked to
19  Detective Brock?
20     A. That was in May?
21     Q. You remember you came to the old court house
22  and you talk to Detective Brock, do you remember that?
23     A. Yes.

89

1    Q. When you were there, did you see anybody else
2    you knew either going up or going down the court house
3    --
4         MR. MAURER: Excuse me, Your Honor. Can I
5    take a moment to consult with counsel?
6         THE COURT: Yes, you may.
7         MS. KELSEY: I'll withdraw the question, Your
8    Honor.
9    BY MS. KELSEY:
10        Q. Did --
11        MS. KELSEY: I have no further questions at
12   this time.
13        THE COURT: Mr. Maurer?
14        MR. MAURER: Thank you, Your Honor.
15             CROSS-EXAMINATION
16   BY MR. MAURER:
17        Q. Mr. Predeaux -- good afternoon, first, sir.
18   Ms. Kelsey asked you a question about whether there
19   were any reasons why you might want to say something
20   bad about the defendant back in July of 2002, do you
21   remember that question?
22        A. Yes.
23        Q. Well, there were probably about 40 or 45

90

1    reasons, weren't there, why you might want to say
2    something about him that might be able to help you?
3         A. No.
4         Q. Can you think of what the 40 or 45 reasons
5    might have been?
6         A. No.
7         Q. Like number of years in jail?
8         A. No.
9         Q. You weren't?
10        A. No.
11        Q. Why don't we just talk about that a little
12   bit. I'm going to try to keep my dates straight here.
13   First of all, let's -- let's go back and talk about
14   the circumstances in which you were approached. You
15   told Ms. Kelsey earlier that at some point in time you
16   were called over to the Attorney General's Office to
17   speak to Detective Brock, do you remember that?
18        A. Yes.
19        Q. And do you remember going over to the
20   Attorney General's Office at that time?
21        A. Yes.
22        Q. Do you remember going into a room with
23   Detective Brock?

91

1    A. Yes.
2    Q. Was Ms. Kelsey there at that time?
3    A. I believe so.
4    Q. Pardon me?
5    A. I think so.
6    Q. You believe so?
7    A. Yes.
8    Q. Okay. Did you speak to them at that point?
9    A. Yes.
10   Q. Were you willing to speak to them at that
11   point?
12   A. Yes.
13   Q. Didn't you tell them that you Wanted to have
14   a lawyer before you spoke with him at that time?
15   A. I didn't really say too much, nothing there.
16   Q. You didn't say too much or nothing there?
17   A. No, not really nothing.
18   Q. Did you have a lawyer at this time?
19   A. No, I didn't have no lawyer.
20   Q. Did you tell them you wanted a lawyer or you
21   should have a lawyer?
22   A. I think they said I could have a lawyer
23   present, something like that. I ain't sure. I don't

92

1    know.
2    Q. Did you ask to have a lawyer present?
3    A. No.
4    Q. Did you give them a statement on that date?
5    Tape?
6    A. In May.
7    Q. Yeah.
8    A. I think I did.
9    Q. You think you gave them a taped statement in
10   May of 2002?
11   A. No, I didn't give no taped statement, they
12   just spoke to me about the incident and asked me if I
13   knew anything about it.
14   Q. With what did you tell them?
15   A. I told them that I lived right there where it
16   happened at; that's what I basically told them.
17   Q. What else did you tell them?
18   A. I was around that area that night.
19   Q. What else did you tell them?
20   A. I think that's about it, if I can remember.
21   Q. Now, at that time, and, again, we're talking
22   about May of 2002, you were in jail, correct?
23   A. Yes.

P. 97 : 3

State v. Damone Flowers

97

1 A. Yes.

2 Q. Possession of a deadly weapon by a person

3 prohibited, a maximum sentence of eight years, you

4 understand that, didn't you?

5 A. Yes.

6 Q. Conspiracy second degree, two years.

7 Resisting arrest, one year. You're shaking your head

8 that means yes?

9 A. Yes.

10 Q. On this set of charges you knew you were

11 facing two then twelve, 12 potential years, right?

12 A. Yes.

13 Q. You also got arrested on another set of

14 charges, did you not?

15 A. Yes.

16 Q. Drug charges, right?

17 A. Yes.

18 Q. And on that set of charges you were charged

19 with trafficking in cocaine, right?

20 A. Yes.

21 Q. You were also charged with possession with

22 the intent to deliver cocaine, correct?

23 A. Yes.

98

1 Q. And what was it maintaining a vehicle,

2 maintaining a dwelling?

3 A. Maintaining a dwelling. •

4 Q. Maintaining a dwelling. Okay. You're also

5 aware of the potential maximum sentence you could

6 receive for those charges, are you not?

7 A. Yes.

8 Q. For example, in the trafficking in cocaine,

9 you understand you could receive a maximum of 20 years

10 in jail and a three-year minimum mandatory, correct?

11 A. Yes.

12 Q. I'm just going back to when you gave this

13 statement, not to the way thing are now, you knew back

14 then that that's what you faced, right?

15 A. Yes.

16 Q. On the possession with the intent to deliver

17 cocaine -- I'm sorry, am I boring you, you're yawning?

18 A. I mean, continue I didn't tell you to stop.

19 Q. Thank you. On the possession with the intent

20 to deliver cocaine, you understand that you have a

21 prior conviction for possession of cocaine, right?

22 A. Yes.

23 Q. Back in '98?

99

1 A. Yes.

2 Q. So you understood as someone who is very

3 familiar with the system with possession of intent

4 your sentence enhances or gets bigger, right?

5 A. Yes.

6 Q. You know that?

7 A. Yes.

8 Q. You also understood with that particular

9 charge that there's a minimum mandatory jail term that

10 the court has to apply, right?

11 A. Yes.

12 Q. All right. And you agree with me that the

13 minimum mandatory there is five, right?

14 A. Yes.

15 Q. And the maximum sentence is 20, right?

16 A. Yes.

17 Q. Maintaining a dwelling, the maximum sentence

18 is three years in jail, right?

19 A. Yes.

20 Q. On that pending set of charges back in May

21 and June of this year, before you gave that statement

22 to the police, you were facing a maximum of 43 years

23 in jail with a minimum mandatory sentence of eight

100

1 years if you got convicted of those charges, correct?

2 A. Yes.

3 Q. Can you tell us what your understanding of

4 minimum mandatory years are or is?

5 A. That's like the least amount of time you can

6 get.

7 Q. And of those eight years, how many of those

8 eight years do you have to do if you get an eight-year

9 minimum mandatory sentence?

10 A. You got to do eight.

11 Q. Every day, right?

12 A. Yeah.

13 Q. So prior to you giving this statement, you

14 are facing seven separate charges that carry with them

15 a maximum of 56 years with a minimum mandatory term of

16 eight years, right? Agree?

17 A. Yes.

18 Q. Okay. Now, you came to court in April, do

19 you remember that?

20 A. Yes.

21 Q. And do you remember -- actually, you first

22 came to court in March 21st, it looks like, of 2002

23 for something called a fast track hearing, correct?

101

1  A. Yes.
2  Q. And the fast track hearing is if you're on
3  probation already and you get arrested on new charges,
4  they put all the cases together to try to get them
5  worked out, right?
6  A. Yes.
7  Q. Try to make a deal, right? And you went to
8  court on March 21st of 2002, and you were offered a
9  plea at that time, weren't you?
10  A. Yes.
11  Q. Do you remember what the plea offer was?
12  A. The plea was for everything.
13  Q. What?
14  A. I think it was. I don't remember. I think
15  three years or something like that.
16  Q. I'm going to show you Defendant's Exhibit No.
17  2 indicating what plea offer was tended to you at this
18  time, do you see that? Can you read that hand
19  writing?
20  A. Not really, what does it say that?
21  Q. Fast track plea offer, combine possession
22  with the intent to deliver, trafficking of cocaine,
23  possession of a deadly weapon by a person prohibited,

102

1  violation of probation, eight years in jail suspended
2  after four years?
3  A. Four years, three years for the trafficking
4  and a year for the gun.
5  Q. So back in April, excuse me, in March 2002
6  you were offered a plea to resolve all these charges,
7  which would have put you in jail a minimum mandatory
8  for four years and a maximum term of eight years,
9  correct?
10  A. Yes.
11  Q. You didn't like that, did you?
12  A. No.
13  Q. That wasn't acceptable to you, was it?
14  A. No.
15  Q. Because you didn't want to serve that much
16  jail time?
17  A. Because I knew I would have to get convicted
18  for all those charges in order to get that jail time.
19  Q. Right. So you didn't want that deal?
20  A. No.
21  Q. Okay. You rejected the deal, you go to court
22  on April 17th at 2002, at that time you have your fast
23  track hearing, you get found guilty for the violation

103

1  of probation and you get a year, right?
2  A. Yes.
3  Q. So that's a year in jail that you're doing,
4  right?
5  A. Yes.
6  Q. That's in April 17th of 2002. You get taken
7  into the Attorney General's Office back in May of 2002
8  and the Attorney General's Office says to you or
9  Detective Brock says to you, if I understood your
10  testimony correctly, we'd like to talk to you about a
11  shooting that occurred back in 1998, right?
12  A. Yes.
13  Q. Now, this is May of 2002, right. From August
14  1st of 1998 to May of 2002, have you ever said
15  anything to anybody about having any knowledge of what
16  happened at that scene?
17  A. No.
18  Q. You had information, which if the tape is to
19  be believed, you had information specifically
20  designating who the shooter was, correct?
21  A. Yes.
22  Q. And you never said that to anybody, you never
23  told anybody that, correct?

104

1  A. Yes.
2  Q. And you never came forward with that
3  information even though what you've told us is that
4  you don't even really hardly know him, Mr. Flowers?
5  A. Yes.
6  Q. You kept that to yourselves in case you
7  needed it some day?
8  A. Not really, it didn't really have anything to
9  do with me.
10  Q. Then May 2002 you get this visit, questions
11  are asked, you don't have a lawyer and then later on a
12  lawyer gets involved, correct?
13  A. Yes.
14  Q. And then does the lawyer say to the Attorney
15  General, By the way my client has some information
16  about this shooting; is that what happens?
17  A. I'm not sure -- I don't know if he did that.
18  Q. How do you get a visit in July of 2002 then
19  from the Attorney General's Office? Who set that up
20  for you?
21  A. I don't know who sets it up. They came down
22  to see me.
23  Q. Well, what do you think made them come down

Ũ 104-106.                    State v. Damone Flowers

| 105 | | 107 |
|---|---|---|

**105**

1  there?
2  A. Because I gave them a statement the first
3  time I saw them in May; that's why they came down to
4  see me.
5  Q. You gave them a statement the first time you
6  saw them in May?
7  A. Yes.
8  Q. That's your recollection?
9  A. Yes.
10  Q. So you're saying no attorney took steps on
11  your behalf to contact the Attorney General's Office
12  to tell them now what you had to say?
13  A. At that time I had to conflict, I didn't have
14  an attorney at that time.
15  Q. Mr. Terranova?
16  A. Yes.
17  Q. Didn't Mr. Terranova contact the Attorney
18  General's Office saying you now had information to
19  give him?
20  A. Maybe, I didn't know what he did.
21  Q. Did you meet with him?
22  A. Yeah, I met with him.
23  Q. Did you provide him with information

**107**

1  Q. Take a look at that?
2  A. Oh, I know what that is.
3  Q. Is that your handwriting?
4  A. Yeah, that's my handwriting.
5  Q. Did you send that?
6  A. Yeah, I sent that, I had to, it is my hand
7  writing.
8  Q. Now, you just got done telling this jury that
9  you hadn't had any contact with Mr. Flowers during
10  that time period, didn't you?
11  A. That was back in 2000, it wasn't no lie, I
12  don't remember writing that letter; that was back two
13  years ago almost, three years ago.
14  Q. Oh really?
15  MR. MAURER: Can I have this admitted as the
16  witness already identified?
17  MS. KELSEY: No objection.
18  THE COURT: Very well.
19  THE CLERK: Defendant's Identification A is
20  Defendant Exhibit No. 5.
21  (Defendant's Exhibit No. 5 was admitted.)
22  BY MR. MAURER:
23  Q. So you deny that you just lied to this jury

**106**

1  concerning this case?
2  A. Yeah.
3  Q. And you give him a statement telling the
4  Attorney General's Office as to what he can say,
5  right?
6  A. Yes.
7  Q. In the mean time, you said that you were not
8  having any contact with the defendant?
9  A. No.
10  Q. No. Do you have a nickname?
11  A. No, people call me, Petie.
12  Q. Pet Rock Dog?
13  A. Some people.
14  Q. People call you Pete Rock?
15  A. Some people.
16  MR. MAURER: May I have this marked for
17  identification?
18  THE CLERK: Defendant's for Identification A.
19  THE COURT: Has the prosecution seen it?
20  (Defendant's Identification A was marked for
21  identification.)
22  MR. MAURER: They have, Your Honor.
23  BY MR. MAURER:

**108**

1  when you told them that you had no contact with
2  Mr. Flowers some time in May of this year while
3  whatever was going on was going on in terms of you
4  talking to the State?
5  A. May of this year?
6  Q. This year.
7  A. I don't remember.
8  Q. Look at the first, if you will, sentence of
9  the letter, does it make reference to a specific date?
10  A. Yeah, it does.
11  Q. What date does it make reference to?
12  A. May the 6th.
13  Q. Of what year?
14  A. 2002.
15  Q. So you sent this to Mr. Flowers in the prison
16  May 6th 2002?
17  A. Yes.
18  Q. After the time you first visited Detective
19  Brock or at or about the same time?
20  A. I don't -- I don't know.
21  Q. You don't know. What kind of game are you
22  playing?
23  A. I'm not playing a game I don't really

113

1  Fifth Amendment rights; however, you can question him
2  on whether or not -- I mean, you can questions him on
3  that, further on that, whether or not he's had
4  something to lose.
5      I mean, I'm not telling you to preclude from
6  that kind of questioning, but I think once he asserts
7  his Fifth amendment right, you have to drop the
8  question of whether he did it, do you understand what
9  I'm saying.
10     MR. MAURER: I understand what you're saying,
11 obviously, with your ruling I think it is
12 cross-examination grounds at this point in time,
13 especially in light of the fact that his attorney was
14 made aware of the facts beforehand and told me that he
15 had discussed this with him about those pending
16 charges.
17     THE COURT: I believe that's why his attorney
18 is made in the courtroom to be present just when such
19 an issue comes up. And I don't think that if he wants
20 to assert his Fifth Amendment right, I think he's
21 entitled to do that any time he wants to do that.
22     MR. MAURER: All right, well, can I then ask
23 him if he's in fact invoking his Fifth Amendment

114

1  privilege?
2      THE COURT: Yes.
3      (A sidebar ended.)
4  BY MR. MAURER:
5      Q. Your preference would be not to answer that
6  last question that I asked you, would it not?
7      A. Excuse me?
8      Q. Your preference would not to answer that last
9  question that I asked you, would it not?
10     A. Yeah.
11     Q. You just said you weren't going to answer
12 that question, didn't you?
13     A. Right.
14     Q. Because it suits your purpose not to answer
15 it at that time, correct?
16     A. Yeah.
17     Q. And you do whatever it is you need to do to
18 suit your own purposes, correct?
19     A. I don't understand what you're saying.
20     Q. You do what you do to get what's best for
21 you?
22     A. What do you mean?
23     Q. It is a pretty simple question, your actions

115

1  and the things that you do, you do for your own
2  benefit, right?
3      A. Yeah.
4      Q. So if it suits your purposes, you talk; if it
5  doesn't suit your purposes to talk you don't talk,
6  right?
7      A. Yeah, if you want to say that.
8      Q. Now, you just got done saying that you
9  weren't really worried about those pending charges?
10     A. No.
11     Q. You're looking at a mandatory minimum of
12 eight years and a potential of 56 years and you're not
13 worrying about that?
14     A. Nope.
15     Q. Why not?
16     A. Because I'm not.
17     Q. Why?
18     A. Because I'm not.
19     Q. You just got done telling us earlier you
20 don't like being in jail?
21     A. Nobody likes being in jail.
22     Q. That's right. And you're looking at the
23 prospect of doing eight long hard years in either

116

1  Gander Hill and Smyrna, right?
2      A. Right.
3      Q. Yet you're not worried about that, right?
4      A. Right.
5      Q. Because you got an ace in the hole?
6      A. I have a paid attorney, I don't -- ace in the
7  hole, I don't know what you mean.
8      Q. The ace in the hole is you can go and talk to
9  them about this guy, right?
10     A. That don't have nothing to do with my case,
11 they didn't say you're going to get this amount of
12 time. They don't have nothing to do with my case.
13     Q. Really. This prosecutor is the prosecutor in
14 your drug case, isn't she?
15     A. I ain't been to court for that yet.
16     Q. Right. And you don't expect to get something
17 back for testifying?
18     A. No.
19     Q. You already have, haven't you?
20     A. How, what have I --
21     Q. Let's take a look at this first case,
22 Mr. Predeaux. Now, you have a prior conviction for
23 possession of a deadly weapon by a person prohibited,

D 131-132                          State v. Damone Flowers

129

1    Q. And what was the State's recommendation as
2  far as your sentence is concerned?
3    A. Level V suspended after time served -- time
4  served at sentencing.
5    Q. So the State agreed to recommend Level V,
6  which is jail, and then agreed to suspend that and let
7  you get probation, correct?
8    A. Correct.
9    Q. No additional jail time, correct?
10   A. Correct.
11   Q. All right. Not withstanding the fact that
12 this was a second weapons offense for you, correct?
13   A. Correct.
14   Q. All right. Now, actually you didn't really
15 have any -- when you say, "time served" that is if you
16 get some jail time sitting waiting to go to trial,
17 right?
18   A. Yes.
19   Q. And you didn't really have any time served,
20 did you, because you were already serving jail time on
21 the violation of probation?
22   A. For the same charge.
23   Q. But that time that you were sitting in prison

130

1  you were getting credit for the violation of
2  probation, right?
3    A. Yes.
4    Q. So really there was no time served?
5    A. Well, there was six months Level V for the
6  weapons offense and six months Level V for the drug
7  offense.
8    Q. Yeah, on the violation of probation, not the
9  new charge?
10   A. Yes, yeah on the violation of probation, but
11 the violation of probation was based on that charge.
12   Q. I understand that, but that happened back in
13 April, right?
14   A. What happened back in April?
15   Q. You got sentenced on the violation of
16 probation in April of 2002?
17   A. Yes.
18   Q. Before you gave the statement to the police
19 in July, right?
20   A. Yes.
21   Q. And we talked about the fact that you didn't
22 take the plea that was offered to you back then, the
23 plea of guilty of possession of a deadly weapon by a

131

1  person prohibited. Do you remember we locked one year
2  mandatory with it, right?
3    A. Yes.
4    Q. Now, you're get a plea to carrying a
5  concealed deadly weapon in late July, right?
6    A. Yes.
7    Q. Which carries no time with it, right?
8    A. Yes.
9    Q. In fact. it carries only probation, so you
10 get something, don't you?
11   A. Yes. I got what it says right there.
12   Q. What's the condition of this plea? What does
13 it say here, at the bottom, what do you have to do?
14   A. What does it say? It says testify in any
15 proceedings if called by the State.
16   Q. And there are no proceedings other than this
17 proceeding, are there, where you could be a witness,
18 right?
19   A. I guess.
20   Q. So the State basically recommends probation
21 for you on that, changes the charge from a minimum
22 mandatory jail term to a year and you agree with them
23 that you will testify in proceedings pending, right?

132

1    A. If that's what it says.
2    Q. Is there any reason why the drug case wasn't
3  also resolved at that time?
4    A. It wasn't time for me to go to court yet.
5    Q. And that charge in fact is still hanging over
6  your head, right?
7    A. Yes.
8    Q. In fact, it is scheduled for trial on
9  November 21st; is that right?
10   A. Yes.
11   Q. You've already mentioned that the prosecutor
12 is Ms. Kelsey on that case; is that correct?
13   A. Yes.
14   Q. You understand -- I mean, you've told us that
15 you've been around the Court system for a while. You
16 understood even if you walked in here and you didn't
17 really remember what happened on August 1st of 1998 or
18 remember that statement that was taped that you gave
19 back in July, it was still going to be allowed to be
20 used in court, you knew that, didn't you?
21   A. I don't know. I don't know if it was going
22 to be allowed to be used in court.
23   Q. You didn't discuss it with your counsel?

133

1    A. What about a tape coming to court? No, I
2    didn't have no reason.
3    Q. If you got up there and said, I don't
4    remember anything, you knew that statement was still
5    going to be used, didn't you?
6    A. I guess.
7    Q. You guess?
8    A. Yeah, you used it, that's how I know you used
9    it today.
10    Q. But you knew before today it could be used if
11    you got up there and said you don't remember?
12    A. Yes.
13    Q. And in fairness as things stand now as you
14    sit there and testify, the trafficking charge that we
15    talked about with the three-year mandatory time has
16    been dropped against you, right?
17    A. Yes.
18    Q. The weight is not enough, you knew that?
19    A. Yes.
20    Q. For trafficking you got to have more than
21    five grams?
22    A. Yes.
23    Q. The Medical Examiner's report came back it is

134

1    less than five grams?
2    A. Yes.
3    Q. So you knew it wasn't trafficking, but you
4    are facing the possession with the intent to deliver
5    charge, correct?
6    A. Yes.
7    Q. And if you're convicted on that, you
8    understand you can still get the mandatory five years
9    that we talked about earlier?
10    A. Yes.
11    Q. Now, you watched your statement earlier,
12    correct? The one that you gave back in July?
13    A. Yes.
14    Q. And although I understand that you're
15    presently saying that you don't remember making the
16    statement really or remember saying the things that
17    you said, I do have a couple of questions I want to
18    ask you about that: First of all, I'd like to just
19    kind of use this rough description here. We've
20    already used this before and I'm going to represent to
21    you that this represents East 22nd Street here, and on
22    the left hand side this would be Lamotte Street down
23    here, Market Street up at the top here, all right?

135

1    And you already indicated to us that you
2    lived on Lamotte Street; is that correct?
3    A. Yes.
4    Q. At that time, is that correct?
5    A. Yes.
6    Q. When you talked to the police, you remember
7    watching that statement?
8    A. Yes.
9    Q. All right. And do you remember that as you
10    watched that statement you indicated to the police
11    officer that -- excuse me for just a moment.
12    When you were questioned back then, you
13    indicated that there were ten to fifteen people on the
14    same side of the street as the shooter, do you
15    remember saying that on the tape?
16    A. Yes.
17    Q. Which side of the street would you have been
18    making reference when you gave that statement back
19    then? To this side of the street, correct?
20    A. Okay.
21    Q. This is where the car was when the person got
22    shot?
23    A. Yes.

136

1    Q. This is 22nd Street?
2    A. Right.
3    Q. You told the police, I think, that you're
4    located was somewhere down here on the corner?
5    A. Right.
6    Q. And you also told the police that there was
7    approximately fifteen people on the sidewalk where the
8    shooter was, correct?
9    A. Right.
10    Q. Do you remember where those fifteen people
11    were or what you were talking about?
12    A. About the fifteen people?
13    Q. Yeah.
14    A. They was on the sidewalk, like on the
15    sidewalk.
16    Q. All up and down on the sidewalk there?
17    A. Yeah.
18    Q. And do you remember that when you told the
19    police that there were fifteen people, ten to fifteen
20    people on the same side of the street as the shooter,
21    he said to you, It wasn't quite fifteen people, was
22    it?
23    A. I mean roughly. I just said roughly.

