IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT    OF    DELAWARE

DAMONE E. FLOWERS,
        PETITIONER,

                                        Civ. Act. No. 06-356-GMS

V.

THOMAS C. CARROLL, WARDEN,

and CARL C. DANBERG, ATTORNEY

GENERAL FOR THE STATE OF DELAWARE,
        RESPONDENTS,



FILED

JAN 16 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD Scanned

## PETITIONER'S REPLY

Pursuant to RULE 5(e) of the Rules Governing Section 2254 Actions, 28 U.S.C. fall.
§ 2254, the petitioner states the following in reply to the respondent's answer:

### CLAIMS NOT TIME BARRED

(A) The Delaware Supreme Court affirmed the petitioner's conviction and sentence on
AUGUST 31, 2004. See, **FLOWERS v. STATE**, 858 A.2d 328. Although the petitioner did not seek review by
the UNITED STATES SUPREME COURT, the ninety-day period in which he could have filed a petition
for writ of certiorari expired on NOVEMBER 29, 2004. Pursuant to section 2244(d)(1), a federal habeas
petitioner must file an application for writ of habeas corpus within one year of the date on which
the state court judgment becomes final upon conclusion of direct review. 28 U.S.C. § 2244(d)(1)(A).
Thus the petitioner had until NOVEMBER 29, 2005 to file his federal habeas petition without
running afoul of 2244(d). However, the petitioner's MAY 24, 2006 application for writ of habeas
corpus was timely due to statutory or equitable tolling of the time period during which
the petitioner's state postconviction action was pending in the state courts. 28 U.S.C. § 2244(d)(2).

The petitioner first attempted to file a post-conviction motion pursuant to Superior Court
Criminal Rule 61 on APRIL 27, 2005. That filing was voided as non-conforming for failure to have

original signature. **See Del. Dkt. at item 102.** The petitioner signed the motion and returned it to Superior Court where it was "properly filed" on MAY 3, 2005. **See Del. Dkt. at 103-105.** The petitioner sent an attached memorandum of law with the motion in addition to a letter for clarification on the filing date to avoid confusion with respect to 2244(d)(2). **See Del. Dkt. at 105.**

**On** JUNE 28, 2005, the Superior Court, specifically JUDGE MARY JOHNSTON, denied the motion without prejudice and in an exercise of discretion directed petitioner to amend the motion pursuant to RULE 61(b)(6), so that the motion complied with the restrictions set forth in RULE 61(b)(2). (See, BRIEF FOR EXCUSION OF PROCEDURALLY DEFAULTED CLAIMS, hereafter BRIEF FOR EXCUSION-EXHIBIT A). After investigation, the petitioner wrote JUDGE MARY JOHNSTON in a letter dated JULY 11, 2005 indicating, in part, that the motion for post conviction relief was already set forth in summary form in accordance with RULE 61(b)(2). **See Del. Dkt. at 107.** As such, it was the lengthy attached memorandum of law in support of the motion that JUDGE JOHNSTON had issue with. The petitioner pointed out that RULE 61(b)(2) addressed a RULE 61 motion singularly but did not mandate that attachments, such as a memorandum of law, be in summary form. For pratical purposes it is almost impossible to prepare a memorandum of law in summary form. The petitioner expressed his concerns over JUDGE JOHNSTON's ORDER and requested appointment of counsel pursuant to RULE 61(e) to assist in meeting the judge's order. The petitioner then clearly stated: "Otherwise I must ask that the Court accept my resubmitted MOTION FOR POST CONVICTION RELIEF and attached MEMORANDUM of law as it stands." (See BRIEF FOR EXCUSION-EXHIBIT B).

Clearly the petitioner's letter warranted a responce, infact the petitioner closed the letter with, "That said, I await the Court's response in the near future." In the alternative the petitioner requested that the RULE 61 motion be accepted as filed. Nevertheless, JUDGE JOHNSTON did not respond to the petitioner's letter and failed to redocket the motion. When no response by SEPTEMBER, the petitioner amended the memorandum of law taking it down from 122 pages to 107 pages. With the identical RULE 61 motion and the amended memorandum of law the petitioner resubmitted the postconviction motion to the Court which was then docketed on SEPTEMBER 20, 2005. Along with the motion the petitioner sent another

letter to Judge Johnston inquiring about the lack of a response to the July 11, 2005 letter. (See Post-Conviction Motion).

In their answer, the respondents argue that the time period between May 3, 2005 through September 20, 2005, was not tolled since the May 3, 2005 motion was not a properly filed post conviction motion. Comparison of the two motions for post conviction relief, one filed on May 3, 2005 and the other filed on September 20, 2005, will demonstrate that the motions literally identical word for word. This highlighted the point the petitioner made in his July 11, 2005 letter to Judge Johnston. The motion was already in summary form in accordance with Rule 61(b)(2). There was nothing to abridge or amend. Judge Johnston's issue was with the memorandum of law. As such Rule 61(b)(2) **clearly** gives the Court and a defendant guidelines by which to submit and address a motion under this rule. However, Rule 61(b)(2) is mute on the contents of attachments such as a memorandum of law, briefs or exhibits & affidavits. The motion is not synonymous with its attachments. Therefore, the petitioner reasonably had the legal foundation upon which to contest Judge Johnston's order to amend the memorandum of law.

Alternately, Judge Johnston could have simply accepted the properly filed motion and returned the memorandum with directions to amend it. Instead Judge Johnston denied without prejudice the motion, which conformed to Rule 61(b)(2), solely because the attached memorandum was lengthy. When the petitioner pointed this out in his July 11, 2005 letter and requested that Judge Johnston either appoint counsel to assist in summarizing the memorandum of law or accept the motion as it had been properly filed on May 3, 2005. Judge Johnston failed to respond to the petitioner's request by either granting or denying appointment of counsel, giving further directives, ruling on the motion as filed or at the least redocketing the motion on July 11, 2005.

Traditionally, a statute of limitations is not tolled by the filing of a complaint that is subsequently dismissed without prejudice. "Typically, when a complaint (or habeas petition) is dismissed without prejudice, that complaint or petition is treated as if it never existed. **HULL v. KYLER, 190 F.3d 88, 103-04 (3d Cir. 1999).** The question before this Court is whether the post conviction motion was properly

filed on MAY 3, 2005, for purposes of tolling the one-year filing deadline? Or in the alternative, should the post conviction motion have been redocketed on July 11, 2005 per the petitioner letter on that date? The question of whether a properly filed post conviction motion can relate back to the date that the motion was first filed, albeit not properly, is currently before the THIRD CIRCUIT in **AUSTIN v. CARROLL, No. 04-3811.**

From NOVEMBER 29, 2004, through MAY 3, 2005, roughly 6 months elapsed. The petitioner spent that diligently investigating and preparing the post conviction motion. When the motion was filed on MAY 3, 2005, there was roughly six months left before the one-year filing deadline expired on NOVEMBER 29, 2005. As of MAY 3, 2005, the time period must be statutorially tolled up to APRIL 4, 2006, the date the Delaware Supreme Court dismissed the petitioner's appeal of the post conviction motion. If this time period is not statutorially tolled then it must be equitably tolled. See, **FAHY v. HORN, 240 F.3d 239, 244 (3d Cir), cert. denied. 122 S.Ct. 323 (2001).** Equitable tolling applies only when the principles of equity would make the rigid application of a limitation period unfair. The petitioner must show that he exercised reasonable diligence in investigating and bringing the claims. Mere excusable neglect is not sufficient. **MILLER v. NEW JERSEY STATE DEPT OF CORR, 145 F.3d 616 (3d Cir. 1998).**

The petitioner exercised diligence in presenting his claims to the court in light of his pro se status. As noted above the APRIL 27, 2005 non-conforming was immediately signed and mailed back to the Court. When JUDGE JOHNSTON denied without prejudice the motion, the petitioner investigated and responded back to JUDGE JOHNSTON within 14 days, when it appeared that JUDGE JOHNSTON was going to essentially ignore the JULY 11, 2005 letter. The petitioner amended the memorandum of law and mailed the motion and memorandum back in to the Superior Court, this within 40 days. As such the petitioner exercised reasonable diligence in bringing the motion. MILLER, id.

As such, attention should reasonably focus on JUDGE JOHNSTON. In denying the motion, failing to respond to the subsequent JULY 11, 2005 letter and accepting the motion as filed on MAY 3, 2005 or redocketing the motion on JULY 11, 2005. JUDGE JOHNSTON's actions or inactions should activate

the language in 28 U.S.C.§ 2244(d)(1)(B), which states: the limitation period shall run from the latest of: (B) the date on which the impediment to filing an application created by state action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action. When Judge Johnston refused to accept the petitioner's properly filed motion of MAY 3, 2005, failed to respond to the petitioner's July 11, 2005 letter and accepting the MAY 3, 2005 or redocketing the motion on July 11, 2005. Judge Johnston, herself, became the impediment to filing the post conviction motion essentially denying the petitioner access to the court in violation of the Due Process Clause. BOUNDS v. SMITH, 430 U.S. 817, 821, 97 S.Ct. 1491 (1977).

Equitable tolling applies only where the petitioner "has in some extraordinary way been prevented from asserting his rights." MILLER, id. The specific circumstances here must fall under 'extraordinary circumstances.' Judge Johnston arbitrarily refused to accept the petitioner's post conviction simply because the attached memorandum of law in support of the motion was to lengthy. Judge Johnston then refused to respond to the petitioner's letter in any way at all, refused to appoint counsel, refused to redocket the motion, refused to accept the motion and reject the memorandum of law, thus denying the petitioner access to the Court. Access to the Court was granted when the petitioner slimmed down the memorandum of law by several pages.

When the post conviction motion was filed on MAY 3, 2005, the petitioner was well within the one year filing deadline due to expire on November 29, 2005. Any time that elapsed from MAY 3, 2005 through September 20, 2005, must be attributed to Judge Johnston's actions or inactions. It would be very unfair to deny the petitioner equitable tolling of that time period due to Judge Johnston's actions or inactions when he has demonstrated diligence in presenting that motion to the Court only to be prevented by the judge.

Alternately, the petitioner requested that Judge Johnston accept the motion as submitted on MAY 3, 05, and rule upon it, in the July 11, 2005 letter. Therefore, if, MAY 3, 2005, does not trigger the tolling mechanism, then the July 11, 2005, request should trigger the tolling mechanism starting on July 11, 2005. This would leave 4 months and 18 days before the one year filing deadline expired

on November 29, 2005. That would leave 4 months and 18 days remaining once the State court round of review was complete. The record reflects that the Delaware Supreme Court's final ruling on the appeal of the postconviction was docketed on April 4, 2006. Accordingly, the time period after April 4, 2006, would not be subject to tolling. The petitioner's application for writ of habeas corpus was filed on May 24, 2006, well within the remaining 4 months and 18 days, thus within the one-year filing deadline.

Given the respondent's answer that the time period between January 12, 2006, the date the 30 day period for filing expired for the Notice of Appeal, through May 24, 2006, the date the petitioner's habeas corpus petition was filed, was not tolled because the notice of appeal was not a properly filed motion. Again, if the post conviction motion filed on May 3, 2006, does not trigger the tolling mechanism, then the petitioner's July 11, 2005 request should trigger the tolling mechanism. This would leave 4 months and 18 days before the one-year filing deadline expired on November 29, 2005. That would leave 4 months and 18 days remaining once the State court round of review was complete. If that review became final on January 12, 2006, then with 4 months and 18 days remaining to file his habeas petition. The petitioner's application for writ of habeas corpus was filed on May 24, 2006, still within the remaining 4 months and 18 days, thus within the one-year filing deadline.

(B) On December 13, 2005, the Superior Court denied the petitioner's post conviction motion. Pursuant to Delaware Supreme Court Rule 6, the petitioner had 30 days to file a notice of appeal. Accordingly the petitioner had until January 12, 2006 to file the notice of appeal. The respondent's argue that the time period between January 12, 2006, through May 24, 2006, was not tolled because the petitioner's notice of appeal was not a "properly filed" motion that would trigger the tolling mechanism. The petitioner has thoroughly briefed the Court on this issue in his Brief For Excusion. For purposes of the record the petitioner will reply to the respondent's answer.

On January 8, 2006, the petitioner delivered his notice of appeal to prison authorities, specifically Correctional Officer Hedges, for delivery to the clerk of the Delaware Supreme Court. See, HOUSTON v. LACK, 487 U.S. 266, 270, 276 (1988) ( pro se prisoner's notice of appeal deemed filed

on date of delivery to prison authorities for forwarding to court clerk.); also, **LOMAX v. ARMONTROUT,** 923 F.2d 574, 575 (8TH CIR. 1991)(pro se notice of appeal timely when petitioner delivered notice to prison authorities within 30 days of entry of judgment). Attached to the envelopes containing the notice of appeal were 2 pay-to(s) to cover postage cost once the envelopes were weighed in the prison mail room. (See BRIEF FOR EXCLUSION EXHIBIT C). The 2 pay-to(s) required % HEDGES to sign and date them in the petitioner's presense. And further required that the transaction be logged in the unit log book on the same date. A recent resolution on the petitioner's internal grievance regarding the matter found: "The petitioner's pay-to was dated 1/8/06. The pay-to was logged in the housing unit on 1/13/06. The package was mailed out of D.C.C. on 1/14/06 ... "(See EXHIBIT-1-A). Therefore, due to negligence on the part of the correctional officers working BUILDING 17 SHU, the notice of appeal was delayed constituting an impediment external to the petitioner.

On TUESDAY, JANUARY 17, 2006, the clerk issued a notice to show cause, to which the petitioner responded to several times. (See BRIEF FOR EXCLUSION EXHIBITS E-H). On FEBRUARY 15, 2006, the Court directed the State to reply to the petitioner's response. (See BRIEF FOR EXCLUSION EXHIBIT J&K). On APRIL 4, 2006, the Delaware Supreme Court dismissed the petitioner's appeal due to untimely filing. (See, BRIEF FOR EXCLUSION EXHIBIT L). On MAY 24, 2006, the petitioner filed this application for writ of habeas corpus.

Again, the respondent's argue in their answer that because the notice of appeal was dismissed due to untimely filing, the notice was not a "properly filed" motion. So that the time period from JANUARY 12, 2006 through MAY 24, 2006 was not tolled and further that the time period is not subject to equitable tolling since the delay in forwarding the petitioner's notice of appeal was not an extraordinary circumstance sufficient to invoke the doctrine of equitable tolling.

The record is clear that between JANUARY 8, 2006, (date petitioner delivered notice of appeal to prison authorities for forwarding to clerk) through APRIL 4, 2006, (date Delaware Supreme Court dismissed appeal). The petitioner has diligently pursued his claims with the Delaware Supreme Court. TITLE 28 U.S.C. § 2254(b) and (c), makes it abundantly clear that a petitioner's application

for writ of habeas corpus in federal district court based on an alleged federal constitutional violation will not be granted unless the applicant has exhausted the remedies available in the State courts. See, ROSE v. LUNDY, 455 U.S. 509, 102 S.Ct. 1198 (1982).

The petitioner was compeled by 3 2254(b)(c) to exhaust these claims in the state court before proceeding to federal district court. The respondent's argue that as of JANUARY 17, 2006, the date the clerk issued the notice to show cause, that the petitioner was on notice that his appeal was untimely. As such the petitioner should have filed his federal habeas petition to forestall the expiration of the limitation period. The petitioner questions under which TITLE 28 U.S.C. 3 2254 or 2244 would this have been permitted? Study of both sections and the language does not direct a petitioner to take such a route to forestall the expiration of the limitation period. For that matter, nothing within the Delaware Supreme Court Rules puts a prisoner on notice that prison authorities are not considered judicial personnel by the Court. As noted in the BRIEF FOR EXCUSION this extraordinary situation placed the petitioner at an extreme disadvantage with seemingly no remedy. Here prison authorities delayed forwarding the notice of appeal to the clerk past the filing deadline, although the petitioner had done everything possible to comply with the procedural rules. Nevertheless, the appeal was dismissed due to no fault of the petitioner, solely because of prison authority's negligence. The petitioner has lost an entire round of state review and claims 1-11 are deemed exhausted but procedurally defaulted in this petition unless the petitioner satisfies the cause-and-prejudice test. This extraordinary situation is aggravated because the notice of appeal is not a properly filed motion therefore the one-year limitation is not tolled. Other then equitable tolling, what remedy is afforded to a pro se litigant who has diligently tried to comply with all procedural rules but runs afoul of those rules arguably through no fault of his own?

Again, a Court, in its discretion, may equitably toll the one year filing period when "the petitioner has in some extraordinary way.. been prevented from asserting his rights...see, MILLER, id. By definition the word equitable means : marked by due consideration for what is fair and impartial, unhampered by technical rules the law may have devised that limit

recovery or defense. See BARRON'S DICTIONARY LEGAL TERMS.

In both instances above (A) and (B) the petitioner, as a pro se litigant, exercised diligence in investigating and presenting his claims to both the Superior Court and the Delaware Supreme Court at every available opportunity in a timely manner. HOGAN v. McBRIDE, 74 F.3d 144, 147 (7TH CIR. 1996) (if the petitioner has presented his argument to the right courts at the right times -as the state define these courts and times- then the claims are preserved for federal collateral review). The petitioner understands that there is no relaxed standard for pro se litigants. ALEXANDER v. DUGGER, 841 F.2d 371, 374 (11TH CIR. 1988) But the facts from (A) and (B) above combined must constitute an extraordinary way by which the petitioner has been prevented from asserting his rights. This must trigger equitable tolling of the time period from MAY 3, 2005 through APRIL 4, 2006. Anything else and the petitioner will have been made to endure an unnecessarily rigid enforcement of state and federal procedural rules that do not promote the interests of justice.

