IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF DELAWARE

DAMONE E. FLOWERS,
    PETITIONER,

                                   CIV. ACT. No. 06-356-GMS

V.

THOMAS C. CARROLL, WARDEN,

AND CARL C. DANBERG, ATTORNEY

GENERAL FOR THE STATE OF DELAWARE,
                RESPONDENTS,



FILED

MAY 21 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD scanned

## MOTION(S)/MEMORANDUM IN SUPPORT OF HABEAS CORPUS PETITION

NOW COMES, the petitioner, DAMONE E. FLOWERS, pro se, to request that this HONORABLE COURT construe and include the following information and materials to be in support of the habeas corpus petition (D.I. 7), and decide on the motions lodged herein. The petitioner offers the following herewith:

1. ON FEBUARY 27, 2007, the COURT denied the petitioner's request for default judgment. (D.I. 32). The record revealed that the State filed its answer on DECEMBER 13, 2006. (D.I. 22), so that the petitioner's motion was moot. Additionally, the COURT denied the petitioner's motion(s) for appointment of counsel without prejudice to renew. (D.I. 21, 32).

2. ON FEBUARY 28, 2007, the COURT denied the petitioner's motion to invoke discovery. (D.I.8). The COURT concluded that there was no "good cause" to grant the request at that time. See RULE 6(a)(b), 28 U.S.C. fall 2254; DEPUTY v. TAYLOR, 19 F.3d 1485, 1493 (3d CIR. 1994).

3. Taking the COURT's rulings into consideration the petitioner reviewed all of the motions, briefs, memorandums and appendixes that had been previously filed in support of the habeas corpus petition. Specifically, the petitioner focused on ARGUMENTS I, II, VIII, IX and XI of the habeas corpus petition since the request for appointment of counsel and motion to invoke discovery correlated to these arguments.

The COURT will note that in ARGUMENT VIII the petitioner alleged that the State elicited and utilized false evidence to obtain the conviction. Proving this argument was/is predicated upon the COURT and the petitioner receiving exculpatory evidence that was withheld from the petitioner by the State. (ARGUMENT II). Namely, the petitioner sought to obtain exculpatory statements given to investigators by MARVIN SWANSON and BRUCE DUNCAN, in that both men either identified or indicated to investigators that there was an additional shooter besides the petitioner or identified a different individual as the shooter from the night in question. The COURT's DENIAL of the motion to invoke discovery essentially castrated this argument since the exculpatory statements given by SWANSON and DUNCAN factually prove out the second part of the argument.

LIKEWISE, in ARGUMENT IX the petitioner alleged that the State committed multiple BRADY violations by withholding exculpatory BRADY statements after numerous general and specific request. To support this allegation the petitioner provided the COURT with the letters of notification from the State to defense counsel(s). (See APPENDIX TO OPENING BRIEF) (A 14-16; 19-20). Defense counsel's reply letters specifically requesting those exculpatory statements and materials. (See APPENDIX TO OPENING BRIEF A 17; 19-20). The ensuing general and specific requests for that exculpatory BRADY materials. (See A 17; 19-20; 26-29; 30-32; 33-38; 39-45).

Additionally, the petitioner provided the COURT with copies of correspondence between defense counsel, EUGENE MAUREZ, and the petitioner in which counsel firmly declared that the State had never turned over that exculpatory BRADY evidence to him. (See MOTION FOR EXPANSION OF RECORD, ATTACHMENTS-EXHIBITS R&S). All this material coupled with the State's answer to this allegation led the petitioner to believe that this argument was impregnable. Nevertheless the COURT denied the petitioner's motion to invoke discovery.

With renewed determination the petitioner believed that if it was possible to obtain affidavits from the four witnesses that made up the nucleas of the BRADY violation arguments and presented them to the COURT, he would stand a better chance of prevailing on his habeas corpus petition since affidavits from the witnesses coupled with all the other submitted materials would unequivocally prove the existence of the witnesses and the exculpatory nature of the statements they provided to investigators.

The petitioner was able to locate BRUCE DUNCAN, who is currently incarcerated at S.C.I. GEORGETOWN, DE. The petitioner also located CHARMAINE MAYO. Both expressed a willingness and reluctance to become reinvolved with the case. The petitioner has been unable to locate BENNIE WRIGHT, MARVIN SWANSON and EARL BALTIMORE of BALTIMORE, MD. due largely to his incarcerated status.

Additionally, the petitioner reached out to both former defense attorneys, THOMAS PEDERSEN and EUGENE MAURER. (EXHIBIT TWELVE). THOMAS PEDERSEN did respond to the petitioner's letter but elected not to provide the petitioner with free legal advice. (EXHIBIT TEN ). To date EUGENE MAURER has refused to respond to the petitioner's letters or his family's telephone calls.

4. FURTHER, the petitioner located and contacted FRED TATE of TATE INVESTIGATIVE SERVICES. (EX. ELEVEN). The COURT will remember that FRED TATE was the private investigator hired by EUGENE MAURER to locate and interview both state and defense witnesses prior to trial. (See APPENDIX TO OPENING BRIEF A 72-76; 78-80). Fortunately, FRED TATE responded to the petitioner's letter and did forward to the petitioner all the reports on file concerning this case. (EXHIBITS ONE-NINE).