D (42-44                    State v. Damone Flowers

141

1      Q. You kept that one specifically for four
2   years?
3      A. I don't know if I still have it, I presume I
4   still have it. I held onto it. I don't know if I
5   still have it now.
6      Q. I'm just going on your words, Mr. Predeaux.
7   you said, I read about it in the newspaper I still
8   have the article, right?
9      A. Yeah.
10     Q. Now, I take it that at least in your mind you
11  believe that you're being truthful today, correct?
12     A. Yes.
13     Q. And I take it in your mind that you believe
14  that you were being truthful back in July of 2002 when
15  you gave your statement, correct?
16     A. Yes.
17     Q. And I think you've already told us that your
18  purpose in giving that statement at that time was not
19  to secure any kind of benefit for yourself, right?
20     A. Right.
21     Q. And you're not expecting that may be this
22  possession with intent charge will be reduced to a
23  possession charge so that you don't have to go to jail

142

1   at all?
2      A. I can't say that, I don't know until I go to
3   court, but most likely it is going to get dropped
4   because I never had possession of the drugs.
5      Q. You didn't?
6      A. No.
7      Q. Where were they found?
8      A. They were found in belongings, it wasn't
9   found on me.
10     Q. Whose home were they found in?
11     A. I believe my mother's house.
12     Q. Are you staying there at the time?
13     A. No.
14     Q. You weren't required to stay there as part of
15  your probation?
16     A. No, I wasn't living there at that time.
17     Q. You think it is going to get dropped?
18     A. I don't know what's going to happen, I'll
19  find out November 21st.
20     Q. But you know what you want to have happened,
21  don't you?
22     A. Of course.
23     Q. With your proposal to the State, you know

143

1   what that is, don't you? Giving all the help you're
2   giving here?
3      A. I don't know what you're talking about.
4      MR. MAURER: May I have this marked as
5   defendant's identification or exhibit?
6      MS. KELSEY: I'm not objecting to it.
7      MR. MAURER: Okay. Exhibit.
8      THE CLERK: Defendant's Exhibit No. 6.
9      (Defendant's Exhibit No. 6 was admitted.)
10  BY MR. MAURER:
11     Q. I'm going to show you what's been marked as
12  Defendant's Exhibit No. 6, which appears to be a
13  letter from your lawyer to Ms. Kelsey, do you see
14  that?
15     A. Yes, I see it.
16     Q. Okay. You were provided with a copy of that
17  letter back in September of 2002, correct?
18     A. Yes.
19     Q. How can you say that you don't know what you
20  wanted to have happen in that case after receiving
21  that?
22     A. That's not guaranteeing me that something is
23  going to happen for me.

144

1      Q. But that's your proposal?
2      A. My proposal for what?
3      Q. Made by your lawyer on your behalf to the
4   prosecutor in terms of how to handle that pending
5   case?
6      A. Oh, yes. Nobody told me that if I do this
7   then we're going to get this dropped down to this. I
8   wasn't promised nothing from nobody.
9      Q. That's only because this case, for whatever
10  reason, has not been worked out and is still sitting
11  there, right?
12     A. Yes. I ain't before to court for it yet.
13     Q. What's the proposal here for how the case
14  should be handled?
15     A. There was no -- it is not trafficking that's
16  basically what the letter says.
17     Q. I assume you will not be presuming a charge
18  of trafficking -- this is your lawyer -- if this is a
19  simple possession charge. I believe we could work out
20  a plea to avoid a trial.
21     A. Of course, it is not trafficking.
22     Q. Well, you're charged with possession of
23  intent, right?

157

1  home. I have blocked out a lot of stuff from since my
2  past.
3      Q. I don't want to get into your past?
4      A. Well, that's in my past, four or five years
5  ago.
6      Q. If I may finish?
7      A. I don't care what happened back then.
8      Q. If I may finish. All I want to know is if
9  anybody showed you a tape between when you made the
10  tape and today? Did anybody show you a tape to try to
11  tell you what the tape stated?
12      A. No. You and Detective Brock said you
13  couldn't find my tape and another guy's tape, yeah,
14  when I was uptown with you. When the Detective Brock
15  came and got me and took me uptown, you and Detective
16  Brock said my tape and another guy's tape was the only
17  two tapes that you all could not find and all of a
18  sudden that pops up.
19      Q. That's to the best of your memory, correct?
20      A. That's exactly what happened; that's exactly
21  what happened.
22      Q. Okay. Did you speak at all -- did you speak
23  at all to Damone the night that person was shot and

158

1  killed?
2      A. I don't know.
3      Q. No?
4      A. I don't know.
5      Q. Okay. Is it possible that you could have
6  spoken to him that night?
7      A. Maybe.
8      Q. Pardon?
9      A. I don't know.
10      THE COURT: Did you say, Maybe?
11      THE WITNESS: Yeah, maybe. Maybe not. I
12  don't know.
13      MR. RAMBO: Okay.
14  BY MR. RAMBO:
15      Q. So I take it since it is just a maybe, that
16  if you had spoken to him that night you wouldn't know
17  what he said today?
18      A. I don't know, I don't remember.
19      Q. Okay. And I take it that you were not a
20  witness to the shooting?
21      A. The shooting happened on 22nd Street, I'm on
22  23rd street. I don't got bionic eyes or something. I
23  can't see around no corners. I was not a witness to

159

1  anything.
2      Q. And when you went downtown to give the
3  statement to Detective Brock, you were in a room when
4  you talked to him, correct? Was it a big room or a
5  small room?
6      A. To Detective Brock?
7      Q. Yes.
8      A. I'd say some kind of room.
9      Q. You weren't handcuffed, were you?
10      A. When they brought me out the house I was
11  handcuffed.
12      Q. Were you handcuffed in the room when the
13  statement was taken?
14      A. I don't know.
15      Q. Can't even remember that?
16      A. No.
17      MR. RAMBO: Thank you, I have no more
18  questions.
19      MR. MAURER: Your Honor, I have some
20  trepidation, but I have some voir dire.
21      THE COURT: Very well.
22      VOIR DIRE
23  BY MR. MAURER:

160

1      Q. Good afternoon, Ms. McDougall.
2      A. Good afternoon.
3      Q. A couple of questions. You made a statement
4  that I didn't quite hear, where the Judge repeat it
5  back then you said that your mind was altered all the
6  time?
7      A. Yeah. I'm saying they know my past. They
8  know me. They know I'm a chronic user. I might have
9  told them anything to go home.
10      Q. So when you talked back then your mind was
11  altered, you're talking about drug usage?
12      A. Yeah.
13      Q. Okay. When you say, "back then" are you
14  talking about back in -- you mentioned to us that you
15  spent some time in jail, so you're doing better now,
16  right?
17      A. I'm okay.
18      Q. But back then you were using drugs all the
19  time?
20      A. Yeah. I have been a chronic user for years,
21  but, you know --
22      Q. What kind of drugs, Tyshiak?
23      A. I used to smoke cocaine.

161

1  Q. All right. And you have no recollection
2  today of speaking to Detective Brock?
3  A. I remember vaguely talking to him, but like I
4  said, I don't know exactly what I said to him --
5  Q. Do you remember whether --
6  A. -- or led up to me saying whatever I said to
7  him.
8  Q. Do you remember whether or not you were
9  smoking cocaine the day you were talking to him?
10  A. I don't remember because I always was.
11  Q. I'm sorry?
12  A. I don't remember because the majority of the
13  time I always was.
14  Q. What happens to you when you smoke crack
15  cocaine?
16  A. Nothing, nothing. You know what I mean, I
17  might probably would have told them anything because I
18  was scared.
19  Q. My question was, though, what happens to your
20  brain when you smoke crack cocaine?
21  A. What happens to everybody's brain when they
22  smoke crack?
23  Q. I don't know, you have to tell me, please.

162

1  What does it do to your brain?
2  A. I don't know.
3  Q. Does it affect the way you see things?
4  A. Like I said, I probably would have said
5  anything.
6  Q. I'm sorry?
7  A. Like I said, I probably would have said
8  anything.
9  Q. You're not using now?
10  A. No.
11  Q. Okay. You haven't had any today?
12  A. No.
13  Q. You're sure?
14  A. Positive.
15  Q. Okay. And -- all right, thanks.
16  MR. RAMBO: No more questions, right now, we
17  would like to call Detective Brock.
18  THE COURT: And then you're going to recall
19  this witness?
20  MR. RAMBO: Yes, and I think we can finish
21  with that today.
22  THE COURT: All right. You need to step down
23  for a moment. Detective broke is going to take the

163

1  stand for a moment, you just need to have a seat and
2  we will be over for you shortly. Do you understand
3  that?
4  A. Yes, ma'am.
5  MR. RAMBO: We call Detective Brock.
6  DETECTIVE ANDREW BROCK, having been
7  previously sworn under oath as a witness for the
8  State, was recalled to the stand and testified further
9  as follows:
10  FURTHER DIRECT EXAMINATION
11  BY MR. RAMBO:
12  Q. Detective Brock, you've just heard
13  Ms. McDougall's testimony, do you recall her coming to
14  the Wilmington Police Department?
15  A. Yes.
16  Q. And do you recall when that happened?
17  A. The exact date? I'm not 100 percent sure of
18  that, I have to be refreshed, my memory --
19  Q. Can you tell us the circumstances under which
20  she came to the Wilmington Police Department?
21  A. Yes. Part of this investigation was that we
22  supplied information to our local Federal Bureau of
23  Investigations Task Force, one person is assigned to

164

1  that division from the Wilmington Police Department
2  and that person's name, Lee Sullivan, and him acting
3  on a tip from an anonymous source believed --
4  MR. MAURER: Objection, Your Honor, is this
5  relevant -- I don't know where we're going with this.
6  MR. RAMBO: We can do it a different way,
7  Your Honor.
8  MR. MAURER: I just don't know what he is
9  going to say.
10  BY MR. RAMBO:
11  Q. Did you bring her to the Wilmington police
12  station?
13  A. Yes, she was brought in.
14  Q. Did you bring her?
15  A. Yes.
16  Q. Okay. When you got her there, you
17  interviewed her?
18  A. Yes.
19  Q. And in what manner and what fashion did you
20  record the interview?
21  A. Video tape.
22  MR. RAMBO: May I have this marked for
23  identification?

| 165 | 167 |
|---|---|
| 1     THE COURT: Is there any objection to it | 1     tape, this is how much the State purposes to show for |
| 2  being admitted? | 2  'that day. We ask to resume the direct examination and |
| 3     MR. MAURER: No. | 3  the State will be completed with that in just a few |
| 4     MR. RAMBO: Move it as a State's Exhibit. | 4  minutes. |
| 5     THE CLERK: State's Exhibit 34. | 5     THE COURT: Very well. |
| 6     (State's Exhibit No. 34 was admitted.) | 6     MR. RAMBO: Do you want me to leave the tape |
| 7  BY MR. RAMBO: | 7  in, Mr. Maurer? |
| 8    Q. Do you recognize the videotape? | 8     MR. MAURER: No, it is okay. |
| 9    A. Yes. It appears to be a copy of the original | 9  BY MR. RAMBO: |
| 10  videotape interview of Tyshiak McDougall and myself. | 10    Q. Tyshiak, does that viewing of the tape that |
| 11     MR. RAMBO: Thank you, no more questions. | 11  you hadn't seen before ever help you remember what . |
| 12     MR. MAURER: No, questions -- no questions. | 12  happened that night? |
| 13     THE COURT: Very well. You may step down. | 13    A. Nope, I don't remember. I don't remember |
| 14     MR. RAMBO: I ask that Ms. McDougall be | 14  making that tape neither. |
| 15  recalled and I further request permission to play | 15    Q. At any place on the tape, do you remember |
| 16  about 12 minutes of this videotape -- but for the | 16  yourself using the word, gun? |
| 17  State's purpose I would like to play about 12 minutes | 17    A. No. |
| 18  of it. | 18    Q. You heard yourself, didn't you? |
| 19     MR. MAURER: It has been agreed to, Your | 19    A. I heard it. I don't remember it. · |
| 20  Honor. | 20    Q. You don't remember what you heard on the tape |
| 21     THE COURT: ·Very well. | 21  just a few minutes ago? |
| 22     (A videotape is being played for the jury.) | 22  .  A. No. |
| 23     MR. MAURER: Your Honor, this isn't working. | 23    Q. Did you use the word, T-shirt, on the tape? |

| 166 | 168 |
|---|---|
| 1  Can you hold up for a moment? We have the only | 1    A. That's what it said. |
| 2  unavailable -- are you saying you can't hear it? I | 2    Q. That's what you said? |
| 3  can't understand it. | 3    A.' That's what the tape said. |
| 4     MR. MAURER: It keeps flickering on and off, | 4    Q. That's what you said on the tape? |
| 5  so I can't see the person while she's speaking. | 5    A. I don't know. I don't remember. I keep |
| 6     MR. RAMBO: We have no objection to anyone | 6  telling you that. You keep asking me the same |
| 7  moving in order to get a better view, certainly he can | 7  question 25,000 different ways. I don't remember. I |
| 8  look off mine, whichever. | 8  could have said anything like I said. |
| 9     MR. MAURER: The problem is it is not just | 9    Q. But you did know by listening to the tape |
| 10  me. | 10  that you were out on your porch that night? |
| 11     MR. RAMBO: I did notice that his set was | 11     MR. MAURER: Excuse me, Your Honor, it is |
| 12  flickering, but ours was not. He can look off mine. | 12  really repetitive. |
| 13     MR. MAURER: Thank you, hopefully this will | 13     MR. RAMBO: Okay, Your Honor. |
| 14  be okay. | 14     THE WITNESS: I know you keep asking me the |
| 15     MR. RAMBO: Request the Court's permission to | 15  same question, I keep telling him the same answer I |
| 16  rewind the tape approximately one minute just so we | 16  don't remember. |
| 17  can get clean when the objection was being made. | 17     MR. RAMBO: I give up. No more questions. |
| 18     MR. MAURER: It wasn't really an objection, I | 18     CROSS-EXAMINATION |
| 19  just couldn't see. | 19  BY MR. MAURER: |
| 20     MR. RAMBO: Whatever it was. | 20    Q. I'm not going to quite give up, a couple more |
| 21     THE COURT: Okay. | 21  things on a different area. We've already talked |
| 22     (A tape was played for the jury.) | 22  about this, asking you about this tape again or other |
| 23     MR. RAMBO: Your Honor, I have stopped the | 23  than to ask you that, you do specifically recall |

169

1  saying on the tape that both Sean McNeill and Joe
2  Harris were in the area yourself, do you remember
3  saying that?
4     A. I don't remember making the tape.
5     Q. You don't remember and you don't remember
6  hearing it from watching it today either?
7        Let's go back a bit, you had an understanding
8  of your physical condition back in 1998. You've
9  indicated that you went to jail for a period of 25
10 months, correct?
11    A. Yes.
12    Q. When did you get out of jail on that 25-month
13 term?
14    A. I maxed out last year, December the 8th.
15    Q. December 8th of the year 2001. So from 2001
16 until now you've been --
17    A. No, I did my thing. I did my time.
18    Q. Now, let's go back to '98 and the year or
19 months or whatever leading up to 1998, and I hate to
20 ask this question but how old were you in 1998?
21    A. 28, 29.
22    Q. I'm sorry?
23    A. 28, 29.

171

1     A. No.
2     Q. You smoke it through a pipe?
3     A. Yes.
4     Q. And you asked a little bit about this
5  earlier --
6     A. Why do I have to do -- what does this have to
7  do --
8     Q. I'm almost done and you can go home for the
9  weekend and we won't bother you again. You testified
10 earlier that when you used crack cocaine your mind
11 goes into an altered state. Do you remember saying
12 that?
13    A. Yes.
14    Q. And does that affect the way that you see
15 things?
16    A. It affects everything.
17    Q. Okay. So if I take crack cocaine or if you
18 take crack cocaine does it -- you said, It affects
19 everything, in other words you don't see as well, you
20 don't hear as well?
21    A. I just might -- I just might say anything.
22    Q. And you just might say anything when you're
23 taking it?

170

1     Q. Okay. The birth date is 12/10/69, right?
2     A. Yes.
3     Q. So in the years before you were 28 and 29,
4  I'm going to have to ask you this question, when did
5  you start using cocaine?
6     A. I was about 15.
7     Q. Fifteen, so then from the time you were 15
8  until August 1st of 1998, you had been using crack
9  cocaine for a period of about 13 years; is that right?
10    A. Yeah, the only time I wasn't using is when I
11 had my babies.
12    Q. And you have how many babies?
13    A. Three.
14    Q. So in the nine-month period of times you
15 would stop using the crack cocaine?
16    A. Yeah.
17    Q. Other than that you used it on a regular
18 basis?
19    A. Yes.
20    Q. Daily basis and when you used crack cocaine
21 do you smoke it through a pipe?
22    A. Yeah.
23    Q. You don't inject it, right?

172

1     A. Yes.
2     Q. You're not real reliable, I guess, when
3  you're on the drug?
4     A. No, I wouldn't believe me.
5     Q. I'm sorry?
6     A. I wouldn't believe me.
7     Q. Now, did you get a look at yourself on the
8  tape before the questions were asked?
9     A. Yes.
10    Q. And I noticed that your body is all jerking
11 around and moving all around, is that the way you are
12 normally or --
13    A. No, I was just tore up.
14    Q. You were what?
15    A. I was just tore up.
16    Q. "Tore up" means what?
17    A. High, drunk probably, because they ran and
18 busted in and scared me and kicked in the door.
19    Q. All right.
20       MR. MAURER: That's all I have.
21       THE COURT: Very well. The civil contempt is
22 withdrawn, you may step down. And I believe there is
23 no objection to this witness being excused?

21

1  you could again put the intersection of Lamotte Street
2  and 22nd Street. Show what intersection it is that this
3  map represents on there?
4      A. Also represents the same location of the X.
5  22nd and Lamotte right there.
6      Q. That square, where is that on that map?
7      A. In that location.
8      Q. These three marks right here, where are they on
9  that map. I should give you a different color pen for
10 that map. Go over the ones you just did.
11     MR. MAURER: Perhaps we could have him put an
12 initial next to what he is drawing because otherwise we
13 are getting a compilation of other witnesses' testimony
14 and where things are located. My request would be if he
15 is going to draw on that item that is already in
16 evidence, that he put the initials of the person whose
17 map we are talking about next to them so we don't view
18 this as a composite.
19     MS. KELSEY: That is why I was asking him to
20 put blue on.
21     THE COURT: To aide in the understanding of the
22 Exhibit I think putting initials next to the color would
23 help.

23

1      MR. MAURER: If I might, Your Honor.
2      THE COURT: Yes. you may.
3  BY MS. KELSEY:
4      Q. And then this mark right here says subject with
5  a gun.
6      A. (Witness complies.)
7      Q. And then this mark where it says "alleyway."
8      A. (Witness complies).
9      Q. Thank you.
10     Now. if I could show you -- can you see that?
11     A. Yes.
12     Q. Can you show us on the map -- we are out of
13 different colors. If you put them in red the general
14 area where the shells are in this picture.
15     A. I will mark it with a red X, the location of
16 the shells.
17     Q. Where is the van on that particular map on the
18 picture?
19     A. (Witness complies.)
20     Q. Where is the --
21     MR. MAURER: I am going to object. This is the
22 problem with there is we now have four different
23 witnesses' writing on this document, and now they are

22

1      MS. KELSEY: Put like a blue mark here and put
2  R-S. That would be good, and a red mark.
3  BY MS. KELSEY:
4      Q. I think you were about to put these three marks
5  right here on that.map.
6      A. That would be on the north side of East 22nd
7  Street.
8      Q. Then these marks right here. these three would
9  be -- now I will direct your attention to State's
10 Exhibit No. 31. And do you recognize that map?
11     A. Yes, that is the diagram that myself and
12 Matthew Chamblee prepared.
13     Q. If you can do this, box in the middle, box
14 right there. You need another pen? We will do this one
15 in black. If you can mark on the top with a black mark
16 put N-C. Put this box right here.
17     A. (Witness complies).
18     Q. Box next to it on that map.
19     A. (Witness complies).
20     Q. Box above it if you can put that on it.
21     A. (Witness complies).
22     Q. If you could put in the 31?
23     A. (Witness complies).

24

1  putting thins on this that some of the witnesses were
2  talking about and didn't identify as being there at that
3  time.
4      THE COURT: Objection is sustained.
5      MS. KELSEY: No further questions with regard
6  to this.
7      THE COURT: Are you done with the Exhibit?
8      MS. KELSEY: Yes, Your Honor.
9  BY MS. KELSEY:
10     Q. Now, Detective Brock, when were you assigned to
11 this investigation?
12     A. On August 1 of 1998.
13     Q. At about what time?
14     A. Approximately 1:25, thereabouts, in the
15 morning.
16     Q. Other than the witnesses that testified, did
17 you attempt to interview any other people?
18     A. Yes. I did.
19     Q. And, approximately, how many other people were
20 you able to interview?
21     A. Approximately 15.
22     Q. And how cooperative --
23     MR. MAURER: Objection. May we approach

25

1  sidebar, please.
2       THE COURT: Counsel approach, please.
3       (The following sidebar conference was held.)
4       MR. MAURER: I would like to ask the jury be
5  taken out and we preview every single area of this
6  examination. So far everything she has done has been
7  objectionable.
8       THE COURT: We are going to take a short
9  recess. Please be reminded not to discuss the case
10 among yourselves.
11      (Jury left courtroom at 10:30 a.m.)
12      MR. MAURER: I apologize I raised my voice. It
13 gets frustrating. I would submit every single area that
14 the prosecutor has gone into, except for a very small
15 part with this witness, who I thought was going to be a
16 very brief witness, is objectionable. I would like to
17 ask the Court require that the State proffer what they
18 are going to ask this witness about so that I don't have
19 to keep objecting with respect to the last question.
20      Again, I don't have any authority with me. I
21 am once again going to ask for a mistrial with
22 prejudice, and argue that the State goaded me into
23 asking for the mistrial at that point in time. That

26

1  question was so clearly improper, it asked the witness
2  about interviews that he had with other people who are
3  not witnesses in this case, and asked him to comment on
4  what their attitude was and whether they were
5  cooperative or not, which is blatant hearsay. Blatant
6  hearsay. And --
7       THE COURT: For the record, the objection is
8  sustained as to hearsay.
9       MR. MAURER: The question is so patently
10 improper. I don't know how any reasonable attorney can
11 ask a question like that thinking it is proper, and not
12 expecting me to have to get up once again in front of
13 this jury and object and ask for another mistrial.
14      THE COURT: Motion for a mistrial is denied.
15      MS. KELSEY: If I could inquire. I don't -- if
16 I can get an opportunity to respond before the Court --
17 I don't quite see how it is hearsay, because the State
18 isn't asking that question for the truth of the matter
19 asserted. They are not, in fact, even asking what the
20 people said or did not say. What the point of the
21 question and the reason for the question is to show that
22 there were other people that Detective Brock attempted
23 to interview. The witnesses have testified there was ·

27

1  somewhere between 20 and 60 people out there. For the
2  most part, the witnesses were uncooperative.
3       I think that is admissable, especially in an
4  instance like this where it is clear that it was not
5  easy for Detective Brock to get anybody to tell him what
6  happened on this street on this particular day as
7  evidenced by the tapes of the interview that have been
8  admitted.
9       So it is the State's position that that
10 question clearly wasn't calling for a hearsay response
11 because it is not being offered for truth of the matter
12 asserted. As a matter of fact, there is -- no one's
13 response is being introduced at all.
14      MR. MAURER: The truth of the matter were
15 witnesses were interviewed who were not being
16 responsive. That's exactly the truth of the matter.
17 Corroborates what they said or did not say. It is
18 irrelevant completely.
19      THE COURT: Objection is sustained.
20      MR. MAURER: Can I ask for a proffer where we
21 are going since I had to object to every single area.
22      MS. KELSEY: We have a couple of questions,
23 another area where I intended to go was whether or not

28

1  he attempted to locate other people that he could
2  interview. Whether or not he could find some of those
3  people.
4       MR. MAURER: That would be objected to. It is
5  irrelevant. We are trying the case based on witnesses
6  who testified in this trial. It is unfair to allow an
7  inference there is lots of people floating around out
8  there who did not want to cooperate. That is what she
9  is trying to do.
10      MS. KELSEY: Your Honor there were somewhere
11 between 20 and 60 people out there. The jury has heard
12 from five. They certainly have -- the State has to be
13 able to offer some explanation as to why there aren't
14 any other witnesses. The State has to be able to argue
15 Detective Brock looked for other witnesses. He simply
16 could not find any.
17      MR. MAURER: If he said he looked for any I
18 could not find any. I am okay with that. To start
19 having him characterizing other witness's actions,
20 whether they were cooperative -- that is where my
21 problem is.
22      MS. KELSEY: That is what I said the question
23 was going to be. Did he look for other witnesses. Was

A-159.

33

1    A. After securing the search warrant, we developed
2  information that the defendant lived at 21 Scarborough
3  Park Apartments, located in the City of Wilmington. We
4  also had information that he frequently used his
5  grandmother's address, I believe 2203 West Street. We
6  obtained a search warrant for those two premises. They
7  were executed, and the defendant was not located.
8         After proceeding after that, I issued a
9  tele-type to the surrounding jurisdictions, also
10  contacted local and national Crime Stoppers and Channel
11  6 television broadcast for Damone Flowers. We also set
12  up 24-hour surveillance at his sister's address in
13  attempts to locate him, all which were unsuccessful.
14         We also issued his name in the national
15  computer information center which is also the national
16  broadcast to other police agencies we are looking to
17  apprehend Damone Flowers for Murder First Degree and
18  weapons charges.
19    Q. When did you finally locate him?
20    A. We were contacted in November of 1999 by Lt.
21  Tim Jones of Kingsville, North Carolina Police
22  Department.
23    Q. When was the defendant returned to Delaware?