Additionally, untimeliness alone in the filing of an appeal from denial of state post conviction relief as the only State ground for refusing to consider the merits of petitioner's federal constitutional claims is inadequate. OLIVER v. WAINWRIGHT, 795 F.2d 1524, 1529 (11TH CIR. 1986).

## PROCEDURAL DEFAULT

### (A) THE CAUSE AND PREJUDICE TEST.

When a federal habeas corpus petitioner had failed to follow a rule of state procedure at trial, on appeal or on state post conviction review in the manner or at the time required under state law, the federal courts nevertheless have the power to address the merits of the petitioner's claims. There was discretion, however, to dismiss the petition under the procedural default doctrine. The standard for such dismissal has changed from a deliberate-bypass test to a cause-and-prejudice test. COLEMAN v. THOMPSON, 501 U.S. 722 (1991).

The cause prong of the cause-and-prejudice test is satisfied by some objective factor external to the [defense] that impeded the petitioner's efforts to comply with the state's procedural rule. COLEMAN, id. As forwarded in the petitioner's BRIEF FOR EXCUSION, the petitioner's appeal of the post conviction motion was dismissed due to untimeliness, although the petitioner did deliver the notice

9.

of appeal to prison authorities within 30 days of entry of judgment for forwarding to clerk. See, HOUSTON v. LACK, SUPRA; also, LOMAX v. ARMONTROUT, SUPRA. The dismissal of the post conviction appeal subsequently resulted in claims (grounds) 1 thru 11 of the habeas petition becoming procedurally defaulted.

The respondents agree that cause for the procedurally defaulted claims, 1 thru 11, are attributed to the D.C.C. prison authorities delay in forwarding the petitioner's notice of appeal to the clerk of the Delaware Supreme Court after the petitioner had delivered the notice of appeal to prison authorities for that purpose (See ANSWER pgs. 11-12). See, IVY v. CASPER, 173 F.3d 1136 (8TH CIR. 1999)(it is the fact of nondelivery of prisoner's timely and properly mailed motion, not the reason for that nondelivery, that constitutes cause for the procedural default. Thus it is enough for the [petitioner] to establish, as he has, that the nondelivery of the [notice of appeal] was not the result of any want of attention on his part to the requirements of the states filing deadlines).

Unlike in federal prisons where prisoners can have the date, address and type of outgoing legal mail logged by prison authorities in a ledger, Delaware's state prisons do not have a prison mailbox rule. In a federal prison, if the prisoner should run afoul of filing deadlines, the facility has only to check the ledger to determine the exact date that it was delivered to prison authorities for forwarding to the court. As noted, there were 2 pay-to(s) attached to each manila envelope that would cover postage cost once the envelopes were weighed in the mail room. (See BRIEF FOR EXCUSION EXHIBIT C). Pay-to(s) have to be dated and signed by the unit officer in the inmates presence and then given a log number, which is forwarded to the lead officer on duty for delivery to the mailroom. Although not a ledger such as those provided in federal prisons, this pay-to process is as close as possible to being able to determine the exact date that a state prisoner delivered his outgoing legal mail to prison authorities. Here, the petitioner verified the above above process in three ways: 1. the petitioner secured copies of the actual pay-to(s) from the Business Office at D.C.C. (See BRIEF FOR EXCUSION EXHIBIT C); 2. the petitioner secured a copy of his inmate account for the month of JANUARY 2006, which displayed the date and log numbers of the JANUARY 8, 2006, pay-to(s). (See BRIEF FOR EXCUSION EXHIBIT D); the informal grievance resolution determined that the petitioner's

10.

pay-to(s) were dated on JANUARY 8, 2006. But was not logged in the unit log until FRIDAY, JANUARY 13, 2006. The mailroom received the mail on JANUARY 13, 2006 and mailed it out on JANUARY 14, 2006. It was not received by the clerk until JANUARY 17, 2006. (See ATTACHED EXHIBIT 1-A).

Whether willfully or inadvertently prison authorities were negligent in their duties to forward the notice of appeal to the clerk and thus are the cause of its untimely filing. As such D.C.C prison authorities constitute the objective factor external to the petitioner that impeded his efforts to comply with the state's procedural rules. COLEMAN, id.

## (B) PREJUDICE

The prejudice prong of the cause-and-prejudice test, less frequently litigated then the cause prong, typically is analyzed by looking at some combination of actual innocence, plain error and nonharmless constitutional error. STRICKLER v. GREENE, 527 U.S. 263 (1999). Here the petitioner is uncertain if he must demostrate only how he was prejudiced by D.C.C. prison authorities non-delivery of his notice of appeal to the clerk's office. Or, if he must move to the merits of each procedurally defaulted claim (1 thru 11) that resulted due to the non-delivery and establish prejudice with each claim. As a result of this uncertainty, the petitioner will address both.

### PREJUDICE DUE TO D.C.C. PRISON AUTHORITIES NON-DELIVERY OF NOTICE OF APPEAL.

1. PETITIONER DENIED ACCESS TO THE COURT. The U.S. SUPREME COURT has stated: "It is now established beyond doubt that prisoners have a constitutional right to access to the courts. BOUNDS v. SMITH, 430 U.S. 817, 821, 97 S.Ct. 1491 (1977). The Courts have cited the Due Process Clause, the Equal Protection Clause, The First Amendment and the Privileges and Immunities Clause of Article IV of the Constitution as the basis for the right. MURRAY v. GIARRATANO, 492 U.S. 1, 11 n. 6, 109 S.Ct. 2765 (1989); PETERKIN v. JEFFES, 855 F.2d 1021, 1036 n.18 (3RD CIR. 1988).

Prisoners must be permitted court access that is "adequate, effective and meaningful." BOUNDS v. SMITH, id. at 822. The petitioner has argued in this petition as well as in his BRIEF FOR EXCUSION that under the specific circumstances of this case, there is no adequate remedy to untimely filings which result in dismissal of the appeal due to prison authorities delays in forwarding notice of appeal.[1]

---

1. The petitioner has forwarded a 1983 civil action against D.C.C. to the District court dated Sept. 12, 2006, regarding this matter.

Although all categories of prisoners are entitled to court access and the right extends to postconviction proceedings such as habeas corpus petitions, civil rights actions and other civil proceedings. **BOUNDS v. SMITH, 430 U.S. at 827; also, COFIELD v. ALABAMA PUBLIC SERVICE COMMISSION, 936 F. 2d 512, 517 (11TH CIR. 1991) (right to court access is strongest with respect to "direct and collateral appeals of criminal convictions").**

   2. TOLLING OF TIME PERIOD. The Court may decide that the time period between JANUARY 12, 2006, through MAY 24 was not tolled because the notice of appeal was not properly filed. This due solely to prison authorities failure to forward notice of appeal to clerk after petitioner delivered notice to prison authorities within 30 days of entry of judgment. Further, the Court may decide that the time period is not subject to equitable tolling, preventing the petitioner from having claims 1-11 addressed by federal district court.

   3. ENTIRE ROUND OF STATE REVIEW LOST. Due to no fault of his own, the petitioner has lost an entire round of state court review in the state's highest court which subsequently resulted in claims 1-11 being procedurally defaulted. It is obvious that the petitioner has been made to endure undue hardship and prejudice through no fault of his own. **ALEXANDER v. DUGGER, 841 F. 2d 371, 374 (11TH CIR. 1988) (holding that a habeas petitioner, who had been a pro se litigant when filing postconviction motions in state court... showing that he made a good faith attempt to comply with proper state procedures but was frustrated through no fault of his own when motion he mailed to court not docketed).**

## APPLICATION OF SUPERIOR COURT CRIMINAL RULE 61(i).

   Before moving to establish prejudice in claims 1-11, the petitioner must address the Superior Court's application of a procedural bar when denying postconviction motion.

   The record is clear on the fact that the last reasoned state court to consider claims 1-11 was the Superior Court in the petitioner's post conviction motion. The appeal of the post conviction motion was dismissed due to untimeliness. The post conviction motion was denied on DECEMBER 13, 2005. In the Court's ORDER JUDGE JOHNSTON denied the motion pursuant to Superior Court Criminal Rule 61(i)(4) former adjudication. JUDGE JOHNSTON's application of this procedural bar constitutes an independent and adequate state ground for denial of claims 1-11. A state ground is independent only if the state court actually relied on a state

12.

rule sufficient to justify its decision. A state ground is adequate only if the state court acts in a consistent and principled way concerning its rule. See, **COLEMAN v. THOMPSON, supra.**

**FIRST,** addressing the "independent" aspect of JUDGE JOHNSTON reliance on RULE 61(i)(4). The record is clear that the petitioner alleged BRADY violations, inter alia, in GROUNDS 1, 3, & 8. And alleged a BRADY violation exclusively in GROUND 9. (Compare to claims 1, 2, 8 & 9 in HABEAS CORPUS PETITION). It is well settled Delaware law that when the prosecution fails to disclose material exculpatory evidence in violation of the BRADY rule, postconviction relief cannot be procedurally barred, as a BRADY violation undermines the fairness of the proceeding leading to the judgment of conviction. See, **JACKSON v. STATE, 770 A.2d 506 (Del. 2001);** also, **BRADY v. MARYLAND, 373 U.S. 83 (1963).** Notwithstanding settled Delaware law, JUDGE JOHNSTON applied RULE 61(i)(4). Specifically, in addressing grounds 1-4 in the postconviction motion, JUDGE JOHNSTON found that prosecutorial misconduct had already been adjudicated in either the petitioner's new trial motion or on direct appeal. Review of the record will demonstrate that although falling under the title "prosecutorial misconduct," none of the allegations raised in grounds 1-4 had been formerly adjudicated.

In addressing ground 8, JUDGE JOHNSTON found this allegation to be "essentially the same" as ground 1. Review of the record disputes this finding. (Compare to claim 8 in HABEAS CORPUS PETITION). In addressing ground 9, JUDGE JOHNSTON stated: "the defendant's contention that such materials exists, and that they would have been exculpatory, is pure speculation and is not supported by the record. Again review of the record and documents within the appendix demonstrates that JUDGE JOHNSTON's findings were in error. (Compare to claim 9 in HABEAS CORPUS PETITION).

Additionally, in ground 11 of the postconviction motion, the petitioner alleged 8 seperate claims of ineffective assistance of counsel. (Compare to claim 11 in HABEAS CORPUS PETITION). It has been established that the petitioner filed only one postconviction motion. Accordingly, claims of ineffective assistance of counsel could not have been raised until postconviction proceedings. **REYNOLDS v. ELLINGSWORTH, 843 F.2d 712 (3RD CIR 1988).** Nevertheless, JUDGE JOHNSTON found this claim to be formerly adjudicated. Again, JUDGE JOHNSTON's application of RULE 61(i)(4), former adjudication, was clearly in error. See, **COMBS v. COYLE, 205 F.3d 269, 275 (6TH CIR. 2000).**

A state ground is independent only if the state court actually relied on a state rule sufficient to justify its decision. Here, it was obvious that JUDGE JOHNSTON relied on RULE 61(i)(4) erroneously, so that it is not an 'independent' state ground for denial of the petitioner's post conviction motion.

SECOND, addressing the 'adequate' aspect of JUDGE JOHNSTON's reliance on RULE 61(i)(4). The U.S. SUPREME COURT has found that to be 'adequate' a state procedural rule must be consistently and regularly applied. COLEMAN v. THOMPSON, SUPRA; HARRIS v. REED, 489 U.S. 255 (1989); also, POWELL v. LAMBERT, 357 F.3d 871, 874 (9TH CIR. 2004). There is existence of case law which appears, on its face, to show inconsistent application of Superior Court Criminal Rule 61(i), in two unpublished cases, STATE v. KEITH (APRIL 2004) and STATE v. LAWRENCE (APRIL 2004 Del), both cases appear to have been decided without application of RULE 61(i) procedural bar. Regarding these two cases the State, when inquired by the Superior Court, responded that both defendants withdrew their RULE 61 motions, although there seems to be some indiscrepancies on this point, and entered into plea agreements. The State further argued that the court should not consider unpublished decisions because they have no precedental value. Notwithstanding this argument, there seemed to be an implicit agreement between the Superior Court and the State that no opinion be written for other movants to use. Whatever the case, these two unpublished cases seem to show an inconsistent application by the Superior Court of RULE 61(i).

## PREJUDICE WITHIN CLAIMS 1-11 - CLAIMS 1&2

The facts are indisputable that the State approached men and women after their arrest on serious criminal charges and propositioned these individuals to make damaging statements against the petitioner. Despite all the other evidence supporting this allegation, the COURT need only look to the time and date that MARVIN SWANSON, OTHELLO PREDDUX, BENNIE WRIGHT, BRUCE DUNCAN and MARCIA JETER were approached.[1] The circumstances were all identical or similar. These individuals had

[1] The exact time and date still unknown relating to SWANSON, WRIGHT and JETER. SWANSON and WRIGHT are subject of BRADY violation allegations in this petition. DUNCAN approached on DEC. 19, 2001; PREDDUX approached on MAY 6, 2006.

14.

Somehow run afoul of the law, they lived on or frequented the area of 22nd & LAMOTTE STREET and were therefore approached shortley after their arrest or while their criminal cases were pending. Of the five known witnesses approached under these circumstances, PREDOUX and SWANSON received benefits for cooperating with the State.

The facts and argument supporting the petitioner's allegations that both SWANSON and PREDOUX were awarded benefits for cooperating with the State and that this exculpatory evidence was suppressed by the State has been sufficiently detailed in the application for writ of habeas corpus. (See HABEAS CORPUS PETITION, OPENING BRIEF-GROUNDS 1 & 2)

In their answer, the respondent's argue that, "in the criminal justice system, it is often necessary for prosecutors to rely upon informers." And that, "it has long been recognized that grants of immunity, plea agreements and sentencing leniency are appropriate tools for use in the criminal justice system and simply because a witness received a benefit from the State, does not mean that his testimony was constitutionally inadmissible. (See ANSWER pg 13).

On this point the petitioner absolutely agrees. However, whenever the State reduces any pending charges (related or not) or makes any arrangement with any state witness, disclosure is mandatory. SEE, MICHAEL v. STATE, 529 A.2d 752 (1987)(quoting BRADY v. MARYLAND, id.) Delaware has consistently held that the dropping of a charge against a state's witness is clearly relevant to the issue of bias. See, VAN ARSDALL v. STATE, 524 A.2d 3 (1987). Evidence which the petitioner could have used to impeach PREDOUX by showing bias or interest, as well as exculpatory evidence falls within the BRADY rule. Such evidence is "evidence favorable to an accused "so that, if disclosed and used effectively, it might make the difference between conviction and acquittal. UNITED STATES v. BAGLEY, 473 U.S. 667 (1985).

The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. Indeed, it is upon such subtle factors as the possible interest of a witness in testifying falsely that the petitioner's life and liberty depended. NAPUE v. ILLINOIS, 360 U.S. 264 (1959). Here, the jury was not at liberty to determine PREDOUX' credibility and consider any benefits he received in exchange for his testimony armed with the true facts, as the respondent's suggest.

The record reflects that the State presented PEEDOUX to this jury as a cooperating witness with whom "no deals" had been made thereby strengthening his credibility with this jury. Further, the State argued that "no deals" had been made with any state witnesses in closing arguments, adding integrity to the State's prosecution where none existed. Based on the verdict this jury returned, the State's position on this issue was accepted as the truth.

To satisfy the prejudice prong sufficiently enough to excuse the procedural default, the petitioner must convince the Court that there is a reasonable probability that the result of the trial would have been different if the State had not suppressed exculpatory evidence. STICKLER v. GREENE, 527 U.S. 263 (1999). The record reflects that this was a close case with the jury deliberating in excess of 10 hours over the course of three days. The factual revelation to this jury that the lead investigator and the very prosecutors before them had formulated a corruptive process in which they approached individuals after their arrest on serious charges, propositioned these individuals to cooperate with the State in exchange for benefits and had developed two witnesses in this manner. One testifying in this trial and then was attempting to hide these facts in order to mislead the jury. It is certain that these revelations would have caused this jury to loose considerable, if not all, faith in the investigation and in the State's prosecution. These revelations would have demonstrated for this jury the absolute lack of faith the State had in its own case. And if the State did not believe in its case enough not to strengthen it with untrustworthy witnesses developed through this corrupt practice. This jury could very well have questioned why it was now expected to believe in a case, the lead investigator and state prosecutors did not believe in initially. In that the State's actions prevented the jury from learning the true facts surrounding PEEDOUX, confidence in the verdict is undermined.

As it stands, the State deceptively denied the truthful facts surrounding PEEDOUX and completely suppressed the benefit awarded to SWANSON, so that the jury never knew that a full year before PEEDOUX was approached. SWANSON had been awarded a release from serving 5 years LEVEL I in exchange for agreeing to cooperate with the State. The State's actions worked to the petitioner's substantially disadvantage infecting the entire trial. Prejudice is sufficiently established to excuse procedural default.