After review of FRED TATE's report several points worth mentioning come to mind. FIRST: FRED TATE did infact interview CHARMAINE MAYO over the telephone on MAY 2, 2002. Ms. MAYO indicated to Mr. TATE that she was present on 22ND & LAMOTTE STREET the night of the shooting. Ms. MAYO indicated that the car driven by the victim did go forward through the crowd and then backwards at which points shots were fired at the vehicle. Ms. MAYO indicated that the petitioner was not the shooter. Ms. MAYO also indicated or identified the shooter as JOE HARRIS. (EXHIBIT FIVE).

Based upon Ms. MAYO's statement to Mr. TATE which was inturn reported to defense counsel. Mr. MAURER knew well before trial that Ms. MAYO had identified JOE HARRIS as the shooter on the night in question. Despite this fact defense counsel elected not to call Ms. MAYO on the petitioner's behalf at trial. The Court will be reminded that the petitioner alleged in the habeas corpus petition in ARGUMENT XI-Ineffective Assistance of Counsel. 3RD ALLEGATION that defense counsel abandoned the pre agreed upon defense at the last minute. That abandonment resulted in defense counsel electing not to call any witnesses on the petitioner's behalf, including Ms. MAYO who was initially slated to testify for the petitioner and did attend the trial.

3

This glaring fact supports the petitioner's argument that counsel abandoned the preagreed upon defense in the mist of a close case that hinged solely on eyewitness testimony. SECOND: The fact that Ms. MAYO identified JOE HARRIS as the shooter directly under cuts State prosecutor, CYNTHIA KELSEY's closing remarks that "no one definetly says JOE HARRIS was shooting." Again, the State's closing arguments on this issue were/was the topic of the petitioner's argument in the habeas corpus petition. (See Argument VIII). The petitioner alleged that the State knew unquivocally that more than one individual indicated to investigators that JOE HARRIS was the shooter prior to trial. To argue anything else to the jury would mean that the prosecution was lying to the jury to obtain the petitioner's conviction. The fact that the petitioner had attempted to prove this argument through the withheld statements of MARVIN SWANSON and BRUCE DUNCAN does not mitigate the potency of Ms. MAYO's identification of JOE HARRIS as the shooter. Infact it only highlights the importance of obtaining the withheld SWANSON and DUNCAN statements. THIRD: As of MAY 2, 2002, defense counsel was aware of the fact that Ms. MAYO had identified JOE HARRIS as the shooter. Defense counsel never relayed this fact to the petitioner, who only learned of this fact when he received FRED TATE's report on MAY 9, 2007. This constitutes a second violation of RULE 1.4(3) COMMUNICATION of the DELAWARE LAWYERS' RULES OF PROFESSIONAL CONDUCT.

Additionally, defense counsel failed to object to Ms. KELSEY's closing remarks despite having evidence' in the form of an eyewitness, who could refute the State's position that no one definetly said that JOE HARRIS was the shooter. Again this must support the petitioner's argument that counsel abandoned the petitioner's case by electing not to present the preagreed upon defense militating a finding that the petitioner was denied effective assistance of counsel.

5. A second fact that came to the petitioner's attention was:

FIRST. FRED TATE did interview BENNIE WRIGHT at the former GANDER HILL PRISON. MR. WRIGHT indicated to MR. TATE that the petitioner did infact have a gun and did shoot the gun up in the air on the night in question. MR. WRIGHT indicated that he did not think that the petitioner had shot the victim because he(petitioner) had many opportunities to shoot directly into the car as it passed in front of him (petitioner).

Mr. WRIGHT also indicated that at least one more person started shooting a gun at the vehicle from the south west corner onto 22ND STREET, describing the sounds of two different weapons being fired. (EXHIBIT NINE).

SECOND. Taking Mr. WRIGHT's statement into consideration there was two pictures being drawn by witnesses. One, is that the petitioner was not the shooter, JOE HARRIS was. Two, is that both the petitioner and JOE HARRIS shot at the vehicle driven by the victim after he attempted to hit individuals in the street with his vehicle.

Defense counsel was aware of MR WRIGHT'S statement as early as MAY, 2002, but counsel was aware of MR. WRIGHT well before MR. TATE interviewed him. Despite the this fact and the two pictures witness' were painting, defense counsel never explored any alternative defenses for the petitioner. BENNIE WRIGHT'S statement was similar in context to statements given to investigators by RONETTA SUDLER as well as MARVIN SWANSON. Although SWANSON'S statement has been withheld, the State's initial notification to defense counsel T. PEDERSEN indicated that SWANSON had also identified an additional shooter. (See APPENDIX TO OPENING BRIEF A 19-20). Again, BRUCE DUNCAN'S statement was withheld but a map that was drawn by him during the interview placed JOE HARRIS at the scene of the shooting in the spot from which the fatal shots were fired. (See APPENDIX TO OPENING BRIEF A 14-16).