34

1    A. After extradition hearing process he was
2  ultimately returned to Wilmington, Delaware in February
3  of 2000.
4    Q. Now, did any of the witnesses identify a car
5  that the defendant usually drove?
6    A. Yes. I believe --
7         MR. MAURER: Objection Your Honor. Once again
8  she is asking him to comment about another witness's
9  testimony.
10         THE COURT: If you could indicate it without
11  indicating what the witness said.
12  BY MS. KELSEY:
13    Q. Did you learn that the defendant drove, usually
14  drove a particular car?
15    A. Yes, we learned that he normally operated a
16  maroon Honda Accord.
17    Q. Did you locate that maroon Honda Accord?
18    A. Yes, in May of '99, we were contacted by Chief
19  Lithgow of the Tinnicum Township police department,
20  advising us they had a vehicle in their custody that had
21  a wanted status on it.
22    Q. Who was that vehicle registered to?
23    A. We checked DMV registration files. It was

35

1  registered to Adrianne Dawson.
2    Q. And did you obtain a search warrant for that
3  car?
4    A. Yes, we did.
5    Q. Did you locate anything in there which would --
6  did you locate anything in there?
7    A. Miscellaneous paperwork with the name of Damone
8  Flowers on it.
9         MS. KELSEY: I have no further questions.
10         CROSS EXAMINATION
11  BY MR. MAURER:
12    Q. Good morning, one or two questions. We have
13  now put those maps into -- sort of a combined them all
14  into one large exhibit. One thing I noticed was that
15  you did not have Mr. Predeaux draw a map, did you?
16    A. No, he did not prepare a map.
17         MR. MAURER: That's all I have.
18         THE COURT: Anything further? You may step
19  down.
20         MR. RAMBO: Your Honor, the State rests its
21  case.
22         MR. MAURER: Defense rests, Your Honor.
23         THE COURT: Very well. Members of the jury,

36

1  there are some matters that need to be taken care of
2  outside of your presence. We will take a recess.
3  Hopefully it won't take more than 20 minutes. Once
4  again, you are reminded you are not to discuss the case
5  among yourselves.
6         (Jury left the courtroom at 10:45 a.m.)
7         MR. RAMBO: Your Honor, the State appreciates
8  the fact that Your Honor gave us proposed jury
9  instructions last week to look over. With respect to
10  those instructions, the State is asking there be two
11  additional instructions given, one is the standard
12  flight instruction, which we think is appropriate given
13  the facts that have been adduced in this case. The
14  second one reads as follows, There were video tapes
15  introduced into evidence in this case. You should know
16  that for legal reasons some editing of the tapes was
17  necessary. You should not infer anything negative
18  toward the defense or the State because such editing was
19  done. I don't think that is objected to.
20         THE COURT: Both are without objection, I
21  assume.
22         MR. RAMBO: I will hand the second one forward,
23  if I may.

49

1   occasions, with any prior statements that they gave.
2   That is what I like to call internal consistency of a
3   witness who testifies before you.
4       Number 4, is the witness's testimony consistent
5   with what other witnesses have testified to in the case?
6   In other words, is there a cohesive story being
7   presented to you, albeit with minor variations. I guess
8   the question comes down to what is a minor variation.
9   Is there external variation, which is cohesiveness among
10  the different witnesses that are presented.
11      Number five, is the testimony of the witness
12  consistent with any demonstrably proven fact in the
13  case. In other words, is what the witness saying
14  consistent with stuff or evidence that is confronting
15  them; photographs, for example, but unfortunately in
16  this case as we will talk about at the conclusion of my
17  address to you, there is no physical evidence to compare
18  what the witnesses are saying to, except for a couple
19  small things.
20      Last, but not necessarily least, with regard to
21  witnesses is; what motive does the witness have in
22  testifying before you? Now, not every part of these six
23  categories applies to all five witnesses in this case.

51

1       When a witness gives a statement in the
2   confines of the police department, that witness is not
3   subject to face-to-face accusations, nor is that witness
4   subject to any kind of cross examination. So they can
5   say anything without potential penalty of perjury,
6   without opposing counsel having an opportunity to
7   question them about what they are saying, and I would
8   also like to ask you to consider, and this is with no
9   disrespect intended towards the police officers
10  involved, but the witness is also subject both subtly
11  and not so subtly, which we will see specific examples
12  of, to the influence of the person asking the questions.
13      In that regard it seems very clear that by the
14  time these statements were give by the various witnesses
15  there were two things operative. You will note if you
16  look at statements or remember the dates that most of
17  the statements were not taken on August 1 of 1998, most
18  of them are taken sometime later.
19      We know from the witnesses' testimony that in
20  the interim, there has been a lot of talk on the street,
21  lot of rumors flying around, a lot of hearsay flying
22  around. There is a lot of newspaper articles written
23  about this particular case. All sources of information

50

1   But I would suggest to you that when we are through
2   talking about them for a period of time here you will
3   see with regard to these six categories, which basically
4   incorporate the Judge's instruction on witness
5   credibility that there are flaws and fatal flaws in
6   testimony of all the witnesses.
7       Before talking about that, let me, if I might,
8   say a word or two about taped statements. You notice
9   that during the course of this trial every single
10  witness had to either swear or affirm what they were
11  going to say is the truth. There is a reason why a
12  witness takes an oath during the trial. There is a
13  reason why we want live testimony at trials.
14      You have heard me object a couple times in
15  front of you about hearsay testimony which are
16  statements from people who are not here to talk to you.
17  And the reason is that our system, once again, is based
18  upon face-to-face confrontation between witnesses and
19  the defendant. It is a system that allows this
20  confrontation of witnesses and, perhaps, most
21  significantly, in this case, most significantly it is
22  the system that relies upon cross examination in order
23  to expose the testimony given by a particular witness.

52

1   for people who are in the area. We found out today
2   that, obviously, as of August 2, Damone Flowers was the
3   police's primary suspect in the case and Detective
4   Brock's investigation and, in fact, an arrest warrant
5   had already been issued for him. Facts which I suggest
6   affected the interview techniques that were conducted.
7       You don't have to take my word for it. You can
8   see them when you look at the tapes, if you look at
9   tapes. You have to decide what happened not only when
10  the witnesses were on tape, but what happened when the
11  witnesses were not on tape.
12      We have, for example, with Vernon Mays
13  Detective Brock's testimony that no one even talked to
14  him when the camera was turned off. He went into
15  another room to look at the photographs. We have
16  Vernon's testimony saying the entire time I was in the
17  room. police officers were coming in and out talking to
18  me all the time about the case. We will return to that
19  in a little bit.
20      He has a difficult job, I understand that, but
21  at point in time he is interviewing witnesses, he
22  already has a suspect. He already has his arrest
23  warrant. So in reaching what the prosecution talks

**53**

1  about in their opening statement as the truth, I would
2  suggest to you when you are interviewing a witness that
3  is it is not appropriate if you are trying to get the
4  truth out of someone to threaten them with a violation
5  of probation. It is not appropriate to threaten that
6  person with jail time if they don't talk.
7        Most significantly it is not appropriate to
8  threaten a witness, I am talking about Ronetta Sudler
9  right now, that her children are going to be taken away
10  from her if she didn't basically say what he wants to
11  hear. The prosecutor says she lies for an hour an 13
12  minutes. but how do you know that? How do you know she
13  wasn't telling the truth for an hour and 13 minutes.
14  All of a sudden after she, quote, unquote, goofs, she
15  thinks holly mackerel I am going to jail, going to lose
16  my kids. I better give the information they are looking
17  for.
18        I would argue to you, I would ask you to
19  consider that it is not appropriate for a police officer
20  to suggest to a witness in trying to find out who the
21  shooter was, to tell that witness that the person who
22  fired the shots lives in the neighborhood, as he did
23  with Matthew Chamblee. It is not appropriate, I would

**54**

1  suggest to you, at the time immediately prior to on tape
2  the witness making an identification to say to them, I
3  am counting on you. I really need your help.
4        It is not appropriate when a witness gives an
5  answer on tape that the officer doesn't like because it
6  is inconsistent with what other people say, to go back
7  and say are you sure? Are you sure? With Mr. Chamblee,
8  when Chamblee said that he had pants on, the officer
9  said, Are you sure about that? Are you sure about that?
10  We know another witness said something different. It is
11  not appropriate, if you look at Mr. Predeaux's
12  statement, going to talk about him in a short bit, to
13  change the witness's story through the use of
14  suggestion.
15        You will remember when you looked at that tape,
16  I am going to grab this because it is the closest thing
17  to me, you have two sides of the street here. This is
18  where the shooting came from. This is where there were
19  other people. You will remember when Predeaux was first
20  questioned the officer said to him, how many people were
21  on the north side of the street? Predeaux said about
22  30.
23        Well, obviously, he doesn't want to hear that .

**55**

1  because every other witness that he talked to says there
2  is nobody over there. The officer then says. wasn't it
3  more like ten or 15, you could have been wrong? It
4  could have been more than ten or 15, almost cross
5  examining his witness. Then Mr. Predeaux said I will go
6  with that.
7        Perhaps the biggest example of lack of
8  reliability with those statements comes through Vernon
9  Mays, taped statements that he gave. You will recall
10  that the tape goes on with him for, I forget exactly how
11  long, 35, 40 minutes and throughout the entire tape, you
12  saw it, we stressed it when he testified, throughout the
13  entire tape Vernon Mays has the shooter left handed. In
14  fact, he said he was walking down the street firing left
15  handed; one right after another.
16        You will see when you look at the tape it goes
17  off. There is a break over a significant period of
18  time, during which time the identification is made,
19  during which time according to Mays he is being talked
20  to by a lot of different people. According to Officer
21  Brock no one is talking to him. The tape comes back on,
22  and you will see it, that he does two things when the
23  tape comes back on. First he identifies Damone Flowers

**56**

1  as the shooter. Second he said, these are his words, I
2  now know. I now know that the shooter was right handed.
3  Well, how does he now know that? After spending an hour
4  saying he was left handed. Why would that even come up
5  at that point in the tape? So what happened? We asked
6  Detective Brock, nothing happened. Did he all of sudden
7  get a vision from on high saying oh, geez now I remember
8  even though I have been saying for an hour he is left
9  handed, now he is right handed or did something happen
10  or the other witness that existed at that time said the
11  shooter was right handed somehow that point got across.
12        Who is the witness testifying. As we look
13  throughout six things that I talked about, I would urge
14  you to accept the proposition if you want to get a
15  conviction of someone for guilty beyond a reasonable
16  doubt. that the witnesses that you present should be
17  reasonably decent people that don't have a lot of
18  baggage. Unfortunately as the prosecutor will tell you
19  in her rebuttal summation they are stuck with what they
20  are stuck with in terms of what happened.
21        But in this case looking at the reliability of
22  people now, this is the first category that I am talking
23  about. You have heard from two drug addicts; Ronetta

A-162.

9

1 those people from four different places don't even know
2 each other. or hardly know each other. aren't
3 associated. did those four people all happen to make up
4 the same story that the defendant is the person who shot
5 Alfred Smiley?
6 There is also, in addition to those four
7 eyewitnesses, Tysheeh McDougal. You had an opportunity
8 to see Tysheeh McDougal. She certainly didn't care
9 enough based on her demeanor on the stand, nor is she
10 probably capable of making up a story, and yet she tells
11 Detective Brock that the defendant. that Sean McNeil and
12 Joe Harris came around and said something to the
13 defendant which upset him. That he went upstairs, came
14 back down with a gun wrapped in a T shirt. Renetta
15 Sudler places the defendant on the side of the street
16 with a gun wrapped in a T-shirt and a few minutes later
17 she hears the gunshots which turn out to be the fatal
18 shots for Alfred Smiley. So, Ladies and Gentlemen, is
19 that chance that those four people came forward?
20 I want to look a little bit at the individual
21 statements that the witnesses said. First of all,
22 Vernon Mays says that he couldn't see the car. He could
23 see the defendant shooting but, he could not see what he

10

1 was shooting at because there was a van in the way. If
2 you look at the map that Detective Brock has marked up
3 you look at where Mr. Mays says that he was, and the map
4 Mr. Mays drew, he talks about that van. That van is
5 still in the pictures. If you look at State's Exhibit
6 16. That van is still in the pictures when Detective
7 Sammons takes those pictures a couple hours later.
8 If Vernon Mays was not there, did not see what
9 he saw. how did he know that van was there? Now, Vernon
10 Mays gives a description of the defendant is different
11 from the description that the other witnesses give. He
12 puts a shirt on him with no glasses and white shorts.
13 At first glance you will think that is a problem. He
14 did not change his clothes. He was wearing the same
15 thing when all four saw him; but, Ladies and Gentlemen,
16 if you think about it, whenever anybody sees any
17 particularly exciting event, or something exciting
18 happens in your life, or you talk to people about it,
19 everyone's recollection is a little bit different about
20 what they saw on that particular occasion or what
21 happened on that particular occasion, or what came first
22 on that particular occasion,
23 And in this -- if testimony resolved exactly

11

1 the same, wouldn't you think it was rehearsed? Wouldn't
2 you think they had talked to each other if it were
3 exactly the same, if it were perfect. It would sound
4 rehearsed. It would sound like they had talked to each
5 other. But when it is a little different, you know that
6 each one is going by who their own recollection, and not
7 what someone else told them, or not what they heard on
8 the street.
9 The next person I want to look at is Renetta
10 Sudler. She is a reluctant witness. She didn't want to
11 be involved. She didn't want to be known as a snitch.
12 She heard the defendant is a friend of her boyfriend
13 Sean McNeil. She hangs out in this particular area.
14 Would she lie? Ladies and gentlemen, absolutely.
15 I mean, in fact, if you look at the video tape
16 when she talks to Detective Brock, she lies for over an
17 hour. She tells Detective Brock she wasn't there. She
18 went home. She was home by ten o'clock because she was
19 on probation. She had to -- wanted to be home when
20 probation came to check to see if she was home by her
21 curfew. She would lie. But would she lie and help the
22 State? Well, you have to decide that.
23 After an hour, she fesses up. But during that

12

1 hour, look at -- if you look at the tape again you can
2 see it is -- does Detective Brock ever tell her what to
3 say? I mean, he tries every interview technique in the
4 book. But did he ever say I know you saw this, I know
5 you saw that? No. He says, I know you are not telling
6 the truth. I know you were not home. I know you were
7 out there. I know that your boyfriend Sean McNeil was
8 out there. I have talked to him. I talked to your
9 cousin. I know you were out there, but he did not tell
10 her what other people have said about what happened out
11 there.
12 When she finally -- eventually just wears her
13 down. He talks to her for so long she messes up. She
14 laughs and she said that she saw the defendant fire the
15 shots. She saw the gun wrapped in a shirt, that she
16 places the defendant on the street where the shells were
17 later recovered on the street where Vernon Mays had also
18 placed the defendant. and firing the gun from the place
19 where the fatal shots had to have come from, fatal shot
20 had to come from. She is so sure, Ladies and Gentlemen,
21 she said if anyone else tells you different, they will
22 have to be lying.
23 But look at Renetta Sudler. She talked to

A-163.

**13**

1 Detective Brock that particular day. She obviously
2 thought she wasn't going to have to testify because
3 Detective Brock told her she was not going to have to
4 testify. When she gets in here and does have to testify
5 she says she did not remember anything. She didn't
6 remember the shooting at all. But, Ladies and
7 Gentlemen, she tells you she remembers that she was at
8 the Oasis or Ambrosia on that particular night. She
9 went to the Oasis or Ambrosia every Friday and Saturday
10 night. She never says for how long, but on a regular
11 basis. Why would she remember this particular night
12 four years ago, but she does not remember the shooting.
13 She tells you on the statement. She had never seen a
14 shooting. That shows her bias. She is not here to help
15 the State. She wasn't ever here to help the State but
16 she places the defendant as the person who fired the
17 fatal shots.
18 She talks about Joe Harris -- I want to digress
19 a minutes and talk about Joe Harris for a minute. She
20 has heard rumors he also fired shots. There is not any
21 physical evidence that there were other shots fired.
22 There are not any shell casings on the other side of the
23 street. She thinks that there is, that he could have

**14**

1 because she thinks she read in the paper that Alfred
2 Smiley was shot in the chest. She is thinking it is
3 from in front. There are no shell casings on the street
4 on the other side of the street where she thinks Joe
5 Harris was.
6 This does not prove anything. It could have
7 been a revolver. There is not anybody who definitely
8 say they saw Joe Harris shooting. You may be thinking
9 well, the State hasn't proven beyond a reasonable doubt
10 that Joe Harris wasn't there, but the State doesn't have
11 to prove beyond a reasonable doubt that Joe Harris
12 wasn't there, or that Joe Harris didn't fire any shots
13 because the State has proven beyond a reasonable doubt
14 that the shot which killed Alfred Smiley came from the
15 right hand side.
16 And the people that talk about Joe Harris,
17 Renetta Sudler, she talked about Joe Harris, said he
18 wasn't in the her line of vision from across the street.
19 She didn't know if shots were fired from somewhere else
20 and the fatal shot came from the right hand side. You
21 know that from the grazing of his arm, you know that
22 from where the bullet went in his right arm pit. We
23 know that because the bullet traveled through his right

**15**

1 lung and heart, then landed in his left lung. You know
2 that because you look at pictures of the inside of the
3 car, the bleeding is on right hand side, is towards the
4 passenger side in the vehicle.
5 So the State hasn't proven beyond a reasonable
6 doubt, or may not have proven beyond a reasonable doubt
7 that Joe Harris wasn't there. We have proven beyond a
8 reasonable doubt that Joe Harris is not the one that
9 fired the fatal shot. It was the defendant.
10 The next witness that I want to talk about is
11 Matthew Chamblee. He is young. He is nervous. He
12 lived in that area. He knows -- but he knows the
13 defendant. He did not know him by his name. He knows
14 him as the chicken cheese steak guy. The guy that comes
15 into the sub shop where he works and gets a chicken
16 cheese steak. He knows that he wears glasses. He knows
17 that he usually drives a maroon or red car. He may not
18 have actually seen his whole face, may have seen it from
19 the side; in fact, he says that from the witness stand.
20 But, Ladies and Gentlemen, you know that you
21 don't recognize people just by their face. When you see
22 someone that you know, you recognize them by how tall
23 they are, by the way they wear their hair, by whether or

**16**

1 not they have glasses or don't have glasses, by the way
2 they walk, by the way they talk, what clothes they wear,
3 by the way they wear their clothes, not just the clothes
4 they wear.
5 If you see someone that you know, you can
6 recognize them even if you don't see them, their whole
7 face. And in this particular instance, he didn't have
8 that long an opportunity to look, but he did get to see
9 the defendant's whole body. He knew that the side of
10 his face, glasses, clothes that he wore, the way his
11 hair was cut, the way his hair was styled, that it was
12 the defendant. He was sure when he talked to Detective
13 Brock that it was the defendant, it was the guy, chicken
14 cheese steak guy who came into the Quality Sub Shop.
15 Someone that he knew.
16 He picked that person out of a lineup. He
17 also, Ladies and Gentlemen, talks about the pop, pop
18 sound which is the same sound that Vernon Mays heard.
19 There is Othello Predoux. He is not anxious to help the
20 State either. Has he open charges. He has been in jail
21 since this particular incident occurred. He never
22 approached the State. He went to jail in April of this
23 year on a violation of probation and he never approached

17

1 the State. The State approached him and he gave a
2 statement that was 4 years later. So his details are
3 sketchy. He wants a deal. He did not get deal.
4 He forgets on the witness stand what he said.
5 He did not have the same excuse that other witnesses
6 have that they talked about this four years ago. He
7 just talked about it in July. He places the shooter on
8 the street, on 22nd Street where the shell casings are
9 later found. He also knows from the newspaper that
10 Alfred Smiley was shot in the chest, but he still places
11 the defendant on the side of the street. So those four
12 eyewitnesses place the defendant as the person who
13 committed the shooting.
14 You also have the testimony of Tysheeh
15 McDougal. She is truly a reluctant witness. In fact,
16 she refused to answer questions when Mr. Rambo asked her
17 questions when she was on the witness stand. She had to
18 go downstairs, then come back later before she would
19 answer any questions. She clearly has no motive to help
20 the State. She probably is not capable of making up a
21 lie. You had an opportunity to observe her. You had an
22 opportunity to hear her talk about her drug use. Yet
23 she also describes the defendant as being at the scene

18

1 with a gun in his hand wrapped up in a shirt and acting
2 like he intended use it. She hears the gunshots a few
3 minutes later.
4 There is the fact that the defendant fled.
5 Ladies and gentlemen, why did he flee if he did not do
6 it? He was gone by the time Detective Brock got a
7 search warrant to look at his sister's house and
8 grandmother's house, he was already gone. They did not
9 find him until November of 1999, over a year later. He
10 was gone. Why did he run? Does that show that he was,
11 in fact, the shooter? Does that show his consciousness
12 of guilt? That is something that bolsters the fact the
13 four eyewitnesses who saw the defendant do it. The fact
14 there were four eyewitnesses proves beyond a reasonable
15 doubt that the defendant committed this offense.
16 But when you add the fact there were four
17 eyewitnesses, then you have the testimony of Tysheeh
18 McDougal and the fact that the defendant fled, you know
19 that the State has proven beyond a reasonable doubt that
20 the defendant committed this offense.
21 Witness, eyewitness, Ladies and Gentlemen may
22 not be proof beyond a reasonable doubt for a lot of
23 different reasons; but two eyewitnesses, is that proof

19

1 beyond a reasonable doubt? Again, that depends. Three
2 eyewitnesses? Is the defendant really just having a bad
3 day or a bad life? But four eyewitnesses. Ladies and
4 Gentlemen, that is proof, past proof beyond a reasonable
5 doubt. When those four eyewitnesses' testimony is
6 bolstered by the fact that there was another witness
7 that placed the defendant at the scene and the defendant
8 fled, that is proof beyond a reasonable doubt.
9 Is it chance, Ladies and Gentlemen, if you look
10 at State's Exhibit No. 2, which is has been marked to
11 show where the defendant -- where the witnesses place
12 certain things on the city map. Is it chance that they
13 all overlap? They all place the shells at the same
14 place, all place the van at the same place, all place
15 the shooter at the same place. They all place the car
16 at the same place. Is it chance that they all got that
17 part of it right? No. It is proof beyond a reasonable
18 doubt.
19 Though the four eyewitnesses, the fact that
20 Tysheeh McDougal also places the defendant at the scene;
21 the fact that the testimony shows that they all are
22 consistent in where they place the scene in this
23 particular murder, proof beyond a reasonable doubt that

20

1 it is the defendant who murdered Alfred Smiley and the
2 defendant is guilty of Murder First Degree and the
3 defendant who is guilty of Possession of a Firearm
4 During the Commission of a felony. That is why your
5 verdict, Ladies and Gentlemen, should be guilty. Thank
6 you.
7 (The closing remarks by the Defense were not
8 requested to be transcribed at this time.)
9 (Jury enters the courtroom at 1:15 p.m.)
10 THE COURT: Are you using the easel?
11 MS. KELSEY: I was going to put the map up
12 there.
13 THE COURT: Mrs. Kelsey, you may proceed.
14 MS. KELSEY: Thank you Your Honor. Mr. Rambo
15 said in his opening that justice was like a train and it
16 moves slowly. Probably when Mr. Rambo said that he did
17 not realize just how slowly until he spent some long
18 times sitting around waiting to get there. This is the
19 end. The judge will instruct you on the law. I want to
20 thank you for your time. I want to thank you for your
21 attention. I want to thank you for your patience
22 throughout the inevitable delays that occur in every
23 criminal trial and always seems to be more annoying when

25

1    Why did he put the shooter on the right hand
2    side if he did not know, unless he saw it. If it were
3    just Othello Predoux you would certainly -- the State
4    wouldn't have proven its case beyond a reasonable doubt.
5    But it was just not Othello Predoux.
6        Mr. Chamblee. He did not have an axe to grind.
7    He has no issue in this case. He does not know anybody.
8    But the defense talks about there is his opportunity to
9    observe. He knew the defendant. He knew him. may not
10   have gotten a good opportunity to look at his face, but
11   he was sure then it was the guy who -- did not know his
12   name -- chicken cheese steak guy from the sub shop. He
13   recognized him not by just his face, but he knew he had
14   glasses on. So he saw part of his face. He knew the
15   defendant, like everybody knows other people, by not
16   just their face; the way they wear their hair; way they
17   wear their clothes; how tall they are; how they are
18   built; all of those things identify someone and he was
19   sure -- granted, four years later when he gets on the
20   witness stand and he is a young kid, still 16 at the
21   time. He is 20 now.
22       He gets on the witness stand, cross examined by
23   Mr. Maurer, who is very good at pointing out some things

26

1    that are, perhaps, were inconsistent. Does he start to
2    stop and think? Is he not sure. He is a young kid. He
3    has never -- he is not experienced in testifying. Is he
4    going to argue with Mr. Maurer? Is he going to just
5    say, these are important points, but we not only have
6    Matthew Chamolee who was sure back then when it
7    happened, but you have him and Othello Predoux.
8        Renetta Sudler, she was always a reluctant
9    witness. Would she lie? Absolutely she would lie
10   because she does lie. She lies to Detective Brock. She
11   gets on the witness stand. She doesn't want to say now
12   what she said back then. She said she remembers being
13   at the Oasis. She doesn't remember seeing the shooter.
14   But she places -- and, again, it is all on the same map.
15   She place herself across the street where there is an
16   alley. Places the bull -- shooter where the shell
17   casings are later recovered, even though she knows she
18   read the article that Alfred Smiley was shot in the
19   chest. She places the shooter on the right hand side.
20   She doesn't believe herself that what she saw is what
21   she saw.
22       She certainly didn't tell that story to help
23   the State. The defense says well you can look at the

27

1    tape. You can see she finally just said that to get out
2    of there. Look at the tape, look at where she messes
3    up. She is telling you a story as if that is what she
4    heard. All of a sudden she said I saw this. That is
5    how it comes to be that she finally tells the truth.
6    She finally has to admit she is there. There has been
7    no suggestion about what should happen.
8        Then look at Vernon Mays. The defense makes a
9    comment about the left hand. He says on the tape Vernon
10   Mays says on the tape through the whole part first that
11   the shooter used his left hand. When they come back and
12   do the photo identification, he adds in there it wasn't
13   his left hand, it was his right hand. The Defense wants
14   to make a big deal about that that he changes his mind
15   with regard to which hand it was.
16       Matthew Chamblee, who is only other person they
17   talked to at that particular point in time doesn't say
18   which hand the shooter used. Why does it matter to --
19   why would it matter to the police, which hand he said
20   the shooter used, or did Vernon Mays have a chance to
21   while he is waiting an hour for the officers to get back
22   to him, did he have a chance to think about it. Picture
23   it in his head and realize that he was not exactly right

28

1    that it was the other hand. Now that he had a chance to
2    think about it little bit, he wanted to add that in.
3    Make sure that is clear while he is back on the tape.
4        So those are things you have to look at. Are
5    there statements perfect? Are they consistent? Mr.
6    Maurer is right, Mr. Mays says he has on a blue shirt,
7    white shorts. Chamblee said he has on no shirt, which
8    is consistent with Sudler and McDougal, and black pants.
9        You saw Mr. Mays. You saw Mr. Chamblee when
10   they came in the courtroom. You saw the way they were
11   dressed. Are they fashion mavens? Are they worried
12   about what everybody is wearing, what they are wearing.
13   They are trying to tell the officer what they remember?
14   There are people who don't remember what they wore
15   yesterday, much less what someone else wore yesterday.
16   Trying to picture it in their mind they may not get it
17   right. They may know they saw their friends yesterday,
18   but are they going to remember what their friends had on
19   yesterday? Probably not.
20       You have an opportunity to see Mr. Mays,
21   Mr. Chamblee, do they dress like the kind of people who
22   care what people wear, or are going to remember what
23   people had on? Did they get it wrong? Maybe. One of

A-166

29

them had to because they are not the same.