## (B)CLAIM 3

The record is sufficiently established at this point so that the Court can take a wide lense view of this case from its inception right up to the present application for writ of habeas corpus. In so doing, the Court can clearly see a pattern of actions on the part of the State prosecutors, CYNTHIA KELSEY and JAMES RAMBO, and the lead investigator, DT. ANDREW BEACK, calculated to ensue that the petitioner would be convicted on these charges. This fact is none the more obvious then in the development and handling of State witness OTHELLO PREDOUX.

The only point that needs to be made here is how the State's misleading position during the MAY 8, 2002, office conference, which prompted the HONORABLE JUDGE HAILE ALFORD to postpone the trial, prejudiced the petitioner. To establish prejudice, the petitioner must show 'not merely that the errors at [trial] prejudiced the petitioner, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" **MURRAY v. CARRIER, 477 U.S. at 493-94(1986).**

Without PREDOUX as a damaging State witness testifying in this trial, the prosecution would have rested on the shoulders of eyewitnesses VERNON MAYS, MATHEW CHAMBLEE, ROUETTA SUDLER and TYSHIEK McDOUGAL. The record reflects that MAYS and CHAMBLEE recanted their previous identification of the petitioner as the shooter at trial. Both SUDLER and McDOUGAL claimed memory loss at trial so that their incriminating testimony came in through TITLE II SECTION 3507. To clarify, TYSHIEK McDOUGAL was not an eyewitness to the shooting. Review of the record demonstrates that McDOUGAL gave a statement to investigators in which she indicated that she saw the petitioner with a gun 5-10 minutes before the shooting. Both SUDLER and McDOUGAL indicated that they each had a history of drug abuse in the years leading up to the night of the shooting.

The petitioner was prejudiced by the State's calculated lies and withholding of the true facts surrounding PREDOUX from JUDGE ALFORD at the MAY 8, 2002 office conference, which led to the subsequent postponement of the MAY 7, 2002 trial. This because the five month postponement provided the State with time to develop PREDOUX into a damaging State witness. And as a damaging State witness PREDOUX, although not ideal, helped strengthen and bolster a State case that was relatively weak up to that point. The Court need only imagine if the State had disclosed all the true facts surrounding PREDOUX to

17.

JUDGE ALFORD, such as the fact that they had approached PEEDOUX on MAY 6, 2002 in an attempt to solicite damaging testimony against the petitioner and that PEEDOUX indicated that he wanted a deal in exchange for his cooperation therefore wanted his attorney present for further discussions. And that this is what prompted the pro-offer from PEEDOUX to his attorney, who called JAMES RAMBO on MAY 7, 2002 after the jury had been seated. Further, that PEEDOUX pro-offer basically duplicative in nature. Based solely on the tone of JUDGE ALFORD's questioning of the State prosecutors after the oral application was made to disqualify defense counsel, this Court must agree that JUDGE ALFORD would have excluded PEEDOUX as a witness and the trial would have proceeded as scheduled. Which in turn would have meant that the State's prosecution would have hinged on the remaining eyewitnesses.

The UNITED STATES SUPREME COURT has indicated on previous occassions that it is improper for the prosecution to intentionally delay trial to gain some tactical advantage over [defendants], SEE, **UNITED STATES V. MARION, 404 U.S. 307, 325 (1971).** The State prosecutors went into the MAY 8, 2002, office conference with the set purpose of securing more time before the trial got officially underway so that they could secur PEEDOUX as a witness in order to strengthen a weak case that hinged on inconsistent eyewitnesses. The fact that the State requested that the jury not be sworn in on MAY 7, 2002, proves that they were anticipating PEEDOUX 'contacting them. With the trial seemingly underway securing PEEDOUX would only be possible if the trial was delayed. Realizing that it had a case that would be unsuccessful, the State violated the petitioner's due process rights by withholding all the facts from JUDGE JOHNSTON, so that she could not make a determination that would have excluded PEEDOUX as a witness. The subsequent postponement gave the State the advantage of adding another witness to its prosecution.

Therefore, the State's lies and withholding of the true facts surrounding PEEDOUX, worked to the petitioner's substantial disadvantage because it permitted the State the opportunity to strengthen its case. The petitioner has sufficiently established prejudice to excuse the procedural default.

18.

## (c) CLAIM 4

The Court will see that this claim is not essentially the same as claim 15. This claim dealt solely with the State's closing arguments while claim 15 dealt with the State's opening remarks. Further, the petitioner objected to the State's closing remarks when State prosecutor KELSEY implored the jury to keep in mind that someone had approached MAYS and intimidated him. The record reflects that this marked the fifth time during the trial where the State suggested or insinuated witness tampering and intimidation without admitting any competent evidence to support these highly prejudicial arguments. Here the petitioner need only establish prejudice to excuse the procedural default.

The repeated suggestions and insinuations that the petitioner had the wherewithal to tamper with the judicial process was clearly calculated to make the jury believe that the petitioner was implicitly responsible for the state witness' inability to identify him as the shooter or recall events from the night in question on the witness stand.

In essense, the State prosecutors wanted the jury to believe that witnesses were afraid to identify the petitioner as the shooter in the courtroom because they had been approached on the street and coerced or intimidated by some unidentified person acting on the petitioner's directives. These suggestions and insinuations were not isolated, momentary aberrations occuring in the heat of trial but were deliberate, calculatingly malicious efforts to make the jury dislike the petitioner by making references to matters that was not in evidence. BERGER v. UNITED STATES, 295 U.S. 78 (1935); U.S. v. PHILLIPS, 476 F.2d 538 (1973).

The record reflects that the State made these highly prejudicial suggestion during the re-direct examination of VERNON MAYS after cross examination revealed MAYS' uncertainty and inability to identify the petitioner as the shooter. The State's timing can only be construed as a calculated effort to make the jury believe that MAYS was recanting his previous identification because he'd been intimidated by someone acting on the petitioner's directive. The State revisited their prejudicial arguments during the direct examination of MATTHEW CHAMBLEE, who testified directly after MAYS. On direct CHAMBLEE initially stated that he could not see the shooter's face. Cutting CHAMBLEE off State prosecutor RAMBO asked CHAMBLEE had anyone in the neighborhood approached him with a police report.

19.

This question considering its timing and coming directly after MAYS' testimony was clearly calculated to make the jury believe that CHAMBLEE had been approached on the street and coerced or intimidated thus the reason why he was unable to identify the petitioner. Again the State made this highly prejudicial suggestions during the direct examination of OTHELLO PREDOUX. This after PREDOUX repeatedly claimed memory loss to all operative facts from the night in question. Again it is clear that the State wanted the jury to make the connection between PREDOUX' sudden amnesia and his being intimidated by some act of the petitioner. Finally, during closing arguments the State made the highly prejudicial argument of witness intimidation to the jury at which point the petitioner objected since the State had made these suggestions throughout the trial and was closing their case without ever presenting a shred of competent evidence to support those arguments. Thus, there is little doubt that this was a calculated effort by the state to make the jury believe that the petitioner was guilty of witness tampering and intimidation.

As such, the State prejudicial suggestions and insinuations imply actions by the petitioner about which no competent evidence was ever admitted to support. **JOHNSON v. UNITED STATES, 347 F.2d 803 805(1965).** By doing so, the State succeeded in making the jury believe that the uncertainties and inconsistencies by their witnesses must be attributed to the petitioner. This shifted the burden of proof to the petitioner and violated his right to a fair trial. **BROWN v. UNITED STATES, 370 F.2d 242, 246(1966).**

The State's prejudicial suggestions and insinuations infused this entire trial with a negative undercurrent and worked to the petitioner substantial disadvantage. The jury surely adopted the State's insinuations after witness, after witness, either recanted or claimed memory loss. Those prejudicial prejudicial suggestions when not supported by a shred of admitted competent evidence infected the entire trial with constitutional error, thus distorting the evidence so that the State's inconsistent eyewitnesses became the petitioner burden. This violates due process. Prejudice must be sufficiently established to excuse the procedural default.

### CLAIMS 5

Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S.C.A. CONST. AMEND. 14. And Courts must take steps by rules and regulations that will protect their processes from prejudicial outside interferences. Neither prosecutors, defense counsel, the accused, court staff nor enforcement officers coming under jurisdiction of the court should be permitted to frustrate its function. SHEPPARD v. MAXWELL, 384 U.S. 333 (1966). The prejudicial outside interference here was the bailiff's unauthorized ejection of people clearly associated with the petitioner in a non-discreet manner that caused a negative commotion in view of the jury. This unauthorized act was precipitated by the State's highly prejudicial suggestions and insinuations of witness tampering, witness intimidation and gang affiliations. The record reflects that by the third day of trial State witnesses MAYS, CHAMBLEE and SUOLER[1] had already testified. Given the nature of their testimony, specifically the recantations and sudden memory loss along with the State's insinuations that the petitioner was implicitly responsible for their witness' inconsistent trial testimony because of the alleged "DOUBLE-DEUCE GROUP of 22ND STREET REGULARS." It is reasonable for this Court to conclude that security and enforcement personnel, like the jury, would begin to assume that the large number of the petitioner's family and friends attending the trial were, in fact, part of this alleged "DOUBLE DEUCE GROUP" whom operated on a "code of silence." Under this belief the bailiffs and enforcement officers began denying the petitioner's family entry into the courtroom. They also began making unreasonable demands of the petitioner and seeing covert activity in common gestures, such as the petitioner waving by to family members when he exited the courtroom, which was seen by enforcement officers as covert hand gestures between gang members. All this leading up to paranoia that caused the bailiff, without any authorization, to eject people clearly associated with the petitioner in a non-discreet manner that caused a negative commotion in view of the jury.

In their answer, the respondents seem to argue that the unauthorized ejections, the resulting negative commotion and subsequent prejudice to the petitioner was somehow his fault therefore excusable. The petitioner certainly did not propose to that jury that there was a "DOUBLE-DEUCE GROUP/22ND STREET REGULARS" whom operated on a conspiratal "code of silence" set into motion after the shooting. Nor did the petitioner

21.

suggest or insinuate to that jury that witnesses had been coerced or intimidated. The cause of the bailiff's unauthorized ejections rests with the State. This Court need only look to the bailiff's explanation for the unauthorized ejections to find merit to which party was the cause of the bailiff's unauthorized actions. (See Appendix A-141). The bailiff specifically stated: "And with the gang related relations that we have in the Courts, hand signals, eye contact, those things can be effective in the Court system and they can take us out!"

The State's prejudicial suggestions even caused defense counsel to demand that the petitioner not look at the State's witnesses while they testified. This because defense counsel became concerned that the jury was beginning to believe that the State's eyewitnesses were intimidated by the petitioner and did not want the jury to interpret any actions by the petitioner, including staring, that would support that belief. So while defense counsel was demanding that the petitioner not look at the testifying witnesses, the enforcement officers are demanding that the petitioner not look anywhere else in the courtroom except the witness stand. This while the trial is in session. Again, due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. **U.S.C.A. CONST. AMEND. 14.**

Despite the arguments above, the issue here is whether the bailiff's unauthorized ejections that caused a negative commotion in view of the jury and lack of a curative instruction resulted in prejudice sufficient to excuse the procedural default.

A special burden, as usual, rests on the trial judge to control the conduct of court's officers and the trial judge should act at times even without an objection. **WASHAM v. STATE, 235 A.2d 280 (1967).** Here the trial judge agreed that the bailiff should have come to her first and advised her as to what was going on. (See Appendix A-140). At that point the trial judge should have given a sua sponte curative instruction to the jury or alternately proposed that a curative instruction be given to the jury to the effect that, the jury was not to assume or associate any wrongdoing on the part of the petitioner that resulted in

---

[1.] ROHETTA SUDLER INITIALLY REFUSED TO EVEN ENTER THE COURTROOM. (See. APPENDIX A-134).

the bailiff's ejection of the petitioner's family members. The trial judge should have also made the jury aware that the women had been talking to each other in the courtroom after being told not to do so and therefore were ejected. (See Appendix A-140). And further that the bailiff's actions were not authorized, so that the negative commotion that occured should likewise not be attributed to the acts of the petitioner. If, defense counsel then contested that proposal, any prejudice the petitioner incured could alternately be attributed to ineffective assistance of counsel.

Failure to give such a curative instruction allowed the jury to unjustifiably assume that the petitioner had done something wrong. The ensuing negative commotion that took several minutes to resolve, the visibly heightened security following the commotion, the half hour recess followed by absolutely no explanation for the events that just occured could only lead that jury to conclude that the petitioner had done something to warrant all of the courtroom reactions. Standing alone the trial judge's failure to give a sua sponte curative instruction may not rise to the level of a constitutional error but when coupled with the pattern of egregious prosecutorial misconduct, the other constitutional errors, and the highly prejudicial suggestions and insinuations of witness intimidation and gang affiliation. This Court must agree that the trial judges failure to give a sua sponte curative instruction permitted the jury to believe that each negative twist and turn of the trial all added up to the fact that the petitioner was a dangerous man likely guilty of the crime against him. Therefore, the trial judge's failure to instruct the jury worked to the petitioner's substantial disadvantage by permitting the jury to become biased against him. The petitioner has established prejudice sufficiently enough to excuse the procedural default.

## CLAIM 6

Individually, the three errors committed at trial were constitutional errors standing alone that violated the petitioner 14 AMENDMENT right to due process. BROWN v. ALLEN, 344 U.S. 443 (1953); also, COOPER v. WAINWRIGHT, 807 F.2d 881, 888-89 (11TH. CIR. 1986). The test applied to determine whether a trial error makes a trial fundamentally unfair is whether there is reasonable probability that the verdict might have been different had the trial been properly conducted. KIRKPATRICK v. BLACKBURN, 777 F.2d 272,

23.

278-79(5TH CIR.1985), Several errors taken together can also violate a petitioner's right to due process and cause the trial to be fundamentally unfair. LUNDY v. CAMPBELL,888 F.2d 467,481 (6TH CIR.1989). The Court has no set formula to perform a cumulative error analysis and each case must be independently examined. LAVERNIA v. LYNAUGH, 845 F.2d 493,496(5TH CIR.1988).

The three constitutional errors were not harmless as the respondents argue. Nevetheless, the harmless error standard for determing whether habeas relief must be granted for constitutional errors of the trial type is whether the error had substantial and injurious effect or influence in determining the jury's verdict. When a federal judge is in grave doubt about whether a trial error of federal law satisfies this standard, the error is not harmless and the habeas corpus petition must win. In addition, a possible exception to the standard exists if a deliberate and especially egregious trial-type error or one that is combined with a pattern of prosecutorial misconduct, so infected the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. See, BRECHT v. ABRAHAMSON,507 U.S. 619 (1993).

Individually each constitutional error that occured at trial is subject to the harmless standard of review to determine whether relief must be granted. (See HABEAS CORPUS PETITION GROUNS 13&14). The fundamentally unfair trial which violates due process is rare, but when it does occur cumulative error analysis should be available to habeas petitioners. DERDEN v. McNEEL,978 F.2d 1453(5THCIR.1992). In that the first and second errors(compare GROUNDS 13&14) were presented individually to the highest state court,[1] they are exhausted with no procedural bars to impede the Court from reaching the merits of this argument.

As a cumulative error argument requiring cumulative error analysis, the record reflects that this claim is exhausted but procedurally defaulted unless the respondents can establish cause-and-prejudice. CAUSE has been established and acknowledged by the respondents. The petitioner need only establish prejudice to excuse the procedural default.

Cumulatively the constitutional errors add up to plain error that made the trial fundamentally unfair.

---

[1] THIRD ERROR PRESENTED TO SUPERIOR COURT IN POST CONVICTION MOTION-GROUND 6.

These errors were also combined with a pattern of prosecutorial misconduct. (See HABEAS CORPUS PETITION GROUNDS 1-4, 8 & 9). All combined, the errors eviscerated defense counsel's credibility in violation of the petitioner's 6TH AMENDMENT right, revealed to the jury the most prejudicial type of information, that being the petitioner's prior troubles with the law in violation of the petitioner's 14TH AMENDMENT right and exposed the jury to blatant hearsay within hearsay evidence that pressed upon the jury the belief that a vast number of uncooperative witnesses existed, whom were operating on a code of silence, this in violation of the petitioner's 14TH AMENDMENT.

With constitutional error after constitutional error, it can reasonably be argued that the jury reached a point where they felt that the defense warranted little or no trust. This despite the evidence that was presented at the trial. Without faith in defense attorney MAURER and realizing that the petitioner had prior troubles with the law coupled with the prejudicial hearsay within hearsay testimony about a vast number of uncooperative witnesses. Some jurors may well have reached a point where they simply tuned out the trial proceeding prematurely, convicting the petitioner solely on the cumulative effect of those errors. Therefore, the cumulative effect of the trial errors worked to the petitioner's actual disadvantage and add up to plain error that made the trial fundamentally unfair. Prejudice has been sufficiently established to excuse the procedural default.

### CLAIM 7

The petitioner need only satisfy the prejudice prong to excuse the procedural default. To establish prejudice under the cause-and-prejudice standard, the petitioner must show not merely that the errors.. at trial created a possibility of prejudice but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *CARRIER, 477 U.S. at 493-94* (quoting U.S. v. FRADY id.)