With several witnesses indicating that there was two shooters on the night in question and that the shooting resulted from the victim driving his vehicle backwards on 22ND STREET with the intention of hitting someone in the crowd. (See APPENDIX TO OPENING BRIEF A 89-92). Defense counsel could have explored and presented an argument or defense to the jury that the petitioner's actions were reckless and cruel, a wicked and depraved indifference to human life which are elements of a lesser included offense such as murder in the second degree, manslaughter or criminal negligent homicide. In short, defense counsel could have presented a defense to the jury that this was a crime of passion. Again, the COURT must keep in mind that the petitioner never knew specifically what MR WRIGHT'S statement was until MR. TATE forwarded this report to him on MAY 9, 2007. Infact the petitioner was surprised by the context of MR WRIGHT'S statement in that it was assumed that MR WRIGHT indicated that the petitioner was

not the shooter.

Nevertheless, defense counsel did not explore any alternative defenses and did not present any defense to the jury despite having the means to do so.

THIRD. Although BENNIE WRIGHT did express a seemingly strong desire not to testify in this case to MR. TATE. Defense counsel could have called MR. WRIGHT as an adverse or hostile witness. This in the event that the petitioner agreed to a defense of a lesser included offense. Had the petitioner consented to this defense, counsel could have revealed to the jury the fact that Dt. Brock had failed to investigate MR. WRIGHT's account of the night in question particularly his eyewitness account of a second shooter. Defense counsel could have revealed to the jury that Dt. Brock failed to allow MR. WRIGHT to view mug shots to determine if he could identify the second shooter. A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the petitioner. See, BOWEN v. MAYNARD, 799 F.2d 593, 613 (1986); LINDSEY v. KING, 769 F.2d 1034, 1042 (1985). MR. WRIGHT indicated to MR. TATE that Dt. Brock had implied that he (WRIGHT) had been told, apparently by some unknown person, to say that others were shooting. This demonstrated that Dt. Brock was displeased with MR. WRIGHT's statement for no other reason then that he (WRIGHT) indicated that there was two shooters. Dt. Brock's position surely affected his unwillingness to investigate MR. WRIGHT's or any other witness that gave a similar statement. All of this could have been revealed to the jury, yet defense counsel decided not to present any defense on the petitioner's behalf. These facts and arguments supports the petitioner's allegations that he was denied effective assistance of counsel.

6. Additionally, FRED TATE'S report indicates that defense counsel ordered him to stand down on the second day of trial. (EXHIBIT TWO). The record will reflect that by the second day of trial only VERNON MAYS and JAMES HOWELL had testified. Such an order by defense counsel can be construed as a prerequisite to his decision to abandon the preagreed upon defense. Defense counsel's order prevented MR. TATE from locating BRUCE DUNCAN, who was incarcerated at D.C.C. in SMYRNA, DE at the time. The Court will remember that JUDGE HAILE ALFORD had signed an order permitting MR. TATE to enter GAUDER HILL to interview both BENNIE WRIGHT and BRUCE DUNCAN. (SEE APPENDIX TO OPENING BRIEF A 78-80)

DUNCAN had recently been transferred to D.C.C. and so MR.TATE did not interview him. After being told to stand down no further steps were taken to locate and interview DUNCAN.

It must be stressed again that the letter of notification from the State to defense counsel indicated that BRUCE DUNCAN gave a statement to investigators in which he stated that the petitioner was not the shooter. (See APPENDIX TO OPENING BRIEF A 14). The fact that defense counsel decided to call off MR.TATE before MR.DUNCAN was interviewed and further elected not to call him at trial to testify on the petitioner's behalf is not the action of a reasonably competent defense attorney. Further, the petitioner paid defense counsel a considerable sum of money to represent him. Money from which MR.TATE's fees were paid.

Prior to trial defense counsel had access to and was aware of at least two witnesses whom indicated to investigators that the petitioner was not the shooter, namely MS. MAYO and MR.DUNCAN. Of the two, MS.MAYO identified Joe HARRIS as the shooter. It remains to be seen if MR.DUNCAN identified Joe HARRIS as the shooter but the map drawn by MR. DUNCAN placed Joe HARRIS at the scene. Notwithstanding the other witnesses statements which could have supported the defense of a lesser included offense. Defense still had to three witnesses, MS. MAYO, MR. DUNCAN and MR.BALSMORE of BALTIMORE, MD., whom he could have utilized to support the preagreed upon defense. The fact that he utilized none of these witnesses illustrates counsel's obvious abandonment of the petitioner's case in the middle of trial. This must support the petitioner's argument that he was denied effective assistance of counsel.

Again, the petitioner must reiterate to the COURT that up to this point and time, defense counsel, EUGENE MAURER, has never been ordered to answer to the petitioner's allegations of ineffective assistance of counsel. Even though the petitioner did raise the same eight claims of ineffective assistance of counsel in his RULE 61 MOTION FOR POST CONVICTION RELIEF that are raised in his habeas corpus petition.