So is that explainable in the whole thing, is it proof beyond a reasonable doubt? Or does it dispel the proof beyond a reasonable doubt. No, it does not. So based on that, Ladies and Gentlemen, that is the only difference that you have. You don't have -- color of the gun, they are the only differences that you have. You didn't have -- you have them all putting the van there blocking Chamblee and Mays' view, have them all placing the shooter there by the alley, actually going in the alley.

They have the car at that end of the street, all of that is consistent. Look at the maps that each of them drew when Detective Brock interviewed them. It surely, they are place -- there is physical evidence and the eyewitnesses place the defendant at the place where the physical evidence is. So what they say is consistent with the physical evidence in this particular case.

The defendant said Renetta Sudler said they were ducking behind cars. They were no cars. There is no cars in the pictures that Detective Sammons took. Ms. Sudler also said, as soon as the shooting happened

30

they all left. They took a green Cadillac. They took Pookie's car, K.O., and meatball who were in a car showed up later at the Thunderguards. All of those cars that were parked on that street when the shooting happened are now gone.

MR. MAURER: Your Honor, I am going to object. There is no evidence there were cars parked by K.O., Meatball. There is no evidence in this record to support that.

THE COURT: I will remind the jury nothing said during closing statements is evidence. Your recollection of evidence will control.

MS. KELSEY: All of those -- you look at the evidence, look at what they said about who was in the car, where those cars went. The defense says that when Detective Brock talks to Othello Predoux, he asks him are you sure? He does. When Predoux says there were 15 people on the north side of the street. Detective Brock does say, Are you sure? You can see that on the tape. He never says there was another witness who said there were less people. He just said Are you sure? Based on what he heard from other people.

Othello Predoux also said there were 60 people

31

out there other people say is there were less people out there. Everyone agrees that it seemed like a lot. They blocked the street. Keep in mind someone approaches Mr. Mays between the time he gives the statement to the police --

MR. MAURER: Objection, Your Honor.

THE COURT: Once again, your recollection will control.

MS. KELSEY: Someone approached Mr. Mays between the time that he gave a statement to the -- shortly after he gave a statement to the police officers. And the fact that person approached him made him afraid. He called Detective Brock. Keep that in mind, also.

The defense said that Chamblee was probably the State's best witness because he had no axe to grind. What axe to grind did Vernon Mays have? He knew the defendant a long time ago and the only thing he remembered about him was he was good at athletics, if he is the person that he remembered that was good. Is that an axe to grind? Is that a motive to make up a story that he is the murderer? He has no axe to grind either. He has no reason to say it was the defendant or wasn't,

32

if it wasn't.

So, Ladies and Gentlemen, the point is is that the State has the burden of proof. The State has to prove the defendant guilty beyond a reasonable doubt. What the defense says about the witnesses is true. There are problems with all of them. But, Ladies and Gentlemen, there is not just one of them. Eyewitness testimony has problems, but we don't have just one eyewitness. We have four eyewitnesses. When you get four eyewitnesses, and they all say that it was the defendant, they all place the defendant at the same spot, they all -- as physical evidence. They all -- they may disagree about what clothes he had on, may disagree with what color gun he had, disagree about how many shots were fired, but there were a lot of people. No one was expecting it. It was sort of the kind of thing where you are shocked when it happened, but all of those people say that the defendant was the shooter.

The defendant is the person who murdered Alfred Smiley and four people is proof beyond a reasonable doubt, even when any one of them would not be proof beyond a reasonable doubt. You don't just have four eyewitnesses. You do have four eyewitnesses which is

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE          )
                           )
        vs.                )Crim. Id. No.
                           )9808000260
DAMONE E. FLOWERS,         )
                           )
        Defendant.         )May 8, 2002

        - - - - -

BEFORE:

        HONORABLE HAILE L. ALFORD

        - - - - -

APPEARANCES:

        JAMES A. RAMBO, ESQ.
        CYNTHIA R. KELSEY, ESQ.
        Deputy Attorneys General

        EUGENE J. MAURER, JR., ESQ.
        For Defendant

        - - - - -

        OFFICE CONFERENCE
        - - - - -

---

**G**   **3**

1   question as to why not yesterday instead of before
2   this morning and everything. And, in any event, he
3   said there was a young lady sitting next to him
4   translating for him, but that he did send in a letter
5   to Jury Services that indicated that he couldn't
6   speak English. And the young lady that was sitting
7   next to him told him that, you know, they were
8   basically asking did you know any of these people,
9   and he didn't know any of these people, so that's why
10  he never said anything.
11          So the bottom line is I have already excused
12  him and fortunately we picked three instead of two
13  alternates.
14          I understand that there's something you want
15  to tell me?
16          MR. MAURER: Well, there's obviously no
17  objection from the defense on that.
18          MS. KELSEY: Nor the State.
19          MR. MAURER: I guess I should speak.
20          Mr. Rambo called me yesterday afternoon, 5
21  or so, sometime around there, indicating that it was
22  the State's intention to call a witness by the name
23  of Othello Predox or Predeoux, depending upon how you

---

**2**

1          May 8th, 2002
2          Chambers
3          9:39 a.m.
4   PRESENT:
5          As noted.
6          THE COURT: I don't know where this is
7   going, but I should report that Jury Services called
8   up this morning to indicate that they had David
9   Mendoza -- Victor Mendoza, I'm sorry, Victor Mendoza,
10  who's Juror Number 5, who has indicated that he
11  cannot speak English.
12          MS. KELSEY: Why didn't he say that
13  yesterday?
14          THE COURT: Hmm?
15          MS. KELSEY: Why didn't he say that
16  yesterday?
17          THE COURT: That would be very nice if they
18  would do that.
19          But, in addition, I've called to speak to
20  Jury Services to -- because this happens more often
21  than it should.
22          And, anyway, I had Evette Hernandez, the
23  bailiff, speak to him and asked the very same

---

**4**

1   pronounce his name, and that was mentioned earlier to
2   your Honor, and I indicated, at the time, it was my
3   recollection Mr. Predeoux was a former client of
4   mine. And after going back to my office, I
5   researched my prior files and learned that I, in
6   fact, had represented Mr. Predeoux on two separate
7   cases, one of which resulted to a plea to misdemeanor
8   theft and one of which resulted to a plea of
9   possession of a deadly weapon by a person prohibited,
10  drugs, and resisting arrest. And I never developed a
11  close relationship with him. The last case, I think,
12  was in 1988 -- or 1999.
13          So this morning, I went down and I discussed
14  it with Mr. Flowers after reviewing the rule, which I
15  think is 1.3, where you deal with former client
16  representation, and I think under the provisions of
17  that rule, and we probably should do this in his
18  presence in court, he can waive any potential
19  conflict of interest that exists. Ultimately, of
20  course, it's the Court's decision on what to do with
21  it, but he would be prepared to waive any conflict of
22  interest that might otherwise exist.
23          Now, we can get into this more in court with

A-168.

-5-

1  the rules. I brought them over with me and we can go
2  from there.
3      Additionally, if he's going to be called,
4  obviously, I need some time to do a little bit of
5  research on him to see what he's been up to since
6  1999 in terms of cross-examining him.
7      THE COURT: All right, but you have not had
8  any cases with him since 1999?
9      MR. MAURER: No, and I never -- unlike some
10 clients, I didn't develop any kind of a relationship
11 with him. I mean, most of the time, I was contacted
12 by his family and I know he's called me since 1999
13 looking for representation, but I have not
14 represented him since then.
15     THE COURT: Does the State have anything to
16 add?
17     MR. RAMBO: Yes. Mr. Maurer's correct with
18 respect to my phone call. We do intend to call
19 Mr. Predeoux as a State's witness after
20 conferring -- just prior to my call with Timothy
21 Terranova of the Public Defender's office.
22 Mr. Terranova represents Mr. Predeoux right now on
23 two separate sets of charges. Mr. Terranova made a

7

1  waiver that's involved here, but the appearance of
2  impropriety or the possible appearance of impropriety
3  in front of the jury. We know what, based upon the
4  proffer, we know what Mr. Predeoux is going to say.
5  We don't know what's going to happen on the stand.
6  We don't know whether Mr. Predeoux might recant,
7  whether he won't recant. If he does recant, what
8  appearance does that give the proceeding in front of
9  the jury, because it's going to be clear that he's
10 represented him in the past.
11     There's case law to support that proposition
12 even in circumstances where the representation took
13 place seven years before and neither party really
14 remembers the association except to say, I think I
15 represented that guy seven years before.
16     And I refer the Court to a case of State
17 versus John Loyal, a case out of New Jersey, and I'll
18 hand your Honor the Westlaw excerpt from that case.
19 We just don't think we can do it.
20     THE COURT: Well, I guess the other side of
21 the coin is why should not the Court exclude this
22 witness at this late date given the fact that the
23 defendant has been incarcerated since the arrest and

6

1  proffer to us as to what testimony would come from
2  Mr. Predeoux and we have determined, based upon that
3  proffer, that he would be an essential witness in
4  this case, an eyewitness in this case. And there
5  aren't a whole lot of eyewitnesses in this case that
6  occurred at 1:30 in the morning four years ago
7  roughly.
8      THE COURT: Is there independent evidence?
9  Does he corroborate things that he would not
10 necessarily know?
11     MR. RAMBO: Yes, ma'am. And so for that
12 reason, we think that we should not proceed in this
13 trial, not so much because --
14     THE COURT: You should not what?
15     MR. RAMBO: We should not proceed in this
16 trial with Mr. Maurer representing the defendant.
17     And I have apologized to him for this late
18 development. It wasn't our fault that the
19 development occurred; our fault in the sense of Ms.
20 Kelsey and myself, the chief investigating officer
21 felt as a hunch that we would interview this person
22 because he was close to the defendant for a number of
23 years. We feel that it's not so much the question of

8

1  that he has counsel, that it was eve of trial -- in
2  fact, day of trial, picking the jury, when this came
3  up as far as the Court and the defense?
4      MR. RAMBO: I can understand your Honor's
5  thoughts in that situation if we were talking about a
6  burglary charge or perhaps even a robbery charge.
7      Here, we're talking about the most serious
8  criminal charge that can be brought before the Court
9  and it's the State's burden obviously to produce
10 evidence beyond a reasonable doubt.
11     If your Honor were to take that position in
12 a case of this sort, we suggest that that would be
13 clearly error. We're saying that because the State
14 acknowledges that there's no physical evidence in
15 this case that ties this defendant to the murder.
16 What we have is just a couple of people who were on
17 the street, again, at 1:30 in the morning, four years
18 ago, who are eyewitnesses, and that's all we have
19 essentially.
20     Let me finish if I may?
21     THE COURT: All right. I wanted to ask a
22 question with respect to that eyewitness.
23     MR. RAMBO: Okay.

A-169.

9

| | |
|---|---|
| 1    THE COURT: Is this duplicative? Do you | 1    position to produce abundant other case law |
| 2  already have eyewitnesses that are saying essentially | 2  indicating that this should not be a disqualifying |
| 3  the same thing as this new witness? | 3  factor under the circumstances if the defendant |
| 4    MR. RAMBO: Well, we don't think it's | 4  waives it, number one. |
| 5  duplicative in the sense that there are certain | 5    Number two, I see no reason at all why it |
| 6  factors that make this witness' testimony even more | 6  has to even come up that I represented this man |
| 7  credible, because, according to the proffer, he had | 7  previously. I mean I agree that if that fact comes |
| 8  actual contact with the defendant immediately after | 8  out during the course of the trial, that's no good |
| 9  the shooting and there was some instruction given by | 9  because then I lose all my credibility with the jury, |
| 10  the defendant to him. That's not true with respect | 10  so I would think that we can fashion instructions to |
| 11  to either one of these -- the witnesses that the | 11  him that that fact is not to be mentioned and I |
| 12  State would produce. Moreover, I call the Court's | 12  certainly won't bring it up. |
| 13  attention to the fact -- | 13    Number three, if the Court does not exclude |
| 14    THE COURT: I'm sorry, could you repeat that | 14  the witness' testimony, then given the fact that it |
| 15  again? You're saying the distinction is? | 15  is late-developing, the fact that the jury has not |
| 16    MR. RAMBO: I'm saying the distinction is | 16  been sworn, and the fact that the State's trying to |
| 17  this man actually had contact and a conversation with | 17  disqualify me, then I would probably seek a |
| 18  the defendant immediately after the shooting. And | 18  continuance to explore this witness further, find out |
| 19  that's not true with respect to the first two folks | 19  what he's going to say, and I have to do my own |
| 20  that were just in the area and weren't as close on a | 20  investigation on him as I've done with the other |
| 21  daily basis to the defendant as was Mr. Predeoux. | 21  witnesses in the case. These are people who are |
| 22    Moreover, I do call the Court's attention | 22  street people who have bad records who -- what he |
| 23  also to the fact that the defendant, following the | 23  says may create a need to develop other witnesses to |

10

| | |
|---|---|
| 1  shooting, fled for well over a year and was in no | 1  counter what he's saying and this is being done at |
| 2  hurry to turn himself in. There's a witness that | 2  the last minute. |
| 3  would testify in this case that he telephoned her on | 3    Those are my differing positions. |
| 4  the day following this incident. She said, "Turn | 4    One, I'd like to exclude him altogether. |
| 5  yourself in." Her name is Brenda Bryant. And the | 5    Two, if the Court is inclined to disqualify |
| 6  defendant said, "I'm not going to turn myself in." | 6  me, then I seek a continuance so we can present the |
| 7  She said, "If you have nothing to hide, you'll turn | 7  Court with authorities on whether I should be able to |
| 8  yourself in." | 8  remain in the case. |
| 9    So he wasn't in a hurry, he wasn't worried | 9    THE COURT: Perhaps that seems to be the |
| 10  about this case being presented and worried about | 10  appropriate way to go; to, at least at this point in |
| 11  speedy trial rights. He was worried about being | 11  time, continue the case and let the State brief its |
| 12  apprehended. | 12  position and let the defense brief its position. |
| 13    So I want the Court to have that background. | 13    And in either case, if I made a decision |
| 14    THE COURT: Anything further? | 14  today, the trial would not go forward today. |
| 15    MR. MAURER: Well, a couple of points. | 15    So it seems to me that's at least prudent at |
| 16    Obviously, it's a pretty weighty thing for | 16  this time. |
| 17  the State to seek to disqualify the defendant's | 17    MR. MAURER: My request for a continuance, I |
| 18  selected attorney on the day of trial based upon New | 18  hope it's not a lengthy continuance, because he has |
| 19  Jersey decision and in a situation where the problem | 19  been in jail for a long period of time. |
| 20  has been created at the last minute by, if not their | 20    Part of my request is predicated upon the |
| 21  intentional acts, but certainly the fact that this | 21  fact he is serving a sentence on an unrelated robbery |
| 22  development occurred at the last minute. | 22  second conviction which will expire in approximately |
| 23    So it seems to me that I would be in a | 23  three weeks. |

A-170.

13

15

1   THE COURT: Well, that makes it even less of
2   a problem that he's incarcerated. He has been
3   incarcerated and is actually serving another sentence
4   at this time. So --
5       MS. KELSEY: I mean if it's rescheduled
6   because new counsel has to be appointed, though, we
7   won't be able to do it before this courthouse closes,
8   do you think? I mean if it's just like a week or
9   two --
10      THE COURT: I can't speak for new counsel.
11  I mean, obviously, this is a serious matter that the
12  person, if there is new counsel appointed, would need
13  time to make sure that they felt adequately
14  acquainted with the case to go forward.
15      MR. MAURER: I'll put this in my brief, but
16  I want to make the matter of record.
17      I put in tons of time on this case. I have
18  looked at those tapes over and over again. I've
19  prepared very minute detailed cross-examinations.
20  For another lawyer to get involved at this late date,
21  I mean they're going to have to replicate as many
22  hours -- I mean I don't keep my hours, but I put in
23  an awful lot of time on this. I'd really hate to get

1   since we haven't sworn them.
2       MR. RAMBO: I defer to him in terms of the
3   time necessary because it is an imposition. I
4   understand that.
5       MR. MAURER: It's the State's motion to
6   disqualify me at this point in time. I think they
7   should file their brief first and I would ask one
8   week. I'll respond in one week.
9       MR. RAMBO: That sounds fair.
10      THE COURT: All right. So ordered. Thank
11  you very much.
12      MS. KELSEY: When are we supposed to file
13  our brief?
14      THE COURT: One week. And then there will
15  be one week to respond.
16          - - - - -
17
18
19
20
21
22
23

14

1   knocked out at the last minute by the amount of time.
2       I think I'll find case law if my client
3   waives the conflict, it's not a problem.
4       MR. RAMBO: As I said earlier, I know
5   there's case law to the contrary, so I guess it will
6   be a battle of the case law.
7       THE COURT: All right. So in terms of the
8   schedule, one week?
9       MS. KELSEY: Are we going to keep this jury
10  or are we going --
11      THE COURT: I think I'm going to have to let
12  this jury go. We told them the time period. I don't
13  remember whether any of the ones who had time
14  constraints after March 17th were picked, but --
15      MR. MAURER: We'd never get this done.
16      THE COURT: I don't know. How fast do you
17  think this issue can be briefed? Perhaps we can
18  contemplate that.
19      MR. MAURER: I don't see how we can keep
20  this jury.
21      MR. RAMBO: I don't either. I agree with
22  Mr. Maurer.
23      THE COURT: I don't think it's necessary ,

16

CERTIFICATE OF COURT REPORTER


I, Kathleen D. Feldman, Official Court
Reporter of the Superior Court, State of Delaware, do
hereby certify that the foregoing is an accurate
transcript of the proceedings had, as reported by me,
in the Superior Court of the State of Delaware, in
and for New Castle County, in the case herein stated,
as the same remains of record in the Office of the
Prothonotary at Wilmington, Delaware.
        WITNESS my hand this __ day of _____
, 2002.


            Kathleen D. Feldman
            Cert. No. 159-PS
            Official Court Reporter

A-171.

EUGENE J. MAURER, JR., P.A.

ATTORNEYS AT LAW
1201 A KING STREET
WILMINGTON, DELAWARE 19801

(302) 652-2900
FAX (302) 652-9123

May 22, 2002

The Honorable Haile L. Alford
Associate Judge
Superior Court
Public Building
Wilmington, DE 19801

## RE:   **State of Delaware v. Damone Flowers**
          **ID #9808000280**

Dear Judge Alford:

The defendant is charged with murder in the first degree arising out of an incident that is alleged to have occurred on August 1, 1998.    The matter was scheduled for trial on May 7, 2002.   On that date the state revealed prior to jury selection that they anticipated calling a witness by the name of Othello Predeoux. Despite the fact that the alleged offense with which the defendant is charged occurred in 1998, this was the first time that this witness was made known to the defense. This was because the witness had not "spoken up" or provided information to the police or the prosecutor's office until a few days prior to trial.   It now appears that the witness is claiming to have observed the shooting.

Although counsel has not been fully apprised of Predeoux' circumstances, an independent review in the Prothonotary's Office discloses that he is charged in two separate cases in this Court.   In one, the defendant is charged with possession of a deadly weapon by a person prohibited, carrying a concealed deadly weapon, conspiracy in the second degree and resisting arrest.   In the other, the witness is charged with trafficking in cocaine, possession with intent to deliver cocaine, maintaining a dwelling and possession of drug paraphernalia.   Both cases apparently have been scheduled for trial.   The resolution of these cases obviously could be affected or impacted by the witness' cooperation in this prosecution.

Counsel for the defendant immediately recognized the rather unusual appellation of the witness and advised the prosecutor and the Court that he had

A-172.

previously represented the witness. Specifically, counsel represented the witness in connection with crimes involving dishonesty on which he entered a plea of guilty to misdemeanor theft on April 18, 1996. Counsel also represented the witness on felony offenses in connection with which he entered pleas of guilty to possession of a deadly weapon by a person prohibited, possession of cocaine and resisting arrest on December 14, 1998. The plea was actually entered through Thomas Pedersen, Esq. who was assisting counsel with his practice at that time. Counsel does not maintain that this factor makes any difference in the analysis since Mr. Pedersen was acting as an agent for counsel at the time.

The jury in this case was selected but not sworn on May 7. Although counsel had secured a waiver from his client after full disclosure of the above circumstances, the State nevertheless orally moved to disqualify counsel from further representation of Mr. Flowers. Due to the seriousness of the matter and the fact that a hasty decision was inappropriate under the circumstances, the Court discharged the jury panel (which had not been sworn) and directed that the parties file written submissions. The State filed a memo with this Court dated on May 14, 2002. This is the defense's response to that memo in opposition to the State's Motion to Disqualify.

The State seeks disqualification of counsel under the Delaware Rules of Professional Conduct. "Initially, this Court must be wary of an opponent's efforts to disqualify the other side's counsel of choice." *State v. Baker*, Del. Super., Cr. A. No. 9406016784, Herlihy, J. (Feb. 15, 1995) (ORDER). The starting and finishing point for analysis of this issue is, therefore, Prof. Cond. R. 1.9. Conflict of Interest: Former Client. That rule, which controls the disposition of this issue, states as follows:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

> (a)     Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

> (b)     Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known."

2

Curiously, despite this Rule. direct applicability to the problem presented to the Court, the state fails to draw the Court's attention in any significant detail to the provisions of this Rule.