In their answer, the respondent's argue that the CONFRONTATION CLAUSE guarantees an opportunity for effective cross examination, not cross examination that is effective in whatever way, and to whatever extent, the defense migh wish. DELAWARE v. FENSTERER, 474 U.S. 15,20 (1985), However, for purposes of the CONFRONTATION CLAUSE there is no significant difference between a witness who fails to testify about an

alleged offense because he is unwilling to and a witness, who's silence is compelled by an inability to remember. On the witness stand the jury may view the demeanor of each as they indicate why they will not discuss the crucial events. But in neither instance are the purposes of the CONFRONTATION CLAUSE satisfied. **CALIFORNIA v. GREEN, 399 U.S. 169-170 (1970).**

What has become apparent in Delaware criminal prosecutions is that the State prosecutors are relying, if not banking, on TITLE 11 SECTION 3507 to prove their cases at the expense of the adversarial process. Prior to trial a damaging taped statement is secured from a witness. At trial, that witness' only purpose of being called is to serve as a conduit for the admission of stale evidence, the reliability of which can never be tested before the trial fact finder by cross examination of the witness about the operative events from the night in question because the witness now claims memory loss. In this scenario, the prior damaging taped statement basically goes from introduction of the evidence to the jury, straight through to the deliberating room unchallenged.

Here, the opportunity for cross examination is inadequate because TITLE 11 SECTION 3507 invariably conflicted with the CONFRONTATION CLAUSE and the petitioner's constitutional right to confront the witness against him. **POINTER v. TEXAS, 380 U.S. 400 (1965); DOUGLAS v. ALABAMA, 380 U.S. 415 (1965).** The petitioner could not effectively cross examine a witness that claims memory loss and likewise could not effectively cross examine a video tape. The key word here is effectively. The jury was left essentially with the unelucidated damaging accusations made by SUDLER, McDOUGAL and PREDOUX in their prior taped statements. **DUTTON v. EVANS, 400 U.S. 74 (1970).**

The contents of those damaging taped statements were effectively utilized by the State in closing arguments to the State's advantage and the petitioner's disadvantage, since the petitioner was prevented from using very little from either witness' in-court testimony that would refute or challenge the witness' prior damaging taped statements. The record reflects that effective cross examination of the State's remaining eyewitnesses, MAYS and CHAMBLISS, resulted in both witnesses essentially recanting their previous identification of the petitioner as the shooter. And the petitioner was able to effectively attack and discredit the State's prosecution.

With regards to SUDLER, McDOUGAL and PEEDOUX, stand-by counsel directed each witness to stand the witness stand and claim memory loss to whatever questions they could not remember. Which translates to claim memory loss to any question you don't want to answer. The edge goes to the state because they have a prior damaging taped statement that SECTION 3507 permits to be introduced as evidence. This trial problem would be equalized if the petitioner in turn had prior taped statements where the witnesses recanted all their previous statements. But that is not the case.

The petitioner could not even utilize the witnesses in-court amnesia to any real advantage because the State seized upon their witnesses convenient, albeit coached, memory loss as another opportunity to forward to the jury the prejudicial suggestion that the witness' amnesia was the product of witness intimidation.

The jury had no other options but to accept the State's case as the truth when the bulk of that case came in literally unchallenged courtesy of TITLE II SECTION 3507. This gave undue strength to the State's case that would not have existed had the petitioner been able to effectively cross examine these witnesses. This is exactly what the State had in mind when they sought the delay of the MAY 7, 2002 trial. They could not have put PEEDOUX on the witness stand, had that trial gone forward, because if PEEDOUX claimed memory loss there was no prior taped statement to rely on. The same result obtains when SUDLER and McDOUGAL claimed memory loss. The State could care less about their in-court statement because they have a prior damaging taped statement to rely on. All the witnesses were simply conduits through which the damaging taped statements come in. The only thing left for the State to do was give the jury a viable reason why the eyewitnesses in-court testimony was not consistent with their prior taped statements. The record reflects that the State did that by suggesting and insinuating witness intimidation.

This must constitute a breakdown in the adversarial process, so that the integrity of the trial was eroded and absolutely no faith can be put in the outcome. Admission in the absence of effective cross examination of certain types of suspect and highly damaging statements is one of the threats to a fair trial against which the confrontation clause was directed. BRUTON v. UNITED STATES, 391 U.S. at 136(1968).

Delaware courts have interpreted JUSTICE WHITE's opinion in CALIFORNIA v. GREEN, SUPRA., to suggest a case-by-case approach with emphasis on each case's particular facts as appropriate in determining whether there has been a violation of the CONFRONTATION CLAUSE due to lack of effective cross examination. DUTTON v. EVANS, id. This case's particular facts must lead this Court to conclude that the petitioner's right to effective cross examination was denied thus violating the CONFRONTATION CLAUSE. The petitioner has established prejudice sufficient enough to excuse the procedural default.

## CLAIM 8

(a) In their answer, the respondent's argue that, "the record is clear, however, in APRIL 2002, PREDOUX had been found to have violated his probation, and that he did not enter a plea agreement concerning his other charges until after FLOWERS trial. There is simply no basis for his claims in the record."

What the record is clear on, is that PREDOUX entered into a reduced plea on JULY 29, 2002, eleven days after he made an extremely damaging taped statement identifying the petitioner as the shooter. This reduced plea occured roughly 3 months before the petitioner's trial in OCTOBER 2002. The State agreed to drop a Carrying Concealed Deadly Weapon charge which carried a minimum/mandatory LEVEL I sentence for 2ND Conviction. And PREDOUX plead guilty to Poss. Deadly Weapon Person Prohibited, which carried no min./mandatory jail time, Conspiracy 2ND and Resisting Arrest. The State recommended a LEVEL II sentence suspended for time served followed by probation, notwithstanding that this was PREDOUX' second weapons conviction. A special condition of that reduced plea and sentence recommendation was that PREDOUX would testify in any proceedings if called by the State. (See Appendix A-151). PREDOUX acknowledged at trial that the only proceeding he would be a witness in was the petitioner's trial. (See Appendix A-151). Therefore, there was a clear correlation between the reduced plea and sentence recommendation and PREDOUX' willingness to testify against the petitioner. The special condition of the reduced seals the deal. Whenever the State reduces any pending charges (related or not) or makes any arrangement with any state witness, disclosure is mandatory. BRADY v. MARYLAND, 373 U.S. 83 (1963). The respondent's argument is simply without merit.

The record reflects the chronological order of events from MAY 6, 2002, when the State approached

28.

PREDOUX, right up through the petitioner's trial. So that when PREDOUX denied that he had any deals, agreements or promises regarding his charges, the State prosecutors were supposed to correct that false testimony. **ALCORTA v. TEXAS, 355 U.S. 28 (1957)**. It is well established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the 14TH AMENDMENT. **MOONEY v. HOLOHAN, 294 U.S. 103 (1935); PYLE v. KANSAS, 317 U.S. 213 (1942)**.

Here the State elicited the false testimony from PREDOUX and then argued a "no deals" position with regard to any state witness during closing arguments. Obviously, State prosecutor KELSEY though it was important to establish before the jury on direct examination of PREDOUX that no deals had been made with him. And the "no deals" argument during closing was the last testimony heard by the jury about the matter from the State's side.

The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a petitioner's life and liberty may depend. **NAPUE v. ILLINOIS, 360 U.S. 264 (1959)**. The petitioner should have been allowed to reveal the entire truth surrounding PREDOUX' motivation for cooperating with the State to the jury. By being prevented from doing so due to the State's suppression of PREDOUX' benefits and the calculated suppression of the SWANSON benefit almost a year in advance of PREDOUX, the State sufficiently deprived the petitioner of his fundamental right to confront the witness and expose factually his bias. This was aggravated further by the State's utilization of that suppressed evidence to elicit and argue to the jury a point founded on false testimony. This worked to the petitioner's substantial disadvantage and infected the entire trial, with constitutional error. The petitioner has established prejudice sufficient to excuse the procedural default.

(b) The Court must keep in mind that the actual exculpatory statements provided to investigators by MARVIN SWANSON and BRUCE DUNCAN are still being withheld by the State. Therefore it is extremely frustrating that the respondents are able to argue here that SWANSON and DUNCAN did not identify JOE HARRIS as the shooter, when no one but the respondents have seen the actual video taped statements of either witness. This violates BRADY standing alone.

29.

The respondent's cite the Supplement Police Report as its basis to argue that: "The record does not support [FLOWERS] contention that SWANSON would identify JOE HARRIS as the shooter. Infact, the record show that SWANSON could not identify the shooter. (See Appendix A-82). For the sake of clarification the statement(s) that SWANSON provided to investigators on AUGUST 2,1998, (See Appendix 82&83-A), is not the statement that is the basis of the petitioner's BRADY violation claims regarding this witness.(See HABEAS CORPUS PETITION 1,2&9). The exculpatory statement that the petitioner continues to refer to was provided to investigators at GANDER HILL some time in the opening months of 2001.(Exact date and time unknown due to withholding). The early 2001 exculpatory statement was made by SWANSON shortly after he had been convicted and sentenced to five years LEVEL II on drug charges. (See Appendix A-96). It is the same early 2001 statement that State prosecutor JAMES RAMBO notified former defense counsel, THOMAS A. PEDERSEN, of at the MAY 15,2001 office conference. (See Appendix A-19). In that statement, SWANSON (name omitted) identified an additional (second) shooter. PEDERSEN requested that BRADY statement by letter dated MAY 31,2001. (See Appendix A-19). In that SWANSON was being a confidential informant, PEDERSEN sought and received confirmation from the State that the confidential informant, who identified an additional shooter in the GANDER HILL interview was infact MARVIN SWANSON. (See Appendix A-21).

Either the State's prosecutors, KELSEY and RAMBO, did not forward this exculpatory statement to MRS. MCFARLAN in the Department of Justice and therefore Mrs.McFARLAN is citing the AUGUST 1998 statements out of ignorance. OR, the respondents are deceitfully attempting to mislead the Court. Whatever the case may be, the exculpatory statement made by SWANSON in the opening months of 2001 is the basis of the petitioner's BRADY argument regarding this witness. (See HABEAS CORPUS PETITION GROUND 9). The release from serving that 5 year sentence SWANSON was awarded for cooperating with the State is, inter alia, the basis of arguments raised in this petition. (See HABEAS CORPUS PETITION GROUND 1&2). This COURT must not confuse the AUGUST 2,1998 statements with the early 2001 exculpatory statement. They are two different statements.

Likewise BRUCE DUNCAN provided investigators with an exculpatory statement on DECEMBER 19,2001. (See Appendix A-14). At that interview DUNCAN drew a map.(See Appendix A-15-16).

The State prosecutors sent defense attorney, MAURER, the map when they notified him of the exculpatory statement. (See Appendix A-14). From that December29,2001 exculpatory statement, the State has only turned over the map drawn by DUNCAN. The actual tape has been withheld up to this point.

Nevertheless, on the map drawn by DUNCAN are several structures representing buildings, houses and cars on 22ND & LAMOTTE STREET from the night of the shooting. DUNCAN wrote the petitioner's name in a place on the map obviously meant to indicate where the petitioner was standing when the shots were fired that killed Smiley. DUNCAN also wrote the name Joe, i.e Joe HARRIS, in a place on the map obviously meant to indicate where Joe HARRIS was standing.

Because the petitioner has not been permitted to review the actual exculpatory statements provided by SWANSON and DUNCAN to investigators. The petitioner has consistently asked the reviewing courts to reserve making a decision on the merits of this claim until the State has been made to turn over the actual withheld statements from both men. Only then will the Court be able to, inter alia, verify two things: 1. the identity of the additional (second) shooter provided to investigators by SWANSON in the early 2001 interview at GANDER HILL, and, 2. the nature of DUNCAN's inclusion of Joe HARRIS in his exculpatory statement. With those two points verified the Court can then reach the merits of this claim.

The petitioner will now establish sufficient prejudice to excuse the procedural default. This can be accomplished in two ways since this claim consists of a BRADY violation, where the State elicited and utilized false testimony. And the actual withholding of SWANSON and DUNCAN's statements.

First, the record is sufficiently developed so that this Court can determine that OTHELLO PREDOUX and MARVIN SWANSON did receive benefits from the State for their cooperation. At trial, the jury is the sole trier of fact, responsible for determining witness credibility and resolving conflicts in testimony. Jurors should have every opportunity to hear impeachment evidence that may undermine a witness' credibility. BRADY v. MARYLAND, supra,. In UNITED STATE v. BAGLEY, 473 U.S. 667 (1985), the Court disavowed any difference between exculpatory and impeachment

31.

evidence for **BRADY** purposes.

A central point that made the State's prosecution successful was their ability to argue to the jury that the integrity of their case was not compromised due solely to their argument that no state witnesses had received any benefits for cooperating with the State. The State approached the issue first with PEEDOUX obviously meaning to get it out in the open to mitigate any taint to PEEDOUX credibility that would occur if defense counsel made the allegation during cross examination. After PEEDOUX denied that hed been awarded any deals regarding his charges, the State raised the issue again during closing arguments. This after defense counsel had attempted to impeach PEEDOUX credibility on cross. During closing, the State argued that PEEDOUX did want a deal for cooperating with the State, but no deals were awarded to him. (See Appendix A-165). The State's argument shored up the integrity of the State's case which had become compromised, thus making their case more palatable to the jury. When the truth of the matter was that PEEDOUX had received a reduced plea after giving a damaging statement and agreeing to testify at the petitioner trial. The State had further plans to favorable resolve his pending drug charges after the petitioner's trial, which was exactly what happened less than a month after the petitioner's trial.

The truth surrounding benefits awarded to State's witnesses was evidence favorable to the petitioner, so that, if disclosed and used effectively might have made the difference between conviction and acquital. **U.S. v. BAGLEY, id.** Had the petitioner been able to make the State acknowledge by its own admission or through cross examination of PEEDOUX or alternately calling SWANSON to testify, that benefits had been awarded to State witnesses and that these witnesses had been developed solely because the State approached them deals in hand. That jury would have undoubtably questioned the integrity of the prosecutors and lead detective, and unquestionably would have lost significant confidence in the State's prosecution. This because it would have revealed that the State's case was founded, in part at least, through corruptive practices that produced equally corrupted witnesses. This fact could have been utilized by the petitioner as a trial strategy, that being to discredit the investigation and the case it produced. See, e.g., **BOWEN v. MAYNARD, 799 F.2d 593, 613 (1986)**

(" a common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and [we] may consider such use in assessing a possible BRADY violation."); LINDSEY v. KING, 769 F.2d 1034, 1042 (1985) (awarding new trial of prisoner convicted in LOUISIANA state court because withheld BRADY evidence "carried within it potential..for the.. discreting.. of the police methods employed in assembling the case.") When the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it. See KYLES v. WHITLEY, 514 U.S. 419 (1995).

Peecoux 'damaging taped statement was used by the state to bolster and corroberate the State's other eyewitness statements, all adding up to form the fabric of the State's case Additionally, the State's suppression of SWANSON and PEEDOUX' benefits was aggravated further when that suppression was used by the State, enabling them to elicit and argue false testimony from PEEDOUX, and during closing arguments. The State's eliciting and utilizing false testimony worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with constitutional error. Prejudice has been established sufficiently to excuse the procedural default.

## CLAIM 9

It is time for this Court to stop this game of cat and mouse being played by the respondents. In their answer, the respondents alternately argue that the petitioner has failed to establish that the witness' statements exist or that those statements were exculpatory. That defense counsel was fully aware of the existence of all four witnesses and that the prosecutors supplied defense counsel with "statement summaries" and other BRADY material relating to these witnesses."

On the one hand, the respondent's challenge the actual existence of the exculpatory statements made by MARVIN SWANSON, BRUCE DUNCAN, BEULIE WRIGHT, EARL BAISMORE (formerly BALTIMORE, MD. witness) and CHARMAIN MAYO. Then on the other hand the respondents argue that, "defense counsel was fully aware of the existence of all four witnesses and that the prosecutors supplied defense counsel with "statement summaries" and other BRADY material relating to these witnesses." Which is it?

It is highly unlikely that State prosecutor JAMES RAMBO would approach former defense attorney, THOMAS A. PEDERSEN ESQ., and indicate to him that the State had a confidential informant, who had been interviewed at GANDER HILL sometime before the MAY 15,2001 office conference, who identified an additional shooter (second) besides the petitioner, if that witness' statement did not exist. (See Appendix A-19). It is highly unlikely that the State prosecutors would shortly thereafter confirm that the confidential informant was MARVIN SWANSON, if the witness' statement did not exist. (See Appendix A-21). It is highly unlikely that THOMAS PEDERSEN would file a Motion to Withdraw as counsel in AUGUST 2001,due to a conflict of interest regarding confidential informant MARVIN SWANSON. And indicate as much in his motion to JUDGE HAILE ALFORD, if the witness' statement did not exist. [1] (See Appendix A 23-25). It is highly unlikely that JUDGE ALFORD would grant PEDERSEN's motion to withdraw, if the witness' statement did not exist. It is highly unlikely that PEDERSEN would confirm all the above facts in a JANUARY 23, 2006 letter, if the facts were not truthful. (See Appendix A-95).