Given the nature of MR.TATE's report in light of defense counsel's highly prejudicial decision to rest the petitioner's case without calling any witnesses or presenting **any**

type of defense coupled with the petitioner's meritorious allegations of ineffective assistance of counsel, militates an order from this Court directing EUGENE MAURER to answer to the constitutional allegations of ineffective assistance of counsel lodged against him in the habeas corpus petition.

At this time, the petitioner is lodging a written motion requesting that this HONORABLE COURT issue an ORDER directing defense counsel, EUGENE MAURER, to answer to the allegations of ineffective assistance of counsel leveled against him in the petitioner's habeas corpus petition, with leave to reply to counsel's answer.

7. Based upon the forwarded arguments and the facts relayed from MR. TATE's report, the petitioner must now renew his motion to invoke discovery. Having reviewed **DEPUTY v. TAYLOR, 19 F.3d 1485, 1493 (3d Cir. 1994)**, the petitioner understands that he is not entitled to go on a fishing expedition through the State's files in hopes of finding some damaging evidence. **MUNOZ v. KEANE, 777 F.SUPP 282, 287 (S.D.N.Y. 1991).** A petitioner establishes "good cause" by "pointing to specific evidence that might be discovered that would support a constitutional claim." SEE **DEPUTY, id.**

Narrowing down the previous motion to invoke discovery, the petitioner is now specifically seeking the following:

A. The exculpatory BRADY statement given to investigators by LAMAR MARVIN SWANSON at the former GANDER HILL PRISON in the first quarter of 2001. This must include the identity of the second shooter which MR. SWANSON provided to investigators, any benefits MR. SWANSON received for cooperating with the State and copies of all police interview notes reflecting statements of the witness.

This exculpatory statement would support the petitioner's constitutional claims in ARGUMENT I, II, VIII and IV & XI. (SEE HABEAS CORPUS PETITION).

B. The exculpatory statement given to investigators by BRUCE DUNCAN on DECEMBER 19, 2001. This must include copies of all police interview notes reflecting statements of the witness.

This exculpatory BRADY statement would support the petitioner's constitutional claims raised in ARGUMENT VIII, IX & XI. (SEE HABEAS CORPUS PETITION).

C. Copies of all police interview notes reflecting statements made by state witness Ronetta Sudler on August 11, 1998. In the state's discovery package, specifically the SUPPLEMENT POLICE REPORT, no indication was made that Ms. Sudler had identified Joe Harris as a shooter. (See Appendix to Opening Brief A 85). However when Ms. Sudler's video taped statement was played at trial, an apparently portion meant to be edited revealed that Ms Sudler repeatedly told Dt. Brook that Joe Harris shot at the vehicle driven by the victim on the night in question.

The notes should reflect the fact that the State was aware that Ms Sudler indicated that Joe Harris was a shooter. Editing of the tape was performed by the State and the attempt to suppress this fact supports the petitioner's ARGUMENT'S **IX**. This being that the State knowingly suppressed and withheld exculpatory BRADY evidence.

8. FURTHER, based upon MR. TATE's report and the petitioner's renewed motion to invoke discovery, the petitioner will renew his motion for appointment of counsel. It is understood that a habeas petitioner has no automatic constitutional or statutory right to representation in a federal habeas proceeding. **COLEMAN v. THOMPSON, 501 U.S. 722, 752(1991).** However, the COURT may seek representation by counsel for a habeas petitioner "upon a showing of special circumstances indicating the likelihood of substantial prejudice to [petitioner] resulting... from [petitioner's] probable inability without such assistance to present the facts and legal issues to the court in a complex but arguably meritorious case." **TABRON v. GRACE, 6 F.3d 147, 154 (3d Cir. 1993); 18 U.S.C. 3006A (a)(2)(B)**(representation by counsel may be provided when a court determines that the "interest of justice so require.").

In summary fashion the petitioner has demonstrated the difficulty he has encountered while trying to contact former defense lawyers, witnesses and investigators. Not to mention the State level rulings that have been lodged against him due to circumstances outside of his control, such as D.C.C.'s mail room's delay of his outgoing notice of appeal which resulted in the **Delaware SUPREME COURT's** dismissal of his appeal of the RULE 61 motion due to untimely filing. Which further resulted in ARGUMENTS **I - II** being exhausted but procedurally defaulted in this Court.

9.

Nevertheless, the petitioner has demonstrated diligence in presenting his constitutional claims to the COURT and MR. TATE's report demonstrates what type of critical evidence is available if the petitioner has the proper avenues to pursue it. At this point, the COURT has the ability to issue an ORDER directing the State to turn over to the petitioner the exculpatory BRADY statements he has sought since the inception of collateral attacks on his conviction. In the alternative, the COURT can appoint counsel, permitting same, to facilitate the discovery process on the petitioner's behalf. The petitioner will argue here that if the COURT were to do neither then there is a likelihood that the petitioner will **incur** substantial prejudice resulting from his inability to obtain the exculpatory BRADY materials from the State as well as his inability to have defense counsel answer to the allegations of ineffective assistance of counsel without an ORDER from this COURT.