It obviously is not the law that counsel who represents a client may never represent another client against whom the former client is to give testimony. If that were the case then there would be no need to formulate the Rule in the above fashion. Rather, a straightforward pronouncement prohibiting all subsequent representation under these circumstances would have been enacted. Rather, as was noted in *State v. Drach*, 1 P.3d. 864 (Kansas 2000), "The fact that a lawyer has once served a client does not preclude this lawyer from using generally known information regarding a client when later representing another client." *See also, Hunter v. State*, 770 So.2.d 232 (Florida 2001). These same principles are found in the commentary to Rule 1.9:

> "Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client. However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client."

The cases and the Delaware Professional Conduct Rules and Commentary therefore envision situations where a lawyer who previously represented a client who is testifying against a present client is not disqualified from representation under all circumstances. It is therefore necessary to examine both paragraphs of Rule 1.9 to determine whether disqualification is appropriate under any given set of circumstances. Although there are no Delaware cases directly on point, *Webb v. E.I. duPont De Nemours & Co.*, 811 F.Supp. 158 (D. Del. 1992) is instructive.

In that case, the plaintiff filed a suit against the duPont Company seeking benefits under ERISA arising out of her husband's employment with that company. The plaintiff was represented in the suit by an attorney who previously was employed by the duPont Company for a period of 27 years. The last 3 years of that employment included advising duPont on ERISA matters. As part of the discovery process, the plaintiff's attorney included in a filing resisting a Motion for Summary Judgment, information that he prepared while representing the company. The defense sought to disqualify plaintiff's counsel primarily on the grounds that he had disclosed information that was confidential in nature and that was obtained during the course of that counsel's prior representation of duPont. The court chose not to resolve the case on that matter however.

Relying on *Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382 (3rd Cir. 1972); *cert. denied*, 411 U.S. 986 (1973), the court ruled that "the former client need show no more than that the matter embraced within the pending suit was substantially related to the matters or the cause of action wherein the attorney previously represented the former client". In reaching its conclusion that disqualification was

3

appropriate under the circumstances of that case, the court noted that the purpose of the Rule was not merely to protect the disclosure of confidences but rather to protect the integrity of the system. In enunciating the test to be applied, the court included as a precondition to the disqualification of counsel that "the present client's matter must either be the same as the matter the lawyer worked on for the former client or a 'substantially related matter'".

It is the defense's position that the matters on which he previously represented Othello Predeoux are not the "same" or "substantially related" to this case so that there is no conflict of interest established *ab initio*.    Counsel commenced representation of Predeoux in March of 1996 on charges of felony theft and conspiracy occurring in September of 1995. That case resulted in a guilty plea on April 18, 1996. Later, counsel represented Predeoux in an indictment charging carrying a concealed deadly weapon, possession of a deadly weapon by a person prohibited, possession of cocaine and other related offenses. The incidents giving rise to that case occurred on September 9, 1998, and a guilty plea was entered on December 14, 1998.

This defendant is charged with a homicide occurring on August 1st of 1998. Predeoux has never been charged with this offense nor has there ever been a suggestion made by the state that he was a suspect.  Predeoux never consulted counsel regarding his current charges nor did he ever discuss the events of August 1 with counsel. The revelation that Predeoux would be a witness in this case came as a complete surprise when it was revealed by the state on May 7.

Clearly, this is not the same matter as that on which counsel previously represented the witness.  Nor could it be said under any conceivable set of circumstances that this homicide prosecution is "substantially related" to the theft and firearms charges which were the subject matter of counsel's previous representation. *See, e.g., State v. Outten*, Del. Super., Cr. A. No. IN-92-01-1144, Herlihy, J. (Dec. 1, 1992) (Mem. Op.). Indeed, those two cases were resolved prior to the time at which the defendant was actually arrested.  Not only is the current prosecution not "substantially related to the prior representation but it is not related in any way, even insubstantially".  This situation does not even faintly resemble the cases for which this Rule was enacted and on which our Courts have previously ruled. *See, Webb, supra; In re Mekler*, Del. Supr., 689 A.2d 1171 (1996).

The cases cited by the state are of no assistance in deciding this issue in that they deal with factual situations which are widely disparate to that presently before the Court. This is not a case where defense counsel is simultaneously representing two co-defendants one of whom pleads guilty and becomes a government witness. *See, United States v. Edwards*, 39 F.Supp.2d 716 (1999). The case of *United States v. Alberti*, 470 F.2d 878 (2d.Cir. 1972) is actually supportive of the defendant's position. There, the attorney had represented an actual unindicted co-conspirator in

4

the same case who later testified in the trial. Counsel in that case addressed the issue prior to the commencement of the trial and the attorney even advised that he knew information that the witness had given to him as a client. The court ruled that it was incumbent upon the defendant to show actual prejudice resulting from a real conflict of interest and the court found no conflict of interest under the circumstances of that case. The court ultimately determined that there was no actual conflict of interest which prejudiced the defense of the case. In many ways, *Alberti* foreshadowed the United States Supreme Court decision recently handed down in *Mickens v. Taylor*, ___ U.S. ___ (2002) where the Court also required a showing of prejudice in a situation where there had been a potential conflict of interest not addressed by the trial court.

This is also not a situation where counsel is representing multiple defendants in the same trial so that cases dealing with those presumptively prejudicial situations are inapposite. *See, Lewis v. State*, Del. Supr., 757 A.2d 709 (2000). In summary then the state has not provided the Court with any precedent which would support disqualification of counsel under the circumstances of this case.

The state also in its memo raises the specter that counsel would use confidential information to the disadvantage of the former client as proscribed by Rule 1.9(b). The state ignores the last portion of the Rule which indicates that "when the information has become generally known" no ethical violation occurs by counsel utilizing said information.

When counsel becomes aware that a witness with a questionable background is going to testify for the state, it is counsel's common practice to search the Prothonotary's records for any and all information regarding that witness that could be utilized for impeachment purposes. Although counsel is personally familiar with Predeoux' prior cases based upon his own recollection that information is readily available to anyone with an interest and as such is part of the public domain. Any member of the public is free to review the Court's files regarding this individual. A review of the Court's file will indicate to the interested onlooker the charges which were placed against the witness, the factual bases of the charges as evidenced by the Affidavit of Probable Cause attached to the original complaint and the ultimate disposition of these charges as well.

There is nothing in counsel's memory above and beyond that which is readily available in the public record which can be used to impeach the witness. Contrary to the state's argument in their memorandum, there is nothing confidential about the fact that Mr. Predeoux has been convicted for theft nor that he possessed a handgun as a result of which he was convicted for possessing that handgun. There needn't be an "independent source" for impeachment material in that the information regarding Predeoux' prior criminal dealings is information that would have come to counsel's knowledge irrespective of his prior representation. In other words, there is nothing

5

about counsel's prior representation of the witness which provides him with any additional information or advantages that would not have been available from a perusal of the public record. Therefore, there would not be a conflict of interest under Rule 1.9(b).

Although it has been demonstrated that there is no conflict of interest present here given the verbiage of the Delaware Rules of Professional Conduct, even if there were continued representation of the defendant would not be problematic. *Cf. Mickens v. Taylor*, *supra.* ⌐Although not absolute, the choice of counsel exercised by a defendant is presumptively accepted by the court and actions in derogation of that election are viewed with disfavor. *See, Wheat v. U.S.*, 486 U.S. 153 (1988). *Wheat* recognized that the choice of counsel was not absolutely binding on the court where countervailing interests trumped the defendant's election. However, *Wheat* was also a case where counsel represented multiple defendants arising out of the same transactions as that with which the defendant was being prosecuted. As that court noted,

> "It is hardly novel to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *See also, Powell v. United States*, 287 U.S. 45 (1932).⌐

As indicated in the attached Affidavit, the defendant has been fully apprised of counsel's prior representation of Mr. Predeoux and has chosen to waive any conflict of interest that might otherwise have existed. Mr. Flowers has been fully advised of the circumstances and strongly wishes to continue with his current attorney of record. This choice should be respected.⌐*See, United v. Cunningham*, 672 F.2d 1064 (2d Cir. 1982)⌐ Indeed, Flowers "has retained [Maurer] as his counsel and the Court should respect that in its weighing process. Further, the Court [should be] mindful of the dangers of entertaining, thus, encouraging, motions to disqualify opposing counsel." *State v. Baker*, at *2.

Finally, there are multiple practical considerations which militate against the granting of the disqualification order under the present circumstances. This offense occurred on August 1, 1998, and although the defendant fled the jurisdiction resulting in some delay, the matter has been pending before the Court for a very considerable period of time.   The defendant was previously represented by court appointed counsel Thomas Pedersen who himself withdrew from the case based upon a perceived conflict of interest.   Present counsel entered his appearance for the defendant on October 1, 2001, and has been representing the defendant since that time.   The entry of counsel's appearance occurred only after the defendant's family incurred significant financial sacrifices to hire a private attorney for the defendant. Counsel has worked closely with the defendant since that time and has gained the

6

A-177.

defendant's confidence. This intangible aspect of the attorney/client privilege cannot be overemphasized in the context of a murder prosecution.

From a financial point of view, if counsel is disqualified from representation, the defendant's family will not be able to secure other private counsel to represent his interests. The family has basically dissipated savings and other sources of income in order to secure the services of present counsel. Given the amount of work that counsel has done on the case, counsel would not be in a position to provide the family with any type of substantial refund sufficient to secure the services of other competent defense counsel.

Further, counsel has expended countless hours in preparing this case for trial and has become intimately familiar with the state's case. Counsel has reviewed police reports, evidence detection reports and taped statements of eleven separate witnesses. Counsel has reviewed all discovery materials and filed numerous motions on the defendant's behalf. Counsel has also met with the defendant on several occasions and has utilized the services of a private investigator to interview several of the state's witnesses. All of these efforts will be wasted if new counsel is required.

If counsel is disqualified new counsel would have to be chosen from the pool of conflict attorneys at a time when those resources are severely overextended. Any new lawyer would have to replicate the efforts of present counsel, resulting in the application of scarce resources to a situation which does not warrant such application. Indeed, counsel has recently served on a Supreme Court committee addressing these issues and one of the areas looked at by the committee is a re-working of the conflict rules to eliminate conflicts of interest under the circumstances of this case.

The defendant is presently serving a sentence in connection with a prior conviction which sentence will soon expire. Mr. Flowers has been waiting for an inordinate length of time for this case to come to trial. If new counsel is appointed, further delay of up to three to four months will occur while the new attorney repeats all of the work that present counsel has undertaken. Although these practical considerations are not controlling insofar as the ethical issue is concerned, they should be considered by the Court in reaching its ultimate conclusion.

"Because disqualification of counsel during pending litigation is an extreme measure, courts must closely scrutinize the facts of each case to avoid injustice." *In re Cendant Corp. Securities Litigation*, 124 F.Supp.2d 235, 249 (D. N.J. 2000) (internal citations omitted). The defense would therefore submit that there is no conflict of interest under the circumstances of this case and as envisioned by Rule 1.9 of the Professional Conduct Rules. In deciding this issue, it is respectfully submitted that the Court should consider the commentary to the Rule which was quoted above and which does not create an automatic rule of disqualification where an attorney previously represented a witness who is prepared to testify against a current client.

7

Γ The defendant's rights under the Sixth Amendment to the United States Constitution and Article 1, Section 7 of the Delaware Constitution are paramount to the ephemeral interests of the state in seeking disqualification of counsel in this case. ⌐

For all of the foregoing reasons, the defendant requests that the State's Motion to Disqualify be denied.

Respectfully yours,

Eugene J. Maurer, Jr.

EJM:br

xc.    James Rambo, Esq.
       Cynthia Kelsey, Esq.
       Damone Flowers

8

A-179.

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) |
| v. | )    ID #9808000280 |
| | ) |
| DAMONE E. FLOWERS, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S PROPOSED VOIR DIRE QUESTIONS

The defendant in this case is charged with murder in the first degree and possession of a firearm during the commission of a felony. It is alleged that on August 1, 1998, the defendant did intentionally cause the death of Alfred C. Smiley by shooting him with a handgun.

1. Would the nature of these allegations make it difficult for you to be impartial in deciding the innocence or guilt of the defendant?

2. Have you or any member of your family or close friends been the victim of a crime of violence?

3. In this case there will be introduced into evidence photographs showing the body of the deceased victim. These photographs may be somewhat difficult to view. Would the viewing of the photographs under these circumstances make it difficult for you to serve as a juror in this case?

4. The defendant in a criminal case has the right not to testify. If the defendant were to exercise that right and elect not to testify in this case, would that fact make it more likely that you would believe that he was guilty of the commission of these crimes?

5. Do any of you have such strong feelings against firearms that you would be unable to be fair and impartial in judging the innocence or guilt of the defendant?

EUGENE J. MAURER, JR.
1201-A King Street
Wilmington, DE  19801
Attorney for Defendant

DATED:      October 22, 2002

49

1    A. No.
2    Q. And, specifically, did you say to them, Get
3    the F out of the way?
4    A. No.
5    Q. Did the person in the rear of the car say,
6    Get the F out of the way?
7    A. No.
8    Q. Did Mr. Smiley say, Get the F out of the way?
9    A. No.
10   Q. Did any of the three individuals inside the
11   car make any statements of an inflammatory nature to
12   the individuals that were outside of the car or in the
13   street?
14   A. No.
15   Q. So your testimony is that you deny anybody
16   inside the car saying anything to anybody outside of
17   the car?
18   A. Yes.
19   Q. And you're positive about that?
20   A. Like I side before, I signaled. I didn't say
21   anything to anybody.
22   Q. I'm just talking about you at this point in
23   time. I understand what you're saying. My question

50

1    also had to do with comments from anybody else inside
2    the car to the people outside. Did you hear either --
3    A. No.
4    Q. Let me finish. -- Mr. Smiley or the
5    passenger in the back seat make any comment to the
6    people outside of the car?
7    A. No.
8    Q. And, specifically, did you hear either of
9    those two say to the people outside of the car, Get
10   the F out of the way?
11   A. No.
12   Q. That was not said? And your indication again
13   was that the music was quite loud?
14   A. Yes.
15   Q. The windows were open in the car?
16   A. Yes.
17   Q. I heard your testimony directly on direct
18   examination, you apparently heard two or three shots
19   yourself?
20   A. Yes.
21   Q. Or what you now know to be shots?
22   A. Yes.
23   Q. You didn't know they were shots on the night

51

1    this occurred?
2    A. No.
3    Q. Okay. And in your testimony today -- you're
4    indicating you're not sure of the direction from which
5    the shots were fired?
6    A. I'm not sure.
7    Q. Okay. When you spoke to the Detectives on
8    August 1st or 2nd of 1998, did you have an idea that
9    the shooting might have been coming from either side
10   or both sides at once?
11   A. Well, when I first heard them they sounded
12   like they were coming from the right side. I heard --
13   they were -- the sound was strong on the right side,
14   but I really don't know.
15   Q. My question was: When you spoke to
16   Detectives back in August of 1998, did you indicate to
17   them that you thought the shooting was coming from
18   both sides of the car?
19   A. Both sides?
20   Q. Yeah.
21   A. I really don't remember.
22   Q. Could you have told them that?
23   A. I don't remember.

52

1    Q. I'm sorry?
2    A. I don't remember.
3    Q. I'm not asking if you remember or not, is
4    that something you could have told them?
5    A. Possibly.
6    Q. How about statements from people on -- first
7    of all, let me go back before I ask the next question.
8    What type of car were you guys driving in?
9    A. A gray Honda Accord.
10   Q. Was it automatic or stick shift?
11   A. Automatic.
12   Q. So in order for the engine to be revved, one
13   would have to have taken the car and put it in drive
14   and placed it into neutral and jammed the foot on the
15   gas pedal, right?
16   A. I don't know. I don't have a driver's
17   license.
18   Q. You're sitting in the front of the car,
19   right?
20   A. Yeah.
21   Q. How old are you?
22   A. 27.
23   Q. Do you know how to drive a car?

13

1  haven't yet reach a point where we can get into
2  people's minds and find out exactly what's going on
3  there Three Dimensionally and that likely will not
4  happen for a while. So I don't want you to expect
5  that the State is going to be able to prove that there
6  is some logical motive in this case because we're
7  never going to get there.
8      The murder weapon as I indicated and the
9  fingerprint evidence indicated is negliable. There
10  were also mistakes made in the investigation. And,
11  specifically, I think in one instance Detective Brock
12  transposed witness statements and thought that another
13  person had made it and put it in his report that way.
14  But there are videotapes of these various statements.
15  And simply looking at that videotape you can tell that
16  that didn't really occur. And you will likely have an
17  opportunity to do that in this trial.
18      The big picture in this case is
19  identification. And there is a lot of identification
20  of Damone Flowers as the shooter that night. And
21  you're going to hear all about that identification.
22      There's a Latin expression, Veredictu, which
23  means speak the truth; that's where we get the word

14

1  verdict from.
2      The State is going to ask you to listen very
3  carefully to all of the evidence in this case and then
4  render a verdict in accordance to that truth as we see
5  that verdict in accordance with the truth to this case
6  will be guilty as to Murder in the First Degree and
7  guilty as to Possession of a Firearm During the
8  Commission of a Felony.
9      We thank you, all of us, in advance for your
10  attention in this case.
11      THE COURT: Mr. Maurer.
12      MR. MAURER: Thank you. May it please the
13  court.
14      Good afternoon, ladies and gentlemen of the
15  jury. I've already been introduced by Mr. Rambo. My
16  name is Gene Maurer, and I am a lawyer -- actually,
17  can I move this, Your Honor? I'm afraid I'm going to
18  trip over it.
19      THE COURT: Yes, you may.
20      MR. MAURER: -- who represents Mr. Flowers,
21  who also has been introduced to you -- excuse me, by
22  the prosecutor. And what both the prosecutor and
23  myself are permitted by law at that point in time is

15

1  to give you guys what are called opening statements.
2      In looking at the jury materials that were
3  given beforehand in selecting the jury, there's not
4  very much on there. There are no hidden deep dark
5  secrets, just some very basic information.
6      One of the pieces of information is whether
7  or not you have sat on juries before, and I see that
8  with regards to most of you that is you haven't. A
9  couple have, but most of you have not. So this may be
10  your initial experience with the criminal justice
11  system. And as it turns out, your initial experience
12  with the criminal justice system that will deal with
13  the most serious criminal charge that can be placed
14  against a human being in our system, which is Murder
15  in the First Degree. And of course a companion
16  charge of Possession of a Firearm During the
17  Commission of a Felony.
18      And the Court has told you a couple of things
19  about the case, generally. And I'd like to reiterate
20  them a little bit to talk about a couple of principles
21  before I start talking about what we expect or what
22  is expected that the evidence in this case will be.
23      In a criminal trial, whether it is spitting

16

1  on the sidewalk, jaywalking, rape, robbery or the most
2  serious of all, Murder in the First Degree, there are
3  two basic principles that the jury is told by the
4  Court to keep in mind as the jury is considering the
5  evidence presented from the witness stand, which will
6  come in the form of witness testimony: The form of
7  photographs, which you will see today; some exhibits,
8  which you will see and perhaps even some taped
9  interviews that you'll see that were taken during the
10  course of investigation.
11      But the Court will tell you that there are
12  two basic principles that you will keep in mind in any
13  criminal case that, first of all, Damone Flower, he's
14  presumed innocent. He is charged with a crime and it
15  is your duty at the time to presume that he is
16  innocent.
17      The second principle that you have to keep in
18  mind, which is the same principle as that on the flip
19  side of it is that, because this is a criminal trial
20  the State bares and you've heard this no doubt on
21  juries it is every bit as important as it was in early
22  in age it is every bit as important as it was in early
23  days in ages before things got so complicated in

93

1    A. It has been four years, so I can't be exact
2  to it.
3    Q. You can look at your report?
4    A. I don't have an exact listing of how many
5  bullet holes and where they exactly where on the
6  report. I just have overall general photos of the
7  windshield and the front of the vehicle.
8    Q. All right. Do you need to look at them?
9    A. The pictures?
10    Q. The photographs to help you?
11    A. It would probably help.
12    Q. The first question I would have is how many
13  bullet holes were there in the windshield of the car,
14  if you can deduce that from what you see?
15    A. It would appear to me to be -- well, I see
16  three to the windshield; that's just from my viewing
17  this. And I also see the hole in the left front
18  quarter panel of the vehicle; however, from
19  recollection I don't know if that could be -- some how
20  the car revved up and hit, so as of now I see four
21  holes. Three being in the windshield and one being in
22  the left quarter panel.
23    MR. MAURER: May I come around?

94

1    THE COURT: Yes, you may.
2  BY MR. MAURER:
3    Q. If I might, and it is for the juries
4  identification not mine, we're looking now at the
5  windshield of the vehicle on the passenger's side or
6  the driver's side?
7    THE COURT: What photo are we looking at?
8    MR. MAURER: Exhibit No. 9.
9  BY MR. MAURER:
10    Q. Are we looking at the passenger's side or the
11  driver's side?
12    A. Well, it actual appears to be more into the
13  center and to the driver side.
14    Q. Center and to the driver side. Were there
15  any efforts made to determine the angle at which the
16  bullets entered the windshield of the car?
17    A. I'm not sure if that was done or not.
18    Q. Were there any efforts made to determine the
19  trajectory from which -- that's almost the same as the
20  angie I guess -- from which the bullets entered into
21  the car to make a determination as to, for example,
22  the height of the person shooting or whether the
23  bullets were being shot up or down. Was there any

95

1  work by your people?
2    A. I don't think anybody is proficient in that.
3    I think it would be speculation. They might have shot
4  from down here or up here, so, again, it would be
5  probably a guess.
6    Q. Well, I'm certainly not asking you or anybody
7  to guess. But I guess my question is: Was there any
8  further examination opportunity of those bullet holes
9  to get any further information from them?
10    A. Not that I'm aware of.
11    Q. So we have three bullet holes one the side of
12  the car, a ricochet from the Street or whatever --
13    A. Or you know if it hit and hit something and
14  went up, I don't know for sure.
15    Q. Okay. When you arrived at the scene was the
16  passenger window of the car open or closed?
17    A. I'm not positive.
18    Q. Would your report or the photographs --
19    A. The photographs might indicate it.
20    Q. Do you still have them right there?
21    A. Yes, I do. It appears that it is down
22  approximately one or two inches, actually, from this
23  photo --

96

1    Q. If I might approach you?
2    A. -- as I can tell.
3    MR. MAURER: All right. For the record, Your
4  Honor, we're looking at State's Exhibit No. 19 at this
5  point. We're looking at the Honda -- actually, I
6  think, Officer, either I communicate to you the wrong
7  car or you're looking at the wrong car. I'm talking
8  about the car up by -- the victims vehicle, yeah,
9  please.
10    THE WITNESS: I'm sorry.
11  BY MR. MAURER:
12    Q. This one might help you, it looks like its
13  down?
14    A. Yes, it does appear to be down all the way.
15    Q. Is that the way the car appeared when you
16  arrived there?
17    THE COURT: Which photo is that?
18    MR. MAURER: Exhibit No. 9, Your Honor.
19    THE COURT: Thank you.
20  BY MR. MAURER:
21    Q. So it would appear then, assuming that's
22  consistent with the way it was then, when you first
23  arrived that the window was in fact down; is that

105

1    them.
2        THE COURT: Do you want to do it now?
3        MS. KELSEY: It should be five minutes, ten
4    minutes.
5        MR. RAMBO: In the meantime I'll keep my eye
6    out for Ms. McDougall. I'll check that now if I may.
7        MR. MAURER: Your Honor, what time are we
8    starting tomorrow? I thought you said you had
9    motions.
10       THE COURT: I just have one.
11       MR. MAURER: All right.
12       MS. KELSEY: We're done, I apologize to the
13   Court again. Ronetta Sudler is down in lock up.
14       THE COURT: Would you bring in the jury,
15   please.
16       THE BAILIFF: Yes, Your Honor.
17       (The jury enters the room at 2:30 p.m.)
18       THE COURT: Good afternoon, members of the
19   jury, we apologize for the late start. It is through
20   no fault of the Court.
21       Are we ready to proceed?
22       MR. RAMBO: Yes, Your Honor.
23       MS. KELSEY: Yes, Your Honor.