Likewise, it is highly unlikely that State prosecutor CYNTHIA KELSEY would notify defense counsel, EUGENE MAURE ESQ., by letter dated DECEMBER 21,2001 and indicate to him that another individual named BRUCE DUNCAN stated that the petitioner was not the shooter, if this witness' statement did not exist. (See Appendix A-14). It is highly unlikely that MRS. KELSEY would include in her letter to defense counsel, a map DUNCAN drew at the interview, if the witness' statement did not exist. (See Appendix A 15-16).

Again, it is highly unlikely that the State prosecutors would turn over to defense counsel, a copy of an unintelligible taped statement of a witness named BENNIE WRIGHT, which the State indicated was BRADY material, if that witness' statement did not exist. (See Appendix A 35-36). It is highly unlikely that MAURER would file a Motion For Production of BRADY MATERIAL in Superior Court on April 15, 2002, specifically requesting an intelligible copy of BENNIE WRIGHT's taped statement, along with a current address, police interview notes and transcriptions of the witness' statement, if the witness' statement did not exist. (See Appendix A 35-36). It is highly unlikely that JUDGE ALFORD would conduct an office conference,

---

[1] MARVIN SWANSON'S NAME WAS INTENTIONALLY OMITTED FROM THE MOTION TO WITHDRAW.

34.

relating specifically to DISCOVERY on APRIL 22,2002, and ORDER that DISCOVERY materials be delivered by APRIL 26,2002, if the statements did not exist.(See Del. Okt at 43).

It is highly unlikely that the state prosecutors would turn over to the defense a SUPPLEMENT POLICE REPORT containing a redacted statement of a witness from BALTIMORE, MARYLAND, who witnessed the shooting and saw the shooter on the night in question. The witness was shown a photographic lineup, which included the petitioner, but did not identify the petitioner. (See Appendix A·8b). The name and current address of the witness was withheld. It is unlikely that defense counsel would request that JUDGE ALFORD compel the State to reveal the witness' name and address, in the same MOTION FOR PRODUCTION of BRADY MATERIAL, filed in Superior Court on APRIL 15,2002, in order to secur the witness' presense at trial through the INTERSTATE COMPACT, if the witness did not exist. (See Appendix A 36-37).

The detailed documentation within the petitioner's Appendix to Opening Brief dispels any further attempts by the respondents to challenge the petitioner to establish that the witness's statements exist or that those statements were exculpatory. A new trial will be granted for a BRADY violation only if the petitioner can demostrate both that the prosecution withheld exculpatory evidence and that the evidence was material, in that the petitioner did not receive a fair trial because of its absence. See, **HOLLMAN v. WILSON, 158 F.3d 177, 180 (3d Cir 1998); UNITED STATES v. PELULLO, 105 F.3d 117, 122 (3d Cir 1997).**

Having unequivocally established the existence of the witness' statements and their exculpatory nature. The petitioner has already thoroughly briefed the Court on this BRADY violation claim pertaining to materiality. (See HABEAS CORPUS PETITION GROUND-9). Before moving to establish the prejudice prong sufficiently enough to excuse the procedural default, the petitioner must further address the respondent's answer on this claim.

The respondent's argued that, " the record reveals that defense counsel was fully aware of the existence of all four witnesses. See D.I. 6 at A 72-73, 80. The record also shows that prosecutors supplied defense counsel with statement summaries and other BRADY material relating to these witnesses. See, e.g., D.I. 6 at A·13, A·14-16, A·17, A·35."

The petitioner has never contended that defense counsel was unaware of the four witnesses and their exculpatory statements. This is obvious because the State notified both attorney(s) regarding the witnesses. So that maybe the word "suppressed" should have been replaced with the word "withheld." What the petitioner has consistently argued was/is that after notification, followed by multiple specific and general requests, the State never turned over the actual taped statements containing the exculpatory materials of M. SWANSON, B. DUNCAN and B. WRIGHT or alternately a transcription of their exculpatory statements. Neither did the State turn over the actual name and address of the BALTIMORE, MARYLAND witness.

Mere notification, in the form of "statement summaries" of exculpatory BRADY statements cannot be deemed to satisfy disclosure. BRADY v. MARYLAND, 373 U.S. 83 (1963). This because the "statement summaries" are vague and devoid of specific details. For example, MARVIN SWANSON did identify an additional shooter in his early 2001 interview at GANDER HILL. The "statement summaries" the respondents speak of was actually State prosecutor JAMES RAMBO's notifying THOMAS PEDERSEN about a confidential informant at the MAY 15, 2001 office conference. (See Appendix A-19). The respondents can't possibly think that BRADY has been satisfied based upon that "statement summary" when the identification of the additional shooter has not been disclosed. Further, the "statement summary" was devoid of the date and time of that interview, who the interviewers were and the circumstances that led to the interview. The petitioner has continuously argued in this petition that SWANSON was approached after he was convicted and sentenced to 5 years LEVEL II on drug charges. And that SWANSON was awarded a release from serving that sentence after he made a statement and agreed to testify for the State. Therefore, the "statement summary" was devoid of any of these pertinent facts as well.

Likewise the "statement summaries" and "other BRADY material" the respondents speak of was the DECEMBER 21, 2001 letter from State prosecutor CYNTHIA KELSEY to defense counsel concerning BRUCE DUNCAN. The enclosed map that DUNCAN drew is the "other BRADY material" the respondent's make reference to. (See Appendix A-14, 15-16). Neither of these "statement summaries" satisfy BRADY and were devoid of the current or last known addresses of the witnesses, preventing the petitioner from locating the witnesses.

It seems pretty simple to clear up this BRADY violation claim. All the respondents need to do is prove that the State delivered M.SWANSON, B.DUNCAN and BENNIE WRIGHT'S actual taped statements to defense attorney(s), PEDERSEN or MAURER. Just prove that the delivery was made by certified mail or courier, and the exact date and time. Defense counsel has clearly indicated that the State never turned over the actual taped statements after inquiry. (See MOTION FOR EXPANSION OF RECORD-EXHIBITS R & 5).

In that the respondents cannot factually prove that the State turned over the actual BRADY materials, they elect to argue instead that "statement summaries" and other BRADY materials" were supplied to defense counsel. Again, these "statement summaries," which realistically can only be called notifications, do not satisfy BRADY. MOONEY v. HOLOHAN, 294 U.S.103(1935)("[disclosure], it is a requirement that cannot be deemed to be satisfied by mere notice...").

To establish prejudice under the cause-and-prejudice test, the petitioner must show not merely that the [errors] at trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." CARRIER, 477 U.S. at 493-94 (quoting UNITED STATES v. FRADY, 456 U.S.152,179(1982)).

The three components of a true BRADY violation and the four aspects of materiality under, UNITED STATES v. BAGLEY, 473 U.S 667(1985), has been briefed in the habeas petition. See HABEAS CORPUS PETITION-GROUND 9). The record reflects that the petitioner made multiple general and specific requests for the exculpatory BRADY materials. (See Appendix A-17, A-19, A-26-32, A 34-45), and unless the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the [respondents] simply cannot avoid responsibility for knowing when the withholding of exculpatory evidence has come to portend such an effect on this trials outcome as to destroy confidence in the result. KYLES v. WHITLEY, 514 U.S. 419(1995).

Here, the respondent's had knowledge of and ultimately withheld: 1. the identification of a second shooter; 2. the exculpatory statements of SWANSON, DUNCAN and WRIGHT; 3. benefits awarded to two State witnesses for their cooperation; and, 4. the name and current or last known address of the

37.

BALTIMORE, MARYLAND witness. The willful withholding of this exculpatory material made the state's case much stronger and the defense much weaker then the full facts demostrate.

The essense of the state's case was the testimony of its eyewitnesses. The record clearly reflects the inconsistencies and uncertainties coming from the State's eyewitnesses. By calling MARVIN SWANSON as an adverse witness, the petitioner would have established for the jury the identity of another shooter. In light of VERNON MAYS' testimony of two different guns being fired, (See Appendix A-115) and RONETTA SUDLER's indication that Joe HARRIS was a shooter. (See Appendix A-114). Although SWANSON did identify the petitioner as a shooter as well, the petitioner could have shown that SWANSON's early 2001 statement was contrary to his AUGUST 1998 statement and that he only identified the petitioner to recieve the award of a release from serving the 5 year sentence after being approached by the State. Further, the question of whether Dt.Beox actually investigated SWANSON's identifications of the second shooter could have been presented to the jury. The petitioner could have attacked the reliability of the investigation, a classic trial tactic. **BOWEN v. MAYNARD, 799 F.2d 593, 613(1986).**

By calling BRUCE DUNCAN to testify at the trial, the petitioner would have presented an eyewitness to the jury who did not see the petitioner shoot the victim on the night in question. Based on the map DUNCAN drew for investigators, JOE HARRIS was placed in the location from which the fatal shots came. This fact could have been explored and presented to the jury. In light of investigators finding that HARRIS was very uncooperative and refused to give complete and truthful answers as to his exact location during the incident. (See Appendix A-83).

By calling BENNIE WRIGHT to testify at the trial, the petitioner would have presented a second eyewitness to the jury, who did not see the petitioner shoot the victim on the night in question. Likewise, by calling the BALTIMORE, MARYLAND witness to testify at the trial, the petitioner would have presented a third eyewitness to the jury, who did not see the petitioner shoot the victim. This witness, now known to be one EARL BALSMORE, would have directly undercut MATTHEW CHAMBLEE's initial identification of the petitioner because BALSMORE was the nephew CHAMBLEE testified to being with on the night in question. Nor would the harm to the State's case on identity have been confined to CHAMBLEE alone.

The fact that neither CHAMBLEE or MAYS could provide consistent and certain eyewitness identifications of the petitioner undercut the State's case but the remaining eyewitnesses called to testify for the state all claimed memory loss, so that the essence of the State's case would have been dramatically weakened. Finally, by calling CHAIRMAN MAYS to testify at the trial, the petitioner would have presented a fourth eyewitness to the jury, who did not see the petitioner shoot the victim on the night in question.[1]

In assessing the significance of the evidence withheld, one must, of course, bare in mind that not every item of the State's case would have been directly undercut if the BRADY evidence had been disclosed. KYLES v. WHITLEY, SUPRA. But the petitioner need not demostrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. BAGLEY id.(cited in KYLES). One shows a BRADY violation by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

The petitioner rested the defense without calling any witnesses, so that based solely on opening and closing arguments and cross examination of the State's eyewitnesses. The jury deliberated in excess of 16 hours over the course of three days. Which clearly signals that the jury was not convinced of the petitioner's guilt. Had the petitioner been able to analyze the facts from those exculpatory statements, follow up on any resulting information, located and produced these witness' at trial and utilized their eyewitness accounts productively. There can be no doubt that this jury would have returned with a different verdict, because the whole case is cast in a different light. The State's withholding of the exculpatory materials violated the petitioner's 14TH AMENDMENT right to due process. BRADY id.

---

[1] Additionally, the petitioner planned to call S. McNEILL, M. BARTLEY and J. HARRIS to testify.

## CLAIM 10

The record is clear that MAYS was put into a highly corruptive environment during the retrieval phase of the memory process, when the contamination risk is at its highest for the purpose of making an identification. The respondents nor Dt. Brock can offer a reasonable explanation for MAYS' sudden change in the details of the shooting. When coupled with MAYS' inconsistent and uncertain in court identification of the petitioner, the reliability of the pre-trial identification must be questioned. IN STOVELL v. DENO, 388 U.S. 293(1967); and, SIMMONS v. UNITED STATES, 390 U.S. 377(1968), the Court recognized that evidence of identification -- a critical issue in a criminal trial -- should not be received if the circumstances of a pre-trial confrontation were so infected by suggestiveness as to give rise to an irreparable likelihood of misidentification.

Likewise, the respondents offer no explanation that justified Dt. Brock's highly suggestive directives when interviewing CHAMBLEE, an impressionable juvenile witness. The phenomenon in eyewitness identification known as UNCONSCIOUS TRANSFERENCE, Dt. Brock's highly suggestive directives coupled with CHAMBLEE'S inconsistent and uncertain in-court identification of the petitioner can reasonably lead one to conclude that the pre-trial identification of the petitioner was unreliable.

Neither MAYS or CHAMBLEE'S pre-trial identification of the petitioner can stand up to a constitutional test for reliability. STATE v. ASKEW, 688 A.2d 1346(1997). Without that test for reliability the jury was exposed to pre-trial identifications of the petitioner that very well could have been the product of misidentifications by both witnesses. The State was able to utilize those pre-trial identifications to refocus the jury when the in-court identifications by both witnesses became inconsistent and uncertain. In that the crux of the State's case was eyewitness testimony, the unconstitutionally tested pre-trial identifications helped strengthen the State's case, in large part, because the State was able to bolster and corroberate the four eyewitnesses testimony as a whole. When CHAMBLEE'S in-court identification was uncertain, the State was able to bolster it by arguing that MAYS was 100% certain like CHAMBLEE. OR when PREDDUX could not remember the operative facts from the night in question, the State would argue that CHAMBLEE put the petitioner in the same spot on the street as

PREDOUX. The spot from which the fatal shots were fired.

If, the pre-trial identifications by both witnesses had been constitutionally tested for reliability and found to be the product of unduly suggestive or corruptive procedures thus suppressed. Assuming that the State still would call MAYS and CHAMBLEE to make in-court identifications of the petitioner, each witnesses' description and details from the night would be based off of memory, standing alone. Therefore, any cross examination that exposed inconsistencies and uncertainties by MAYS and CHAMBLEE would not have been nullified by the taped pre-trial statements, without the prior taped statements, MAYS and CHAMBLEE don't identify the petitioner at trial with any degree of certainty. Leaving the State to attempt to bolster and corroborate their case through SUDLER, McDOUGAL and PREDOUX. The record reflects that these three witnesses claimed memory loss, making it almost impossible for the State to gloss over the inconsistencies and uncertainties from their eyewitnesses. The State's case was a numbers game and their ability to convince the jury that the petitioner was the shooter was based, in part, on the argument that five people corroborated the basic facts of the case. Without that safety net, the State would have had to present their case, witness by witness.

DI. BROCK utilized highly suggestive and corruptive interview procedures to acquire the pre-trial identifications of the petitioner from MAYS and CHAMBLEE. In that they were not constitutionally tested they cannot be deemed reliable. Since the State relied heavily on those pre-trial identifications the result of the trial is in question, because those identifications worked to the petitioner's actual disadvantage. Prejudice is established sufficiently enough to excuse the procedural default.

### CLAIM 11

For the record the petitioner raised the claim of ineffective assistance of counsel for the first time in his post conviction motion pursuant to Superior Court Criminal Rule 61. (See Post Conviction Motion-Ground 11). Claims of ineffective assistance of can only be raised in a post conviction proceeding, not on direct appeal without an evidentiary hearing below affording the accused counsel full opportunity to be heard. COLLINS v. STATE, 420 A.2d 170 (1980). Accordingly, a motion pursuant to Rule 61 was the proper vehicle to bring ineffectiveness claims before the Delaware courts.

41.

REYNOLDS v. ELLINGSWORTH, 843 F.2d 712 (3RD CIR. 1988).

The record reflects that Superior Court JUDGE MARY JOHNSTON denied the post conviction motion pursuant to RULE 61(i)(4), former adjudication.[1] In as much as that was the petitioner's first and only post conviction motion and the proper vehicle to bring ineffective assistance of counsel claims. There was absolutely no way that the claim could have been formerly adjudicated thus procedural barred by RULE 61(i)(4). Therefore JUDGE JOHNSTON'S ruling was in error.

The Delaware Supreme Court dismissed the petitioner's appeal of the post conviction motion due to untimely filed Notice of Appeal. The dismissal of the post conviction appeal makes the Superior Court the last reasoned state court to address the claim of ineffective assistance of counsel. See, YLST v. NUNNEMAKER, 501 U.S. 797 (1991). Normally, habeas review would be precluded when the last reasoned state court to address the ineffective assistance of counsel claim clearly rested on state procedural grounds as seperate and independent basis for decision. See, JOHNSON v. PINCHAK, 392 F.3d 551, 557 (3d Cir. 2004). However, the claims of ineffective assistance of counsel, first presented in the RULE 61 motion could not possibly be barred pursuant to RULE 61(i)(4) because there had been no opportunity for adjudication to transpire, so that habeas review cannot be precluded. COMBS v. COYLE, 205 F.3d 269, 275 (6TH CIR 2000) (habeas review not precluded because petitioner's ineffective counsel claims, first presented in [petition] for state post conviction relief rather than on direct appeal, were not procedurally [defaulted] barred.)

Due to the dismissal of the post conviction appeal, the claim of ineffective assistance of counsel is exhausted but procedurally defaulted unless the petitioner established the cause-and-prejudice standard. LINES v. LARKINS, 208 F.3d 153 (2000). The petitioner has already satisfied the cause prong of this test. In that the two prong standard articulated in STRICKLAND v. WASHINGTON, 466 U.S. 668, 688 (1984), also calls for the movant to demonstrate actual prejudice. The petitioner will attempt to establish prejudice without rehashing arguments made in the habeas petition.

---

1.
   JUDGE JOHNSTON ONLY ALLUDED TO THE FIRST THREE CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL ALTHOUGH THERE 8 TOTAL CLAIMS.