Granted, the COURT can rule on the petitioner's habeas corpus petition standing as it is but the petitioner will submit that such a ruling would be based on incomplete facts. The issues raised in the habeas corpus petition are complex but arguably meritorious. To clarify the petitioner is not asking the COURT to appoint counsel to represent him during these entire proceedings. Only to facilitate the discovery process and assist in bringing that material to the COURT in a proper manner in context to the arguments already raised in the habeas corpus petition.

## CONCLUSION

BASED upon the above forwarded arguments and materials, the petitioner requests that this Court construe the same as a memorandum in support of the habeas corpus petition. Additionally, the petitioner requests that the Court make a ruling on the renewed motion to invoke discovery lodged herein, the motion for appointment of counsel to facilitate that process lodged herein. And finally, to direct defense counsel, EUGENE MAURER, to answer to the allegations of ineffective assistance of counsel raised in the habeas corpus petition including the latest developments argued herein.

MAY 17, 2007

RESPECTFULLY SUBMITTED,

Damone Flowers

DAMONE FLOWERS

TATE INVESTIGATIVE SERVICE

April 30, 2007

Damone Flowers
DCC
1181 Paddock Rd
Smyrna, DE 19977

Dear Mr. Flowers,

    I hope this letter finds you in good health.

    I have enclosed all of the reports I have on file concerning your case.   I hope the reports are of help.

    Should you need anything else, please have your current attorney call.

    Sincerely,

    Frederick C. Tate
    President
    Tate and Associates, Inc.

(EXHIBIT ONE)

# TATE INVESTIGATIVE SERVICES



FILE NUMBER:   Damone Flowers

SUBJECT:        Witness Search and Interviews

DATE AND TIME: 4/02/02

INVESTIGATOR:  Fred Tate

SUMMARY: This Investigator was hired to locate and interview several witnesses in this matter.

Investigative Procedures:

On 4/03/02 the summary of witness interviews was reviewed.  We then attempted to confirm telephone numbers and address of the listed witnesses in this case.  No listings could be found. Letters of introduction were prepared in the event the witnesses were not home.

During the next few weeks, this investigator attempted to contact the witnesses in this case.  A total of 10 hours was used.

Two of the addresses were found vacant.

The home of Michael Chamblee, 33 E 22nd Street was vacant.

The home of Tyshiek McDougal, 2235 N. Pine Street was vacant.

The home of Marvin Swanson, 1411 E. 27th Street showed no signs of being occupied and neighbors were of little help.  The location was visited on numerous occasions.

The Wilmington Housing Authority advised that a Lakisha Harris lived at that location, however, she does have a four-year-old son named Marvin Swanson.

Lois Ronneta Sudler McNeal was located in the Sussex Correctional Institute in a boot camp there.  She refused to be interviewed.

Computer Data searches found that Marvin Swanson gave 1411 E. 27th St as his address.  Numerous attempts to contact him failed.

Tyshiek McDougal was located at 2237 N. Pine Street and a statement taken.  Ms. McDougal appears to be mentally challenged.

Charmaine Mayo was contacted and interviewed several times. She gives a telephone number of 427-9965.

Bennie Wright was interviewed in Gander Hill Prison.

Damone Flowers was interviewed in his home, 123 Concord Ave.

An address for Michael Chamblee, 2109 N. Locust Street was found incorrect.  No other addresses could be located.

On the second scheduled day of the trial, I was told to stand down on any further investigation.

(EXHIBIT TWO)

# TATE INVESTIGATIVE SERVICE



P.O. Box 9142
Wilmington DE 19809
Office:  302-762-8283
Fax:  302 762-8283

April 8, 2002

Michael Chamblee
33 E. 22nd Street
Wilmington, Delaware 19802

Dear Michael:

I have been hired to speak to you concerning a murder, which occurred in August of 1998.  The murder took place in the area of 22nd and Lamotte Streets.  The case may be scheduled for trial soon, and it is important that I speak to you prior to your being placed on the witness stand.

Our only purpose in this matter is to find out the facts as you remember them.  The interview can be held at your conveinience and should take no more than 20 minutes.

Please call my office as soon as possible.  The telephone number is 302-762-8283.

Sincerely,

Frederick C. Tate

(EXHIBIT THREE)

# TATE INVESTIGATIVE SERVICE

P.O. Box 9142
Wilmington DE 19809
Office: 302-762-8283
Fax: 302 762-8283

April 8, 2002

Charmaine Mayo
1113 Cedar Tree Court
Claymont, Delaware 19809

Dear Charmaine:

I have been hired to speak to you concerning a murder, which occurred in August of 1998. The murder took place in the area of 22nd and Lamotte Streets. The case may be scheduled for trial soon, and it is important that I speak to you prior to your being placed on the witness stand.

Our only purpose in this matter is to find out the facts as you remember them. The interview can be held at your conveinience and should take no more than 20 minutes.

Please call my office as soon as possible. The telephone number is 302-762-8283.