106

1        THE COURT: Members of the jury, I'm going to
2    have to take another recess, I apologize.
3        (The jury left the room at 235 p.m.)
4        THE COURT: I have just been informed by the
5    bailiff that the next witness is refusing to come out.
6    She is indicated that she has no idea what she's being
7    called for. I don't know whether the prosecution
8    wants to speak to her.
9        MS. KELSEY: Yes.
10       MR. MAURER: Does she have counsel, Your
11   Honor?
12       THE COURT: Not that I'm aware of.
13       MS. KELSEY: She's --
14       THE COURT: Is there a possibility that she
15   needs counsel?
16       MR. MAURER: If she's going to refuse to
17   testify, I think she needs to be advised of what her
18   options are.
19       THE COURT: Court stands in recess.
20       (A short recess was taken.)
21       MS. KELSEY: Your Honor, I did attempt to
22   speak with Ms. Sudler, she indicated that she
23   remembered talking to Detective Brock back when this

107

1    happened. She remembered talking with Detective Brock
2    and Mr. Rambo and I back in May, but she says she's
3    forgotten everything now. I tried to explain -- I
4    started to explain to her --
5        THE COURT: When is the last time you spoke
6    with her.
7        MS. KELSEY: May.
8        THE COURT: May of this year?
9        MS. KELSEY: Yes. I spoke -- I started to
10   explain to her that she had a constitutional right not
11   to incriminate herself, but she didn't have a
12   constitutional right not to talk about what somebody
13   else did. I had already told her that you were
14   calling for a lawyer for her and she said she didn't
15   want to talk to me any more until the lawyer got
16   there. So here I am, I'm not talking to her.
17       THE COURT: Well, the lawyer is on his way.
18       MS. KELSEY: Okay.
19       THE COURT: Brandon O'Neill has agreed to
20   talk to her.
21       MS. KELSEY: Thank you, Your Honor. We
22   have --
23       MR. RAMBO: In as much as that was supposed

108

1    to take up the afternoon, Ronetta Sudler, I think we
2    can be productive. I hate to put it this way, but if
3    we recess the day I think we can be much more
4    productive and be done by the end of the day Friday.
5    The reason I say that is because there is another
6    videotape that we want to get to Mr. Maurer today so
7    that he can review it in advance of that witnesses
8    testimony tomorrow and that witness is expected to
9    testify tomorrow and let us know whether there's
10   anything objection in that tape.
11       If he reviews that tape, he's brought to our
12   attention a minor matter of the tape of Ms. McDougall
13   and that's quite reasonable, and we would like to be
14   able to do that as well. So I think if we're able to
15   recess this afternoon and get back tomorrow morning
16   and get through the evidence in two days otherwise --
17       THE COURT: Actually, I would like to take
18   care of this matter this afternoon. If we can get her
19   to testify today and not put off until tomorrow to get
20   something done, if it can be accomplished today.
21       So if that means not playing all the tape and
22   bringing her back, at least, I would like to have this
23   matter resolved before I recess.

129

1    A. Some times, depending on how much you had.
2   How much I was drinking or how much I was smoking.  At
3   this particular night I think it was a lot of people
4   so you know the anxiety of a lot of people and
5   everybody is just partying, everybody passing this and
6   passing that, you just be getting intoxicated.  I
7   don't know how much I had.
8    Q. Would it be your belief that at this point in
9   time that you would have had a significant amount of
10  marijuana and/or alcohol that night?
11   A. Oh, yeah.
12   Q. And did you have enough that you think it
13  would seriously effect your ability to observe things?
14   A. Yeah, yes.
15   Q. Let me jump forward, if I could, to the day
16  on which the statement that you gave to Detective
17  Brock was, which I think you probably don't know the
18  specific date, but I think it is August 11th of 1998.
19  You remember that you gave a statement either before
20  or after Shawn McNeill gave the statement, correct?
21   A. I'm not sure.
22   Q. And did you want to go down to the police
23  station to give a statement?

130

1    A. Of course not.
2    Q. Did you go in their voluntarily?
3    A. Basically.
4    Q. In other words, my question is:  Did you walk
5   into the police station and give this statement after
6   somebody called you or did a police officer come and
7   pick you up?
8    A. No.
9    Q. No what?
10   A. I'm telling you I don't know if it was me or
11  my husband went first, but it was an incident that I
12  pulled up in front of my cousin's house, I don't know
13  if he followed me home or he was parked there waiting
14  for me to get there or what, and they just jumped out
15  and tapped on the car window and said, Get out you all
16  need to go with us.
17   Q. Were you given an option to go or not to go?
18  Did they say, Would you please come down and talk to
19  us?  Or did they say, You're coming with us to give a
20  statement?
21   A. I don't remember.
22   Q. But your testimony previously was that you
23  did not want to go down to the police station to give

131

1   a statement; is that right?
2    A. Of course not if I don't know anything.
3    Q. I'm sorry?
4    A. If I didn't know anything what am I going to
5   make a statement about.
6    Q. Now, do you remember what happened when you
7   were taken down to the police and when you were
8   questioned by Detective Brock?
9    A. No.
10   Q. Okay.  Do you remember that for a period of
11  approximately an hour and 13 minutes you gave him one
12  version of events and then after that point in time
13  you then gave him a second version of events.  Do you
14  remember that?
15   A. I don't know.  I probably was saying anything
16  to get up out there.
17   Q. I'm sorry.
18   A. I probably was saying anything to get out of
19  there.
20   Q. All right.  Do you remember that you
21  initially told him that you were not even there and
22  that you were home with Shawn, and that you didn't see
23  anything happen.  Do you remember that?

132

1    A. I don't remember.
2    Q. All right.  And if you don't remember that,
3   then I guess you don't remember thereafter you gave a
4   statement to the effect that Damone was there and that
5   you saw him fire shots.  You don't remember that
6   either?
7    A. No.
8    Q. All right.  How about the day you were taken
9   into talk to the police were you were smoking or
10  drinking alcohol then or you don't remember?
11   A. I probably smoked some weed earlier that day.
12   Q. As you were being questioned by this officer
13  Brock, you've already indicated that you did not want
14  to be there and you did not wish to make a statement,
15  correct?  Is that correct?
16   A. Yeah.
17   Q. Were there certain threats made by him to you
18  regarding what would happen to you if you didn't tell
19  him or answer the questions as he put them to you?
20   A. I don't remember.
21   Q. All right.  Specifically, where you on
22  probation at that time?
23   A. I don't know.

State v. Damone Flowers

117

1    place which are out of control of any of the parties
2    or the Court.
3         We had such delay today in criminal trials,
4    such delays are more common than civil trials. We
5    apologize for the delay but it was of no fault of the
6    Court or the parties.
7         RONETTA SUDLER, having been called on the
8    part and behalf of the State as a witness, being first
9    duly sworn under oath, testified as follows:
10        DIRECT EXAMINATION
11   BY MS. KELSEY:
12   Q. Ms. Sudler, how old are you?
13   A. 23.
14   Q. Okay. Where are you staying these days?
15   A. I'm at the Work Release in Georgetown.
16   Q. And how long have you been there?
17   A. Forty days now.
18   Q. How did you get to the Court house today?
19   A. They transported me here.
20   Q. Did you -- do you remember back in 1998 when
21   a young man got shot on 22nd Street?
22   A. Actually, I don't remember no details or
23   anything like that.

118

1    Q. Okay. But you do remember that somebody got
2    shot on 22nd Street?
3    A. Yeah. Yeah.
4    Q. And do you remember the man who got shot's
5    name?
6    A. No, I never did.
7    Q. You don't remember his name?
8    A. No.
9    Q. Do you remember that you knew him?
10   A. No, I didn't know him.
11   Q. And do you remember who the Detective was who
12   investigated that shooting?
13   A. Detective Brock.
14   Q. Okay. Is Detective Brock in the courtroom
15   today?
16   A. Yes.
17   Q. And did you talk to Detective Brock about
18   that shooting?
19   A. Yes.
20   Q. Okay. How did you come to talk to Detective
21   Brock?
22   A. I don't know. He came and got me to go down
23   to the police station.

119

1    Q. Okay. Did you know he was looking for you?
2    A. No.
3    Q. Okay. Did you go down to the police station
4    yourself or did he come and get you?
5    A. Came and got me.
6    Q. Where did he get you, do you remember?
7    A. I was staying with a cousin of mine at the
8    time and I think -- I don't know if he was following
9    me or I pulled up in front of the house or something,
10   it was -- I really can't remember, but he -- actually,
11   I don't know if he was him or two other Detectives to
12   be honest with you, I can't remember. But I had my
13   baby and he grabbed me and my husband and told me that
14   we had to go down to the place. But I guess since we
15   had the baby, one of us didn't have to go. They came
16   and took my husband first, I think he went first, I'm
17   not sure.
18   Q. So your husband went down to the police
19   station that day when they stopped you?
20   A. Yeah.
21   Q. And what was your husband's name?
22   A. Shawn McNeill.
23   Q. Okay. And how old was your baby?

120

1    A. I don't remember.
2    Q. You don't remember?
3    A. Nah.
4    Q. And you didn't go down that day?
5    A. No.
6    Q. Did you go down yourself some other day or
7    did you -- they come and get you some other day?
8    A. I don't remember. I don't even remember if I
9    went first or what, to be honest with you, I really
10   don't.
11   Q. You say, "I don't remember," you don't
12   remember how you got to the police station?
13   A. No.
14   Q. But you do know that you went to the police
15   station?
16   A. Yeah.
17   Q. And --
18   A. And I was in the car with him and another
19   Detective, but I'm not sure if it was the first time
20   or did they come back and get me another day or what.
21   I'm not sure.
22   Q. Okay. When you got to the police station,
23   what happened?

133

1  Q. Pardon me?
2  A. I don't remember.
3  Q. All right. Do you remember whether or not he
4  said to you, That you are on probation and we could be
5  in a position to help each other out, you know what
6  I'm saying. Do you remember him saying that to you?
7  A. I don't remember.
8  Q. Do you remember him threatening you and
9  telling you that you would go to jail or could go to
10 jail if you didn't tell him -- I'm not going to say
11 what he wanted to hear, but if you didn't give the
12 statement differently than what you were initially
13 telling him?
14 A. I don't remember.
15 Q. Do you remember him telling you that he could
16 charge you with hindering prosecution and that you
17 could go to jail?
18 A. I don't remember.
19 Q. You remember him threatening you? You have
20 children, don't you?
21 A. Yes.
22 Q. How many children do you have?
23 A. Three.

135

1  after you began to change your story a little bit in
2  terms of what was being questioned of you at that
3  time, do you remember the police officer promising you
4  that you would not have to testify in court?
5  A. No, I don't remember that, but he did mention
6  that to me a couple of months ago again.
7  Q. He did?
8  A. Yes. He said that he's sorry but he told me
9  that he promised me that I wouldn't have to testify in
10 court, but he had to lie for his job or something. I
11 don't know, it was some stuff in which I was making
12 the statement to him. Again, I don't remember any of
13 the stuff that happened so long ago.
14     MR. MAURER: That's all I have at this point,
15 Your Honor.
16     THE COURT: Ms. Kelsey?
17     MS. KELSEY: I don't have any additional --
18 yes, I do.
19 BY MS. KELSEY:
20 Q. Ms. Sudler, did -- when they -- you don't
21 remember how you got to the police station?
22 A. I was in a car with them, but I don't know
23 who actually went first.

134

1  Q. Do you remember him threatening to take your
2  children away?
3  A. I don't know.
4  Q. After you started to change your story in a
5  manner that was more satisfactory, do you remember
6  whether or not he made any promises to you as to
7  whether or not you would have to testify?
8  A. You know what, when I had -- let me see, like
9  a couple of months ago, I don't remember the month or
10 whatever, it was a couple months ago, probably like
11 four to six months ago, I was down at boot camp and
12 they had called me up for court, but then it was
13 Detective Brock and I guess that's the DA lady and
14 another guy, and they had called me in a room and so
15 they were telling me that I know this and I know that.
16 Back to what you were saying, they was telling me
17 that -- what was that that you just said?
18 Q. Well, I wasn't talking about any meeting you
19 had with them four or five months ago, I'm talking
20 only about what happened on August 11th of 1998, the
21 statement -- focus with me on that if you can?
22 A. Okay.
23 Q. I guess the other question that I had was

136

1  Q. Okay. Were you handcuffed?
2  A. No.
3  Q. Were -- where did you sit in the car? I
4  mean, did you say, I don't want to come and they said,
5  Yes, you have to come?
6  A. I don't remember.
7      MS. KELSEY: Thank you, I have no further
8  questions.
9      MR. MAURER: Your Honor, I have no additional
10 questions. But on the issue of voluntariness, I would
11 like to submit the tape to Your Honor for Your Honor's
12 viewing. Now that this issue has presented itself, it
13 is about an hour and 15 minutes long -- well, the
14 whole thing is about an hour and 35 minutes long, but
15 the crucial part that will bear out some of the things
16 I questioned her about, about the threats and promises
17 being made to her, will be seen on the tape. And I
18 submit they go to the issue of voluntariness of
19 whether the tape is admissible in the first place.
20     THE COURT: Very well. So I presume we'll
21 recess for the day for me to do that.
22     MR. MAURER: I would hope that you would have
23 a chance to do that, which you can't do if you're in

101

1  you, do you know who W-2 is supposed to be?
2      A. No.
3      Q. What would that W-2 be in the location of
4  where your home was?
5      A. Right.
6      Q. Is that 31st or 22nd Street?
7      A. Yes.
8      Q. Is that where you used to live?
9      A. Yes.
10     Q. Now, as I view it, the police officer put a
11  W-2 down, whether that's you or your cousin I'm not
12  sure who you were indicating to the police officer,
13  but this is the location where you were, correct?
14     A. Right.
15     Q. And you were looking down the street towards
16  where the shooter was, correct?
17     A. Right.
18     Q. Now, one of the things that I noticed that is
19  missing from the diaphragm is a depiction of any other
20  individuals who were on the north side of the street,
21  on the same side as you and the shooter, correct?
22     A. Correct.
23     Q. All right. Was there anybody on that north

102

1  side of the street at the time that the shots were
2  fired between you and the person who shot the gun?
3      A. Yes, there was a crowd of people down
4  underneath of him where the shots were being fired
5  from.
6      Q. What do you mean "underneath of him"?
7      A. Like down the street at the other end of the
8  corner.
9      Q. So to be sure, that would be down closer to
10  Lamotte Street, correct?
11     A. Yes.
12     Q. But in terms of in between you and the person
13  who was firing the shots, there were no other people;
14  is that correct?
15     A. I didn't pay attention to that, I didn't -- I
16  just hurried and went back into the house.
17     Q. So you sort of were not paying attention?
18        You have to answer.
19     A. No.
20     Q. So your best recollection today based on the
21  fact that you weren't paying a whole lot of attention
22  to that is that you don't recall there being anybody
23  on the north side of the street between you and the

103

1  person who fired the shots, correct?
2      A. Right.
3      Q. And you've already told us that you don't
4  know a person by the name of Vernon Mays, correct?
5      A. Right.
6      Q. Did you talk to anybody outside of your house
7  that night before the shots were fired?
8      A. No.
9      Q. Besides your cousin?
10     A. No.
11     Q. Okay. Were you the only person that was on
12  this portion of the sidewalk that night who worked at
13  the Quality Sub Shop?
14     A. Yes.
15     Q. And it is your sworn testimony today that you
16  did not stop and talk to a person by the name of
17  Vernon Mays in front of your house that night?
18     A. No.
19     Q. No you did not. Now, the other thing that --
20  well, before I get to that. Would you agree with me
21  that at least from your ability to perceive thing that
22  the closer a person is to you, the better able -- the
23  better you are able to give a description of them or

104

1  identify them. Do you agree with that?
2      A. Yes.
3      Q. So it is easier for you to describe me and
4  identify me when I'm standing close to you, correct?
5      A. Yes, right now.
6      Q. Would you also agree with me that the further
7  I move away from you, the more difficult it becomes to
8  give a description of a person?
9      A. Yes, right now.
10     Q. Pardon me?
11     A. Right now because I wear glasses now.
12     Q. You do?
13     A. Yes.
14     Q. And when did you start wearing glasses?
15     A. That year in January.
16     Q. Do you have them with you?
17     A. No.
18     Q. What do you need your glasses for?
19     A. I need them for farsighted.
20     Q. For farsighted?
21     A. Yeah.
22     Q. So in other words what you're saying is that
23  at least since you've got to glasses or since you've

25

1   the street, once again where, according to your
2   statement, you and your friends were diving between
3   cars, do you see that?
4       A. Yes.
5       Q. And would you agree with me that there
6   doesn't appear to be a car anywhere in site on that
7   side of the street until you get half way up the
8   block?
9       A. Yes.
10      Q. So that the only cars -- if anybody was
11  diving behind cars, the only cars people could have
12  been diving behind are way up the street where the
13  shooting occurred; isn't that right?
14      A. Yes.
15      MR. MAURER: That photograph, I think I
16  identified that as State's Exhibit No. 6. Can I ask
17  that the monitor be taken back to where its resting
18  place is?
19  BY MR. MAURER:
20      Q. And just to complete the -- to complete the
21  scene, I'm not sure I used this, but I'm going to show
22  you State's Exhibit No. 12, which shows a black car
23  with circles on the pavement indicating where some

27

1       A. Yes.
2       Q. After that, did you receive a visit from a
3   couple of people?
4       A. Yes.
5       Q. Is one of the people you received a visit
6   from Detective Brock?
7       A. Yes.
8       Q. And another person, Prosecutor Kelsey, they
9   came back into lock up there?
10      A. Yes.
11      Q. To talk to you?
12      A. Yes.
13      Q. Did they tell you you had to testify?
14      A. No, not --basically I didn't talk. I asked
15  for a lawyer.
16      Q. Okay. I want to talk to you a little bit
17  about in terms of your reliability a little bit about
18  your drug history, okay?
19      A. Okay.
20      Q. You've been a drug user -- how old are you
21  now?
22      A. I'm 23.
23      MS. KELSEY: Excuse me, Your Honor, can we

26

1   shells were picked up, that you don't have to worry
2   about, it also is a full frontal picture of the other
3   side of the street on 22nd Street, have you seen that
4   photo, this is State's Exhibit No. 12, do you see
5   that?
6       A. Yes.
7       Q. And this would cover, would it not, the
8   territory between Lamotte Street proceeding west on
9   Market Street again on 22nd, right?
10      A. Yes.
11      Q. Would you agree with me that there is not one
12  motor vehicle on the opposite side of the street?
13      A. Yes.
14      Q. So people could not be diving behind cars
15  that were not there, could they?
16      A. No.
17      Q. Now, the prosecutor asked you, Ms. Sudler, if
18  you wanted to be here today and you indicated that you
19  did not. And you also indicated that you did not want
20  to be here yesterday as well, correct?
21      A. Yes.
22      Q. And you had initially indicated this refusal
23  to come into court and testify?

28

1   approach the bench.
2       (A side-bar was reported.)
3       MS. KELSEY: We've provided Mr. Maurer with
4   her record for purposes of -- I think, he can ask her
5   about treatments involving drugs; however, he can't
6   ask her questions about drug history. And this
7   particularly point in time -- but I don't think he can
8   produce into evidence her entire drug history and
9   record just to show that she's a bad person any more
10  than the State can do it.
11      MR. MAURER: I'm not offering into this to
12  show she's a bad person. I'm offering the extend of
13  her drug usage over the years to show that it makes
14  her less reliable and her observation less reliable
15  when she's influenced, number one. Number two, the
16  State brought out the statements that was introduced
17  into evidence about the fact that the she was on
18  probation at the time. I'm certainly entitled to
19  inquire into her conviction in trafficking cocaine,
20  which occurred in 2000, I believe.
21      I have a different matter on an evidentiary
22  basis. I want to talk about this history of using
23  drugs over the years and the fact that using drugs,

173

1    MR. MAURER: None.
2    MR. RAMBO: None.
3        THE COURT: You are excused. Have a good
4    weekend.
5        THE WITNESS: Thank you.
6        MR. RAMBO: One final very brief witness
7    today from the State, Your Honor, and we can discuss
8    scheduling thereafter if it would please the Court.
9        THE COURT: Very well.
10       MR. RAMBO: The State calls Adrienne Dawson.
11       ADRIENNE DAWSON, having been called on the
12   part and behalf of the State as a witness, being first
13   duly sworn under oath, testified as follows:
14           DIRECT EXAMINATION
15   BY MR. RAMBO:
16   Q. Good afternoon, Ms. Dawson.
17   A. Hello.
18   Q. You are the defendant's sister, correct?
19   A. Yes.
20   Q. Prior to August the 1st of 1998, where did he
21   live?
22   A. With me.
23   Q. Okay. And where was that exactly?

174

1    A. 217 Scarbrook Park Drive.
2    Q. Can you tell us where Scarbrook Park is in
3    terms of the city of Wilmington, State of Delaware?
4    A. It is on the outskirts -- on the out skirts
5    of Wilmington.
6    Q. Is it on the north side or the west side, if
7    you know?
8    A. I don't know where we're considered at.
9    Q. Is it anywhere near the Elsemere Bridge?
10   A. It is right around the corner of that by the
11   skating rink.
12   Q. Okay. Now, you say that your brother lived
13   with you before August 1st of 1998. How long had he
14   lived with you before then?
15   A. Well, he was in --
16       MR. MAURER: Excuse you say me -- could the
17   witness be responsive to the question.
18       THE COURT: Please don't answer any question
19   other than what is asked, don't make any voluntarily
20   statements.
21       MR. MAURER: Can I have a moment to speak
22   with counsel?
23       THE COURT: Yes.

175

1    BY MR. RAMBO:
2        Q. While in your house, how long did he live
3    with you all together?
4    A. Oh, it was off and on for years.
5    Q. Off and on, okay. There's a period of time
6    before August 1st that he lived in your house and I
7    just wanted to know how long that period was that he
8    lived in your house, just tell us that if you will
9    please?
10   A. When he came home from -- I don't remember
11   when that was -- I don't remember the date, when he
12   came home from jail.
13       MR. MAURER: Objection.
14       MR. RAMBO: Please ask her just --
15       THE WITNESS: I'm not understanding the
16   question.
17       MR. MAURER: Maybe we should get through this
18   witness and go from there.
19   BY MR. RAMBO:
20   Q. Let me put it this way, did you see him after
21   August 1st 1998 in your home?
22   A. No.
23   Q. Okay. Did you see him for six months at your

176

1    home? Did he come back within six months of August
2    1st?
3    A. No.
4    Q. Did he come back within a year?
5    A. No.
6    Q. He never came back and lived with you, did
7    he?
8    A. No.
9        MR. RAMBO: Thank you.
10       MR. RAMBO: Thank you no questions.
11       MR. MAURER: No questions.
12       THE COURT: Very well you may step down.
13       THE COURT: That concludes the testimony for
14   today. Counsel approach -- hold on counsel approach
15   please.
16   .    (A sidebar was reported.)
17       THE COURT: Were you going to make an
18   application?
19       MR. MAURER: Yes. Let me just set the
20   scenario. I'm not necessarily blaming the State for
21   this, but it became clear to me when Mr. Rambo said
22   apparently the purpose of calling this witness was to
23   show that the defendant lived with her before and

177

1 never lived with her after August 1st, or to show that

2 he took off, which I would say points out as a fact

3 that is not any dispute.

4 The State chose to establish that through

5 calling the defendant's sister. As she started to

6 answer the question I interrupted and I talked to Mr.

7 Rambo and I said to him, She was about to say, you

8 know, after he got out of jail he lived with me. I

9 have no objection if you lead her on this point.

10 He didn't lead her. He went back and he

11 asked the question and it came out. Now the jury

12 knows that the defendant has a prior criminal record.

13 I'm going to have to move for a mistrial.

14 MR. RAMBO: The jury is well aware of the

15 fact that the defendant was in jail because of

16 Predeaux, because they were on the same pod together.

17 That information has already been in front of the

18 jury. I didn't lead her, I didn't --

19 THE COURT: The statement was prior. The

20 statement -- the question was: Prior to August 1998,

21 all of what Mr. Predeaux could have been since his

22 arrest.

23 MR. RAMBO: I asked her a specific question.

179

1 (A sidebar ended.)

2 THE COURT: That concludes the testimony for

3 today I'll ask you to return at 9:30 once again. Once

4 again, please be reminded not to discuss the case

5 amongst yourselves or with anyone else. If there

6 should be any trial publicity of this case you're not

7 to read it. Have a good weekend, you deserve a good

8 one. We all do, I think. Have a good weekend, see

9 you on Monday.

10 (The jury left the room at 4:30).

11 THE COURT: Court stands in recess.

12 (Whereupon, court is in recess.)

178

1 THE COURT: We're not saying that you --

2 MR. MAURER: I'm saying --

3 THE COURT: Do you want to speak to the

4 defendant about this trial?

5 MR. RAMBO: What?

6 MR. MAURER: I believe this is now the

7 defendant's motion for a mistrial. Do you want to

8 speak to that?

9 MR. MAURER: I'm just -- it could have been

10 avoided. I mean -- it may have been unintentional.

11 MR. RAMBO: There is not way that any witness

12 in this trial could be lead to speak in a certain way.