A. RONETTA SUDLER and TYSHIEK McDOUGAL both made highly damaging taped statements that were admitted at trial pursuant to TITLE 11 SECTION 3507. Even though defense counsel established that SUDLER and McDOUGAL had a history of drug abuse, he failed to give the jury a scientific foundation upon which they could measure the impact of both witness' drug abuse on their ability to accurately recollect events from the night in questions. Counsel's decision not to hire a drug expert essentially left the jury to infer that the witness' drug abuse somehow prevented them from witnessing this event. While SUDLER and McDOUGAL's taped statements demostrates otherwise. Further, the State's reliance on those taped statements were in no way undercut by counsel's ability to establish both witness' history of drug abuse.

The use of a drug expert would not have been confined to testimony for the defense. A more effective cross examination of both witness would have resulted if a drug expert had been assisting in preparing cross examination. This because vague areas could have been illuminated with expert information that this jury never heard. For example, SUDLER testified to being on "cloud nine." Expert testimony could have explained to the jury why SUDLER felt that she was on "cloud nine." This could have been accomplished by being certain the jury understood the ratio between quantity and SUDLER's body weight or the combination of liquor and marijuana within a given time period leading up to the shooting. A drug expert could have then broken down tolerance levels for the jury and SUDLER's body reacting to those quantities of liquor and narcotics.

McDOUGAL testified that, "I wouldn't believe me when I'm on crack." Again, a drug expert could have assisted defense counsel in explaining to this jury why McDOUGAL was not believable when under the influence of crack cocaine. The jury could have been made to understand that there is a chemical change within the brain when crack cocaine is introduced into the human body either intravenously or inhaled. And that this chemical imbalance effects the sensory organs in ways that vary from person to person when measured against body weight, quantity, quality and tolerance levels. And these are just internal factors, the external factors must also be factored in. This information would have armed the jury with valuable information from which they could then illuminate wholly vague

43.

comments made by both witnesses regarding their drug abuse.

A drug expert could have helped counsel understand that a loymen's jury needs more information than the revelation of drug abuse provides. Coupled with the fact that counsel abandoned the petitioner's case midway through the trial, the decision not to hire a drug expert substantially worked to the petitioner's disadvantage. Prejudice is established.

B. IN that the two prong test articulated in **STRICKLAND** id., demands that a movant establishes actual prejudice. Since the prejudice within the cause-and-prejudice test is essentially the same as the actual prejudice prong in **STRICKLAND** id. The petitioner will not rehash the arguments forwarded in the prejudice prong of this claim in the habeas petition. (See HABEAS CORPUS PETITION GROUND 11; 2ND ALLEGATION).

C. FIRST, at no point during these proceeding has the petitioner ever admitted that some of his defense witnesses were unavailable. The petitioner stated that a private investigator was hired to interview the State's witnesses and defense witnesses prior to trial. (See Appendix A 72-77). And in the middle of trial, defense counsel revealed that all of the defense witnesses had not been interviewed. A fact the petitioner was not aware of prior to trial since the private investigator reported back to defense counsel, not the petitioner. Defense counsel failed to relay this fact to the petitioner until he decided to abandon the pre-agreed upon defense, which constituted calling the seven defense witnesses. This violated RULE 1.4(3) COMMUNICATION, from the Delaware Lawyers' Rules of Proffesional Conduct, which reads: (a) a lawyer shall: (3) keep the client reasonably informed about the status of the matter.

Thus the petitioner went to trial under the incorrect assumption that each defense witness had been interviewed and prepared for trial. Counsel was ineffective for failing to relay this critical fact to the petitioner. The Court will note that counsel obtained an ORDER from JUDGE ALFORD to permit private investigator FRED TATE to enter GANDER HILL for the purpose of locating and interviewing BRUCE DUNCAN and BENNIE WRIGHT. (See Appendix A 79-80). The Court will also note that counsel gave instructions to Investigator TATE to interview CHARMAIN MAYO and MARVIN SWANSON. (See Appendix A 72-73), Shawn McNEILL, JOE HARRIS and the BALTIMORE, MARYLAND witness[1] were the remaining defense witnesses that were

44.

to be located and interviewed. Again, in that Investigator TATE reported back to defense counsel, there was no way for the petitioner to know that each of these witnesses had not been located and interviewed.

SECOND, no review court on the state level has required defense counsel to respond to these allegations of ineffective assistance of counsel. The record reflects that there was no affidavits filed in response to the RULE 61 post conviction motion even though the petitioner raised a colorable federal claim of ineffective assistance of counsel. Due to this void, defense counsel has been unable to verify the defenses preagreed upon plan to call the witnesses mentioned above. Nevertheless, defense counsel did submit a defense witness list to the prosecution and to the Court prior to trial that contained all of the witnesses' names. JOE HARRIS, CHARMAIN MAYO were present at the trial. BRUCE DUNCAN, BENNIE WRIGHT and SHAWN MCNEILL were incarcerated in the state prison system, therefore easily could have been brought in to testify. The BALTIMORE, MARYLAND witness' presense was supposed to have secured through the INTERSTATE COMPACT AGREEMENT and MARVIN SWANSON's last address was forwarded to Investigator TATE.

The Court must keep in mind that several defense witnesses are simultaneously the subject of BRADY arguments in this petition. Namely BRUCE DUNCAN, BENNIE WRIGHT, MARVIN SWANSON and the BALTIMORE, MARYLAND witness, now known to be EARL BAISMORE. Notwithstanding this fact, the petitioner cannot ascertain why defense counsel did not locate, interview and prepare these witnesses prior to trial. The Court must be reminded that it was only in MARCH 2005 that defense counsel revealed that the State had withheld the actual statements of DUNCAN, WRIGHT and SWANSON and BRADY material pertaining to EARL BAISMORE. (See BRIEF FOR EXCUSION EXHIBITS R & S). This after the trial, motions for new trial & direct appeal when the petitioner was preparing the RULE 61 post conviction motion. Whether the State's withholding of the exculpatory statements and other information such as addresses, played a role in counsel's failure to locate, interview and prepare these witnesses for trial is counsel's argument to make. The petitioner argues that counsel's ineffectiveness lead directly to the last minute decision to abandon the preagreed upon defense.

The petitioner was prejudiced by defense counsel's last minute decision to abandon the pre-agreed upon defense because that decision prevented the jury from hearing the following:

1. EARL BAISMORE (formerly referred to as the BALTIMORE, MARYLAND witness) - was an eyewitness to the shooting who did not identify the petitioner as the shooter. (See Appendix A-86). This witness was reasonably expected to testify at trial within the same parameters as his AUGUST 4, 1998 statement. His testimony would have undercut State witness MATHEW CHAMBLEE's identification of the petitioner because the two were standing together at the time of the shooting, notwithstanding its own probative value.

2. SHAWN McNEILL - provided investigators with an alibi to his whereabouts on the night in question. McNEILL indicated to investigators that he was at his relative's house (BRENDA BRYANT)on the night in question until around 2:30A.M., and did not see the shooting. BRENDA BRYANT corroborated McNEILL's alibi in an AUGUST 10, 1998 interview. (See Appendix A-85). McNEILL was reasonably expected to testify at trial within the same parameters as his AUGUST 1998 statement. His testimony would have undercut TYSHIEK McDOUGAL's testimony that JOE HARRIS and McNEILL came to 33 EAST 23RD ST. and told the petitioner about a fight at the OASIS NIGHT CLUB, at which point the petitioner retrieved a handgun and went down to 22ND & LAMOTTE ST.

3. JOE HARRIS - provided investigators with an alibi to his whereabouts on the night in question. HARRIS indicated to investigators that he was home at the time of the shooting. Investigators found HARRIS to be very uncooperative, who refused to give complete and truthful answers as to his exact location during the incident. (See Appendix A-83). HARRIS was expected to testify at trial within the same parameters as his AUGUST 1998 statement which would have undercut TYSHIEK McDOUGAL's testimony. However, defense counsel may have impeached HARRIS due to SUDLER, SWANSON and DUNCAN's testimony placing HARRIS at the scene.

4. BRUCE DUNCAN - provided investigators with an exculpatory statement indicating that the petitioner was not the shooter on the night in question. Although DUNCAN's actual taped statement was withheld by the State, DUNCAN was reasonably expected to testify within the parameters of his DECEMBER 19, 2001 statement. His eyewitness account would have directly undercut the State's witness' account of the shooter.

5. BENNIE WRIGHT - provided investigators with an exculpatory statement indicating that the petitioner was not the shooter on the night in question. Again WRIGHT'S actual taped statement or an

46.

intelligible copy of that taped statement was withheld by the State. WRIGHT was reasonably expected to testify within the parameters of his taped statement. With its independent probative value WRIGHT'S testimony would have also directly undercut the State's witness' account of the identification of shooter.

6. CHARMAIN MAYO - provided investigators with an exculpatory statement indicating that the petitioner was not the shooter on the night in question. It must be noted that the State indicated that MAYO had identified the petitioner as the shooter. (See Appendix A-85). It was only after the State turned over MAYO'S taped statement did it become apparent that MAYO had actually indicated to investigators that the petitioner was not the shooter. The State indicated that investigators mistakenly subplanted witness' statements in the Supplement Police Report. (See Appendix A-182). MAYO was reasonably expected to testify at trial within the parameters as the AUGUST 7, 1998 statement. Her eyewitness account directly under cut State witness' identifications of the petitioner notwithstanding its probative value.

7. MARVIN SWANSON - provided investigators with 3 seperate interviews. Two of those interviews occured in AUGUST 1998, at which point SWANSON indicated that he did not see the shooter. (See Appendix A-82, 83). Then in early 2001, SWANSON provided investigators with a third interview, in which he identified the petitioner and a second individual as shooters on the night in question. The actual taped statement and the identity of the second shooter was withheld by the State and is the basis of BRADY violation arguments in this petition. (See GROUND 9). As an adverse witness, SWANSON would have revealed to the jury the identity of another shooter. The petitioner could have shown that SWANSON only identified the petitioner to receive the award of a release from serving a five year LEVEL II sentence for cooperating with the State. Notwithstanding that SWANSON'S testimony would have eviscerated the State credibility by exposing its practice of awarding benefits to cooperating witnesses. SWANSON'S identification of another shooter would have factually put before the jury, the name and face of a shooter the jury never heard about. Except for the brief reference by the State during closing, the jury never was exposed to the factual argument of another shooter besides the petitioner.

8. MICHEAL BARTLEY - the defense was unsettled on whether to call BARTLEY, who was only expected to provide a timeline and sequence of events leading up to the shooting.

When defense counsel decided not to present the petitioner's case to the jury, that decision was a tactical decision that condemned the petitioner to a sure conviction. No review court should accept or understand that last minute decision given the potential impact the defense witness' testimony could have had on this trial.

Additionally, when counsel decided at the last minute to abandon the pre-agreed upon defense, the Court must agree that closing arguments should have accordingly been adjusted to compensate for that decision. Review of the record reflects that there was sufficient evidence to make an argument for a lesser included offense, specifically defense counsel acknowledged as much before the Court.(See, TRIAL TRANSCRIPTS-SECTION E pgs.37-38). Counsel specifically decided not to request a lesser included offense such as MURDER 2, MANSLAUGHTER or CRIMINALLY NEGLIGENT HOMICIDE. By electing not to include a lesser offense counsel should have demonstrated to the jury that the State had not proven beyond reasonable doubt the crime of first degree murder. Delaware law defines the offense of murder first degree in pertinent part as follows. A person is guilty of first degree murder when: 1.the person intentionally causes the death of another. In order for this jury to find the petitioner guilty of first degree murder, the following elements would have had to be established beyond reasonable doubt. One, that the petitioner caused the death of the victim, ALFRED SMILEY; and two, that the petitioner acted intentionally. Intentionally means it must have been the petitioner's conscious object or purpose to cause the death of ALFRED SMILEY. There is significant evidence to support the fact that the petitioner did not know the victim, had no motive to kill ALFRED SMILEY. And there is evidence that ALFRED SMILEY did intend and/or attempt to run over individuals in the street with his vehicle.(See Appendix A-89, A 90-92). Which led to shots being fired at the car. At the most this demostrated reckless and cruel, wicked and depraved indifference to human life, elements of a lesser included offense. Defense counsel could have argued these facts to the jury, then argued that since the State elected to pursue a first degree murder conviction and has failed to prove the "intentional" element of that charge. The jury must find the petitioner not guilty. If, the jury believed that the petitioner acted reddessly in causing the death of ALFRED SMILEY, but did not intentionally mean to kill ALFRED SMILEY.

48.

Then the jury must find the petitioner not guilty because the State elected to gamble for all or nothing. Defense counsel failed to adjust his closing argument to compensate for the last minute decision to abandon the pre-agreed upon defense.

Again, the Court must note that this jury deliberated in excess of 10 hours over the course of three days. This must indicate that the jury was not convinced of the petitioner's guilt. Given the potential strength and impact the defense witnesses would have had on this case, counsel's decision to abandon the defense worked to the petitioner's actual and substantial disadvantage violating his due process right to effective assistance of counsel. Prejudice has been sufficiently established to excuse the procedural default.

D. After the cross examination of both VERNON MAYS and MATHEW CHAMBLEE, it became apparent that their was undue suggestiveness and corruptive interview procedures that led to the pretrial identifications of the petitioner by both witnesses. As such, defense counsel had an avenue to address the likelihood that both witness' pre-trial identification was the result of highly suggestive and corruptive interview procedures. That avenue was to challenge the admissibility of the pretrial identifications. That challenge would have prompted the trial judge to administer a constitutional test for reliability. NEIL v. BIGGERS, 409 U.S. 189, 199-00(1972); also, MANSON v. BRAITHWAITE, 432 U.S. 98,114(1977).

The factors to be considered in evaluating the likelihood of misidentification include: (1) the opportunity of the witness to view the criminal at the time of the crime. The record reflects that MAYS testified that his was a 5 second glance of the shoot at night with minimal lighting from a distance. (See Appendix A-103) CHAMBLEE testified that he got a glance of the side of the shooter's face, at night, minimal lighting from 60-70 feet away. (See Appendix A-134). (2). The witness' degree of attention. The record reflect that MAYS testified that he was not paying attention to what was happening down the street from him. (See Appendix A-103). CHAMBLEE testified that he was distracted by his nephew and his 45 pound PIT BULL. (See Appendix A-134). (3). The accuracy of the witness' prior description of the criminal. The record reflects that MAYS testified that the shooter was between 20-25 years old, medium build, dark complexion, wearing a royal blue shirt, white baggy shorts, no black beanie hat and no glasses. Also the shooter had a black gun and was walking as he fired

49.

the gun. (See Appendix A 113-114). CHAMBLEE testified that the shooter was wearing a black beenie hat, yellow tinted glasses, no shirt, black pants, black sneakers and was stationary firing a silvery chrome gun. (See Appendix A-137). (4). The level of certainly demostrated by the witness at the confrontation. The record reflects that MAYS testified repeatedly that he was not sure who the shooter was. (See Appendix A-109). CHAMBLEE testified that he was likely mistaken about who he thought was the shooter. (See Appendix A-138). And(5). The length of time between the crime and the confrontation. MAYS was interviewed on AUGUST 2, 1998. CHAMBLEE was interviewed on AUGUST 3, 1998. The petitioner's trial was held in OCTOBER 2002, well over four years after the shooting. Against these factors the trial judge would weigh the corrupting effect of the suggestive identification itself. MANSON v. BRAITWAITE id. The corrupting techniques utilized by Dt. Brock have been extensively outlined in the habeas petition. (See HABEAS CORPUS PETITION GROUND-10).

The respondent's argument that defense counsel had no basis upon which to successfully argue to suppress the identification falls flat. Given the grossly conflicting and inconsistent in-court testimony by both MAYS and CHAMBLEE, coupled with Dt. Brock's corruptive interview procedures. Not only did counsel have the basis to challenge the admissibility of the pre-trial identifications, counsel stood a reasonably strong chance of succeeding.

The petitioner has cited the State's repeated utilization of its witness' prior taped statements to bolster and corroborate its case during closing arguments. The successful suppression of both witness' pre-trial identification would have derailed the State's entire case. In fact, the State touted MAYS and CHAMBLEE as its two best witnesses. Without a challenge to the pre-trial identifications made by both witnesses, the State was able to successfully mesh all its witnesses identifications together. Giving strength as a whole to inconsistent individual testimony.

Therefore, defense counsel's failure to challenge the admissibility of both witness' pre-trial identification worked to the petitioner's substantial disadvantage. Prejudice has been sufficiently established to excuse the procedural default.

(E). There was no way that this jury did not know which spectators were in the courtroom in support of the petitioner and which spectators were in the courtroom in support of the prosecution. Daily there was a drastic difference in numbers.

Due to the timing and manner of the bailiffs' unauthorized ejections and the negative commotion it caused, there was no way that the jury was unaware of what was going on. All other proceedings were haulted by the trial judge, everyone in the courtroom including courtroom personnel and the jury focused their attention on the rear of the courtroom. A time lapse of roughly 4-5 minutes elapsed between the bailiffs first contact with the petitioner's family members and when the bailiff, along with several additional bailiffs and capital police, returned to the courtroom in a dramatic show of security. A recess was immediately called and the jury was escorted out. That recess lasted a full 35 minutes. When the jury finally returned to the courtroom, absolutely nothing was forwarded to the jury concerning the bailiffs' unauthorized ejections or the resulting commotion, but the courtroom was ringed with extra security. This Court must agree that the question of whether a curative instruction would have called more attention to the situation is mute.