Sincerely,

Frederick C. Tate

(EXHIBIT FOUR)

# Report of Interview

**Date:**    5/02/02    **Case #**    Charmaine Mayo    **By:**    Frederick C. Tate

Charmaine Mayo was interviewed over the telephone and
provided the following information:

1  She remembers being on 22nd Street the night of the shooting, but can't remember why everyone

2  was out in the street.  She also remembers Marvin Swanson talking to the men in the car, and the

3  car starting forward and then going backward and shots ringing out.  When the shots rang out

4  Damone was across the street talking to someone.  Everyone ducked when the shots rang out and

5  she remembers seeing a man running down the street toward the car shooting a gun.  She said that

6  she didn't ever say that she saw Damone with a gun and didn't understand why the police wrote

7  that done.

8  Charmaine said that she knew the police were looking for her to talk to her about the case and

9  they might "refreshen" her memory, but right now she don't remember Damone ever having a

10  gun.

11  She was sure that she told the police that there was a man (not Damone) running down the street

12  shooting a gun.

13  (Later in the day, Charmaine called my office and indicated that she had spoken to the police.)

14  She added that the name of the man that was running down the street shooting the gun was Joe

15  Harris.

16  I advised that we may speak to her again.

(EXHIBIT FIVE)

# Report of Interview

**Date:**    4/29/02    **Case #**    Damone Flowers    **By:**    Frederick C. Tate

Vernon Mays was interviewed in his home, 123 Concord Avenue and
provided the following information:

1    Mr. Mays related that he had been in the Unit block of E. 22nd Street on the night of the shooting

2    and that he had observed a large crowd in the street. He also remembers the victim's car stopped

3    near the corner.

4    When the shooting started, he was about 20 feet away from one subject who was holding a gun

5    Hollywood style (my wording) with the gun sideways and his arm extended forward and up and

6    the gun aimed down. Mr. Mays indicated that he has some military background and is familiar

7    with firearms. His first impression was that the man was shooting into the street and not hitting

8    anyone. Mr. Mays further stated that he thought there were two different guns firing. He based

9    this on seeing the flashes from the gun in the hand of the man he saw shooting and hearing those

10   shots and then hearing other shots that sounded different and did not coincide with the flashes

11   from the gun he was watching. Just as he was ducking, he thought one shot whizzed by his head.

12   He further stated that he did not recognize the subject when he saw with a gun when the shooting

13   started. He later learned that Mr. Flowers had been arrested for it and he was concerned because

14   he knew Mr. Flowers and did not think he was the one that shot the person in the car. He did go

15   through several photograph books in the police station later that night, and picked out a picture of

16   a person that was similar to the man he saw with a gun, but wasn't sure it was the shooter.

17   Mr. Mays related that his memory was a bit blurred from the amount of time that has gone by. He

18   also indicated that when the shooting started everything happened very fast.

19   Mr. Mays home telephone number is 656-0810 and his work number (Sweets to You) is 762-

20   0666.

( EXHIBIT SIX )

**TATE INVESTIGATIVE SERVICE**



P.O. Box 9142
Wilmington DE 19809
Office: 302-762-8283
Fax: 302 762-8283

April 8, 2002

Tyshiek McDougal
2235 N. Pine Street
Wilmington, Delaware 19802

Dear Tyshiek:

I have been hired to speak to you concerning a murder, which occurred in August of 1998. The murder took place in the area of 22nd and Lamotte Streets. The case may be scheduled for trial soon, and it is important that I speak to you prior to your being placed on the witness stand.

Our only purpose in this matter is to find out the facts as you remember them. The interview can be held at your conveinience and should take no more than 20 minutes.

Please call my office as soon as possible. The telephone number is 302-762-8283.

Sincerely,

Frederick C. Tate

# Report of Interview

**Date:**    4/29/02    **Case #**    Tyshiek McDougal    **By:**    Frederick C. Tate

Tyshiek McDougal was interviewed in her home at 2237 N. Pine Street and
provided the following information:

1    Ms. McDougal told me that she remembers being at 33 E. 23rd Street the night of the shooting

2    but indicated that she did not remember Damone having a gun. She had been assisting Damone

3    sell crack that night. She does remember him running up to the house after hearing some shots

4    and saying that "some people got shot" but insists that she never saw him with a gun and never

5    heard him say that he had shot anyone. She also said that it was a long time ago and she had

6    trouble remembering things.

7    Ms. McDougal indicated that she was waiting for the police to come interview her about the case.

8    I suggested that she be completely honest about what she remembers. She said she was.

# Report of Interview

**Date:**    5/08/02    **Case #**    Damone Flowers    **By:**    Frederick C. Tate

Bennie Wright was interviewed in Gander Hill Prison and
provided the following information:

1    Mr. Wright stated that he had become involved in this matter after being interviewed by Det.

2    Brock relative to another matter, and told Det. Brock that he had been in the area when the

3    shooting occurred.  He said that Det. Brock had recorded their conversation.  Mr. Wright also

4    stated that he did not want to testify in this matter and would hire a lawyer to prevent his being

5    called to the stand.  I explained that I only wanted to know what he had told Det. Brock and that

6    I could offer him nothing.

7    Mr. Wright then went on to say that he had been at 22nd and Lamotte Street and had observed

8    Damone standing partially in the street, by the curb on the north east corner of Lamotte Street.

9    Damone was talking to some girls in a car that was blocking Lamotte Street.  Another vehicle (the

10   one with the victim in it) had come up behind the girl's car and was waiting to get by.  He said

11   there was a large group of people in the area and the area is poorly lit.  The girls car started to

12   pull over to let the victim's car pass and as the car passed between Damone and the girl's car, the

13   shooting started.  Damone started shooting a gun, holding it up in the air, sideways, and aimed

14   down.  As the car rounded the corner onto 22nd Street, at least one more subject started shooting

15   a gun from the southwest corner of the intersection as the car went around the corner.