13 I asked her a specific question.

14 The Court: Why didn't you ask her a yes or

15 no question? If you asked her if he ever returned

16 after that, yes or no, then -- but in any event I'm

17 going to excuse them for today and I'll leave you over

18 the weekend to argue that.

19 MR. MAURER: Let met see if I can find that

20 authority.

21 THE COURT: I'll just excuse the jury and ask

22 them to return at 9:30 on Monday.

23 MR. MAURER: 9:30, fine.

180

1 STATE OF DELAWARE:

2

3 NEW CASTLE COUNTY:

4

5

6 I, Michele L. Rolfe, Official Court Reporter
of the Superior Court, State of Delaware, do hereby
certify that the foregoing is an accurate transcript

7 of the proceedings had, as reported by me in the
Superior Court of the State of Delaware, and

8 supervised by Kathleen D. Feldman, Chief Court
Reporter, RPR, in and for New Castle County, in the

9 case therein stated, as the same remains of record in
the Office of the Prothonotary at Wilmington,

10 Delaware, and that I am neither counsel nor kin to any
party or participant in said action nor interested in

11 the outcome thereof.

12 WITNESS my hand this 28th day of July, 2003.

13

14 MICHELE R. HONAKER
SUPERIOR COURT REPORTER
Cert#156-PS

15

16
17
18
19
20
21
22
23

A-191.

121

1  responsive. I didn't ask him that question. It was
2  completely unresponsive and uncalled for, and the
3  State never took the time to tell him not to mention
4  that fact, which was critical. I have no credibility.
5        How can I stand here now trying to destroy
6  him as a witness when the jury now knows that at one
7  time I represented him.
8        THE COURT: Does the State have any response?
9        MR. RAMBO: Sure do. We are at exactly at
10 the juncture that the State warned about months ago.
11       THE COURT: But the State was supposed to
12 instruct the witness.
13       MR. RAMBO: Never were we requested to
14 instruct anyone; moreover, we understand what he's
15 testified to today compared to that tape.
16       THE COURT: I'm sorry.
17       MR. RAMBO: He has not followed anybody's
18 instructions before and we did not instruct him
19 specifically because we're not required, legally. He
20 assumed the risk, he started cross-examining him about
21 weapons charges that he represented him on, and he
22 started getting into details about those weapons
23 charges where he represented him.

123

1        THE COURT: And, therefore, I think in
2  further questions by the witness you can question him
3  in that regard, it was a plea and go on. It is out.
4  I don't think there should be any instruction from the
5  Court and I'm going to deny the motion for mistrial.
6        MR. MAURER: I understand that, Your Honor,
7  but so that I can make sure I make my record
8  adequately, my argument was emotional before, but now
9  it is more legal; that impinges Mr. Flowers' right to
10 effective counsel of counsel under the circumstances
11 because of the effect it can have on my credibility as
12 an adequate counsel --
13       The Court: I think the jury understands that
14 a defense counsel represents defendants whether or not
15 he represented that particular witness or not, they
16 realize that you may realize win some you lose some.
17 I assume in this particular case it can be argued
18 where a person was guilty, the client took a plea, so
19 I think it can be brought out in that manner and
20 certainty reduced any interference that's made.
21       MR. MAURER: The problem is I look like, I
22 hate to use this word, but I look like a whore in
23 front of the jury. Here I am tearing apart or trying

122

1        MR. MAURER: How can they blame that on me?
2  I did not ask that question, he gave me the answer and
3  the State new how critical it was when you let me stay
4  in the case. If I ever dreamed that my name would
5  come up as having represented him, I would have gotten
6  out of this case and gotten nowhere near it.
7        It is not fair to him because it is my
8  credibility which is now shot.
9        MR. RAMBO: I don't think his credibility is
10 shot. I think that's an overstatement.
11       THE COURT: The Court will take a recess.
12       MR. MAURER: I think for the record I should
13 reflect that when the witness shot back that I
14 presented him there was laughter from the jury box.
15       THE COURT: Court stands in recess.
16       (Court stands in recess.)
17       THE COURT: Very well. The Court after
18 taking a recess has come to the conclusion that that
19 is not grounds for a mistrial. I think that the fact
20 that that was mentioned can be dealt with in the
21 particular case that you represented, the witness, it
22 resulted in a plea, did it not?
23       MR. MAURER: It did.

124

1  to tear apart a person that I previously presented.
2        The Court: I can view as counsel is more
3  aware of that than the ordinary layperson, but it is
4  what it is, but the motion is denied.
5        MR. MAURER: Can he be instructed not to
6  mention it again, please.
7        THE COURT: Certainly. Mr. Predeaux, that
8  response was not responsive to the questions, so
9  you're asked to answer the questions asked and not
10 volunteer that information. Please do not repeat the
11 fact that Mr. Maurer represented you.
12       THE WITNESS: Okay.
13       THE COURT: He is going to ask a question
14 about that having been as a result of this plea, he
15 represented you in a plea agreement as opposed to
16 going to trial, but other than that don't bring it up
17 any further.
18       (The jury entered the room at 3:20 p.m.)
19       THE COURT: Mr. Maurer?
20       MR. MAURER: Thank you, Your Honor
21 BY MR. MAURER:
22       Q. Mr. Predeaux, since you chose to answer the
23 last question that I asked you in the fashion that you

81

1    get a ruling from the court ahead of time. There is a
2    burglary for which the defendant was convicted on June
3    27 of 1995, the burglary occurred on March 10, of 1998
4    which was six days before his 18th birthday so the
5    case was handled in Family Court.
6        I would like leave of the Court to be
7    permitted to examine him on that question and not
8    withstanding the fact that it is a juvenile, I know
9    the case law prohibits, but given the testimony that
10   he gave, the fact that he was six days shy of his 18th
11   birthday that the crime was committed, and it is a
12   crime involving dishonesty I would like leave of the
13   Court to cross-examine and impeach him with respect to
14   that.
15       THE COURT: Did you identify what the other
16   convictions are?
17       MR. MAURER: I think we're both aware of
18   them. I can for the record say there's a shoplifting
19   December of '95, a shoplifting conviction in January
20   of '96, a theft conviction in September of '95, and
21   there's a -- and I'm not sure the admissibility for
22   the purposes of impeachment but the witness has
23   already given testimony about being on probation and a

82

1    sentencing of violation of probation charge,
2    possession of a deadly weapon by a person prohibited
3    in '98, there's a possession of a narcotic schedule
4    one in '98, which I submit will become relevant as to
5    what punishment he would face with respect to his
6    pending charges that are going to be questioned about.
7    And there's a theft misdemeanor conviction in November
8    of '99.
9        The court should be aware of the fact that
10   this witness at the time had pending against him two
11   different sets of charges, one of which involved
12   weapons offenses, the other of which involved charges
13   of cocaine and possession with the intent to deliverer
14   cocaine. I will represent that the State has provided
15   me everything they have in writing, one of which was
16   resolved by a plea, the other which is still pending
17   so that's his prior criminal history, and that's my
18   application.
19       THE COURT: Does the State have a response?
20       MS. KELSEY: Your Honor, we're not going to
21   oppose Mr. Maurer asking those particular questions.
22       I suppose we could have a long technical
23   legal argument about whether we can or can't, given

83

1    the defendant's status and his pending charges and
2    that he's back in jail, that he's admitted to being in
3    jail for the violation of probation, I don't think the
4    State is in any position to argue that a lot of
5    this -- that the questions Mr. Maurer has indicated
6    wants to ask is relevant.
7       THE COURT: Very well. Has the witness
8    called --
9       THE BAILIFF: Yes.
10       THE COURT: -- to bring up the witness?
11       THE BAILIFF: Yes.
12       THE COURT: Is he back there?
13       THE BAILIFF: Yes.
14       THE COURT: Bring in the jury, please.
15       THE BAILIFF: Yes, Your Honor.
16       (The jury entered the room at 2:16 p.m.)
17       THE COURT: Good afternoon, ladies and
18   gentlemen. We will proceed. Ms. Kelsey.
19       OTHELLO PREDEAUX, having been previously
20   sworn under oath as a witness for the State, was
21   recalled to the stand and testified further as
22   follows:
23           FURTHER DIRECT EXAMINATION

84

1    BY MS. KELSEY:
2       Q. Mr. Predeaux, before the break you had an
3    opportunity to see the tape?
4       A. Yes.
5       Q. Does that refresh your recollection as to
6    what you talked to Detective Brock about?
7       A. Not really, I don't know.
8       Q. No. Let me -- did you -- do you remember now
9    whether or not you talked to anybody after the
10   shooting?
11       A. Did I talk to anybody after the shooting?
12       Q. Yes.
13       A. I mean, what do you mean?
14       Q. Specifically, did you talk to the defendant?
15       A. No.
16       Q. After the shooting?
17       A. No.
18       Q. You didn't talk to him. You didn't see him
19   in the car?
20       A. I don't remember.
21       Q. You don't remember that?
22       A. No.
23       Q. Do you remember -- that's you on the tape,

69

1    A. Oh, I was standing at the corner and it was
2    like maybe ten feet away from the corner, the car was.
3        Q. In which direction?
4        A. 22nd Street is a one-way street, it runs
5    straight up.
6        Q. Straight up to where?
7        A. To Market Street.
8        Q. Where in relation to -- to Market Street was
9    the car?
10       A. It was far from Market Street, it was like --
11       Q. Where was it in relation to Lamotte Street?
12       A. Like ten feet away from the corner.
13       Q. All right. But in which direction? Towards
14   Market or the other way?
15       A. Towards Market because 22nd Street is a
16   one-way street.
17       Q. Okay. What happened as the people were
18   standing there and the car was trying to get through?
19       A. It was just yelling, people telling the car
20   to back up they can't come up that street.
21       Q. Okay. Did the car do anything that you could
22   see?
23       A. Well, it was just beeping the horn saying,

70

1    Move, and nobody moved.
2        Q. Okay. Could you hear who was saying that?
3        A. The driver.
4        Q. You know it was the driver?
5        A. I could hear it was a male driver.
6        Q. Could you see the driver though?
7        A. No, not from where I was standing.
8        Q. And then what happened?
9        A. Then after that I heard shots, and then
10   that's when I moved out of the way and the car sped up
11   to block.
12       Q. When you heard shots, did you look?
13       A. Yeah, I looked.
14       Q. What did you see?
15       A. I just saw somebody shooting.
16       Q. Do you know who was shooting?
17       A. Nah, I didn't see who was shooting, it was a
18   whole bunch of people. I couldn't really decipher
19   where it was coming from.
20       Q. And what did you do?
21       A. After that, after I heard the shots, I moved
22   out of the way because I heard the shots, and then
23   after the shots stopped I went back to look to see

71

1    what happened, but at that time everybody was leaving.
2        Q. What happened to the people that were
3    standing around in the street?
4        A. They all left after the person started
5    shooting.
6        Q. Okay. Do you know how they left, i mean, did
7    they go in cars or did they walk or did they run?
8        A. Some people got in cars, some people was
9    running, walking, they just left. They just
10   dispersed, everybody just left.
11       Q. What did you do?
12       A. I remained on the corner for a minute and
13   then I got on my bike to the Chinese Store; that's
14   when I saw that the car has crashed or something.
15       Q. Where's the Chinese Store?
16       A. The Chinese Store is located right on the
17   corner of 22nd and Market, right next to this tax
18   place or something like that, tax refund place.
19       Q. So to get from Lamotte Street to Market
20   Street, how did you go?
21       A. Straight up 22nd Street.
22       Q. Okay. And where was the car?
23       A. The car was -- it was either like -- it had

72

1    crashed into either a telephone pole or a tree or
2    something.
3        Q. Was anybody in the car?
4        A. Yeah, it was a person in the car that I could
5    see.
6        Q. Where was that person in the car?
7        A. He was in the driver seat, like slumped over
8    a little bit.
9        Q. Okay. Slumped over where or how?
10       A. Like not moving, slumped over. Like
11   something happened to him. When I saw that, I turned
12   back around and went back down the street.
13       Q. When you say, "slumped over" was he forward
14   or to the side?
15       A. Like slumped over forward.
16       Q. Okay. And where did you go after you saw him
17   there?
18       A. I went back to the corner where I was
19   originally at.
20       Q. Did you stop and do something on your way
21   back?
22       A. No.
23       Q. You didn't?

A-194.

49

1  can't sleep at all this night because of this crap.  I
2  don't want to talk no more.
3         The COURT:  I see that you're upset.
4         THE WITNESS:  I don't want to talk no more,
5  Your Honor.
6         THE COURT:  Would you just be quiet at this
7  point.
8         MR. RAMBO:  Your Honor, I would ask if
9  necessary and I understand she doesn't want to speak,
10  but you would ask that the State be entitled to cross
11  examine under the circumstances because I think she is
12  an adverse witness and I think that's rather apparent
13  based upon her demeanor?
14         THE COURT:  I'll allow some leading if
15  that's --
16         MR. MAURER:  I think under the rules that's
17  allowed and, furthermore, I haven't objected to it
18  until this point because there's no objection.
19         MR. RAMBO:  I thank Mr. Maurer for that.
20  BY MR. RAMBO:
21    Q. Tyshiak, I know that you don't want to answer
22  questions, but I only have -- if you look at the clock
23  it is about 17 minutes after and I only have about two

51

1    A. I don't know.  I don't remember.  I don't
2  , know.
3    Q. Do you remember speaking with officer Brock
4  about --
5    A. I don't remember.  I don't remember.  I don't
6  remember.  I don't know what you're talking about
7  okay.
8    Q. Well, did you just tell me a few minutes ago
9  that you did remember?
10    A. Yup, I sure did.
11    Q. So you have forgotten in the last five
12  minutes?
13    A. Look, I don't want to answer your questions,
14  leave me alone, let me go home.  I don't want to go
15  through this.  I don't want to go through this.  I
16  don't want no part of this.  I understand a life was
17  taken, Your Honor, I understand that, but I didn't
18  take it.
19         THE COURT:  We understand that.
20         THE WITNESS:  Why am I here?
21         THE COURT:  Because you have been subpoenaed.
22         THE WITNESS:  For what?  I don't know
23  anything.

50

1  minutes of questions left, okay, if that.  So can you
2  just bear with me for that long?
3    A. I don't want to talk no more.
4    Q. If you don't want to talk any more when I ask
5  you the questions you tell us that, okay?
6         THE COURT:  Well -- actually, you're not
7  permitted not to respond, you need to respond.  He's
8  got a few questions left, respond to the best of your
9  ability.  If you don't remember then simply say that,
10  but you must respond.
11  BY MR. RAMBO:
12    Q. The night that there were a shooting, did you
13  see anyone with a gun?
14    A. I don't know.
15    Q. Okay.  Have you ever in your life ever seen
16  anyone with a gun with a T-shirt?
17         MR. MAURER:  Objection relevancy, Your Honor.
18         THE WITNESS:  I don't know.
19         THE COURT:  I'll allow you to rephrase but
20  that's a little broad.
21  BY MR. RAMBO:
22    Q. Did you hear shots fired when the shooting
23  took place on 22nd street?

52

1         THE COURT:  And I presume Mr. Maurer will
2  cross as well there will be -- they will ask you to
3  watch a video, so you are under subpoenaed.  You say
4  you don't want to go back to jail, I don't want to
5  hold you in contempt either.  I want you to finish, to
6  go home.
7         THE WITNESS:  You have to do what you got to
8  do.  I don't want to answer any more questions.  I
9  want to leave.
10         MR. RAMBO:  Your Honor, under the
11  circumstances the State would purpose --
12         THE WITNESS:  Lock me up because I'm done.
13  I'm not saying nothing else.
14         MR. RAMBO:  The State would purpose that we
15  call Detective Brock about the video, and work with
16  that issue and perhaps she could be -- well, we don't
17  want her to leave.
18         THE COURT:  Well, Detective Brock remains
19  under oath.
20         MR. MAURER:  Your Honor, I don't think we're
21  at a point yet where we can play the video, especially
22  if this witness is saying she isn't going to answer
23  any questions.  I don't get to cross examine her so I

53

1  think we have to deal with her first. Outside of the
2  presence of the jury.
3          THE COURT: We'll take a recess, members of
4  the jury. I can't exactly tell you how long. The
5  usual instructions apply.
6          (The jury left the room at 11:20 a.m.)
7          MR. MAURER: Your Honor, I guess my position
8  is that if she's now saying that she's not going to
9  answer any more questions that extends to Mr. Rambo
10  and myself. And if I can't ask her questions and
11  she's not going to answer my questions, obviously I
12  can't cross-examination her. The tape would not be
13  admissibility so I think she should be told that if
14  she's not going to answer questions, then you would
15  hold her in contempt. She could be given a six-month
16  jail term.
17          THE WITNESS: I just did that 25 months so
18  six months ain't nothing.
19          THE COURT: Well, Ms. McDougall, here's the
20  situation, I do not wish to have you go to jail.
21          THE WITNESS: Okay, so Your Honor why are
22  they forcing me to talk? I don't want to talk. I
23  don't have anything to say to them about this

54

1  situation. I don't know anything to say to them.
2          THE COURT: You do understand the situation
3  that this is a trial, it is a proceeding, you've been
4  subpoenaed, so you do have to answer the questions.
5          THE WITNESS: I'm not.
6          THE COURT: Now, are you saying you won't and
7  I am telling you that I will hold you in contempt and
8  send you to jail.
9          THE WITNESS: Your Honor, I don't want to
10  talk to these people.
11          THE COURT: I understand that you don't want
12  to, but for another half an hour or forty-five
13  minutes, whatever it takes out of your life, don't you
14  think that that's worth doing as opposed to going to
15  jail?
16          THE WITNESS: Not for this. I don't have no
17  parts of this, none. I don't want any parts in this,
18  I don't.
19          THE COURT: That's what Mr. Cross is for --
20  can somebody let him back to speak with his client.
21          MR. CROSS: Thank you, Your Honor.
22          THE COURT: Thank you. I'm going to hold
23  this witness in contempt. Now, I purpose that

55

1  question and I will give her some time to think about
2  it to see if she's willing at some other point to
3  proceed, but at this point I don't think there's
4  anything else I can do.
5          MR. MAURER: I agree.
6          MR. RAMBO: I agree.
7          MR. MAURER: She was given every opportunity
8  to speak and just got to a point where obviously she
9  wasn't going to say anything else. So I guess we
10  should now deal with Mr. Predeaux depending at some
11  point if she refuses to testify I would ask The Court
12  to tell the jury to strike her.
13          MR. RAMBO: I would ask that they be aware of
14  the fact that she was held in contempt.
15          THE COURT: All right. Obviously, I'll hold
16  off on that until some time later this afternoon, to
17  see if she changes her mind. I doubt that she'll
18  change her mind. I believe based on what's happened
19  in the past, it is probably going to take at least 15
20  minutes or so, so we'll recess at this time.
21          (A short recess was taken.)
22          THE COURT: Also the bailiff has informed me
23  that Ms. McDougall wants to speak to me and speak to

56

1  me alone. So what I've done, I have not done that,
2  but what I have done is ask the public defender to
3  come and speak to her, so I don't know who is coming,
4  yet, but that's what's happening now. Are we ready
5  for the jury?
6          MR. MAURER: As soon as we get the defendant.
7          THE COURT: I don't know whether Mr. Cross
8  reported to the parties about what happened with
9  Mr. Predeaux?
10          MR. CROSS: I did, Your Honor.
11          THE COURT: I don't know what happened and
12  why that would have been done, but apparently he was
13  put in the same cell as the defendant.
14          MS. KELSEY: Your Honor, I specifically sent
15  an e-mail to the people who I'm supposed to send an
16  e-mail to telling them that I had subpoenaed him and
17  not to put him with Mr. Flowers. So evidentially
18  there's a communication problem down in lock up
19  because the people who were -- who were down in lock
20  up didn't get the information, but I specifically sent
21  it.
22          MR. CROSS: I think it is -- as best as I can
23  tell because they are two different facilities

41

1    A. Good morning.
2    Q. I'm going to ask you, because it is difficult
3    to hear you some times, maybe it is just me, if you
4    will try to speak to the microphone that will help all
5    of us, okay?
6    A. Yes.
7    Q. Do you mind if I call you Tyshiak while I'm
8    asking you questions?
9    A. No.
10    Q. Tyshiak, how old are you?
11    A. 32.
12    Q. Okay. And where do you live?
13    A. 2237 North Pine Street.
14    Q. That's 22nd and Pine?
15    A. 23rd.
16    Q. 23rd, okay. And how long have you lived
17    there?
18    A. For 30 years.
19    Q. Okay. And there was no reason why you
20    weren't living ther in August of 1998, right? You
21    were still there then?
22    A. I was staying with my aunt.
23    Q. You were?

42

1    A. Here and there.
2    Q. Okay. And do you know the defendant in this
3    case, Mr. Flowers?
4    A. Yes.
5    Q. And did you know him as Mr. Flowers or did
6    you know him by another name?
7    A. I know him as Damone.
8    Q. As Damone, okay. Did you call him any
9    nicknames?
10    A. We called him Moan.
11    Q. Moan, okay. How often in 1998 and
12    thereabouts would you see Moan?
13    A. I really can't recall that, I see him a lot.
14    Q. Okay. Well, let me ask you to estimate, if
15    you will be good enough to do that for me -- hold on,
16    please, bear with me, would it be once a week, once a
17    day, or once a month?
18    A. I don't know. I really can't tell you that,
19    because I don't remember. I have seen him a lot.
20    Q. A lot. Good enough. Fair enough. Was he
21    your friend?
22    A. Yes, he was.
23    Q. Did he live in your neighborhood?

43

1    A. No. I don't know where he lived at, he
2    didn't live near my job, like in my vicinity but=.
3    Q. Is that on 23rd street or Pine Street?
4    A. He didn't live around me, on 23rd street,
5    Pine Street, none of them.
6    Q. Did there ever come a time where he stopped
7    coming around?
8    A. Yeah. He would leave and take breaks and
9    stuff like that, you know, stuff be getting crazy
10    around there. Everybody takes a break from being
11    around the same people, the same things.
12    Q. That's my question then and I understand your
13    answer. When did he take that break, do you know?
14    A. I don't remember all that. I don't remember
15    no dates and all that stuff, I don't remember.
16    Q. Okay.
17    A. I don't.
18    Q. Do you remember whether anything unusual
19    happened before he stopped coming around?
20    A. I wasn't paying attention to him like that,
21    I'm worried about me.
22    Q. Do you have a family, Tyshiak?
23    A. Yes, I have a family.

44

1    Q. Okay. Who's in your family?
2    A. As far as my mother, my mother, brother,
3    sisters, my children, aunts, uncles, cousins, nieces.
4    Q. They all live with you on 23rd Street?
5    A. No, just my children and my mom.
6    Q. Do you know the gentleman to my right?
7    A. Yeah.
8    Q. Who's that?
9    A. Detective Brock.
10    Q. Okay. Do you -- did you ever speak with
11    Detective Brock before?
12    A. I talked to Detective Brock a lot.
13    Q. Okay. Did you ever talk to Detective Brock
14    at the Wilmington Police Department?
15    A. I think so, I think so.
16    Q. Okay. And do you remember what he was asking
17    you about?
18    A. Vaguely.
19    Q. Okay. Understood. What vaguely was he
20    asking you about?
21    A. About the shooting and where was Damone, this
22    that, you know, just a whole lot of stuff. I don't
23    remember everything he asked me.