Defense counsel's failure to object to the bailiff's unauthorized ejections and request a curative instruction allowed the jury to unjustifiably associate some wrongdoing by the petitioner. The dramatic increase in security only added to the jury's belief that the ejections and resulting commotion was the petitioner's fault. This Court can reasonably conclude that with the jury assuming, consciously or unconsciously, that the petitioner had done something wrong to warrant the ejections, the increased security and the very nature of the charges against the petitioner, that the jury may well have reached the conclusion that the petitioner was a "dangerous man." No one can argue with any degree of certainty that based on this trial situation, that the jury did not enter the deliberation room already having condemned the petitioner because they felt he was a dangerous man.

A curative instruction would have mitigated some of that prejudice. As such, counsel's failure to request that the trial judge instruct the jury that the petitioner was not the cause of the ejections and resulting commotion. And no blame was to be placed on him. The trial should have further explained

51.

that the women were ejected for talking in the courtroom and making gestures after having been warned not to, Counsel's decision not to request a curative instruction worked to the petitioner's actual disadvantage. Prejudice has been sufficiently established to excuse the procedural default.

(F). A critical point in the State's prosecution was the need to make this jury dislike the petitioner as a person. This was accomplished, in part, through the highly prejudicial suggestions and insinuations of gang affiliation and witness intimidation. It is common knowledge that a jury is more likely to convict an individual it dislikes. Accordingly, it is critical that the defense utilizes opportunities during the trial to humanize a petitioner, so that he is not relegated to the charges pending against him.

After agreeing to address the flight issue and utilize it as an opportunity to humanize the petitioner before the jury, defense counsel simply forgot. In light of counsel's decision to abandon the petitioner's case in the middle of trial, defense counsel's memory lapse demostrated a breakdown in the adversarial process. Counsel's vigor in defending the petitioner simply whittled down to a desire to get the case to the jury.

As a result, the petitioner was relegated to a "DOUBLE DEUCE" gang member, a man who intimidated witnesses from his jail cell, who had the wherewithal to tamper with the judicial process. At no point did counsel seize any opportunities to remove the negative shadow the State's prosecution cast over the petitioner. Leaving the jury with only the State's negative suggestions about the petitioner's character to draw upon when, in fact, there was a vast amount of positive things that defined the petitioner's life and character in AUGUST 1998. These things should have been presented to the jury since no character witnesses, or any witnesses for that matter, were called by the defense.

Notwithstanding the flight issue, defense counsel's memory lapse left the jury with nothing positive to think about relating to the petitioner. This had to be a factor, however small, in the jury's deliberations. Standing alone, counsel's failure to address the petitioner's flight may not have substantially effected the outcome. But when coupled with all the allegations of ineffective assistance of counsel. The petitioner was denied his due process right to the effective assistance of counsel. Prejudice has been sufficiently established to excuse the procedural default.

(G). Strategic decisions by defense counsel should have been calculated to benefit the petitioner. Given the nature of this case, particularily the inconsistent eyewitness testimony, defense counsel was expected to have the legal knowledge, skill, thoroughness and preparation reasonably necessary for that representation. There was a major shift in the dynamics of this case the minute defense, decided to abandon the preagreed upon defense. That shift placed a burden on the petitioner to prove his innocence confined within opening statements, cross examination and closing arguments.

Within this dynamic, a jury instruction on the dangers of misidentification in this case where every State eyewitness was uncertain, unclear or inconsistent in either their description of events or their identification of the shooter, would have went a long way towards assisting the petitioner in receiving a favorable verdict. Without such an instruction the jury was left to assume that it is perfectly normal to have such wide disparities in critical evidence such as eyewitness testimony. This in a case that hinged solely on eyewitness testimony.

The State argued during closing that each witness' testimony should not be identical, because then the witnesses testimony would seem rehearsed. This argument allowed the jury to accept the inconsistencies and uncertainties from the State's witnesses. To correct that argument defense counsel should have ensured that the jury was alerted to the inherent dangers of misidentification in a case presented through eyewitness testimony, that was uncertain, unclear and inconsistent.

Therefore, defense counsel's failure to request such a jury instruction actually benefited the State's case. Prejudice is sufficiently established to excuse the procedural default.

(H). The petitioner has briefed this issue several times already in the habeas petition. (See HABEAS CORPUS PETITION-GROUNDS 1,2,3&4). The record is developed enough on the issue of benefits awarded to REEDUX for his cooperation with the State and the State's misleading position on the matter. In this eighth claim of ineffective assistance of counsel, the petitioner established sufficient prejudice within the two prong STRICKLAND standard. New information has come to light since the conclusion of the petitioner's trial regarding benefits awarded to MARVIN SWANSON a full year before the State approached REEDUX. In that the motion to withdraw the new trial motion was a post trial error, it remains for the Court's determination.

The petitioner still contends that the record was developed enough, once PREEDOUX' final charges were plead down, for the trial judge to determine whether PREEDOUX had been awarded reduced pleas in exchange for cooperating with the State. Defense counsel should have been more diligent in locating M. SWAEVIU, interviewing him and unearthing the benefit he had received for cooperating with the State almost a year before PREEDOUX was approached. Had defense counsel been more thorough, this fact would have been discovered prior to trial, so that this information could have been effectively used at trial, or in the alternative, utilized in the withdrawn motion for new trial. Prejudice is sufficiently established to excuse the procedural default.

### CLAIM 12

On direct appeal this claim had been interwoven with language of a violation to the petitioner's federal right to a fair trial. (See DIRECT APPEAL). The petitioner utilized UNITED STATES v. PRINCE, 157 F.SUPP. 2d 316, 327 (D.Del. 2001); and STATE v. WRIGHT, 2002 WL 386281 (Del. SUPER.), to support his argument that SUDLER's statement was not voluntarily given. The STATE v. WRIGHT id., case cited numerous federal cases and a constitutional amendment including: UNITED STATES v. WILLIAMS, 447 F.SUPP 631, 636-37 (D.Del 1978) (noting that age, education, experience with the criminal justice system are relevant, not conclusive to the outcome of the voluntariness inquiry); MILLER v. STATE, 1993 (citing COLORADO v. CONNELLY, 479 U.S. 157, 167 (1986) (coercive police activity is a necessary predicate to the finding that a [statement] is not voluntary..."); UNITED STATES v. LEE, 157 F.SUPP. 2d 316, 327 (D.Del. 2001) ("express threats that a defendant's children will be taken away... if she fails to cooperate have been held to be so coercive that defendant's statements were rendered involuntary.") (citing LYNUMN v. ILLINOIS, 372 U.S. 528, 534 (1963), and CONSTITUTIONAL AMENDMENT 5.

The reliance of case law from the federal courts, U.S. v. PRINCE, id, and a State case, STATE v. WRIGHT, id, that relied heavily on federal case law and a constitutional amendment and was identical in subject matter (i.e. voluntariness of statement) can lead this COURT to reasonably conclude that the petitioner submitted to the Delaware Supreme Court a factual basis for this claim and that those facts constituted a violation of his right to a fair trial.

This claim would be non-cognizable if there had been a full and fair litigation of the claim in State

Court. STONE v. POWELL, 428 U.S. 465 (1976). In PIERSON v. O'LEARY, 959 F.2d 1385, 1391 (7TH CIR. 1992), the Court wrote and has repeated since, that an accused receives a full and fair opportunity to litigate if, (1). he has clearly informed the State courts of the factual basis for the claim and has argued that those facts constitute a violation of his constitutional rights and (2). the State court has carefully and thoroughly analyzed the facts and (3). applied the proper constitutional case law to the facts.

Here, the Delaware Supreme Court did not carefully and/or thoroughly analyze the facts because it failed to recognize the constitutional violation inherent in the petitioner's argument on direct appeal. See, FLOWERS v. STATE, 858 A.2d 328 (Del. 2004). Further, the Delaware Supreme Court failed to apply the proper constitutional case law to the facts. As such, the petitioner did not receive an opportunity for full and fair litigation of this claim so federal habeas review must be available. GATES v. HENDERSON, 568 F.2d 830 (2d CIR. 1977)(en banc)("if the state provides no corrective procedures at all to redress [constitutional] violations, federal habeas corpus remains available... further even where the State provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process, the federal intrusion may still be warranted.")

The petitioner was prejudiced by the trial judge's admission of SUDLER's non-voluntary taped statement because the prosecution was able to successfully utilize SUDLER's prior taped statement to corroberate and bolster its remaining eyewitness 'prior taped statements in order to gain a conviction. The State relied heavily on SUDLER's taped statement during closing arguments to the jury. This coupled with SUDLER's coached memory loss, by stand-by counsel, caused actual disadvantage to the petitioner. On the one hand, the Statement was not voluntarily given and the record is sufficiently clear on the threats and promises Dt. Brock subjected SUDLER to in the AUGUST 11, 1998, interview. On the other hand, SUDLER's coached memory loss prevented any meaningful or effective cross examination to mitigate the damaging taped statement or the State's utilization of the taped statement during closing arguments. This militates a finding of a violation to the petitioner's right to a fair trial. Prejudice has been sufficiently established to excuse the procedural default.

## CLAIM 13

The UNITED STATES SUPREM COURT has laid out two broad kinds of constitutional violations that may occur in a criminal proceeding. One is 'structural' affecting the basic elements of a trial. Such would be a biased judge or denial of counsel. The other is 'trial error,' a constitutional mistake made in the course of the trial. The first kind of violation vitiates the proceedings; it may not be considered harmless. The second kind is not necessarily fatal; it may, in light of the whole record, be found not to have caused actual prejudice. BRECHT v. ABRAHAMSON, 507 U.S. 619 (1993). There is also a hybrid, which was laid out in footnote nine of BRECHT as follows: ' the unusual case 'in which there occurs a deliberate and especially egregious error of the trial type, or one that is so combined with a pattern of prosecutorial misconduct' as to infect the integrity of the proceedings 'and 'warrant the grant of habeas relief even if it did not substantially affect the verdict. This constitutional error falls within the second violation set out by the Supreme Court.

The revelation to the jury that the petitioner had previously been in jail, thus had prior troubles with the law, was classified as a harmless error. The petitioner must first focus on the Delaware Supreme Court's review of that harmless error. The principle that collateral review is different from direct review resounds throughout habeas jurisprudence. See, e.g., WRIGHT v. WEST, 505 U.S. 277, 292-93 (1992); TEAGUE v. LANE, 489 U.S. 288, 306 (1989); PENNSYLVANIA v. FINLEY, 481 U.S. 551, 556-57 (1987); MACKEY v. UNITED STATES, 401 U.S. 667, 682 (1971). IN CHAPMAN v. CALIFORNIA, 386 U.S. 18, 24 (1967), the Court held that the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error 'was harmless beyond a reasonable doubt.' The state bares the burden of proving that an error passes muster under this standard. id.

Review of the Delaware Supreme Court's decision on this claim clearly demonstrates that the Court did not apply the CHAPMAN standard of review to this constitutional error. Although the petitioner sough de novo review, the Delaware Supreme Court reviewed the trial judge's denial of the petitioner's motion for mistrial and new trial for abuse of discretion. See, FLOWERS v. STATE, 858 A.2d 328 (Del. 2004). Under revised 32254, a habeas petitioner is not entitled to relief unless he can establish that the decision of the State court was

contrary to, or involved an objectively unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. **GATTIS v. SNYDER, 278 F.3d 222, 228 (3d Cir. 2002, LAWRIE v. SNYDER, 9 F.SUPP.2d 428, 454 (D.Del. 1998)).** Here, the Delaware Supreme Court's review of this constitutional error was clearly contrary to established federal law as determined by the Supreme Court in **CHAPMAN.** The **CHAPMAN** standard should have been applied here on direct review, but was not. The petitioner is entitled to relief.

Since habeas corpus petitions is a collateral attack, the **KOTTEAKOS** standard should be applied on collateral review. The test under **KOTTEAKOS** is whether the error 'had substantial and injurious effect or influence' in determining the jury's verdict. 'Under this standard, habeas petitioner's may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.'

In this trial, the jury was exposed to the single most prejudicial type of information that could have been brought to their attention. It is human tendency to more readily believe that a person is guilty of a crime if he has a prior criminal history. There is a reasonable possibility that this jury convicted the petitioner on that basis alone, even if they were not convinced beyond a reasonable doubt of his guilt of the crime charged. The petitioner was entitled to have his guilt or innocence determined solely upon evidence tending to prove the crime, uninfluenced by irrelevant and prejudicial facts and circumstances. **NEW YORK v. BLANCHARD, 442 N.Y.S.2d 140 (1981); MICHELSON v. UNITED STATES, 355 U.S. 469 (1948).**

The record reflects that the petitioner's trial strategy, in part, was calculated to insulate the jury from gaining knowledge of his prior trouble with the law. The error that revealed the prejudicial information to the jury was not the petitioner's fault. In fact, defense counsel took extra steps to prevent the prejudicial information from being revealed to the jury, to no avail. See, **UNITED STATES v. HARRINGTON, 490 F.2d 487 (1972)** (if, at trial, a petitioner does not take the witness stand in his own defense, and if he has not himself been responsible for causing the jury to be informed about his previous convictions, he is entitled to have the existence of any prior criminal record concealed from the jury.). No one can argue that this jury did not factor in the prejudicial information of the petitioner's prior incarceration when deliberating this case.

57.

KOTTEAKOS plainly stated that unless an error is merely 'technical' the burden of sustaining a verdict by demostrating that the error was harmless rests on the prosecution. A constutional violation, of course, would never fall in the technical category. The statutory command requires the reviewing court to evaluate the error in the context of the entire trial record. To apply the KOTTEAKOS standard properly, the reviewing court must, make a de novo examination of the trial record. In this review the Court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place. KOTTEAKOS is full of warnings to avoid that result.

Finally, there is an exception to the use of the KOTTEAKOS standard. The Court has held that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. GREER v. MILLER, 483 U.S. 756, 759 (1987). The record in this case must support the petitioner's contention that there was a calculated pattern of prosecutorial misconduct and when combined with this error and/or the other constitutional errors at trial. This Court can still review this claim in the event that it does not meet the KOTTEAKOS standard. The exception to the use of the KOTTEAKOS standard can be applied.

### CLAIM 14

Under revised 3.2254, a habeas petitioner is not entitled to relief unless he can establish that the decision of the State court was contrary to, or involved an objectively unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. GATTIS v. SNYDER, 278 F.3d 227, 228 (3d. Cir. 2002; LAWRIE v. SNYDER, 9 F.SUPP. 2d 428, 454 (D.Del. 1998)).

The prejudicial non-responsive answer by PREDDUK, that revealed defense counsel's previous representation of the witness during cross examination, was labeled as a harmless error. Accordingly, the Delaware Supreme Court's direct review of that harmless error should have been under the CHAPMAN standard. See, CHAPMAN v. CALIFORNIA, 386 U.S. 18, 24 (1967). Careful review of the record demonstrates that the Delaware Supreme Court reviewed the trial judge's denial to grant the petitioner's mistrial application for abuse of discretion. Therefore, the Delaware Supreme Court's direct review of this constitutional error, was clearly

58.

contrary to established federal law as determined by the United State Supreme Court in CHAPMAN *id.* Thus the petitioner is entitled to relief.

Since the habeas corpus petition is a collateral attack, the KOTTEAKOS standard of review should be applied on collateral review.

It must be noted that prior to trial all parties agreed that the orderly and careful presentation of relevant evidence at trial precluded any need for the jury to learn of defense counsel's previous representation of Preeoux. Preeoux was a state witness, so that it was reasonably expected that the State would explain to their witness, that he was not to mention defense counsel's previous representation. At trial, when Preeoux' non-responsive flippant answer revealed defense counsel's previous representation in the midst of an intense cross examination. Defense counsel first inquired if the State had, in fact, instructed their witness not to mention his previous representation, The State acknowledged that it had not. (See Appendix A-204). All things considered, this failure to instruct their witness not to reveal defense counsel's previous representation to the jury, demostrated a calculated effort by the prosecution to leave an avenue open through which highly prejudicial information could reach the jury. Because this revelation would not damage the State's case in anyway, so the State elected not to instruct Preeoux prior to calling him.

Considering the timing and flippant manner of Preeoux' revelation to the jury that defense counsel had previously represented him. The revelation eviscerated defense counsel's credibility with the jury simply because it cast him as a hypocrite. The jury cannot be expected to appreciate the ethical niceties that permit such successive reprentations. The jury laughed at defense counsel which just emphasizes the petitioner's argument that counsel lost significant credibility with this jury. (See Appendix A-192). This is actual and substantial prejudice when coupled with the complete lack of a curative instruction by the trial judge. No refocusing of the jury was sufficient to cure the prejudice the petitioner incured due to Preeoux' revelation that defense counsel had represented him on the very charges he was attempting to impeach his character through. The resulting questions only demostrated how those charges were resolved to the jury, nothing more.

Keeping in mind the other constitutional errors that accured at trial, specifically the revelation that

59.

that the petitioner had previously been incarcerated. This jury may well have concluded by the end of the trial that defense counsel was unworthy of trust because he kept attempting to hide information from them that reflected negatively on himself and/or the petitioner. Peedoux' flippant non-responsive answer coupled with the State's failure to instruct Peedoux not to mention defense counsel's previous representation caused the petitioner actual prejudice, in that the jury lost significant trust and faith in defense counsel which equates to lost trust and faith in the petitioner's defense.