16   Mr. Wright didn't think that Damone had shot the fellow in the car as he had many opportunities

17   to shoot directly into the car as it passed in front of him.  He said that the gun that Damone was

18   firing sounded like an automatic to him as it fired at a rapid rate, and the gun the other fellows

19   were shooting was a revolver with a slower rate of fire.  He added that Damone was holding the

20   gun at arm length, sideways, and pointed down.  Mr. Wright didn't know anyone else at the scene

21   and doesn't know if anyone else was shooting, other than the two he mentioned.

22   I asked Mr. Wright if anyone had approached him concerning this case, other than Det. Brock and

23   me, and he said no.  He said that Det. Brock implied that Mr. Wright had been told to say that

24   others were shooting, and that they probably wouldn't use him.

25   Mr. Wright said that he didn't know of anyone else we should talk to about the matter.

# THOMAS A. PEDERSEN
### ATTORNEY AT LAW
MEMBER DE. BAR
2 N. RACE STREET
GEORGETOWN, DE 19947
TEL. (302) 856-2533
FAX. (302) 856-7745

March 20, 2007

Damone Flowers, #303627
Delaware Correctional Center
1181 Paddock Rd
Smyrna, DE 19977

Dear Damone:

Thank you for your recent letter dated March 2, 2007.  Unfortunately, at this time I am too busy to get involved with your case and have also reached the end of my willingness to offer free legal advice to you.  I wish you the very best of luck in the pursuit of your appeal.

Very truly yours,

Thomas A. Pedersen, Esq.

TAP/ph
cc: file

(EXHIBIT TEN)

DAMONE FLOWERS

D.C.C.

1181 PADDOCK RD.

MR. FRED TATE                                                    SMYRNA, DE. 19977

TATE INVESTIGATIVE SERVICE

P.O. BOX 9142

WILMINGTON, DE. 19809


RE: STATE OF DELAWARE v. DAMONE FLOWERS


Dear MR. TATE,

  Back in February 2002, my former attorney, EUGENE J. MAURER JR. P.A., retained your services to do some investigative work in relation to a first degree murder case that was pending against me at the time. (See ENCLOSED EX. A-72-76; 78-80). Among other things you were retained to interview several witnesses, both for the state and the defense. i.e. witnesses that would be called by both the state and the defense.

  At this point, I, personally, have never seen the actual formal report that you filed with MR. MAURER, regarding the outcome or results of those interviews. Notwithstanding that fact, this report or those findings have become critically important to my pending habeas corpus petition in the DISTRICT COURT of DELAWARE. To the extent that its possible, I would like you to forward to me the results or your findings from those interviews including the individuals you weren't able to locate and the reasoning behind that inability to locate said witness(es).

  I am uncertain if it is normal for the former client of a former client to contact you directly regarding the results of your services. But given the nature of criminal cases of this severity and the pace of the justice system, I cannot imagine that my request is unexpected. In that it is straight forward and my petition is pending before DISTRICT COURT JUDGE GREGORY M. SLEET, FLOWERS v. CARROLL et al., CIVIL ACTION NO. 06-356-GMS. I must ask that you forward those results to me in the very near future.

(EXHIBIT ELEVEN)

Again, the formal report containing the results from the witnesses you were hired to locate and interview, and the bill that was generated from such hirings have become very important to my pending petition in the District Court and in no way reflects negatively on yourself or your company. That said, with all due respect I look forward to hearing from you in the very near future.

Respectfully yours,

DAMONE E. FLOWERS

( EXHIBIT TWELVE )

DAMONE FLOWERS

D.C.C.

1181 PADDOCK RD.

SMYRNA, DE. 19977

EUGENE J. MAURER, JR.

1201-A KING STREET

WILMINGTON, DE. 19801

RE: FLOWERS v. CARROLL et.al.

Dear Mr. MAURER,

Back in February 2002, you retained the services of a private investigator named FRED TATE of TATE INVESTIGATIVE SERVICE, to interview several state and potential defense witnesses (see ENCLOSED EX. A-72-76; 78-80). If you will allow me to refresh your memory, in the middle of my trial, when you proposed that you wanted to rest the defense without calling any witnesses. I argued that there was four witnesses we could call that indicated to investigators that I was not the shooter on the night in question. i.e. BRUCE DUNCAN, BENNY WRIGHT, EARL BALSMORE (MD) and CHARMAIN MAYO. There also was an additional witness who identified 2 shooters, i.e. MARVIN SWANSON. When I made this counter you indicated that all of the witnesses had not been located and interviewed, therefore you were uncertain of what they'd say once on the witness stand.