State v. Damone Flowers

| 45 |
|---|
| 1    Q. Okay. |
| 2    A. It is just like I don't remember everything I |
| 3    told him, you know. |
| 4    Q. And when he asked you about the shooting, did |
| 5    you give him any answers? |
| 6    A. I don't know what I said, I might have gave |
| 7    him answers, but I don't know what I said. |
| 8    Q. You don't recall today. Okay. You don't |
| 9    recall what you said, but do you recall what you did |
| 10   or did not see about the shooting? |
| 11   A. I didn't see anything. I wasn't there. I |
| 12   wasn't there, so I didn't see anything. |
| 13   Q. Where were you? |
| 14   A. I was on 23rd Street at the apartment, at my |
| 15   aunt's apartment. |
| 16   Q. Okay. Is there a porch at that apartment? |
| 17   A. Yes, there's a porch. |
| 18   Q. Did you ever go out on the porch that night? |
| 19   A. I was in and out all the time, so I mean, |
| 20   that day didn't make any difference. It was just like |
| 21   I'm in and out all the time I'm always on the move. |
| 22   Q. Can I ask you a question about whether you |
| 23   can give me a yes or no as to whether you were on the |

| 47 |
|---|
| 1    A. I don't know. There's a lot of police that |
| 2    kicked in that door and I was real scared. Like I |
| 3    said, they kicked in the door, I don't know who was |
| 4    there. |
| 5    Q. Kicked in what door, ma'am? |
| 6    A. Kicked in my aunt's apartment door. |
| 7    Q. Did they have a search warrant? |
| 8    A. I don't know. I don't even know. |
| 9    Q. Okay. |
| 10   A. I was sleep any way when they came in there, |
| 11   I was in there by myself. |
| 12   Q. Did you go with them to the Wilmington Police |
| 13   Department? |
| 14   A. Yup. |
| 15   Q. Did you ride in the police car? |
| 16   A. Yeah. |
| 17   Q. Okay. |
| 18   A. That's the only way I can get there, right. |
| 19   Q. I don't know that's why I'm asking? |
| 20   A. What would I do walk? |
| 21   Q. Be a long walk, wouldn't be it? |
| 22   A. No, not really. |
| 23   Q. Okay. Did you try to tell police what you |

| 46 |
|---|
| 1    porch the night the shooting -- |
| 2    A. No, I cannot. |
| 3    Q. Pardon? |
| 4    A. I cannot give you a yes oar no answer |
| 5    because, like I said, I'm in and out all the time so |
| 6    how can I give you an answer. |
| 7    Q. Did you speak with the officer at all about |
| 8    whether you were in or out of your house that night? |
| 9    A. I don't remember. I don't remember. I swear |
| 10   I don't remember. You keep asking me the same thing |
| 11   and I keep telling you I don't remember. |
| 12   Q. Okay. If you saw some of what you said, |
| 13   might that help you remember better? |
| 14   A. I want to see all of it. Why it came up to |
| 15   me saying what I said -- supposedly had said. I want |
| 16   to see the whole thing. |
| 17   Q. Okay. Who was with you, if anybody, when you |
| 18   went to the Wilmington Police Department to speak with |
| 19   Officer Brock -- |
| 20   A. No one -- |
| 21   Q. Please let me finish my questions, okay. Who |
| 22   was with you, if anyone, when you went to speak with |
| 23   Detective Brock at the Wilmington Police Department? |

| 48 |
|---|
| 1    did or did not know when you spoke with Detective |
| 2    Brock? |
| 3    A. I talked to him, I guess I talked to him, but |
| 4    I don't remember nothing really what I was saying to |
| 5    him, but I talked to him -- I'm saying -- I'm trying |
| 6    to put a lot of that stuff back then and block it out |
| 7    my mind. A lot of it, you know, the streets and |
| 8    everything. I'm trying to put it out my mind. You |
| 9    know, I don't mean to get off what we're talking |
| 10   about, but I really don't want to be here. I -- I |
| 11   don't have anything else to say, so I don't know why |
| 12   you all are doing this to me. I don't have nothing to |
| 13   say. I don't have anything to say. |
| 14        Look I just did 25 months in jail. Look I'm |
| 15   tired of this stuff. I don't want to be here so I |
| 16   really don't want to answer any more of your |
| 17   questions. I'm not -- You need to do your own job. |
| 18   I don't know nothing. |
| 19   Q. Have we talked about that before? |
| 20   A. Yeah, so stop asking me questions. I don't |
| 21   have any answers for you. I don't have any answers |
| 22   for you. I just want to go home. I want to be left |
| 23   alone. You all can deal with this yourselves. I |

| | |
|---|---|
| 1  there are. quote, no meaningful and practical | 1  I went through great pains to make sure that the jury |
| 2  alternatives, unquote, as a remedy. With respect to | 2  didn't hear that he had any kind of problems with the |
| 3  that statement they cite Dawson v. State, capital murder | 3  law previously. The Court's instruction will be there |
| 4  case at 637 Atlantic Second Delaware 1994. A review in | 4  was a comment made about the defendant being in jail, |
| 5  general of all the case law that the State has done | 5  they should disregard it. |
| 6  would indicate that the key questions are whether the | 6  THE COURT: Not use that fact in anyway during |
| 7  response as Mrs. Dawson gave us on Friday was | 7  course of their deliberations. |
| 8  intentionally elicited by the State. | 8  MR. MAURER: Without acquiescing that cures the |
| 9  I suggest that it is clear on its face it was | 9  problem I suppose that is the way to go. |
| 10  not intentionally elicited by the State. It wasn't | 10  THE COURT: All right. I see we are still |
| 11  responsive to the question. I think Your Honor knows it | 11  waiting for the defendant. |
| 12  was not responsive to the question. So the third matter | 12  With respect to the State, what is the |
| 13  that the Courts look to as whether or not this was an | 13  schedule? |
| 14  immediate curative instruction. I suppose with respect | 14  MS. KELSEY: Your Honor, the State has one more |
| 15  to that, the defense didn't ask for a curative | 15  witness. That would be Detective Brock. |
| 16  instruction at that time, without a waiver of their | 16  MR. MAURER: I see some photographs here, if we |
| 17  right to ask for a mistrial. I would seriously doubt | 17  are going to try to get into these, we should do it |
| 18  they will want one today as it would seem to highlight | 18  outside the presence of the jury. |
| 19  the matter rather than have the jury totally forget it. | 19  MS. KELSEY: That is why I am going through |
| 20  We are suggesting that the State acted in good | 20  them now. |
| 21  faith across the board and we just had no idea she was | 21  MR. MAURER: If I could get a proffer maybe we |
| 22  going to say something like that, try to focus our -- | 22  could argue about that. |
| 23  even Mr. Maurer tried to help me by saying lead her. I | 23  MS. KELSEY: Could I have a moment before we |

6

8

| | |
|---|---|
| 1  felt leading and saying isn't it a fact you never saw | 1  address the Court. |
| 2  him after that day wasn't going to be effective as | 2  MR. MAURER: Sure. |
| 3  answering. I guess I assumed a risk I shouldn't have | 3  (Discussion held off the record.) |
| 4  assumed in that regard. Maybe I should have led her. | 4  MR. MAURER: Your Honor, I am now being told |
| 5  THE COURT: I am going to deny the motion. I | 5  that the State proposes to introduce three photographs |
| 6  believe a curative instruction is required, so all I | 6  into evidence which maybe I should let the State make |
| 7  would propose to say is that the jury is to disregard | 7  their offer first as to why they think they are relevant |
| 8  and not use any information about him being in prison | 8  then we can take my position. I will wait. |
| 9  during course of their deliberations. They are to | 9  THE COURT: Very well. |
| 10  totally disregard that response. | 10  MR. MAURER: I am going to object to all three |
| 11  MR. MAURER: I sort of feel like I am betwixt | 11  coming into evidence. |
| 12  and between the statement on the record was I think we | 12  MS. KELSEY: There are three photographs. They |
| 13  made is sufficient record last week about what happened | 13  were pictures of the defendant and some people from 22nd |
| 14  in terms of my conversations with Mr. Rambo and the | 14  Street which we don't know when these were taken. They |
| 15  father this would come out. What the jury has heard is | 15  were seized from the defendant's residence around when |
| 16  that he was in prison. We have no idea why, how long | 16  they executed the search warrant shortly after the |
| 17  for what. | 17  murder. |
| 18  THE COURT: Prison and/or jail. | 18  The State is offering them into evidence for |
| 19  MR. MAURER: And/or jail. I realize the case | 19  two reasons. One, they are the photographs which show |
| 20  law often times will say curative instruction helps. I | 20  the defendant and some of the other people in the |
| 21  doubt it will in this case, especially troublesome and | 21  pictures doing the duce duce which detective Brock would |
| 22  again I have authority. I will give it to the Court | 22  explain that has come up on the tapes already. Sort of |
| 23  later by the way the defendant is not going to testify. | 23  being a -- they don't call themselves a gang, but sort |

A-199.

9

1   of a group of people who loosely associate with each
2   other.
3        It came up in the context of Ronetta Sudler's
4   tape, sort of having their being a code of silence. It,
5   you know, referred to the defendant that's his boy. He
6   wouldn't Sean McNeil wouldn't tell us that is his boy.
7   It is relevant for that reason to show that he was part
8   of that group because he is standing in the photographs
9   doing the duce duce.
10       THE COURT: That group, that group being what
11   group?
12       MS. KELSEY: It's the group of people who do
13   the duce duce. It is not an incorporated association
14   with a list of members, but sort of a loosely associated
15   group of people who hang out in that particular area.
16       It is not even as organized as a gang so one
17   could claim to be a member without having been initiated
18   or anything like that. That is why we want to show the
19   duce duce. Sort of he is one of the loosely associated
20   people who hang out on 22nd Street.
21       THE COURT: 22nd Street is evidence there --
22       MS. KELSEY: No, what is evidence are the
23   people standing around going duce duce. The second

11

1   case. I think this injects an issue into the case which
2   is entirely irrelevant to anything. In fact, I don't
3   think the State should be able to argue, Mr. Rambo in
4   his opening statement talked about this group and a code
5   of silence. There is no evidence of that in the case.
6       This is potentially extremely prejudicial to
7   place the defendant in association with a group, a gang
8   and whatever the case might be, and it is not relevant
9   for any purpose whatsoever. A, we don't know when they
10   were taken; B, we don't know who took them; C, we don't
11   know what the context of the photographs were. It
12   didn't begin to show what the State says it shows.
13   There is now a group showing duce duce because they have
14   three fingers up or two fingers up or one finger up. I
15   would submit they are entirely irrelevant to any issue
16   in the case under Rule 401 and even if they have
17   slightly remote relevance that their prejudicial impact
18   under 403 or 404 far outweighs any possible probative
19   value to say they wanted -- prosecutor wants them in
20   because he had glasses on.
21       Well, I would be more than happy to agree they
22   could cut out his photograph, say this picture was taken
23   from his house when the search warrant was executed. He

10

1   reason that we wanted to introduce the photographs is
2   the defendant has glasses on in the picture. It is hard
3   to say for sure if they are, in fact, yellow glasses
4   because the background on all the pictures that we have
5   are yellow. We would introduce them for that reason.
6       THE COURT: The defendant has the glasses on
7   now.
8       MS. KELSEY: I know they were from back then.
9       THE COURT: That's it.
10       MR. MAURER: I don't know if the State is
11   trying to get this case reversed on appeal. Two of
12   these three have no one in them that is involved in this
13   case except for the defendant. None of the witnesses
14   that testified, and neither Mrs. McDougall or Mrs.
15   Sudler and Mr. Predeaux, none of them are in two of the
16   three.
17       The third photograph does, in fact, have Mrs.
18   Sudler in it, and the defendant is also in it. Now, I
19   don't know who has to say that Sudler and her taped
20   statement in response to a question asked by this
21   detective, you know, talked about this loosely formed
22   association, whatever it might be, of which they are all
23   members. I think that misstates the evidence in this'

12

1   had glasses on. That is not a problem.
2       THE COURT: May I see the photos, please.
3       MR. MAURER: Those two don't have any witnesses
4   in the case in them. This one has one witness Sudler
5   you will see.
6       THE COURT: Anything further from the State?
7       MS. KELSEY: To say it is not relevant in this
8   particular case I think is misstating the evidence. It
9   is clear from having been in the trial that Ronetta
10   Sudler and Predeaux both gave taped statements back
11   at -- gave taped statements before when the defendant
12   wasn't present when they had to be brought into the
13   courtroom and after consulting with counsel they
14   wouldn't voluntarily come in the courtroom.
15       Both of them forgot everything they ever said
16   once they got in the courtroom and had to face the
17   defendant. To say the State is not entitled to argue
18   that they are associates of the defendant and certainly
19   not on the State's side or present any additional
20   evidence I think is misstating the way this case has
21   gone.
22       THE COURT: I think the relevance is tenuous as
23   best based on evidence that has been presented in this

A-200.

**13**

1  case. I do feel that the prejudice would highly
2  outweigh the probative value. For that reason, the
3  Court is excluding the pictures.
4      MS. KELSEY: Thank you, Your Honor.
5      THE COURT: We ready for the jury?
6      MS. KELSEY: Yes, Your Honor.
7      THE COURT: Bring in the jury, please.
8      (Jury enters the courtroom at 10:02 a.m.)
9      THE COURT: Good morning, members of the jury.
10  Once again, we apologize for the delay. I will ask my
11  usual question that is whether anyone has failed to
12  follow the Court's instructions regarding discussion of
13  the case either among yourselves or with anyone else or
14  having viewed, read or listened to any trial publicity
15  about the case by nodding your heads yes or no. Very
16  well. Let the record reflect there were no affirmative
17  responses.
18      Members of the jury, the last witness Adrienne
19  Dawson make a reference about the defendant having been
20  in prison and/or jail. That response is hereby stricken
21  from the record. You are to disregard the response and
22  are not to utilize it in anyway whatsoever during the
23  course of your deliberations.

**15**

1  BY MS. KELSEY:
2      Q. First of all, who drew that map, who assisted
3  in drawing that map?
4      A. This appears to be a diagram that Vernon Mays
5  assisted me in preparing.
6      Q. Who drew -- who put the writing on this upside
7  down but drew East 22nd Street on that; is that your
8  handwriting?
9      A. That would be Mr. Mays' handwriting.
10     Q. That box which is above the dot, on the bottom?
11     A. Here?
12     Q. Yes. What was that supposed to represent?
13     A. That is the parked vehicle.
14     Q. What kind of a vehicle?
15     A. Honda Accord. I believe it was gray in color.
16     Q. What is the dot behind the parked vehicle?
17     A. Supposed to represent where Mr. Mays says the
18  shooter was standing.
19     Q. Do you recall if Mr. Mays made reference to a
20  white van or a van?
21     A. Yes, I do.
22     Q. Is that on that diagram?
23     A. I don't believe so.

**14**

1      We will proceed at this time. Mrs. Kelsey.
2      MS. KELSEY: State's next witness is Detective
3  Brock.
4              ANDREW BROCK,
5      having been first called by the State was sworn on
6  oath, was examined and testified as follows:
7      THE COURT: Once again, I remind you, you
8  remain under oath.
9      THE WITNESS: Yes, Your Honor.
10          DIRECT EXAMINATION
11  BY MS. KELSEY:
12     Q. Detective Brock, in some of the tape that the
13  witnesses have gave on an earlier date they refer to a
14  person by the name of Pookey. What is Pookey's real
15  name?
16     A. Through investigation we revealed that Pookey's
17  real name is Lamar Marvin Swanson.
18     Q. Now, also on the tapes you had some of the
19  witnesses draw maps?
20     A. Yes.
21     Q. If we could start with State's Exhibit No. 3.
22     MS. KELSEY: Can Detective Brock come down?
23     THE COURT: Yes you may step down.

**16**

1      Q. I am going to put up what's been marked State's
2  Exhibit No. 2. I will ask you if you could put, I guess
3  we will put on there where the Mr. Mays had placed the
4  shooter?
5      MR. MAURER: I am going to object. This should
6  have been done with Mr. Mays when he was on to testify.
7  I shouldn't -- had an opportunity to discuss with him
8  this stuff going to be put in through this officer. I
9  object to this coming through this witness.
10     THE COURT: Objection is sustained.
11  BY MS. KELSEY:
12     Q. Point out on State's Exhibit No. 2, where on
13  the actual map of the city Mr. Mays places --
14     MR. MAURER: Same objection, Your Honor.
15     THE COURT: Count approach, please.
16     (The following sidebar conference was held.)
17     MS. KELSEY: Your Honor, I --
18     MR. MAURER: Mr. Mays' statement is in
19  evidence. Mr. Mays testified. The taped statement that
20  he gave to this detective is in evidence. She is now
21  asking this detective questions about the taped
22  statement that is already in evidence, asking him to do
23  things on documents and other evidence that is in the

5

1  person's mind, the law presumes that a person intends
2  the natural consequences of their act. When you fire a
3  gun at someone, you intend to kill them. So the
4  elements of Murder First Degree and the elements of
5  Possession of a Firearm During the Commission of a
6  Felony have been proven beyond a reasonable doubt by the
7  evidence, the physical evidence, and the testimony of
8  the medical examiner in this particular case.
9        The hard part in this particular case is
10  deciding whether or not it is the defendant who is the
11  person who killed, murdered Alfred Smiley. And the
12  evidence that you have which shows that the defendant is
13  the person who murdered Alfred Smiley is the testimony
14  of not one eyewitness, Ladies and Gentlemen, not two
15  eyewitnesses, Ladies and Gentlemen, not three
16  eyewitnesses, but four eyewitnesses who place the gun in
17  the defendant's hands on the night that Alfred Smiley
18  was murdered.
19       The judge will tell you when she instructs you
20  on the law that you have to use your own recollection as
21  to what those witnesses said. In this particular case
22  you are assisted by the video tapes because they have
23  been introduced into evidence; but you have to use your

7

1  and he is given four trays of photographs to look
2  through. And out of those, each tray has 30 or 40
3  pictures. Out of those four trays with 30 or 40
4  pictures he picks the defendant.
5        Is it chance, ladies and gentlemen, that
6  Matthew Chamblee, who knew the defendant, knew -- didn't
7  know his name, but knew the defendant as the chicken
8  cheese guy, steak guy who comes in the sub shop, knew
9  the defendant drove a red or maroon car, and sister
10  happened to have a red or maroon car, knew the defendant
11  wore glasses.
12       Is it chance, Ladies and gentlemen, that he too
13  is shown 12 photographs and he picks out the defendant?
14  Is it chance, Ladies and Gentlemen, that Renetta Sudler,
15  a truly reluctant witness then, and on the witness
16  stand, did not want to be involved, did not want to be a
17  snitch, lied about being there, initially in the
18  beginning and she, too, says that the defendant was on
19  the side of the street firing a weapon.
20       When she gives her testimony, if you recall
21  from the video tapes, when she talks on the tape she has
22  seen the newspaper story about how the victim died. She
23  knows or she thinks she knows that Alfred Smiley was

6

1  own recollection as to what the witnesses said on the
2  witness stand. And what I say, what Mr. Maurer says
3  about what they said or did not say is not evidence.
4        The Judge will also tell you that you have to
5  decide who is telling the truth. And in this case, you
6  have to decide when they are telling the truth, because
7  a lot of the witnesses said different things on tape
8  then what they said on the witness stand.
9        You have to decide who is telling the truth,
10  and you have to decide when they are telling the truth.
11  You have to use your own common sense in deciding who is
12  telling the truth and when they are telling the truth.
13       There are four eye witnesses but there are not
14  just four eyewitnesses. Those witnesses' testimony is
15  bolstered by the testimony on the video tape of Tysheeh
16  McDougal. She puts the defendant at the scene with a
17  gun in his hand acting like he intends to use it. So
18  you don't have just the testimony of four eyewitnesses.
19  You also have the testimony of Tysheeh McDougal. Is it
20  chance, ladies and gentlemen, that one of the
21  eyewitnesses, is it chance that Vernon Mays goes to the
22  Wilmington Police station, gives the officer, gives
23  officer, Detective Brock, a summary of what the he saw,

8

1  shot in the chest. She heard rumors that a person by
2  the name of Joe Harris was also firing on that
3  particular day, but she places the defendant on the side
4  of the street firing a weapon and what Renetta Sudler
5  didn't know is that Alfred Smiley was shot in the chest.
6  He was shot in the chest from the side; where she is
7  assuming that he was shot in the chest from the front.
8        And a Othello Predoux also knew the defendant.
9  Othello Predoux didn't come forward, in fact, in 1998,
10  matter of fact he never came forward. Othello Predoux
11  went to jail in the year 2000, went to jail this year in
12  April and he never approached the State, even though had
13  seen the shooting, he never approached the State.
14       The defense suggests well, he wanted a deal but
15  he never approached the State. But he also places the
16  defendant at the -- on the side of the street where the
17  bullet came from. He has had an opportunity to read the
18  newspaper articles. In fact, he said his girlfriend was
19  in the newspaper articles. He not only read it, but he
20  kept it. He also knows that Alfred Smiley was shot in
21  the chest, but he places the defendant on the side of
22  the street where the actual fatal shot came from.
23       Is that chance, Ladies and Gentlemen, that

A-203.

State v. Damone Flowers

117

1 don't you?
2    A. Right.
3    Q. Back in '98?
4    A. Right.
5    Q. And you got charged again for possession of a
6 deadly weapon by a person prohibited?
7    A. I didn't get charged with that.
8    Q. You weren't?
9    A. Carrying a concealed deadly weapon.
10    Q. You were not charged with possession of a
11 deadly weapon by a person prohibited in '98?
12    A. No.
13    Q. In this year?
14    A. This year?
15    Q. This year.
16    A. No, I was not charged with that.
17    Q. Well, if you were not charged with it, is
18 there any reason why the purposed plea offer that was
19 made to you, included that charge?
20    A. What you mean, I don't understand.
21    Q. Here's Defendant's Exhibit No. 4, there's a
22 plea offer that was extended to you by Ms. Kelsey back
23 in March of 2002, do you recognize that?

118

1    A. Yes.
2    Q. What's the second charge there that's being
3 suggested you plea guilty to back in March of 2002?
4    A. Possession of deadly weapon by a person
5 prohibited.
6    Q. Right. So you are charged with that or were
7 charge with that?
8    A. No, I did not get charged with that.
9    Q. How could you plea guilty?
10    A. I didn't plea guilt. The trafficking cocaine
11 charge that's still an open charge.
12    Q. I understand that that was the plea offer
13 that was purposed to you at that time, right?
14    A. Right, but I didn't sign anything. I didn't
15 take that.
16    Q. I understand you didn't take that, because if
17 you took that at that time you would have gotten a
18 four year mandatory, right?
19    A. Of course.
20    Q. Now, when you gave the statement to the
21 police you added a touch saying when you saw this
22 incident you vomited, right?
23    A. Yes.

119

1    Q. Because I guess you don't like violence or it
2 upsets you to see that kind of violence?
3    A. No, it is the first time I saw something like
4 that before.
5    Q. Okay. But you don't have a problem with
6 violence now, do you?
7    A. I mean, I don't know what you're saying.
8    Q. Well, I'm asking if that upsets you?
9    A. If you do something to me, I'm going to upset
10 you.
11    Q. Maybe you didn't just add that for effect the
12 vomiting part?
13    A. No, that's what happened, that's what I did.
14    Q. You're certainty not a stranger to guns are
15 you?
16    A. No.
17    Q. And guns cause violence, don't they?
18    A. Yes.
19    Q. As a matter of fact, back in '98 when we were
20 talking about that you had two of them on your person,
21 didn't you?
22    A. Yes.
23    Q. As a matter of fact, that was in September,

120

1 early September, of 1998, wasn't it?
2    A. Yes, you represented me.
3    Q. Answer my --
4    MR. MAURER: Can we approach the bench, Your
5 Honor?
6    THE COURT: Members of the jury, we'll take a
7 short recess at this time, please be reminded of the
8 usual instructions.
9    MR. MAURER: Your Honor, can I inquire if the
10 State ever instructed their witness not to mention
11 that fact?
12    MS. KELSEY: No, I didn't, Your Honor.
13    MR. MAURER: I have to move for a mistrial.
14 When we argued this point before that was one of the
15 main things that I said back then, was that I could
16 continue to represent Mr. Flowers because there was no
17 reason why this jury had to learn that I represented
18 him.
19    Now, whether I can bring this case to a
20 successful conclusion from Mr. Flowers is dependant
21 upon a large part on my credibility with this jury.
22 As far as I'm concerned, my credibility is shot in at
23 this point in time. He -- that answer was not

A-204.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR ___NEW CASTLE___ COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | * | |
| | * | |
| V. | * | CrA. No.: _9808000280_ |
| | * | |
| | * | |
| DAMONE FLOWERS | * | |
| Defendant | * | |

## AFFIDAVIT

I, _DAMONE FLOWERS_____, being duly sworn, deposes and says: THAT THE ACCOUNT RELATING TO MAROCKA JETER AND DT. BROCK WAS RELAYED TO ME(DAMONE FLOWERS) BY TELEPHONE CONVERSATION IN APRIL 2006. MRS. MAROCKA JETER HAS EXPRESSED RESERVATIONS ABOUT GIVING AN AFFIDAVIT DETAILING THE ECOUNTER WITH DT. BROCK DUE TO THE FEAR OF REPRISALS FROM DT. BROCK AND/OR THE STATE ATTORNEYS OFFICE.

AS A RESULT THE PETITIONER WILL NOT DISCLOSE MRS JETER'S CURRENT ADDRESS OR TELEPHONE NUMBERS, IN THIS PETITION. THE STATE HAS DEMOSTRATED ITS WILLINGNESS TO SURREPTITIOUSLY REACT TO FACTS ARGUED IN THE PETITIONER'S POST CONVICTION PROCEEDINGS. (SEE GROUND ONE/ARGUMENT 1 IN PETITIONER'S OPENING BRIEF, PAGES 17-18.

_Damone Flowers_

SUBSCRIBED AND SWORN before me this _18th_ day of _May_, 200_6_.

_Timothy J. Marts_
Notary

My Commission expires: June 14th 2006