### CLAIM 15

This claim was presented to the Delaware Supreme Court and therefore is exhausted. As such, the Delaware Supreme Court was the last reasoned state court to be presented with this federal claim. If the last state court to which a federal claim is presented ignores a potential State procedural default and reaches the merits of the claim, federal courts may consider the claim. YLST v. NUNNEMAKER, 501 U.S. 797, 801 (1991) (citing HARRIS, 489 U.S. at 262).

In their answer, the respondents argue that under Delaware Supreme Court Rule 8, only claims that have been fairly presented to the trial court may be presented for review, unless required in the interest of justice. The respondents argue that: "Because FLOWERS raised his challenge to the opening statement for the first time on appeal, he failed to comply with the relevant State procedural requirements. Thus, federal review of [FLOWERS] claim is barred unless he established cause for procedural default in the state courts and actual prejudice. See, COLEMAN, 501 U.S. at 750-51; CASWELL, 953 F.2d at 861-862; DAWSON, 988 F.SUPP at 804-05.

This argument is obviously meritless. The Delaware Supreme Court has already addressed the merits of the claim and federal courts have consistently held that claims addressed on the merits by a state court are not barred from federal habeas review. BOOKER v. DUGGER, 922 F.2d 633, 637 (11TH CIR 1991).

Even if this Court, arguendo, were to interpret the Delaware Supreme Court's review of this claim for plain error as that Court invoking a procedural bar, namely RULE 8. The Delaware Supreme Court's order affirming the conviction was ambiguous on that point. The current standard is that, if the decision of the

last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, then a federal court may address the petition. See, BENNETT v. FORTNER, 863 F. 2d 804, 807 (11TH CIR. 1989).

The record is clear that the Delaware Supreme Court ignored the potential state procedural default and reached the merits of the claim or alternately appeared to rest primarily on the resolution of the claim or interwove the claim. And did not clearly and expressly rely on an independent and adequate state ground. Accordingly, this Court can reach the merits of this claim.

## CONCLUSION

Along with the application for writ of habeas corpus petition, the petitioner also submitted a Motion to Invoke Discovery and a Motion for Expansion of the Record. The Court construed the Motion for Expansion of the Record to be a memorandum in support of the petition in a supplemental order dated September 28, 2006. Based upon the respondents failure to turn over the exculpatory BRADY materials in their answer, the petitioner requests that the Court grant the motion to invoke discovery pursuant to RULE 6, the Court's directives to control.

Additionally, in September 2006, the petitioner forwarded to the clerk of this Court a civil suit (1983) regarding the Department of Corrections and/or Delaware Correctional Center denying the petitioner access to the courts. This dealt specifically with prison authorities delaying the petitioner's notice of appeal past filing deadline resulting in dismissal of the appeal of the post conviction motion. The petitioner made a special note to the clerk indicating that the civil suit was directly related to the present habeas corpus petition. As such, the civil suit has not been docketed in the district court likely pending the outcome of this petition.

Once the respondents have been compelled to turn over all the exculpatory materials, the petitioner requests an evidentiary hearing pursuant to RULE 8. Further, the petitioner requests that the Court demand/order defense counsel to respond to the allegations of ineffective assistance of

61.

counsel, given that no review court has required defense counsel to respond to these claims.

For the foregoing reasons presented in the habeas corpus petition, the respondent's answer and in this reply, the petitioner asks this Court to grant the writ, after further proceedings.

RESPECTFULLY SUBMITTED

DAMONE FLOWERS

JANUARY: 1·10·07

D.C.C.

1181 PADDOCK RD.

SMYRNA, DE. 19977

DCC   Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261
Date: 10/12/2006

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : FLOWERS, DAMONE E | SBI# : 00303627 | Institution : DCC |
| Grievance # : 23426 | Grievance Date : 02/07/2006 | Category : Individual |
| Status : Unresolved | Resolution Status : | Resol. Date : |
| Grievance Type: Mail | Incident Date : 01/08/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location : Bldg 21, Lower, Tier D, Cell 8, Top | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: On Sunday 8 January 2006 I placed two envelopes into the prison mail system on the 4x12. Attached to each manila envelope was a pay-to to cover postage which was signed by the C/O working A tier that night. Each envelope was marked on the exterior: Urgent Legal mail/filing deadline 1-13-06. For some reason the legal mail was held here at DCC until Tuesday, January 17 2006 four days after my filing deadline. Although I put it in the mail 5 days before my 1/13/06 filing deadline. On Friday January 20, 2006 Cathy Howard/ Clerk of the DE Supreme Court sent to me a notice to show cause demanding to know why the court should not dismiss my appeal since it was not filed by the 1-13-2006 deadline. I responded by telling Mrs. Howard the situation and as proof I sent several documents which included an individual statement account for January 2006 , which showed the two January 8 2006 pay-to's. I also indicated that I would attempt to secure copies of the pay-tos which are addressed to the clerks office and dated. Since then I've sent 3 written request to the business office dated 1-17-2006; 1-22-06 At this point the business office has failed to respond.

**Remedy Requested :** Since I need copies of the 2 pay-to's to further prove that I place my legal mail in the prison mail system on Sunday 1/8/06. The clerk of the DE Supreme Court has reserved ruling until I send copies of those pay-to's. The business offices non- response is holding up pending Supreme Court litigation. I need copies of the 2 1/8/06 pay-tos.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| Medical Grievance : NO | Date Received by Medical Unit : |
| Investigation Sent : | Investigation Sent To : Smith, Tonya |
| Grievance Amount : | |

EXHIBIT ONE-A
**Page 1 of 2**

Smyrna Landing Road
**SMYRNA DE, 19977**
Phone No. 302-653-9261

## INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** FLOWERS, DAMONE E | **SBI#**           : 00303627 | **Institution**      : DCC |
| **Grievance #**    : 23426 | **Grievance Date** : 02/07/2006 | **Category**      : Individual |
| **Status**         : Unresolved | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Mail | **Incident Date**    : 01/08/2006 | **Incident Time :** |
| **IGC**            : Merson, Lise M | **Housing Location** :Bldg 21, Lower, Tier D, Cell 8, Top | |

| INFORMAL RESOLUTION |
|---|

**Investigator Name**   : Smith, Tonya                                   **Date of Report** 02/09/2006

**Investigation Report :**

**Reason for Referring:**

---

**Investigator Name**   : Smith, Tonya                                   **Date of Report** 07/12/2006

**Investigation Report :** Inmate Flower's pay-to was dated 1/8/06. The pay-to was logged in the housing unit on 1/13/06. The package was mailed out of DCC on 1/14/06. The pay-to was deducted from Inmate Flower's account on 1/20/06. This timeline was provided to the Delaware Supreme Court on 2/24/06.

**Reason for Referring:** Ms. Smith,
        This grievance has reached the 150 warning. Please investigate, meet with the inmate for a level
        one and resolve if possible. Thank You,
        Cpl. Merson

Offender's Signature:_____

Date              :_____

Witness (Officer)   :_____

EXHIBIT- ONE- A

Page 2 of 2

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE

V.

DAMONE E. FLOWERS

NO. _____
(TO BE SUPPLIED BY PROTHONOTARY)

## MOTION FOR POST CONVICTION RELIEF

1. County in which you were convicted __NEW CASTLE COUNTY__ .

2. Judge who imposed sentence __JUDGE HAILE ALFORD__ .

3. Date sentence was imposed __APRIL 25, 2003__ .

4. Offense(s) for which you were sentenced and length of sentence(s):
   1. MURDER IN THE FIRST DEGREE, SENTENCE IS NATURAL LIFE.
   2. PFDCF, SENTENCE IS TEN YEARS LEVEL Ⅴ.

*Cop of original motion filed in MAY 2005.

5. Do you have any sentence(s) to serve other than the sentence(s) imposed because of the judgement(s) under attack in this motion? YES ___ NO ✓
If your answer is "yes" give the following information:
Name and location of court(s) which imposed the other sentence(s).

_____

_____

_____

Date sentence(s) imposed: _____

Length of sentence(s): _____

6. What was the basis for the judgment(s) of conviction (check one)

( ) Plea of guilty

( ) Plea of guilty without admission of guilt (ROBINSON PLEA)

( ) Plea of nolo contendere

(✓) Verdict of jury

( ) Finding of judge (non jury trial)

7. Judge who accepted plea or presided at trial HONORABLE JUDGE HAILE ALFORD

8. Did you take the witness stand and testify?
No trial ( )    Yes ( )    No ( ✓)

9. Did you appeal from the judgement of conviction? YES ✓   NO ___
If your answer is "yes" give the following information:
Case number of appeal No. 264, 2003
Date of court's final order or opinion AUGUST 31, 2004

10. Other than a direct appeal from the judgement(s) of conviction, have you filed any other motion(s) or petitions/s seeking relief from the judgement in state or federal court?    YES (✓)    NO ( )    HOW MANY ( ONE )

If your answer is "yes" give the following information as to each:

Nature of proceeding(s) MOTION FOR NEW TRIAL FILED IN SUPERIOR COURT ON NOVEMBER 6, 2002, IN ACCORDANCE WITH SUPERIOR COURT CRIMINAL RULE 33.

Grounds raised: 1.EXTREMELY PRESUDICIAL ERROR COMMITED BY STATE WITNESS' NON-RESPONSIVE ANSWER THAT REVEALED DEFENDANT'S PRIOR CRIMINAL HISTORY. 2. Non-responsive ANSWER BY STATE WITNESS THAT REVEALED DEFENSE COUNSEL'S PREVIOUS REPRESENTATION OF THE WITNESS.

Was there an evidentiary hearing? NO .

Case number of proceeding(s) ID # 9808000280 .

Date(s) of court's final order(s) or opinion(s) FEBRUARY 5, 2003 ,

Did you appeal the result/s? INCORPORATED WITHIN DIRECT APPEAL

11. Give the name of each attorney who represented you at the following stages of the proceedings related to the judgment(s) under attack in this motion:

At plea of guilty or trial EUGENE J. MAURER, JR., ESQ.

On appeal EUGENE J. MAURER, JR., ESQ.

In any post conviction proceeding PRO SE.

12. State every ground on which you claim your rights were violated.

GROUND ONE: PROSECUTORIAL MISCONDUCT

Supporting Facts: THE STATE PROSECUTOR'S, CYNTHIA KELSEY AND JAMES RAMBO, EXTENDED DEALS AND REDUCED PLEAS FOR STATE WITNESSES IN EXCHANGE FOR DAMAGING STATEMENTS AGAINST THE DEFENDANT AND SUPPRESSED THIS EXCULPATORY EVIDENCE FROM THE DEFENDANT.

GROUND TWO: PROSECUTORIAL MISCONDUCT

Supporting Facts: THE STATE PROSECUTORS, CYNTHIA KELSEY AND JAMES RAMBO, DELIBERATELY CREATED A LAST MINUTE ISSUE, IN ORDER TO DELAY THE MAY 7, 2002, TRIAL, IN ORDER TO FURTHER DEVELOP WITNESSES IN VIOLATION OF THE DEFENDANT'S DUE PROCESS RIGHTS.

GROUND THREE: PROSECUTORIAL MISCONDUCT ARISING TO DUE PROCESS VIOLATION

Supporting Facts: THE STATE PROSECUTOR'S, CYNTHIA KELSEY AND JAMES RAMBO, ALONG WITH THE CHIEF INVESTIGATOR DT. ANDREW BROCK, DID APPROACH MEN AND WOMEN, WHO LIVED ON AND/OR FREQUENTED THE 22ND & LAMOTTE STREET AREA, AFTER THESE MEN AND WOMEN HAD BEEN ARRESTED ON THEIR OWN CRIMINAL CHARGES, AND PROPOSITIONED THEM TO MAKE DAMAGING STATEMENTS AGAINST THE DEFENDANT AND IN EXCHANGE THE STATE OFFERED LENIENCY, DEALS OR REDUCED PLEAS INVOLVING THEIR CRIMINAL CASES.

GROUND FOUR: PROSECUTORIAL MISCONDUCT

SUPPORTING FACTS: THE STATE REPEATEDLY MADE EXTREMELY PREJUDICIAL SUGGESTIONS OR INSINUATIONS DURING THE DEFENDANT'S TRIAL, THAT HE WAS A MEMBER OF A "DEUCE-DEUCE" GROUP/GANG WITH A "CODE OF SILENCE" BETWEEN THEM, AND THAT THE DEFENDANT HAD PEOPLE APPROACH STATE WITNESSES IN ORDER TO INTIMIDATE THEM, WHEN THESE SUGGESTIONS WERE NOT SUPPORTED BY ANY EVIDENCE.

GROUND FIVE: ABUSE OF DISCRETION

SUPPORTING FACTS: THE TRIAL JUDGE ELECTED NOT TO GIVE A CURATIVE INSTRUCTION TO THE JURY AFTER THE BAILIFF'S UNAUTHORIZED EJECTION OF PEOPLE FROM THE COURTROOM, WHO WERE FAMILY AND/OR FRIENDS OF THE DEFENDANT, IN VIEW OF THE JURY. THE TRIAL JUDGE DECIDES WHO IS TO REMAIN IN THE COURTROOM OR WHO IS TO BE EJECTED FROM THE COURTROOM. THE DEFENDANT WAS PREJUDICED BY THE BAILIFF'S UNAUTHORIZED EJECTIONS BECAUSE IT CAUSED A NEGATIVE COMMOTION INFRONT OF THE JURY, IN A TRIAL IN WHICH THE STATE REPEATEDLY MADE THE EXTREMELY PREJUDICIAL SUGGESTIONS OR INSINUATIONS THAT THE DEFENDANT WAS A MEMBER OF A "DEUCE-DEUCE" GROUP/GANG RESPONSIBLE FOR APPROACHING STATE WITNESSES ON THE STREET IN ORDER TO INTIMIDATE THEM.

GROUND SIX: CUMULATIVE ERRORS

SUPPORTING FACTS: THE DEFENDANT ARGUES IN THIS MOTION FOR POST-CONVICTION RELIEF THAT THE THREE ERRORS COMMITTED IN THE TRIAL, WHICH PROMPTED MISTRIAL APPLICATIONS, CUMULATIVELY AMOUNT TO PREJUDICE, AND A NEW TRIAL MUST BE AWARDED.

GROUND SEVEN : VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL UNDER THE SIXTH AMENDMENT.
SUPPORTING FACTS: THREE OF THE STATE'S FIVE EYEWITNESSES CLAIMED LACK OF MEMORY
AT TRIAL. THE ADMISSION OF THE THREE WITNESSES PRIOR OUT-OF-COURT TAPED STATEMENTS
UNDER TITLE II DEL.CODE § 3507 VIOLATED THE DEFENDANTS CONSTITUTIONAL RIGHT TO CROSS
EXAMINE THE WITNESS UNDER THE CONFRONTATION CLAUSE BECAUSE THE THREE WITNESSES'
CONVENIENT MEMORY LOSS HINDERED EFFECTIVE CROSS EXAMINATION.


GROUND EIGHT: VIOLATION OF DUE PROCESS.
SUPPORTING FACTS: THE STATE KNOWINGLY ELICITED AND UTILIZED FALSE
TESTIMONY TO OBTAIN A TAINTED CONVICTION.


GROUND NINE: VIOLATION OF BRADY.
SUPPORTING FACTS: THE STATE WITHHELD EXCULPATORY EVIDENCE AFTER A
SPECIFIC REQUEST FROM THE DEFENDANT WHICH PRECLUDED ITS USE BY
THE DEFENDANT AT TRIAL.


GROUND TEN: PROFESSIONAL MISCONDUCT RISING TO CONSTITUTIONAL VIOLATION.
SUPPORTING FACTS: THE CHIEF INVESTIGATOR, DETECTIVE ANDREW BROCK, VIOLATED
THE DEFENDANT'S DUE PROCESS RIGHTS BY UTILIZING SUGGESTIVE OR CORRUPTING
INTERVIEW TECHNIQUES IN ORDER TO ACQUIRE THE IDENTIFICATION OF THE
DEFENDANT THAT WAS "SO OFFENSIVE TO A CIVILIZED SYSTEM OF JUSTICE "
THAT IT MUST BE CONDEMNED.

GROUND ELEVEN : INEFFECTIVE ASSISTANCE OF COUNSEL.

SUPPORTING FACTS: THIS GROUND CONTAINS EIGHT ALLEGED DEFICIENCES COMMITTED BY DEFENSE COUNSEL BEFORE, DURING AND AFTER THE DEFENDANT'S TRIAL. THE ISSUES CONSTITUTE A LIST OF ERRORS ON THE PART OF DEFENSE COUNSEL IN PRE-TRIAL DECISIONS, THE LAST MINUTE ABANDONMENT OF THE DEFENSE, FAILURE TO REQUEST JURY INSTRUCTIONS AS WELL AS HIS OBJECTIONS OR LACK THEREOF TO PREJUDICIAL EVIDENCE SUBMITTED BY THE PROSECUTION DURING THE TRIAL. THE DEFENDANT CONCLUDES THAT HE WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS, DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.

Wherefore, movant asks this court to grant him all relief to which he may be entitled in this proceeding.

I declare the truth of the above under penalty of perjury.

Date _____

_____

Signature of Movant