Fast forward to 2005 before I filed my RULE 61 motion, I wrote you asking you to forward to me the exculpatory statements given to investigators by DUNCAN, WRIGHT, MAYO and SWANSON. You indicated in your response to me that the state never turned over that exculpatory material. As a result I included a BRADY violation argument in my RULE 61 motion, pertaining to that withheld BRADY material. When denying the RULE 61 motion, JUDGE JOHNSTON argued that my allegation that this exculpatory evidence actual exist and would have been material was pure conjecture not supported by the record. The appeal of my 61 was dismissed due to untimeliness in the filing of the notice of appeal. The prison mail room delayed the outgoing legal mail for 9 days after I placed in the prison mail system.

Along with my habeas corpus petition, I also filed motions to invoke discovery (RULE 6) and expansion of the record (RULE 7), both pertaining specifically to the withheld exculpatory. IN SEPTEMBER 06, DISTRICT JUDGE SLEET issued a supplemental order directing the state to respond to the motion for expansion of the record, which was construed as a brief in support of the petition. This in addition to an earlier order to respond to the habeas petition.

In their response, the State argued that I haven't proven that the exculpatory statements actually exist and then alternately argued that they turned over "statement summaries" and other BRADY material pertaining to the witnesses. I countered by arguing that the "statement summaries" were actually the state notifying the defense by mail that they'd taken a statement from such and such a witness who indicated that I wasn't the shooter. Additionally, I argued that the "statement summaries" don't satisfy BRADY and that the actual taped statement or a transcription of the statements were withheld, thus constituting a BRADY violation.

Last week JUDGE SLEET denied my motion to invoke discovery stating that I "requests numerous documents and transcripts pertaining to statements allegedly made by several witnesses regarding his(my) innocence. After reviewing the record provided (i.e. the letters from the state prosecutors to us, your requests for the BRADY material and your indication that the state never turned over that material) the court concludes that there is no "good cause" to grant the request at this point in time."

This order leads me to believe that the judge may agree with the state's argument that I haven't proven that these exculpatory statements actually exist. Outside of providing the court with the letters from the State prosecutors to us, our return numerous general and specific requests for the exculpatory material and your indication that the state never turned over the material. I don't know what else to do to convince the court that the state withheld the exculpatory material thus violating BRADY. I need your advise MR. MAURER.

Now back to MR. TATE and the interviews he did or did not complete. I would like a copy of the report he filed detailing the results of those interviews and/or the reason why certain witnesses were never interviewed. I'd also like a copy of the billing arrangement between you two. As you know, I've never seen that report from MR. TATE to you regarding

the results of the work he was hired to do.

In strongly considering actually locating and securing affidavits from DUNCAN, WRIGHT, MAYO and SWANSON myself. This in an effort to prove that the state took these statements from the witnesses but refused to turn them over to us or me. Of course, this would change the argument somewhat because then it appears that you had knowledge of 4 people who indicated that I wasn't the shooter and one witness (SWANSON) who identified a second shooter, but elected not to investigate, locate and call these witnesses at trial. You know I have the upmost respect for you Mr. MAURER. But I need to see Mr. TATE's report. I've went on record in this petition arguing, in part, that your reason for not locating these individuals and calling them to testify at my trial was due largely to the state having withheld vital information pertaining to these witnesses. which really doesn't cut it because we did know about the witnesses and you hired Mr. TATE to interview them. Out of respect I just didn't want to throw you under the bus, notwithstanding the allegation of ineffective assistance of counsel I argued in the petition.

Additionally, there is strong indication that the State provided MARVIN SWANSON with a release from serving a 5 year level V sentence in exchange for his giving a statement against me and agreeing to testify against me at trial. SWANSON had been convicted and sentence to 5 years on drug charges in 2000-2001. Shortly after his sentencing he was released from jail and that exculpatory statement surfaced where SWANSON identified me and an additional shooter. See STATE v. SWANSON CE.A.No. IN00-02-0191 and 0194. You'll notice that this situation unfolded a year before Othello PREDOUX. was approached by the state. You should have found this out prior to trial so that the state's position on PREDOUX could have been put into context or the new trial motion that was withdrawn could have possibly been successful with the SWANSON benefit revealed. In any event, SWANSON was re-arrested in 2005 when I filed my 61 raising, in part, this issue. The State tried to have SWANSON serve the 5 years but after a hearing before TOLIVER, SWANSON's probationary portion of the sentence was re-instated. I need to know whether there was ever an official agreement between SWANSON and the State. And what facilitated his release from GAUDER HILL. Can you assist me in this regard? Can you get any information on this matter?

Because I'm looking to utilize this information (MR. TATE's report and the SWANSON info) in the pending petition. I need you to respond to this letter in the very near future. As always you have my respect and well wishes. Please get back to me in the near future.

Sincerely yours,

DAMONE FLOWERS

I/M ANTOINE FLOWERS
SBI# 332647        UNIT NO. 21
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



LEGAL MAIL

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
844 N KING STREET LOCKBOX 18
WILMINGTON DE 19801-3570



U.S.M.S
X-RAY